# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## DELTA DIVISION

|  |  |  |
|---|---|---|
| DIANE COWAN *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Civil Action No. 2:65-CV-00031-GHD |
| | ) | (previously DC 6531-K) |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOLIVAR COUNTY BOARD OF | ) | |
| EDUCATION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF
# THE UNITED STATES' MOTION FOR FURTHER RELIEF

## TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................... 1

II.    PROCEDURAL HISTORY ...................................................................................... 4

    A.    The July 24, 1969 Order ............................................................................ 4

    B.    The 1989 Consent Order ............................................................................ 6

    C.    The 1992 and 1995 Consent Orders.......................................................... 10

III.   FACTUAL BACKGROUND .................................................................................. 11

    A.    Student Assignment ................................................................................. 12

    B.    Faculty and Staff Assignment ................................................................. 21

IV.   ARGUMENT ......................................................................................................... 23

    A.    The Cleveland School District's Continued Operation of One-Race Schools and Racially Identifiable Schools Violates the Extant Desegregation Orders and Federal Law. ......................................................................................... 23

    B.    Cleveland's Proffered Justifications for Maintaining Racially Identifiable and One-Race Schools are Contrary to Controlling Precedent. ................................ 30

    C.    The District is Violating the 1969 Order, the 1989 Order, and Federal Law by Reinforcing the Racial Identity of its Schools through Faculty and Staff Assignment. ............................................................................................. 36

V.    CONCLUSION....................................................................................................... 37

APPENDIX.......................................................................................................... A-1

# TABLE OF AUTHORITIES

## Cases

Anderson v. Canton Municipal Separate School District,
    232 F.3d 450 (5th Cir. 2000) ................................................... 20

Belk v. Charlotte-Mecklenburg Board of Education,
    269 F.3d 305 (4th Cir. 2001) ................................................... 1

Brown v. Board of Education,
    347 U.S. 483 (1954).......................................... 1, 2, 3, 32, 35, 37

Columbus Board of Education v. Penick,
    443 U.S. 449 (1979)............................................................ 24

Cowan v. Bolivar County Board of Education,
    Civil Action No. DC 6531-K (N.D. Miss. Feb. 3, 1995) (Consent Order)...................... 11, 17

Cowan v. Bolivar County Board of Education,
    Civil Action No. DC 6531-K (N.D. Miss. July 24, 1969)
    (Order)..................... 1, 4, 5, 6, 8, 9, 21, 23, 25, 27, 29, 36, 37

Cowan v. Bolivar County Board of Education,
    Civil Action No. DC 6531-K (N.D. Miss. Mar. 19, 1985)
    (Order Granting Leave for the United States to Intervene as Plaintiff)................... 7

Cowan v. Bolivar County Board of Education,
    Civil Action No. DC 6531-K (N.D. Miss. Nov. 13, 1992) (Consent Order)................... 11, 16

Cowan v. Bolivar County Board of Education,
    Civil Action No. DC 6531-K (N.D. Miss. Sept. 21, 1989)
    (Consent Order) ............................................. 9, 10, 16, 21, 22, 23, 25, 29, 36, 37

Davis v. East Baton Rouge Parish School Board,
    721 F.2d 1425 (5th Cir. 1983) ...................................... 24, 33

Dayton Board of Education v. Brinkman,
    443 U.S. 526 (1979)............................................................ 25

Flax v. Potts,
    915 F.2d 155 (5th Cir. 1990) ................................................. 3

Freeman v. Pitts,
    503 U.S. 467 (1992)......................................................... 12, 24

Green v. County School Board of New Kent County, Virginia,
    391 U.S. 430 (1968)................................................. 3, 12, 24, 31

Harkless v. Sweeny Independent School District,
     388 F. Supp. 738 (S.D. Tex. 1975), aff'd in part, rev'd in part on other grounds, 554 F.2d
     1353 (5th Cir. 1977)...................................................................................................... 34

Keyes v. School District No. 1., Denver, Colorado,
     413 U.S. 189 (1973)....................................................................................................... 26

Lee v. Macon County Board of Education,
     465 F.2d 369 (5th Cir. 1972) ........................................................................................ 33

Lee v. Macon County Board of Education,
     616 F.2d 805 (5th Cir. 1980) ........................................................................................ 26

Lee v. Marengo County Board of Education,
     588 F.2d 1134 (5th Cir. 1979) ...................................................................................... 31

Liddell v. Missouri,
     731 F.2d 1294 (8th Cir. 1984) ...................................................................................... 33

Manning v. School Board of Hillsborough County, Florida,
     244 F.3d 927 (11th Cir. 2001) .................................................................................. 1, 25

Monroe v. Board of Commissioners of City of Jackson, Tennessee,
     391 U.S. 450 (1968)....................................................................................................... 31

Monteilh v. St. Landry Parish School Board,
     848 F.2d 625 (5th Cir. 1988) .......................................................................................... 9

Morgan v. Kerrigan,
     530 F.2d 401 (1st Cir. 1976).............................................................................. 1, 31, 33

Robinson v. Shelby County Board of Education,
     566 F.3d 642 (6th Cir. 2009) ........................................................................................ 36

Singleton v. Jackson Municipal Separate School District,
     419 F.2d 1211, 1217-18 (5th Cir. 1969), vacated in part on other grounds sub nom., Carter v.
     West Feliciana Parish School Board, 396 U.S. 226 (1969), rev'd on other grounds sub nom.,
     Carter v. West Feliciana Parish School Board, 396 U.S. 290 (1970) .................................... 36

Stell v. Savannah-Chatham County Board of Education,
     888 F.2d 82 (11th Cir. 1989) ........................................................................................ 33

Swann v. Charlotte-Mecklenburg Board of Education,
     402 U.S. 1 (1971)..............................................................................................24, 25, 36

Tasby v. Estes,
     517 F.2d 92 (5th Cir. 1975) .......................................................................................... 26

Thomas County Branch of N.A.A.C.P. v. City of Thomasville School District,
    299 F. Supp. 2d 1340 (M.D. Ga. 2004), aff'd in part, rev'd in part, and vacated in part sub
    nom., Holton v. City of Thomasville School District, 425 F.3d 1325 (11th Cir. 2005)........... 1

United States v. DeSoto Parish School Board,
    574 F.2d 804 (5th Cir. 1978) ........................................................................ 32, 33

United States v. Fordice,
    505 U.S. 717 (1992)....................................................................................... 24

United States v. Hendry County School District,
    504 F.2d 550 (5th Cir. 1974) ........................................................................ 9, 20

United States v. Pittman,
    808 F.2d 385 (5th Cir. 1987) ............................................................... 27, 32, 35, 36

United States v. Scotland Neck City Board of Education,
    407 U.S. 484 (1972).......................................................................................... 33

United States v. South Park Independent School District,
    566 F.2d 1221 (5th Cir. 1978) .............................................................................. 26

United States v. West Carroll Parish School District,
    477 F. Supp. 2d 759 (W.D. La. 2007)..................................................................... 27

Valley v. Rapides Parish School Board,
    646 F.2d 925 (5th Cir. 1981) ............................................................................. 26

Wessman v. Gittens,
    160 F.3d 790 (1st Cir. 1998).............................................................................. 12

Wright v. City of Emporia,
    407 U.S. 451 (1972)....................................................................................... 34

Wright v. City of Emporia,
    442 F.2d 588 (4th Cir. 1971) (en banc) (Winter, J., dissenting)........................................... 35

**Statutes**

Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c-6 et seq. ................................. 3, 23, 38

**Other Authorities**

Cleveland Merges Schools, Bolivar Commercial, Jan. 15, 2010, at 1A-2A................................. 19

Over 1,000 Students Out Today, Bolivar Commercial, Feb. 16, 2010, at 1-2.............................. 28

Parents Question School Board, Bolivar Commercial, Feb. 17, 2010, at 1A-2A......................... 28

Trustees Explain Merging, Bolivar Commercial, Feb. 18, 2010, at 1A ......................................... 3

## I.  INTRODUCTION

Before the Supreme Court issued its landmark ruling in <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), the public school district in Cleveland, Mississippi ("Cleveland" or "District") was segregated by law.  Black students were legally required to attend one of four black schools on the "east side" of Cleveland, located to the east of the Illinois Central railroad tracks that run north and south through Cleveland.  White students attended one of six white schools on the "west side" of Cleveland, to the west of the railroad tracks.  Cleveland continued to operate its <u>de jure</u> school system until 1969, when a federal court ordered the District to desegregate its schools.  <u>See</u> Order, <u>Cowan v. Bolivar Cnty. Bd. of Educ.</u>, Civil Action No. DC 6531-K (N.D. Miss. July 24, 1969) (hereafter "1969 Order").

Nearly six decades after <u>Brown</u>, relatively little has changed.  With isolated exceptions, the schools that were "black schools" in Cleveland's old dual school system have never been racially integrated, and remain all black or virtually all black schools today.  The schools in Cleveland that were <u>de jure</u> "white schools" are integrated, but they remain racially identifiable as white schools with student bodies that are disproportionately white.[1]  The racial identity of Cleveland's schools is reinforced by the disproportionate number of black faculty and staff that

---

[1] "'Racial identifiability' means that, due to certain factors, including a percentage of one race of students or faculty in a school or class that is disproportionate to the percentage of that race in the system as a whole, a school is perceived as a 'white school' or a 'black school.'"  <u>Thomas Cnty. Branch of NAACP v. City of Thomasville Sch. Dist.</u>, 299 F. Supp. 2d 1340, 1354 n.17 (M.D. Ga. 2004), <u>aff'd in part</u>, <u>rev'd in part</u>, and <u>vacated in part</u> <u>sub nom.</u>, <u>Holton v. City of Thomasville Sch. Dist.</u>, 425 F.3d 1325 (11th Cir. 2005).  Some courts deem a school racially identifiable if its student enrollment deviates from the district population by plus or minus fifteen percent; other courts apply a twenty percent threshold.  <u>See, e.g.</u>, <u>Belk v. Charlotte-Mecklenburg Bd. of Educ.</u>, 269 F.3d 305, 319 (4th Cir. 2001) ("plus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination."); <u>Manning v. Sch. Bd. of Hillsborough Cnty., Florida</u>, 244 F.3d 927, 935 (11th Cir. 2001) ("Any school with a black/white ratio varying plus or minus 20 points from a 20/80 ratio" is "racially identifiable" or "racially imbalanced."); <u>Morgan v. Kerrigan</u>, 530 F.2d 401, 409 (1st Cir. 1976) ("Racially isolated" is "defined by the school department as more than a 15 percent deviation from the racial ratio for that level in the zone").

the District has placed in the east side schools, and the disproportionate number of white faculty and staff assigned to the west side schools.

While almost every school in the District is an enduring vestige of Cleveland's former dual school system, the segregation of Cleveland's high schools and middle schools is particularly pronounced. Cleveland has two high schools: Cleveland High School and East Side High School. Cleveland High School was a white school in the former dual school system; it is a racially identifiable white school today. East Side High School was a black school in the former dual school system; today its student body is 99.7% black. The two high schools are 1.3 miles apart.

Cleveland also has two middle schools: Margaret Green Junior High School and D.M. Smith Middle School. Margaret Green Junior High School was a white school in the former dual school system; it is a racially identifiable white school today. D.M. Smith Middle School was a black school in the former dual school system; today its student body is 100% black. The two middle schools are 1.2 miles apart.

Brown and its progeny imposed a two-fold constitutional obligation on school districts segregated by law. First, de jure segregated school districts were required to eliminate the laws that compelled black students and white students to attend separate schools. Second—and equally important—school districts were required to take affirmative steps to dismantle their existing segregated schools, to ensure that the end of legal segregation engendered change more transformative than replacing de jure segregated schools with de facto segregated schools.

While Cleveland's schools are no longer segregated by law, the District has ignored its legal obligation to dismantle the former de jure segregated schools. Its failure in this regard is an ongoing violation of the multiple desegregation orders that govern the District, as well as the

2

Fourteenth Amendment to the U.S. Constitution and Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c-6 et seq.  More poignantly, the continued operation of racially identifiable schools in Cleveland has led to the segregation of generations of schoolchildren in the fifty-six years since Brown was decided.

Cleveland, however, continues to speak and act as though it should be exempt from the same process that every other school district was required to undertake to dismantle de jure segregated schools.  One trustee on the Cleveland School District Board of Trustees recently went on the public record opposing consolidation of the District's black and white high schools because, "[a]t this time, we don't feel the community is ready to support just one football team, one baseball team, one set of cheerleaders and one basketball team."  Trustees Explain Merging, Bolivar Com., Feb. 18, 2010, at 1A (attached hereto as Exhibit 1).[2]  As set forth below, Cleveland is currently implementing a school reorganization plan that more deeply entrenches the District's vestigial segregation by reinforcing the divisions between the white west side schools and the black east side schools.

In 1968, the Supreme Court proclaimed that "a [desegregation] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is [] intolerable.  The time for mere deliberate speed has run out."  Green v. Cnty. Sch. Bd. of New Kent Cnty., Va., 391 U.S. 430, 438 (1968) (internal citations and quotation marks omitted). More than forty years later, Cleveland has yet to dismantle its one-race black schools,[3] or propose a desegregation plan that would eliminate the discrepant racial character of the schools on opposite sides of the railroad tracks.  Accordingly, the United States requests that the Court

_____

[2] A complete index of exhibits is attached to this document as an appendix.

[3] Though courts apply slightly varying criteria to determine whether a school is a "one-race school," schools with a student body that is at least 90% white or 90% black are generally considered one-race schools.  See Flax v. Potts, 915 F.2d 155, 161 n.8 (5th Cir. 1990) (citing cases).

(1) find Cleveland in violation of the extant desegregation orders and federal law, and (2) order Cleveland to devise and implement a desegregation plan that will immediately dismantle its one-race schools and put the District on a path to unitary status.

## II.    PROCEDURAL HISTORY

### A.    The July 24, 1969 Order

On July 24, 1965, Diane Cowan and numerous co-plaintiffs filed a desegregation lawsuit against six school districts in Bolivar County, Mississippi, including the Cleveland School District (identified in the pleadings as "Bolivar County District No. 4").  See Complaint at 5, 12-13, Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC 6531-K (N.D. Miss. Jul. 24, 1965) (hereafter, "Complaint").[4]  Of significance, plaintiffs alleged:

> Bolivar County District No. 4 maintains six white schools:  (1) Cleveland High School; (2) Margaret Green Junior High School; (3) Pearman Elementary School; (4) W.J. Parks Elementary School; (5) Boyle Elementary School; and (6) Merigold Elementary School.  Each of these schools is limited to attendance by white pupils only and are staffed by white teachers, white principals, and other white professional personnel.  Regardless of location, these schools may be attended by white pupils only.[5]

Id. at 12.  Plaintiffs further alleged that:

> Bolivar County District No. 4 also maintains four Negro schools:  (1) East Side High School; (2) Nailor Elementary School; (3) B.L. Bell Elementary School; and (4) Hayes Cooper Elementary School.  Each of these schools is limited to attendance by Negro pupils.  They are staffed by Negro principals, Negro teachers and other Negro professional personnel.  Regardless of location, these schools may be attended by Negro children only.[6]

---

[4] The United States was not originally a party to this lawsuit; it joined the lawsuit as a plaintiff-intervenor on March 19, 1985.  See infra at 7.

[5] Boyle Elementary School was closed in accordance with the desegregation plan proposed by the District and implemented by the Court in its order of July 24, 1969.  See 1969 Order at 3.  Merigold Elementary School was closed by the District on July 1, 1986.  See 1985-1986 Annual Report submitted by the Cleveland School District at 1 (attached hereto as Exhibit 2).

[6] School enrollment data compiled in 1968 by the Department of Health, Education and Welfare's Office for Civil Rights ("OCR") verifies that in the period preceding the 1969 Order all the schools in the Cleveland School District were one-race schools.  See Exhibit 3.

4

Complaint at 13.

In response to the Complaint, the Court solicited from each defendant school district a desegregation plan that would bring the district into compliance with its Fourteenth Amendment obligations. On July 9, 1969, the Court issued a ruling from the bench rejecting the plans proposed by four school districts, including the Cleveland School District. See Transcript of Hearing before the Honorable William C. Keady at 6, Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC 6531-K (N.D. Miss. Jul. 9, 1969). In remarks that are material to this proceeding, the Court noted:

> At one time the state of the law was that good faith on the part of a school district was sufficient to enable it to go forward with its desegregation plan without interference from the Court. Now, however, it is quite clear that there must be more than good faith on the part of the Board, although that is still required. There must be a plan presented which will effectually remove the vestiges of the dual system, and it is an obligation on the Board of each school district to present such a plan to the Court. Moreover, no longer may the effectiveness of any plan depend upon the wishes or choice of students or their parents.

Id. at 2 (emphasis added).

On July 24, 1969, the Court issued an order that: (1) adopted the revised desegregation plan submitted by the Cleveland School District, and (2) entered a permanent injunction that still governs the District today. See 1969 Order. The 1969 Order specifically enjoins the District "from discriminating on the basis of race or color in the operation of said School District Number Four of Bolivar County. As hereinafter set out, [the District] shall take affirmative action to disestablish all school segregation to eliminate the effects of the dual school system." Id. at 1. The Order further provides that "[f]or the school year 1970-71 and thereafter, each student shall be assigned to attend the school in the zone in which he resides" Id. at 3 (emphasis in original). Under the heading "Faculty and Staff Desegregation," the Order establishes that

5

"for the 1970-71 school year and thereafter there shall be full faculty and staff desegregation, to such an extent that <u>the faculty at each school is not identifiable to the race of the majority of the students at any such school</u>."  <u>Id.</u> at 4 (emphasis added).  Of relevance here, the Order also requires that "[t]he defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual school system."  <u>Id.</u> at 5.

**B.**     **The 1989 Consent Order**

The 1969 Order did not impel Cleveland to desegregate its schools.  In 1983, the United States received complaints from the parents of black and white children in Cleveland alleging that

> the defendants had failed to enforce the student assignment provision in [the 1969 Order], and had engaged in practices designed to maintain racially identifiable schools in both student and faculty assignment . . . .  Both groups of parents complained that these practices violated their children's constitutional right to the equal protection of the laws and an equal educational opportunity.

Memorandum in Support of Motion of United States for Leave to Intervene as Plaintiff at 3, <u>Cowan v. Bolivar Cnty. Bd. of Educ.</u>, Civil Action No. DC 6531-K (N.D. Miss. Jan. 23, 1985).

These complaints prompted an investigation by the Department of Justice that corroborated the complainants' allegations and led the United States to seek intervention in this lawsuit.  As the United States informed the Court:

> The Department of Justice, having conducted a thorough investigation of the matter, has determined that the defendants have pursued policies and practices that have in effect perpetuated rather than eliminated the vestiges of the dual system of public education in School District Number Four in violation of the Fourteenth Amendment to the United States Constitution, the Court's desegregation order in <u>Cowan</u>, and other applicable federal law.

Id. at 3-4.  The Court granted the United States' Motion to Intervene on March 19, 1985.  See Order Granting Leave for the United States to Intervene as Plaintiff at 2, Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC 6531-K (N.D. Miss. Mar. 19, 1985).

Certain facts alleged in the United States' Complaint-in-Intervention (and substantiated by the factual record) explain Cleveland's failure to desegregate its schools between 1969 and 1985.  The United States alleged inter alia that in the aftermath of the 1969 Order, the District established an unwritten "dual residence policy" whereby white students could avoid attending a majority-black school in their residential zone by establishing a second "weekday residence" in an area where the zoned school was majority-white.  United States' Complaint-in-Intervention at ¶ 13(a), Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC 6531-K (N.D. Miss. Mar. 19, 1985) (hereafter "United States' Complaint").  Though the District officially denied the existence of this policy, see Cleveland School District's Response to Requests for Admission at ¶ 16, Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC 6531-K (Nov. 17, 1988) (attached hereto as Exhibit 4), sworn testimony from a former Superintendent of Schools in Cleveland confirms that the District permitted students to maintain dual residences, such "that if a child resided in a home Monday, Tuesday, Wednesday, and Thursday night and could document that they had clothes, et cetera, in some residence, that that could be considered their residency for the purpose of attending school."  Evidentiary Hearing on Plaintiffs' Motion for Temporary Restraining Order at 78, Caston v. Bolivar Cnty., Miss., Sch. Dist. No. 4, Civil Action No. DC 85-24-WK-O (May 17, 1985) (Testimony of Superintendent John J. Arnold) (attached hereto as Exhibit 5).

7

Willie Jackson, a member of the Cleveland School District Board of Trustees at the time the Board enacted the dual residency policy, testified in a different case that this rule was primarily utilized by white students seeking to avoid the east side schools:

> The rule allows for a minority student to leave a particular zone and go into a zone where he or she is a majority as far as race is concerned . . . . [Y]ou would have to say that for the most part it would be done by whites, [] when you look at the total makeup of each school, in that that predominantly black school has a very small percentage, less than 1 percent I would say, participation of white students.

Transcript of Record at 11-12, <u>Lucas v. Bolivar Cnty., Miss.</u>, Civil Action No. DC 83-136-WK (Sept. 30, 1983) (Testimony of Willie Simmons) (attached hereto as Exhibit 6).

On its face the dual residence policy contravened the requirement in the 1969 Order that each student attend school in the zone where they reside.  <u>See</u> 1969 Order at 3.  The District adopted a new (written) attendance zone policy on January 1, 1984 that defined a student's residence as "the place where the student's parents reside on a permanent basis, where the parents claim homestead exemption, or where the parents are registered to vote."  <u>See</u> Exhibit 4 at ¶ 18.  No mandatory desegregation measures accompanied the new attendance zone policy, and the written policy did not appreciably alter the demographics of Cleveland's schools.

The United States also alleged that Cleveland violated the 1969 Order  by constructing three new schools—Eastwood Junior High School,[7] Cypress Park Elementary School, and Bell Elementary School—"in areas such that black students continue to attend schools with 100%

---

[7] Eastwood Junior High School was renamed "D.M. Smith Middle School" during the 2005-2006 academic year. <u>See</u> 2005-2006 Annual Report submitted by the Cleveland School District at 1 (attached hereto as Exhibit 7).

black enrollments." United States' Complaint at ¶¶ 13(e),15.[8]  Indeed, notwithstanding the fact

that the 1969 Order obligates Cleveland to "locate any new school and substantially expand any

existing schools with the objective of eradicating the vestiges of the dual school system," see

1969 Order at 5, these three schools were built or renovated in the easternmost sector of the

Cleveland School District, an area where the District conceded that schools have always been

completely or predominantly black.  See Exhibit 4 at ¶¶ 10-11, 20-21.

On September 21, 1989, the Court entered a Consent Order negotiated by the United

States and the District to address the concerns delineated in the United States' Complaint-in-

Intervention.  See Consent Order, Cowan v. Bolivar Cnty. Bd. of Educ., Civil Action No. DC

6531-K (N.D. Miss. Sept. 21, 1989) (hereafter "1989 Consent Order").  The 1989 Consent Order

did not supplant the 1969 Order, but it elaborates substantially on the student assignment and

faculty/staff requirements outlined in the original order.  See id. at 16 ("All previous orders and

decrees of this Court shall remain in full force and effect to the extent they are not inconsistent

with or expressly amended by this Consent Order.").  With respect to student assignment, the

Consent Order states that "[t]he Cleveland School District shall not engage in any conduct or

activity that will reestablish the dual school structure."  Id. at 17.

While the 1989 Consent Order reiterates the general desegregation obligations arising

from the 1969 Order, it goes further to mandate that the District take aggressive steps to

encourage students to attend schools where they would be in the racial minority:

---

[8] See Monteilh v. St. Landry Parish Sch. Bd., 848 F.2d 625, 631 (5th Cir. 1988) ("[S]chool districts have an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with proper operation of the school system as a whole to seek means to eradicate the vestiges of the dual system.") (internal quotation marks omitted); United States v. Hendry Cnty. Sch. Dist., 504 F.2d 550, 554 (5th Cir. 1974) ("We cannot tolerate resegregation of a former dual school system, and the School Board . . . must demonstrate that the new construction will not tend to promote such a relapse.").

> Whenever there shall exist schools containing a majority of either black or white students, the school district shall encourage and permit a student (black or white) attending a school in which his or her race is in the majority to choose to attend another school where his/her race is in the minority.

Id. at 4.

The robust majority-to-minority transfer program established by the 1989 Consent Order is animated by three specific requirements. First, the District is required to annually notify students about majority-to-minority transfer options by: (1) providing each student with a written statement describing the transfer program thirty days prior to the close of each academic year, and (2) publishing the notice in a newspaper of general circulation. Id. at 4-5. Second, the District is obligated to provide transportation to all majority-to-minority transfer students. Id. at 5. Finally, the 1989 Consent Order enumerates, in three separate provisions, specific schools the District is obligated to recruit black and white students to attend. Id. at 6.

The 1989 Consent Order also prohibits the District from reinforcing the racial identity of its schools through its assignment of faculty and staff, and mandates an aggressive timetable for Cleveland to transfer faculty and staff members as necessary to achieve meaningful segregation. See id. at 2-4; infra at 21-22.

## C.  The 1992 and 1995 Consent Orders

The 1989 Consent Order specified, in part: "The school district shall develop and implement a plan for desegregating the predominantly black Eastwood Junior High School. The plan shall be developed no later than January 1990 and implemented no later than September 1990." 1989 Consent Order at 8. Pursuant to this directive, the District "considered the continuing racial identifiability of two of the district's schools—Margaret Green [a disproportionately white school] and Eastwood Junior High [a one-race black school]—and determined that steps should be taken to eliminate the continuing racial identifiability of these

10

schools."  Consent Order at 1, <u>Cowan v. Bolivar Cnty. Bd. of Educ.</u>, Civil Action No. DC 6531-K (N.D. Miss. Nov. 13, 1992) (hereafter "1992 Consent Order").  Cleveland subsequently sought the United States' permission to address the racial identifiability of its junior high schools by establishing a magnet school program at the junior high level.  <u>Id.</u> at 1-2.  On November 13, 1992, the Court entered the 1992 Consent Order, which memorializes the parties' agreement to this proposal, based on a shared understanding that "such a program if implemented effectively would result in further desegregation of Eastwood Junior High and Margaret Green Junior High Schools in the Cleveland School District."  <u>Id.</u> at 1-2.

On February 3, 1995, the Court entered another, nearly identical Consent Order authorizing the District to establish a similar magnet program at the high school level.  Consent Order, <u>Cowan v. Bolivar Cnty. Bd. of Educ.</u>, Civil Action No. DC 6531-K (N.D. Miss. Feb. 3, 1995) (hereafter "1995 Consent Order").  Once again, the agreement reflected the parties' belief that "such a program if implemented effectively would result in further desegregation at the high school level in the Cleveland School District."  <u>Id.</u> at 2.

To the United States' knowledge, there have been no additional proceedings before this Court.  The Cleveland School District has never petitioned the Court for a declaration of unitary status, or otherwise claimed to be unitary.

### III.    FACTUAL BACKGROUND

On September 12, 2006, the United States initiated a periodic review of the Cleveland School District to ascertain whether the District was complying with the extant desegregation orders and federal law.  In the course of this review the United States issued several requests for information and conducted a site visit from May 11-14, 2008.  The data cited below was either

produced by Cleveland in response to these information requests or submitted by the District in accordance with its reporting obligations under the 1969 Order and 1989 Consent Order.

The information provided by the District reveals actual or potential violations of numerous "Green factors,"[9] including student assignment, faculty assignment, physical facilities, transportation, and quality of education. However, the most flagrant violations fall into two categories: student assignment and faculty assignment. The United States' position is that these violations compel an immediate and comprehensive realignment of Cleveland's schools. This realignment, if conceived thoughtfully and implemented properly, should ameliorate the conditions that violate the remaining Green factors. Accordingly, the factual and legal discussion below is limited to the areas of student and faculty assignment.[10]

## A. Student Assignment[11]

The student enrollment data provided by the District demonstrates that nearly every school in the District is racially identifiable as a "white" or "black" school. See infra at 13. In a school district where approximately 67% of the students are black and 30% of the students are white, half of Cleveland's schools—the schools on the east side of the railroad tracks—are all

---

[9] "Green factors" are the benchmarks used by courts to measure a school district's progress toward eradicating the vestiges of its formal dual school system. The Green factors include student assignment, faculty and staff assignment, physical facilities, transportation, and extracurricular activities. See Freeman v. Pitts, 503 U.S. 467, 481-84 (1992). In decisions after Green, courts established additional criteria to analyze the adequacy of a school district's desegregation efforts; one such criterion is "quality of education." See Wessman v. Gittens, 160 F.3d 790, 801 (1st Cir. 1998) ("Since Green, federal courts have recognized other permutations, including quality of education.") (internal quotation marks omitted).

[10] The United States expressly reserves its right to seek further relief to remedy violations of other Green factors, including physical facilities, transportation, extracurricular activities and quality of education. In prior correspondence, the United States put the District on notice that with respect to physical facilities, "the District's school facilities with majority black enrollments are not comparable in overall quality to those facilities with white majority enrollments." See Letter from Jonathan Fischbach to Jamie F. Jacks, dated Apr. 6, 2009, at 5 (attached hereto as Exhibit 8).

[11] An attendance zone map of the Cleveland School District is attached hereto as Exhibit 9. This map depicts the attendance zones in the Cleveland School District prior to the current academic year, during which Cleveland has reorganized several of its schools. See infra at 20-21. Cleveland has not provided the United States with an updated map of the District.

12

black or virtually all black.  See id.  The majority of the schools on the west side of the railroad

tracks, including Cleveland High School, Margaret Green Junior High School, and Parks

Elementary School, enroll a student body that is at least twenty percent more white than the

student population for the District as a whole.  See id.  The student enrollment data reported by

the District for the 2009-2010 academic year is reproduced below:[12]

**Student Enrollment in the Cleveland City School District (2009-2010)**

| Location | %Black | %White | %Hispanic | %Asian | %Native American |
|---|---|---|---|---|---|
| *Cleveland High School* (9-12)—536 students | 45.7% | 50.7% | 2.1% | 1.5% | 0.0% |
| *Margaret Green Jr. High School* (7-8)—351 students | 46.2% | 49.3% | 2.6% | 2.0% | 0.0% |
| *Parks Elementary School* (K-6)—359 students | 26.5% | 68.0% | 3.3% | 1.9% | 0.3% |
| *Hayes-Cooper Center* (K-6)—367 students | 42.2% | 54.0% | 1.9% | 1.9% | 0.0% |
| *Pearman Elementary School* (PK-6) —337 students | 54.6% | 37.1% | 7.7% | 0.6% | 0.0% |
| *East Side High School* (9-12)—354 students | 99.7% | 0.3% | 0.0% | 0.0% | 0.0% |
| *D. M. Smith Middle School* (7-8)—195 students | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| *Cypress Park Elementary School* (K-6)—318 students | 98.7% | 1.3% | 0.0% | 0.0% | 0.0% |
| *Bell Elementary School* (PK-6)—273 students | 97.1% | 1.8% | 1.1% | 0.0% | 0.0% |
| *Nailor Elementary School* (K-6)—401 students | 96.3% | 2.5% | 1.0% | 0.0% | 0.2% |
| *Total: 3,491 students* | 67.4 % (2,354) | 29.6 % (1,032) | 2.1 % (72) | 0.9 % (31) | 0.1 % (2) |

*Source:  2009-2010 Annual Report submitted by the Cleveland School District at 1-11 (attached hereto as Exhibit 13).*

---

[12] Charts depicting the student enrollment at each District school in 2007-2008 and 2008-2009 are attached hereto as Exhibit 10.

This enrollment data reveals that the one-race black schools in Cleveland today are the same schools that were black schools segregated by law prior to the 1969 Order. As the plaintiffs' July 24, 1965 complaint alleged (and OCR data confirms),[13] the District maintained four black schools, including East Side High School, Nailor Elementary School, Bell Elementary School, and Hayes Cooper Elementary School. See Complaint at 13. Three of these schools—East Side High School, Nailor Elementary School, and Bell Elementary School—were still one-race schools as of June 10, 2010, when the District submitted its annual report for the 2009-2010 academic year. See supra at 13.[14] Likewise, plaintiffs alleged in 1965 (and OCR data confirms)[15] that four of Cleveland's currently existing schools were de jure segregated white schools: Cleveland High School, Margaret Green Junior High School, Pearman Elementary School, and Parks Elementary School. See Complaint at 12. Forty-five years later, three of these schools—Cleveland High School, Margaret Green Junior High School, and Parks Elementary School—remain racially identifiable majority white schools with student enrollments that deviate by at least twenty percent from the racial composition of Cleveland's student population as a whole. See supra at 13.

The United States is aware of no evidence that Cleveland's one-race black schools were ever meaningfully integrated, or that the District's racially identifiable white schools ever lost their character and reputation as white schools between July 1965 and the present. To the contrary, the factual record developed by the parties after the United States intervened in this

---

[13] See Exhibit 3.

[14] The District has indicated in subsequent correspondence that Bell Elementary School was closed at the conclusion of the 2009-2010 academic year and re-opened as a magnet school in Fall 2010. According to the District, its student body is now 80% black and 20% white. See Letter from Jamie F. Jacks to Jonathan D. Fischbach, dated Mar. 1, 2011 at 1-2 (attached hereto as Exhibit 14).

[15] See Exhibit 3.

lawsuit includes admissions by the District that as of November 17, 1988, Cleveland's east side schools were one-race black schools while the District's west side schools were racially identifiable white schools.  See Exhibit 4 at ¶¶ 20-24.

The anachronism of one-race schools traceable to the Jim Crow era would be disconcerting to uncover in any school district in 2011.  It is particularly striking here, however, because Cleveland's schools are in such close proximity to each other.  The greatest distance between any two zoned schools in Cleveland is 4.1 miles, see Exhibit 9,[16] and most of the District's schools are within 2.5 miles of each other.  See id.  The existence of so many racially identifiable schools in such a condensed area cannot be explained as a consequence of geographic factors, transportation burdens or other logistical barriers.  Instead, the record suggests that Cleveland's current configuration of schools is the product of (1) an overreliance on voluntary choice programs such as magnet schools, and (2) the District's commitment to operating the east side and west side schools as separate entities, reflected most recently in Cleveland's 2010-2011 school reorganization plan.

1.      *The Cleveland School District's Use of Magnet Schools*

As set forth below, Cleveland has taken the unique approach of attempting to desegregate its school system by turning nearly every one of its all-black schools into a magnet school.  Cleveland's long history with magnet programs suggests that such programs may enjoy limited success at the elementary school level.  Empirically, however, magnet schools are not a feasible substitute for the structural reforms typically required to dismantle a de jure segregated school system; including school clustering, school pairing, school consolidation and/or reconfiguring attendance zone boundaries.

---

[16] The Hayes Cooper Center, a District magnet school for elementary-age students, is located in Merigold, Mississippi, approximately 7.5 miles from Cleveland.  See Exhibit 9.

Cleveland's foray into magnet schools began with the 1989 Consent Order, which

provided that

> [t]he school district shall establish a voluntary magnet school at one of the
> predominantly black elementary schools or at the former Hayes Cooper
> Elementary School in Merigold, Mississippi. This dedicated magnet school shall
> be designed to attract a substantial number of non-minority and minority students
> to participate in a desegregated magnet school program . . . . [T]he admission
> requirements established for the school will provide that neither race will exceed
> 50%, plus or minus 5%, of the total student population enrolled at the school.

1989 Consent Order at 9.

The District opted to re-open the Hayes Cooper Elementary School as the Hayes Cooper

Center. As the District's enrollment data indicates, the Hayes Cooper Center is a magnet school

success. The school annually attracts more applicants than available slots, and it has maintained

a diverse student body in accordance with the requirements of the 1989 Consent Order.

Unfortunately, the District has been unable to replicate the success of the Hayes Cooper Center

at any other school, and its magnet school initiatives have failed more often than they have

succeeded.

        a.     <u>D.M. Smith Middle School</u>

As discussed above, the District sought and received authority in the 1992 Consent Order

to implement a magnet school program at the junior high school level for the purpose of

desegregating D.M. Smith Middle School. <u>See</u> <u>supra</u> at 11. It is not clear whether the District

attempted to implement a magnet program at D.M. Smith between 1992 and 2004. In 2004, the

District applied for and received funding from the United States Department of Education

through the Magnet Schools Assistance Program ("MSAP") to establish a magnet program at

D.M. Smith. In its application to the Department of Education, the District stated in relevant

part:

16

> In addition to the racial isolation at the elementary level, the district also needs to address the significant isolation at one of its junior high schools. D.M. Smith Middle School serves 226 students, and they are 99.1% minority. On the other hand, Margaret Green Junior High School serves 330 students, and it is not minority group isolated. D.M. Smith will add a visual and performing arts program serving grades 7-8 with a total enrollment of 226 students. The new middle school program will reduce minority group isolation in the district's junior high school population.

See Cleveland School District's FY 2007 Application for Grants under the Magnet Schools Assistance Program at 32 (attached hereto as Exhibit 15) (original emphasis omitted).

D.M. Smith received MSAP funding for its magnet program for two consecutive three-year grant cycles: 2004 to 2007 and 2007 to 2010. Though the District has not reported the total amount of MSAP funds allocated to D.M. Smith between 2004 and 2010, information submitted by the District indicates that D.M. Smith received $1,126,090 in MSAP funds during the 2004-2007 grant cycle alone. See Exhibit 12 at 24. However, the enrollment data reported by Cleveland reflects that from 2007 to 2010—a period that coincides with Year 4, Year 5 and Year 6 of the MSAP funding cycle—the magnet school program at D.M. Smith Middle School attracted almost no white students. The most recent data produced by the District indicates that D.M. Smith Middle School is 100% black. See supra at 13.

    b.  East Side High School

The District similarly sought and received authority in the 1995 Consent Order to implement a magnet school program at the high school level for the purpose of desegregating East Side School. See supra at 11. It is unclear whether the District attempted to implement a magnet program at East Side High School between 1995 and 2004. In its 2004 application to the Department of Education, the District also applied for and received MSAP funds to establish a magnet program at East Side High School. The District's application to the Department of Education stated in relevant part:

17

> The Cleveland School District also must reduce minority group isolation at the high school level. East Side High School serves 459 students, and 100% of them are minority. Cleveland High School serves 560 students, and 42% of them are minority . . . . The district proposes to open a magnet program at East Side, which will recruit half the population from East Side's current minority population and the other half (non-minority) from Cleveland High School or private/parochial schools. The program proposed for East Side will be the Visual and Performing Arts for grades 9-12 and the International Baccalaureate Diploma Program for grades 11 and 12.

See Exhibit 15 at 32.

Like D.M. Smith, East Side High School received MSAP funding for its magnet program for two consecutive three-year grant cycles: 2004 to 2007 and 2007 to 2010. Though the District has not reported the total amount of MSAP funding allocated to East Side High School between 2004 and 2010, information submitted by the District indicates that East Side High School received $1,604,338 in MSAP funds during the 2004-2007 grant cycle. See Exhibit 12 at 25. However, enrollment data reported by the District reflects that from 2007 to 2010—which coincides with Year 4, Year 5 and Year 6 of the MSAP funding cycle—East Side High School similarly failed to attract white students. The most recent data produced by the District indicates that East Side High School is 99.7% black. See supra at 13.

        c.     Naylor Elementary School

On December 11, 2006, the District applied to the Department of Education to establish yet another magnet school program at Naylor Elementary School, an all-black elementary school on the east side of Cleveland. According to the District's application:

> The purpose of the magnet program is to bring students of different social, economic, racial and ethnic backgrounds together in an educational environment that will be of benefit to all students. The program will attract students from all over the Cleveland School District and Bolivar County and ensure that there is a racially integrated student body.

H.M. Naylor Magnet Center Proposal at 2 (attached hereto as Exhibit 16).

18

Nailor Elementary was accepted into the Magnet Schools Assistance Program for the three-year grant cycle from 2007 to 2010. Cleveland has not informed the United States how much MSAP money was allocated to Nailor Elementary during this three-year period. However, District enrollment data indicates that during the three-year grant period the school's student body was never less than 96.3% black. See supra at 13; Exhibit 10. On January 15, 2010, the Cleveland School District's Board of Trustees voted to close one of the two classroom wings at Nailor Elementary and reassign the school's third grade, fourth grade, and fifth grade students to the all-black Cypress Park Elementary School. See Exhibit 14 at 1-2; Letter from Jamie F. Jacks to Jonathan D. Fischbach, dated Mar. 7, 2011 at 1 (attached hereto as Exhibit 17); Cleveland Merges Schools, Bolivar Com., Jan. 15, 2010, at 1A-2A (attached hereto as Exhibit 18).

        d.      Bell Elementary School

As part of the 2010-2011 school reorganization plan described below, the District closed Bell Elementary School (an all-black elementary school on the east side of Cleveland), dispersed its students to three other elementary schools, and re-opened the school last fall as the "Bell Magnet School for Math, Science, Health and Wellness." See Letter from Jamie F. Jacks to Jonathan Fischbach, dated Jan. 13, 2010, at 1-2 (attached hereto as Exhibit 19). The school selected its students through a lottery system, and the District informed the United States in a letter that Bell's student body is currently 80% "minority" and 20% white. See id.; Exhibit 14 at 2.

Unlike the magnet school initiatives that failed to take root at D.M. Smith, East Side High School and Nailor Elementary, Cleveland shut down Bell Elementary and removed its all-black student population prior to introducing the magnet school concept at the site. See Exhibit 19 at 2. To its credit, the District has represented that it sent at least some of the students from Bell

19

Elementary to two elementary schools with a significant population of white students (Parks Elementary and Pearman Elementary).  Id.

Significantly, the one magnet school success in the District—the Hayes Cooper Center— succeeded using the same three-step approach of closing the school, removing its all-black student population, and re-opening the school with a lottery admissions process.  While this approach has yielded benefits at Hayes Cooper, it has the effect of displacing a population of all-black students every time it is implemented in an east side school.  Meanwhile, the District has preserved the zoned elementary schools that serve the white student population on the west side of Cleveland, while offering these students an array of magnet options in the schools that formerly served the black east side community.  Other desegregation options—like school pairing or reconfiguring attendance zone boundaries—would provide more black elementary students with the stability of a zoned elementary school while distributing the burdens of desegregation more equitably between white west side children and black east side children.  Cf. Anderson v. Canton Mun. Separate Sch. Dist., 232 F.3d 450, 453 (5th Cir. 2000) ("We must . . . ensure that the burdens of desegregation are distributed equally among all classes of citizens.") (citing United States v. Hendry Cnty. Sch. Dist., 504 F.2d 550, 554 (5th Cir. 1974)).

2.    *The Cleveland School District's 2010-2011 Reorganization*

On January 15, 2010, the Cleveland School District's Board of Trustees ratified a plan to reorganize several schools on the east side of Cleveland during the 2010-2011 academic year. See Exhibit 14 at 1-2; Exhibit 17 at 1; Exhibit 18.  Pursuant to this plan, Cleveland paired two all-black elementary schools on the District's east side (Nailor Elementary and Cypress Park Elementary); assigning all students in pre-K, first grade, and second grade to Nailor Elementary and all students in third grade, fourth grade, and fifth grade to Cypress Park Elementary.  See id.;

20

Exhibit 19.  As noted above, the District also closed Bell Elementary School—an all-black school—and reassigned its students to Pearman Elementary, Parks Elementary and Cypress Parks Elementary.  See Exhibit 19 at 2.  Finally, the Board of Trustees authorized the District to close the middle school program at D.M. Smith Middle School (the all-black middle school on the east side) and transfer the middle school to the campus of East Side High School (the all-black high school on the east side).  See Exhibit 18; Exhibit 19.  Under the reorganization plan, the junior high school and high school on the west side of Cleveland retained their current location and configuration.  See id.[17]

As set forth below, the reorganization plan not only contravenes the operative desegregation orders and federal law, but exemplifies Cleveland's lack of good faith in executing its legal obligation to dismantle the District's segregated school system.  See infra at 28-30.

## B.    Faculty and Staff Assignment

The 1969 Order provides that "for the 1970-71 school year and thereafter there shall be full faculty and staff desegregation, to such an extent that the faculty at each school is not identifiable to the race of the majority of the students at any such school."  1969 Order at 4.  This directive is reiterated in the 1989 Consent Order:

> There shall be full faculty and professional staff desegregation at each school operated by the school district, so that the faculty and professional staff at each school is not racially identifiable.  Specifically, the faculty and professional staff at each school to the extent feasible shall reflect the districtwide ratio of minority and nonminority faculty and professional staff.

1989 Consent Order at 2.

---

[17] It appears that the shift of D.M. Smith Middle School to the campus of East Side High School contemplated by the reorganization plan has not yet occurred.

To effectuate this requirement, the 1989 Consent Order imposed an expedited timetable for transferring existing faculty and staff members as necessary to achieve meaningful desegregation:

> Any transfers necessary to achieve the proper desegregation of the faculty, staff and administrators of each school will be completed by the fall of 1990.  The district agrees that it will immediately encourage voluntary transfers of administrators, faculty, and professional staff.  In the event voluntary transfers are insufficient to achieve the required desegregation of the faculty, staff, and administrators for the remainder of the district's schools, reassignments will be made at the beginning of the 1990-1991 school year.

Id. at 4 (emphasis added).

Nevertheless, data reported by the District reflects that while approximately 60% of the District's teachers are white and 40% are black, the ratio of black to white teachers is disproportionately large in schools with an all-black or predominantly black student population, and disproportionately small in schools that have a large contingent of white students. [18]  Thus, during the 2009-2010 academic year 89% of the teachers at Cleveland High School (on the west side) were white, but only 24% of the teachers at East Side High School were white.  See Exhibit 20.  At the middle school level, 80% of the teachers at Margaret Green Junior High School (on the west side) were white but only 25% of the teachers at D.M. Smith Middle School (on the east side) were white.  Id.  Even in elementary schools, the racial composition of school faculty reinforces the racial identity of the school.  At Parks Elementary School, a west side school with a disproportionately large population of white students, the faculty was 92% white and 8% black.

---

[18] The faculty assignment data produced by the District for the past three academic years is reproduced in Exhibit 20.  Notably, the reports submitted by Cleveland to the United States did not report faculty and staff assignment in a consistent manner from one year to the next.  The 2007-08 report refers to "employees," the 2008-09 report to "teachers," and the 2009-10 report to "certified staff."  To the extent the District disaggregated its faculty reports by type of position (e.g., principal, teacher, counselor, custodian, etc.) the tables in Exhibit 20 reflect the apportionment of teachers to schools, and exclude from the tabulations a count of administrative staff and non-certified employees.

Id. By contrast, the faculty at Nailor Elementary School on the east side was 47% white and 53% black during the 2009-2010 academic year. Id.

## IV. ARGUMENT

As set forth above, Cleveland has failed to make good faith efforts to eliminate the vestiges of its former dual school system. The District's unwillingness to dismantle the one-race schools on Cleveland's east side and the racially identifiable majority white schools on Cleveland's west side facially violates the operative desegregation orders and contravenes the Fourteenth Amendment and Title IV of the Civil Rights Act of 1964.

For decades Cleveland has resisted implementing the measures required to dismantle de jure segregated schools. As illustrated below, arguments proffered by the District to further defer this mandate have historically been rejected by federal courts.

**A.**    **The Cleveland School District's Continued Operation of One-Race Schools and Racially Identifiable Schools Violates the Extant Desegregation Orders and Federal Law.**

   *1.*    *The District Has an Affirmative Obligation Under Federal Law to Dismantle Its Dual School System.*

The District's legal obligation to dismantle its dual school system is unambiguously set forth in the Court's prior orders, and echoed more broadly in the jurisprudence of the Supreme Court and the Fifth Circuit. As noted previously, the 1969 Order states that the District "shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system." 1969 Order at 1. This mandate is reiterated in the 1989 Consent Order, which provides that "[t]he Cleveland School District shall not engage in any conduct or activity that will reestablish the dual school structure." 1989 Consent Order at 17.

23

The District's legal obligation to dismantle its formerly <u>de jure</u> segregated schools arises not only from the 1969 Order and 1989 Consent Order, but from the Fourteenth Amendment as well.  <u>See</u> <u>United States v. Fordice</u>, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior <u>de jure</u> dual system that continue to foster segregation."); <u>Swann v. Charlotte-Mecklenburg Bd. of Educ.</u>, 402 U.S. 1, 15 (1971) ("[S]chool authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.'") (quoting <u>Green</u>, 391 U.S. at 437-38); <u>Columbus Bd. of Educ. v. Penick</u>, 443 U.S. 449, 459 (1979) ("Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment.").

This affirmative duty compels a school district once segregated by law to "do all in its power" to desegregate its schools to the greatest possible extent until it achieves unitary status. <u>Davis v. E. Baton Rouge Parish Sch. Bd.</u>, 721 F.2d 1425, 1435 (5th Cir. 1983) ("Until it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system."); <u>see also</u> <u>Freeman v. Pitts</u>, 503 U.S. 467, 485 (1992) ("The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional <u>de jure</u> system.").  This duty is not limited in time or duration, but imposes a continuing legal obligation to desegregate until the school district eliminates the vestiges of its former dual school system.  <u>See</u> <u>Columbus Bd. of Educ.</u>, 443 U.S. at 458 (ruling that defendant district "has been under a continuous constitutional obligation to disestablish its dual school system and that it has failed to discharge this duty"); <u>Dayton Bd. of Educ. v. Brinkman</u>, 443 U.S.

24

526, 537 (1979) ("Given intentionally segregated schools in 1954, . . . the Board was thereafter under a continuing duty to eradicate the effects of that system.").

Here, Cleveland has fallen woefully short of its affirmative duty to do everything in its power to desegregate its schools. Aside from the creation of attendance zone boundaries in the 1969 Order (which were imposed by this Court), Cleveland has never altered the structure or configuration of its school district to spur integration. Decade after decade, as the District's one-race schools showed no signs of becoming integrated, Cleveland did not utilize standard tools of desegregation—such as school pairing, school clustering, or redrawing attendance zone lines—to dismantle these institutions. Indeed, when Cleveland finally did reorganize its schools last fall, it did so in a manner that impedes desegregation.

The 1969 Order obligates Cleveland to take proactive steps to disestablish school segregation. Cleveland additionally committed in the 1989 Consent Order not to engage in conduct that would have the effect of reestablishing its former dual school structure. The facts demonstrate unequivocally that Cleveland has violated both orders.

  2.  *Cleveland's Maintenance of Racially Identifiable Schools Presumptively Violates Its Affirmative Obligation to Eliminate the Vestiges of its Dual School System.*

The polarized racial composition of Cleveland's schools on the east side and west side establishes an almost irrefutable presumption that the District has violated its affirmative legal obligation to desegregate. See Swann, 402 U.S. at 26 ("[I]n a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition."); Manning v. Sch. Bd. of Hillsborough Cnty., Fla., 244 F.3d 927, 942 (11th Cir. 2001) ("[O]nce a plaintiff shows de jure segregation . . . , a presumption arises that all racial imbalances in a school system are the result

25

of the <u>de jure</u> segregation.") (citing <u>Keyes v. Sch. Dist. No. 1., Denver, Colo.</u>, 413 U.S. 189, 208 (1973)).

   The Fifth Circuit has always been skeptical of one-race schools in school districts that have not achieved unitary status.  See <u>Valley v. Rapides Parish Sch. Bd.</u>, 646 F.2d 925, 937 (5th Cir. 1981) (holding that "[w]e cannot ignore the continued existence of one-race schools in this system" and finding "the maintenance of the all-black schools . . . from 1965 through the spring of 1980 is glaring, and clearly requires further relief"); <u>Lee v. Macon Cnty. Bd. of Educ.</u>, 616 F.2d 805, 809, 811 (5th Cir. 1980) (observing that "[i]n reviewing desegregation plans proposing one-race schools, courts must scrutinize the schools to make sure that the authorities' reasons for retaining them can surmount the presumption of unconstitutionality," and finding that the existence of "four predominantly black schools constructed and utilized during a period of <u>de jure</u> segregation can no longer be tolerated"); <u>United States v. South Park Indep. Sch. Dist.</u>, 566 F.2d 1221, 1225 (5th Cir. 1978) (noting that "situations justifying one-race schools are rare and must be carefully scrutinized"); <u>Tasby v. Estes</u>, 517 F.2d 92, 103 (5th Cir. 1975) (stating that "nothing less than the elimination of predominantly one-race schools is constitutionally required in the disestablishment of a dual school system based upon segregation of the races," and rejecting student assignment plan that "would not have altered the racial characteristics of the [district's] schools").

   The United States is not aware of a case in which a federal court has exonerated a school district in circumstances like these where a substantial majority of district schools located in close proximity to each other retain their racial identity from the former <u>de jure</u> school system. In a case with close parallels to the facts here, a court recently held that the continuing presence of one-race schools in defendant's school district compelled a finding that the district had failed

26

to comply with its desegregation obligations.  See United States v. West Carroll Parish Sch. Dist., 477 F. Supp. 2d 759, 760 (W.D. La. 2007).  The court specifically observed that three schools "remained white or virtually all-white schools since 1969" and two other schools were racially identifiable.  Id. at 761.  Finding that those five schools "were clearly segregated in 1969 and remain segregated today" and that the district "made no effort to desegregate its three all-white schools," the court concluded that the district could not rebut the Swann presumption and thereby "failed to comply with its affirmative duty to desegregate."  Id. at 763-64; see also United States v. Pittman, 808 F.2d 385, 386 (5th Cir. 1987) (stating that "[t]he [Hattiesburg] school district is small, compact, and logistically manageable from the standpoint of desegregating by the pairing and clustering of schools.").

Forty-one years after this Court ordered the District to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system," 1969 Order at 1, Cleveland continues to operate four one-race black schools and three racially identifiable majority white schools, all in a ten-school district where every zoned school is situated within a four-mile radius.  See supra at 13; Exhibit 9.  Nothing in the record suggests that Cleveland innately differs from the school districts in Hattiesburg, Mississippi or West Carroll Parish, Louisiana, such that the structural desegregation remedies prescribed in those cases would be improper here.  See Pittman, 808 F.2d at 386; West Carroll Parish Sch. Dist., 477 F. Supp. 2d at 763-64.  Against this backdrop, it is difficult to conceive of a legal justification for the continued existence in Cleveland of one-race schools that have never been desegregated.

       3.      *Cleveland's School Reorganization Plan Contravenes the District's Affirmative Duty to Desegregate its Schools and Violates the Extant Desegregation Orders.*

The violations outlined above are exacerbated by the District's continued segregation of the east side and west side schools through the 2010-2011 school reorganization plan.

27

Significantly, the record reflects that Cleveland's school reorganization plan was controversial, and it attracted significant criticism from east side parents. See, e.g., Over 1,000 Students Out Today, Bolivar Com., Feb. 16, 2010, at 1-2 (attached hereto as Exhibit 21); Parents Question School Board, Bolivar Com., Feb. 17, 2010, at 1A-2A (attached hereto as Exhibit 22). Parents of students slated to attend D.M. Smith Middle School asserted that moving seventh and eighth-grade students onto a high school campus would threaten the students' safety and undermine their academic performance. See Exhibit 22 at 2A. Other parents were concerned that the creation of another elementary school magnet school program would entice desirable teachers and students to leave the other east side elementary schools, further diminishing the performance of those schools. Id. One parent decried the unequal treatment of the east side and west side schools under the reorganization plan:

> We are still concerned about the major changes only happening to the schools on the East Side of town . . . . Margaret Green Junior High School students will continue to operate the same, meaning they will remain in their own separate building and they still have their own cafeteria and gym. However, D.M. Smith students will have to eat and take physical education with 17 and 18 year olds.

Id.

From the United States' perspective, the plan is objectionable on both procedural and substantive grounds. Procedurally, the United States was not informed about the details of the reorganization plan until January 13, 2010—two days before the Board of Trustees voted to approve the plan. See Exhibit 19 at 1-2; Exhibit 18. In response to the District's January 13 letter, the United States notified the District that the plan would require court approval because, inter alia, it eliminated two elementary school zones established by the 1969 Order (Nailor and Bell) and modified the zone lines of at least three other elementary schools (Pearman, Parks, and Cypress Park). See Letter from Jonathan Fischbach to Jamie F. Jacks, dated Mar. 3, 2010, at 1

28

(attached hereto as Exhibit 23) ("Because the Reorganization Plan has the effect of modifying the elementary school attendance zone lines established by the 1969 Desegregation Order, as modified by the 1989 Consent Decree, it is our position that the District cannot implement the plan without court approval."). Nevertheless, the District failed to inform the Court that it was undertaking a major reorganization of its schools before unilaterally enacting the plan in January 2010 and unilaterally implementing it in the fall of 2010. These actions patently violate the 1969 Order and 1989 Consent Order.

Substantively, several components of the reorganization plan are also in tension with the desegregation orders that govern the District. The 1969 Order dictates that "[t]he defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual school system." 1969 Order at 5. The 1989 Consent Order further provides that "[t]he Cleveland School District shall not engage in any conduct or activity that will reestablish the dual school structure." 1989 Consent Order at 17.

Notwithstanding these requirements, the reorganization plan failed to exploit an obvious opportunity to integrate the three all-black elementary schools on the east side with the elementary schools on the west side that enroll a significant population of white students. Instead, the District removed students from one all-black elementary school (Nailor) and reassigned those students to another all-black elementary school (Cypress Park). Moreover, Cleveland disbanded Bell Elementary School without modifying the attendance zone boundaries for Parks Elementary and Pearman Elementary in order to more evenly distribute the District's white elementary school students across the east side and west side elementary schools. Finally, the reorganization plan reflects that Cleveland's Board of Trustees preferred the idea of placing

29

black seventh and eighth-grade students on a high school campus to the idea of merging the

District's all-black and predominantly white middle schools to racially integrate those schools.

**B.     Cleveland's Proffered Justifications for Maintaining Racially Identifiable and One-Race Schools are Contrary to Controlling Precedent.**

The District suggests in correspondence with the United States that its current

configuration of schools is justified (1) because it provides school choice to black and white

students through a majority-to-minority transfer program and magnet school options, (2) as a

means of reducing white flight, and (3) to maintain the current quality of educational

programming in the District.  None of these arguments have merit.

*1.     Cleveland Cannot Comply with the Extant Desegregation Orders and Federal Law Simply by Facilitating School Choice through its Majority-to-Minority Transfer Policy and Magnet School Programs.*

Cleveland asserts that it is not required to affirmatively dismantle its racially identifiable

and one-race schools because it has integrated a portion of its schools (primarily on the west side

of Cleveland) through voluntary measures like the District's majority-to-minority transfer

program and magnet schools:

> In short, the District believes the voluntary majority-to-minority transfer policy, the district's policy of busing Eastside and Cleveland High children for certain classes and the magnet school programs currently in place are positively impacting the racial make-up of our District schools.  The District has complied with each and every mandate of the Consent Order and continues to do so today.

See Letter from Jamie F. Jacks to Jonathan D. Fischbach, dated June 9, 2009, at 3 (attached

hereto as Exhibit 24).

Contrary to the District's position, a school district cannot doggedly pursue desegregation

through a freedom of choice approach when voluntary programs are ineffective.  Accordingly,

this Court rejected Cleveland's original "freedom of choice" desegregation proposal in 1969:

> There must be a plan presented which will effectually remove the vestiges of the dual system, and it is an obligation on the Board of each school district to present such a plan to the Court. <u>Moreover, no longer may the effectiveness of any plan depend upon the wishes or choice of students or their parents.</u>

Transcript of Hearing before the Honorable William C. Keady at 2, <u>Cowan v. Bolivar Cnty. Bd. of Educ.</u>, Civil Action No. DC 6531-K (N.D. Miss. Jul. 9, 1969) (emphasis added).

By relying exclusively on the voluntary choices of white and black students to desegregate the District's schools, Cleveland repeats the same mistake it made forty years ago. Since then, federal courts have emphasized that desegregation plans rooted in school choice are impermissible if they impede a school district's progress toward unitary status. <u>See, e.g.</u>, <u>Green</u>, 391 U.S. at 441-42 (rejecting the board's "freedom-of-choice" plan, which proved ineffective in dismantling the dual system of schools); <u>Monroe v. Bd. of Comm'rs of City of Jackson, Tenn.</u>, 391 U.S. 450, 459 (1968) (overturning lower courts' approval of desegregation plan including a "free-transfer" provision, finding the provision "patently operates as a device to allow resegregation of the races to the extent desegregation would be achieved by geographically drawn zones"); <u>Lee v. Marengo Cnty. Bd. of Educ.</u>, 588 F.2d 1134, 1136 (5th Cir. 1979) ("It is clear that freedom-of-choice student assignment has not worked in the [school district] insofar as desegregation is concerned. The court's order appealed from in the instant case produced no effective result, as the student enrollment figures for the present school year furnished us by the Board amply demonstrate."); <u>cf. Morgan v. Kerrigan</u>, 530 F.2d 401, 409 (1st Cir. 1976) ("Freedom of choice has a long history of failure in achieving desegregation.").

Desegregation plans that rely heavily on magnet programs to drive integration similarly attract careful scrutiny from federal courts. Indeed, in a case with similar facts, the Fifth Circuit rejected a desegregation plan featuring magnet school programs:

> We do not condemn magnet schools, as such.  We say that to rest the desegregation program on the magnet plan with only other minor adjustments does not comply with the Supreme Court's mandate in <u>Swann v. Charlotte-Mecklenburg</u>:  There must be every effort to achieve the greatest possible degree of actual desegregation".  The plan must be one that "promises realistically to work and promises realistically to work now.
> . . .
> We see no escape from the conclusion that the magnet school plan, accompanied only by the small adjustments contemplated, do not meet the constitutional test for dismantling a long established dual system.  <u>Magnet schools should be a supplement to a mandatory desegregation plan based to a reasonable extent on mandatory reassignment and pairing and clustering of schools.</u>

<u>Pittman</u>, 808 F.2d at 390 (emphasis added) (internal citations and quotations omitted).

> 2.  *The District is not Legally Entitled to Operate Racially Identifiable and One-Race Schools For the Purpose of Reducing White Flight.*

After <u>Brown</u>, many school districts sought to evade their desegregation obligations on grounds that the steps required to dismantle one-race schools or eliminate racially identifiable schools would prompt white parents and children to flee the school district, resulting in a higher concentration of black students in the district's schools.  Cleveland invoked this time-worn defense in its letter responding to the notice of violation issued by the United States:

> What the Department of Justice is asking the District to do is to bring in a significant Caucasian population to the traditionally African American schools and to make sure there is a significant African American population in each traditionally majority white school . . . .  In short, what the Department of Justice would have this district do is to force children and parents, all over Cleveland, to report to schools that are not of their choice, nor in their neighborhood.  This effort would, most assuredly, act as a tool which will decrease the integration of our district.

<u>See</u> Exhibit 24 at 3.

It has long been settled that fear of white flight does not entitle a school district to avoid taking basic steps to dismantle <u>de jure</u> segregated schools.  In <u>United States v. DeSoto Parish School Board</u>, 574 F.2d 804 (5th Cir. 1978), the Fifth Circuit emphatically rejected the same

argument asserted here by Cleveland; namely, that fear of white flight should absolve a district

of its desegregation obligations:

> The board's response is to repeat the refrain it has sung since 1968: any alternative measures that promise to increase the amount of desegregation will lead to white flight and the "resegregation" of the schools. This argument must fail. It is the law in the Supreme Court and in this Circuit that white flight "cannot (be) . . . accepted as a reason for achieving anything less than complete uprooting of the dual public school system." (quoting United States v. Scotland Neck City Bd. of Educ., 407 U.S. 484, 491 (1972); Lee v. Macon Cnty. Bd. of Educ., 465 F.2d 369 (5th Cir. 1972)).
> . . .
> The reason for this rule reveals the importance of enforcing it rigorously. "White flight is an expression of opposition by individuals in the community to desegregation of the school system. . . . From the inception of school desegregation litigation, accommodation of opposition to desegregation by failing to implement a constitutionally necessary plan has been impermissible." (quoting Morgan, 530 F.2d at 420).

Id. at 816 & n.25.

The rule announced by the Fifth Circuit in DeSoto is applied universally by federal

courts. See, e.g., Stell v. Savannah-Chatham Cnty. Bd. of Educ., 888 F.2d 82, 85 (11th Cir.

1989) ("Plaintiffs are correct that fear of 'white flight' cannot justify delaying desegregation.");

Liddell v. Missouri, 731 F.2d 1294, 1313 (8th Cir. 1984) ("The exodus of white parents and

students out of fear of integration, or 'white flight,' is no excuse for school officials to avoid

desegregating."); Davis, 721 F.2d at 1438 ("As we have noted, fear that white students will flee

the system is no justification for shrinking from the constitutional duty to desegregate the parish

schools."); Morgan, 530 F.2d at 420-22 ("[C]oncern over 'white flight' . . . cannot become the

higher value at the expense of rendering equal protection of the laws the lower value.") (citation

omitted). Nothing in the factual record of this case provides a compelling basis to depart from

this settled precedent.

   3.    *Concerns About Educational Quality Cannot Justify the Continued Operation of*
         *Racially Identifiable and One-Race Schools.*

Responding to the United States' position that the District is legally required to eliminate

its one-race schools, see Exhibit 8 at 4, Cleveland further asserts in its letter of June 9, 2009 that

"[i]t is also contrary to the Constitution to take programs which are working, where children of

all races are learning side by side, and force those children to go elsewhere." See Exhibit 24 at 3.

Cleveland cites no authority for the proposition that a school district can disregard its

desegregation obligations in the interest of maintaining or enhancing the quality of its

educational programs, nor is the United States aware of decisions endorsing such a view.

As a threshold matter, no evidence in the record suggests that Cleveland is incapable of

providing a quality education to its students in a system of fully integrated schools. Cf. Harkless

v. Sweeny Indep. Sch. Dist., 388 F. Supp. 738, 762 (S.D. Tex. 1975) (observing "it is clear from

this record that the quality of education dispensed at [the formerly black school] prior to

desegregation was inferior to that available in the White schools of the District," but that "[s]ince

desegregation, . . . the scholastic performance of the Negro children has improved sharply."),

aff'd in part, rev'd in part on other grounds, 554 F.2d 1353 (5th Cir. 1977).  Even assuming for

the sake of argument that desegregation would undermine the quality of education in the District,

controlling law from the Supreme Court and the Fifth Circuit establishes that desegregation

concerns cannot be subordinated to a school district's interest in delivering a high quality

education to its students.  See Wright v. City of Emporia, 407 U.S. 451, 467 (1972) (rejecting

school district's quality of education concerns, and noting that "any increased quality of

education provided to city students would . . . have been purchased only at the price of a

substantial adverse effect upon the viability of the county system").  Indeed, a dissenting opinion

34

from the en banc Fourth Circuit opinion in Wright (asserting views ultimately adopted by the

Supreme Court in reversing the majority opinion) observed that

> [i]n an area in which historically there was a dual system of schools and at best
> grudging compliance with Brown, we cannot be too careful to search out and to
> quash devices, artifices and techniques furthered to avoid and to postpone full
> compliance with Brown.  We must be assiduous in detecting racial bias masking
> under the guise of quality education or any other benevolent purpose.

Wright v. City of Emporia, 442 F.2d 588, 589 (4th Cir. 1971) (en banc) (Winter, J.,

dissenting).

Additionally, in Pittman, the Fifth Circuit rejected a desegregation plan from the school

district in Hattiesburg, Mississippi, that proposed a configuration of schools quite similar to

Cleveland's current school system:

> This plan, approved by the district court, is based on the conversion of two of the
> five virtually all-black elementary schools (Jones and Walthall) into magnet
> facilities, with specialized curricula. Equal numbers of black and white students to
> the number 240 would be admitted to these schools upon approval of their
> voluntary applications, so as to maintain a 50 percent black, 50 percent white
> enrollment in each facility. A third black school (Grace Love) would be
> consolidated with a small, racially mixed facility (Eaton) that would be closed,
> resulting in a projected enrollment in grades one through six that would be 73
> percent black. The two remaining virtually all-black schools, Bethune and Eureka,
> would neither become "magnets" nor have any white students in grades 1-6
> reassigned to them. Up to 188 black students would be transferred from Walthall.
> Finally, several attendance zone changes would be made that would reassign
> black children to formerly white schools.

808 F.2d at 387-88.

The Court acknowledged that the plan offered "educational improvements" relative to the

status quo, but rejected the proposal nonetheless:

This appeal turns on the adequacy of the Consent Decree Plan to desegregate the elementary grades in Hattiesburg. In the opinion of this Court that plan is like a voice from the past crying for "gradualism". Constitutionally, its desegregative effect is too little and too late . . . . Some of the educational improvements seem highly desirable, but do not necessarily bear any relation to desegregation. We remand the case to the district court with the suggestion that the parties try again and that they accelerate the desegregation process.

Id. at 388.

**C.     The District is Violating the 1969 Order, the 1989 Order, and Federal Law by Reinforcing the Racial Identity of its Schools through Faculty and Staff Assignment.**

In addition to perpetuating unlawful segregation through its student assignment practices, the District has reinforced the racial identity and reputation of the east side and west side schools through its race-based assignment of faculty and staff. The 1969 Order, 1989 Consent Order, and controlling Supreme Court and Fifth Circuit decisions prohibit the District from reinforcing the racial identity of its schools through the assignment of faculty and staff. 1969 Order at 4; 1989 Consent Order at 2; Swann, 402 U.S. at 18 ("Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . . a prima facie violation of substantive constitutional rights under the Equal Protection Clause is shown."); Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1217-18 (5th Cir. 1969) (ordering that administrators, faculty, and other staff who work with students "shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students"), vacated in part on other grounds sub nom., Carter v. West Feliciana Parish Sch. Bd., 396 U.S. 226 (1969), rev'd on other grounds sub nom., Carter v. West Feliciana Parish Sch. Bd., 396 U.S. 290 (1970); see also Robinson v. Shelby Cnty. Bd. of Educ., 566 F.3d 642, 655 (6th Cir. 2009) ("[T]he faculty of each school [should] reflect the system wide racial ratio of faculty members.") (citations omitted).

36

The 1969 Order specifically provides that "for the 1970-71 school year and thereafter there shall be full faculty and staff desegregation, to such an extent that the faculty at each school is not identifiable to the race of the majority of the students at any such school." 1969 Order at 4. Twenty years later, having failed to comply with this requirement, the District agreed to undertake "full faculty and professional staff desegregation at each school operated by the school district, so that the faculty and professional staff at each school is not racially identifiable." 1989 Consent Order at 2.

Yet another two decades have passed, and Cleveland continues to assign faculty and staff in a manner that reinforces the racial identity of the all-black and disproportionately white schools that the District has failed to dismantle. Data produced by the District reflect that schools with a racially identifiable white student body have a disproportionately high percentage of white faculty and administrators, while schools with an overwhelmingly black student population have a disproportionately high percentage of black teachers and administrators. The District itself concedes that "[t]here are certain schools where the composition of the faculty identifies the racial composition of the student body." Exhibit 24 at 3. Though Cleveland acknowledges this problem, it has failed to take meaningful steps to reassign teachers or otherwise ensure that the racial composition of the faculty at a particular school does not further exacerbate the racial character of that school.

## V.    CONCLUSION

It has now been 57 years since the Supreme Court issued its decision in <u>Brown</u>, and 42 years since the original desegregation order was entered in this case. As thousands of school districts across the country diligently dismantled their dual school systems and made genuine efforts to eradicate the vestiges of those systems, the Cleveland School District has persisted in

37

operating one system of all-black schools on the east side of the railroad tracks, and a separate

system of racially identifiable majority white schools on the west side of the tracks.  As a result,

generations of schoolchildren in Cleveland have been racially segregated in their schools

notwithstanding the clear mandates imposed by multiple desegregation orders, the Fourteenth

Amendment, and Title IV of the Civil Rights Act of 1964.

The District has demonstrated that it lacks the will to meaningfully integrate its schools

absent another, more definitive order from this Court.  Accordingly, and for the reasons stated

above, the United States respectfully requests that the Court (1) find Cleveland in violation of the

extant desegregation orders and federal law, and (2) order Cleveland to devise and implement a

desegregation plan that will immediately dismantle its one-race schools and put the District on a

path to unitary status.

Dated:  May 2, 2011                                   Respectfully submitted,

JOHN MARSHALL ALEXANDER              THOMAS E. PEREZ
United States Attorney                           Assistant Attorney General
Northern District of Mississippi
900 Jefferson Avenue                              _/s/ Jonathan Fischbach_____
Oxford, MS  38655-3608                         ANURIMA BHARGAVA
Telephone:     (662) 234-3351                 JONATHAN FISCHBACH
Facsimile:      (662) 234-4818                 JOSEPH J. WARDENSKI
                                                              United States Department of Justice
                                                              Civil Rights Division
                                                              950 Pennsylvania Avenue, NW, PHB 4300
                                                              Washington, D.C.  20530
                                                              Telephone:     (202) 514-4092
                                                              Facsimile:      (202) 514-8337
                                                              Anurima.Bhargava@usdoj.gov
                                                              Jonathan.Fischbach@usdoj.gov
                                                              Joseph.Wardenski@usdoj.gov

# **APPENDIX**

## **INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit 1 | Trustees Explain Merging, The Bolivar Commercial, February 18, 2010, at 1A |
| Exhibit 2 | 1985-1986 Annual Report Submitted by the Cleveland School District. |
| Exhibit 3 | HEW-OCR Elementary and Secondary Public Schools Survey: Fall 1968 (Cleveland School District) |
| Exhibit 4 | Cleveland School District's Response to Requests for Admission (November 17, 1988) |
| Exhibit 5 | Testimony of Superintendent John J. Arnold, Caston v. Bolivar County, Mississippi, School District No. 4, Civil Action No. DC 85-24-WK-O (May 17, 1985) |
| Exhibit 6 | Testimony of Willie Simmons, Lucas v. Bolivar County, Mississippi, Civil Action No. DC 83-136-WK (September 30, 1983) |
| Exhibit 7 | 2005-2006 Annual Report Submitted by the Cleveland School District |
| Exhibit 8 | April 6, 2009 Letter from Jonathan Fischbach to Jamie F. Jacks |
| Exhibit 9 | Attendance Zone Map of the Cleveland School District Prior to the 2010-2011 Academic Year |
| Exhibit 10 | Student Assignment Tables for Cleveland Schools (Academic Years 2007-2008 and 2008-2009) |
| Exhibit 11 | 2007-2008 Annual Report Submitted by the Cleveland School District |
| Exhibit 12 | 2008-2009 Annual Report Submitted by the Cleveland School District |
| Exhibit 13 | 2009-2010 Annual Report Submitted by the Cleveland School District |
| Exhibit 14 | March 1, 2011 Letter from Jamie F. Jacks to Jonathan D. Fischbach |
| Exhibit 15 | Cleveland School District's FY 2007 Application for the Magnet Schools Assistance Program |
| Exhibit 16 | MSAP Proposal for H.M. Nailor Magnet Center (Submitted December 11, 2006) |

| **Exhibit** | **Description** |
| --- | --- |
| Exhibit 17 | March 7, 2011 Letter from Jamie F. Jacks to Jonathan D. Fischbach |
| Exhibit 18 | <u>Cleveland Merges Schools</u>, The Bolivar Commercial, January 15, 2010, at 1A-2A |
| Exhibit 19 | January 23, 2010 Letter from Jamie F. Jacks to Jonathan D. Fischbach |
| Exhibit 20 | Faculty Assignment Tables for Cleveland Schools (Academic Years 2007-2008, 2008-2009, and 2009-2010) |
| Exhibit 21 | <u>Over 1,000 Students Out Today</u>, The Bolivar Commercial, February 16, 2010, at 1-2 |
| Exhibit 22 | <u>Parents Question School Board</u>, The Bolivar Commercial, February 17, 2010, at 1A-2A |
| Exhibit 23 | March 3, 2010 Letter from Jonathan Fischbach to Jamie F. Jacks |
| Exhibit 24 | June 9, 2009 Letter from Jamie F. Jacks to Jonathan D. Fischbach |

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2011, I served copies of the foregoing Memorandum of Law in Support of the United States' Motion for Further Relief to counsel of record by electronic service through the court's electronic filing system, otherwise via electronic or overnight mail, addressed to:

**Jamie F. Jacks, Esq.**
JACKS, ADAMS & NORQUIST, P.A.
150 N. Sharpe Avenue
P.O. Box 1209
Cleveland, MS 38732
Telephone: (662) 843-6171
Fax: (662) 843-6176

Attorney for the Defendant,
Cleveland School District

**Ellis Turnage, Esq.**
TURNAGE LAW OFFICE
P.O. Box 216
Cleveland, MS 38732

Attorney for private plaintiffs,
Cowan, *et al.*

 /s/ Joseph J. Wardenski
JOSEPH J. WARDENSKI (NY Bar #4595120)