FILED

MAR 2 8 2012

DAVID CREWS, CLERK
BY _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

DIANE COWAN, minor, by her
mother and next friend, Mrs. Alberto
Johnson, et al.; and FLOYD COWAN, Jr.,
minor, by his mother and next friend, Mrs.
Alberto Johnson, et al.                                       PLAINTIFFS

and

UNITED STATES OF AMERICA                        PLAINTIFF-INTERVENOR

v.                                       CIVIL ACTION NO. 2:65-CV-00031-GHD

BOLIVAR COUNTY BOARD OF
EDUCATION, et al.                                             DEFENDANTS

MEMORANDUM OPINION

Presently before the Court are a motion for further relief [5] filed by the Plaintiff-Intervenor United States of America (the "Government"), and a motion to substitute party plaintiffs [40] filed by and through the Plaintiffs' counsel. Upon due consideration, the Court is ready to rule.

I.       FACTUAL AND PROCEDURAL BACKGROUND

Cleveland, Mississippi is a small city in eastern Bolivar County in the Mississippi River Delta with a population of a little over 12,000 residents. The city was a creation of the railroad system; the land that is now Cleveland was the approximate halfway point between Memphis, Tennessee, and New Orleans, Louisiana. The Louisville, New Orleans & Texas Railroad incorporated the town, which was named Cleveland in honor of then-President Grover Cleveland in 1886. Cleveland has since become home to Delta State University and has been named one of the one hundred best small communities in the United States. Cleveland is also the base of the

Cleveland School District, which encompasses 109 square miles and serves the cities of Cleveland, Boyle, Renova, and Merigold.

The Cleveland School District (the "District") is one of many school districts in Mississippi that at one time practiced *de jure* race-based segregation; African-American students were legally required to attend one of four *de jure* African-American schools on the east side of the Illinois Central Railroad tracks that run north and south through Cleveland, while Caucasian students attended one of six *de jure* Caucasian schools on the west side of the railroad tracks. The District has been under the supervision and jurisdiction of this Court since 1965, when it was first ordered, as Bolivar County School District Number 4, to submit a plan of desegregation for the purpose of dismantling its dual school system. Since then, this Court has supervised the District's desegregation efforts through a series of Orders.

This case commenced on July 24, 1965, when numerous individual Plaintiffs sued the Bolivar County Board of Education, six school districts in Bolivar County (including the Cleveland School District, then known as Bolivar County School District Number 4), and others pursuant to Title IV and Title IX of the Civil Rights Act of 1964. The Plaintiffs alleged that the District maintained six schools attended and staffed only by Caucasians: Cleveland High School, Margaret Green Junior High School, Pearman Elementary School, W.J. Parks Elementary School, Boyle Elementary School, and Merigold Elementary School; and the following four schools attended and staffed only by African Americans: Eastside High School, Nailor Elementary School, B.L. Bell Elementary School, and Hayes Cooper Elementary School. The Plaintiffs sought a preliminary and permanent injunction enjoining the Defendants from continuing to operate compulsory biracial public school systems for the children residing in Bolivar County.

2

Judge Claude Feemster Clayton ordered the Defendants to submit a plan to desegregate Bolivar County schools by August 19, 1965. Accordingly, on August 18, 1965, Bolivar County filed its first desegregation plans for school districts 1 through 6, as well as a school bus transportation desegregation plan. The Plaintiffs subsequently filed a motion for supplemental relief, and the Court conducted a hearing on this motion on August 23, 1966. Judge Clayton sustained portions of the motion for supplemental relief, and the Plaintiffs filed an additional motion for a revised desegregation plan. The parties engaged in discovery, and the Plaintiffs subsequently filed an additional motion for supplemental relief. Judge Clayton entered an Order concerning the desegregation of the faculty that took effect with the 1968–1969 school year. Dissatisfied with the result, the Plaintiffs filed a motion for a new plan of desegregation on September 4, 1968. Judge William C. Keady was assigned the case on September 9, 1968. The school districts subsequently filed new desegregation reports.

### A. 1969 Order by Judge Keady

On May 13, 1969, Judge Keady entered a desegregation Order [11] which stated:

> [E]ach deft. district shall, not later than 6-18-69, submit new and workable plan for desegregating schools that will result in r[a]cially nondiscriminatory school system, to be effective for commencement of school year 1969-70 and shall embody concrete and specific proposals for: (a) assignment and transfer of pupils to schools irrespective of race; (b) employ and assign administrative personnel, faculty & staff to such schools, irrespective of race; (c) unitary system for transporting system. Plan must insure 1) no schools wholly attended by negro students. 2) No schools having small fraction of negroes in predom. white schools. 3) No schools without substantial integration of faculty, etc.

Docket Sheet in School Desegregation Case DC6531 [1] at 8.

The school districts submitted new plans to the Court, but Judge Keady entered an Order thereafter disapproving the desegregation plans of Bolivar County school districts 1, 2, 4, and 5

"insofar as they relate to pupil assignment, but in other respects said plans are approved to the extent that they will be incorporated in final order to be entered." *Id.* at 9. Judge Keady approved the transportation plan for the desegregation of public school buses on July 7, 1969. *Id.* On July 9, 1969, Judge Keady issued a ruling from the bench rejecting the plans proposed by four Bolivar County school districts, among them district number 4. Judge Keady noted:

> [I]t is quite clear that there must be more than good faith on the part of the Board, although that is still required. There must be a plan presented which will effectively remove the vestiges of the dual system . . . . Moreover, no longer may the effectiveness of any plan depend upon the wishes or choice of students or their parents.

July 7, 1969 Hr'g Tr. at 6. On July 22, 1969, Judge Keady entered an Order requiring the District to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system." *See* Keady 1969 Order [11] at 1. In that Order, Judge Keady described in detail what was expected of the District in the following categories, which shall be discussed in turn: I. Student Desegregation; II. Faculty and Staff Desegregation; III. Transportation; IV. Services, Facilities, Activities, and Programs; and V. New Construction.

### I.    *Student Desegregation*

The District's zoning plan proposed two zones for "students attending high school grades 7 through 12."[1] *Id.* at 1–3. The dividing line for each high school zone was, and is to this day, the Illinois Central Railroad tracks. West of the Illinois Central Railroad tracks was, and is, Cleveland High School, and east of the Illinois Central Railroad tracks was, and is, Eastside High School. The District's zoning plan allotted "five zones for students attending elementary grades 1 through 6." *Id.* at 1. Judge Keady approved the District's zoning plan, directing that during the 1969–1970 school year each elementary school student would attend the school in the zone

---

[1] Today, the high schools include only grades 9–12.

4

of his or her residence, but that the high school students (then the seventh through twelfth graders) would "be assigned on the basis of their freedom of choice previously exercised." *Id.* at 3. Judge Keady then directed that for the 1970–1971 school year and thereafter each student would be assigned to attend school in the zone of his or her residence. Students could request a transfer only for certain specified reasons, one of which was to "promote desegregation." *Id.* The 1969 Order introduced the majority-to-minority transfer program, in which "defendants shall, on request, permit any student to transfer from a school where students of his race are a majority to any other school within the system where students of his race are a minority, and they may assign students on such basis . . . ." *Id.* at 4.

## II.     *Faculty and Staff Desegregation*

Judge Keady directed that for the 1969–1970 school year, "[w]ithin the full extent of the [D]istrict's ability to do so, including the availability of qualified personnel," the District should employ and assign "not less than one of every six classroom teachers of a different race . . . to each of the schools." *Id.* Judge Keady directed that for the 1969–1970 and 1970–1971 school years and thereafter "there shall be full faculty and staff desegregation, to such an extent that the faculty at each school is not identifiable to the race of the majority of the students at any such school." *Id.*

## III.     *Transportation*

The 1969 Order directed the District to provide a unitary student transportation plan based on territorial zones that would "seek[ ] to eliminate insofar as practicable overlapping or duplicating routes." *Id.* at 5–6. The Order further required that children of all races be treated substantially alike while being transported.

## IV.     *Services, Facilities, Activities, and Programs*

Judge Keady employed a no-segregation, no-discrimination rule for any "grade, service, facility, activity, or program." *Id.* at 5.

V.      *New Construction*

The 1969 Order directed the District, "to the extent consistent with the proper operation of the school system as a whole, [to] locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual school system." *Id.*

**B.      1989 Consent Order by Judge Senter**

In 1985, this Court granted the Government's motion to intervene in this lawsuit as a Plaintiff-Intervenor. The Government alleged that the District "operated a racially dual system of public education in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution" and "pursued policies and practices which frustrated the implementation of the July 22, 1969 desegregation order entered in *Cowan*." Senter 1989 Consent Order [12] at 1. Negotiations ensued and resulted in the Consent Order [12] entered on September 21, 1989. That Order directed the Cleveland School District to implement the provisions contained therein during the 1989–1990 school year and succeeding school years unless subsequently modified by Court Order. The Consent Order elaborated on the student assignment and faculty/staff requirements set forth in the 1969 Order and modified the attendance zones established in the 1969 Order. The Consent Order described in detail what was expected of the District in the following categories, which shall be discussed in turn: I. Faculty/Professional Staff Desegregation; II. Student Desegregation, including A. Majority-to-Minority Transfer Policy, and B. Attendance Zones; III. Equivalent Course Offerings; IV.

Magnet Program; V. Facilities, including A. Specific Improvements, and B. School Construction and Site Selection; VI. Reporting; and VII. Other Provisions.[2]

    *I.      Faculty/Professional Staff Desegregation*

Apparently, the District's faculty and professional staff continued to be racially identifiable by school in the late 1980s, in violation of the 1969 Order. The 1989 Consent Order directed, rather repetitively of Judge Keady's prior 1969 Order: "There shall be full faculty and professional staff desegregation at each school operated by the [D]istrict, so that the faculty and professional staff at each school is not racially identifiable. Specifically, the faculty and professional staff at each school to the extent feasible shall reflect the districtwide ratio of minority and nonminority faculty and professional staff." *Id.* at 2. The Consent Order also required that the District utilize nondiscriminatory and objective criteria in faculty and professional staff assignments and reassignments, and "make every effort to recruit qualified black professionals." *See id.* The District was to make "[a]ny transfers necessary to achieve the proper desegregation of the faculty, staff[,] and administrators of each school" by the fall of 1990. *Id.* at 4. Voluntary reassignments were to be encouraged, but reassignments would be required insofar as necessary "to achieve the required desegregation of the faculty, staff, and administrators for the remainder of the [D]istrict's schools." *Id.* Finally, with respect to faculty and staff desegregation, the Consent Order directed that "any required transfers of principals [would] be accomplished by the 1989–1990 school year." *Id.*

    *II.    Student Desegregation*

Judge Keady's 1969 Order had, with respect to student desegregation, focused on the two high school zones and the requirement that each student attend school in the zone of his or her residence. The 1989 Consent Order reiterated these objectives and provided three exceptions to

---

[2] "VI. Reporting" and "VII. Other Provisions" will be discussed in one category.

the residency zone attendance requirement: majority-to-minority transfer, magnet program participation, and enrollment in equivalent course offerings at another school within the District. The Government alleged, *inter alia*, that the District had violated the 1969 Order by constructing three new schools in the eastern part of the District, which traditionally had had predominantly African-American student enrollment: Eastwood Junior High School (renamed D.M. Smith Middle School during the 2005–2006 school year), Cypress Park Elementary School, and Bell Elementary School. Accordingly, the 1989 Consent Order directed the District to change the elementary school zones as follows: (1) the former Merigold Elementary School zone was included as part of the Pearman Elementary School zone; (2) the boundary lines of Nailor Elementary School were altered; and (3) the west boundary line of Cypress Park Elementary School was altered. Notably, the 1989 Consent Order did not require any changes to the other school zones, including the high school and junior high school zones.

The 1989 Consent Order, repeating the directives of the 1969 Order, required the District to "encourage and permit a student . . . attending a school in which his or her race [was] in the majority to choose to attend another school where his/her race [was] in the minority." *Id.* The 1989 Consent Order set forth specific improvements to be made to the majority-to-minority transfer program: The District was to provide notice to students and their parents/guardians and establish a transportation system to facilitate the transfer program. Further, when Pearman Elementary School attendance reached 50% African-American enrollment, "all [m]ajority-to-[m]inority transfer students from Nailor, Bell, and Cypress Park zones [would] be required to attend Parks Elementary School." *Id.* at 6. Finally, the Order directed the District to "make every effort to ensure that the instructional programs at all junior high schools are comparable in order to attract the [m]ajority-to-[m]inority transfer students." *Id.*

8

### III.    Equivalent Course Offerings

Going beyond the 1969 Order's general prohibition on segregation and discrimination in any school program or activity, the 1989 Consent Order required the District to "ensure uniform opportunity of course offerings to all students throughout the [D]istrict regardless of which school a student attends." *See id.* at 7. The Consent Order further required that at least two college preparatory courses be offered during the school year at both Eastside High School and Cleveland High School, and that such courses were not to be based upon "student preference at that school." *Id.* at 7–8. The District was to develop and improve the instructional programs and curricula at Cypress Park, Bell, and Nailor elementary schools to attract majority-to-minority transfer students. *Id.* at 8. In furtherance of the 1969 Order's general prohibition on segregation and discrimination, the 1989 Consent Order mandated that each District student should be issued a textbook for each course, and that the District equalize all equipment essential for educational programs in all District schools. *Id.* at 9.

In the midst of the directives concerning equivalent course offerings was a mandate that the District "develop and implement a plan for desegregating the predominantly black Eastwood Junior High School" to be implemented no later than September 1990. *See id.* at 8. This shows that the District and the Government were in agreement at that time that Eastwood Junior High School could not be said to have "disestablish[ed] all school segregation" and "eliminate[d] the effects of the dual school system." *See* Keady 1969 Order [11] at 1. This would further appear to show that the parties believed that lacking curricula and educational programs may have been at the heart of the stalled desegregation progress at Eastwood Junior High School.

*IV.*    *Magnet Program*

The 1989 Consent Order additionally directed the District to "establish a voluntary magnet school at one of the predominantly black elementary schools or at the former Hayes Cooper Elementary School in Merigold, Mississippi." Senter 1989 Consent Order [12] at 9. The District was to design the magnet program to attract a substantial number of non-minority and minority students, develop a transportation system to facilitate the magnet program, and recruit for the magnet program. *Id.* at 9–12. The Order further directed the District to provide admission requirements that "neither race will exceed 50%, plus or minus 5%" of total school enrollment, and make every effort to achieve this racially balanced enrollment. *Id.* at 9, 12.

*V.*    *Facilities*

Similar to the 1969 Order, the 1989 Consent Order required "no disparity of maintenance of any of the schools within the [D]istrict." *Id.* at 12. Additionally, as funds allowed, the District was to construct a track and baseball field at Eastside High School by the spring of 1990 and further equalize Eastside High facilities with Cleveland High facilities. The District was required to make any repairs necessary to keep the facilities up to Code without the need to notify the Government of its intent to do so, but the District was required to notify the Government to the extent it intended to undertake major renovations, capital improvements, or other construction. *See id.* at 13–14.

*VI.*    *Reporting and Other Provisions*

Finally, the 1989 Consent Order required the District to file with the Court and serve on other counsel detailed reports of its progress toward desegregation by June 1 of each succeeding school year. The Consent Order required the District to first achieve compliance with the

Court's desegregation orders, next maintain full compliance for three years, and finally for the parties to jointly move to have the District declared unitary.

### C. 1992 Consent Order by Judge Senter

In 1992, the District and the Government jointly moved *ore tenus* for the entrance of a supplemental order to the 1989 Consent Order, both agreeing that a magnet school should be established at the junior high level to eliminate the continuing racial identifiability of both Margaret Green Junior High and Eastwood Junior High. The 1992 Consent Order allowed the District to implement such a program in accordance with the 1989 Order's directive to develop the magnet school program. The Order further directed the District to take affirmative steps to secure funding for the junior high magnet school.

### D. 1995 Consent Order by Judge Senter

Upon joint motion *ore tenus* of the District and the Government, Judge Senter entered a subsequent Consent Order concerning the implementation of magnet schools. The 1995 Consent Order permitted the District to develop and implement a magnet school at the high school level that would reflect the elementary and junior high magnet school programs. The District further agreed to take affirmative steps to secure funding for the high school level magnet school.

### E. Motion to Enforce Prior Desegregation Orders

The Government has now filed a motion requesting that this Court enforce its prior desegregation Orders with respect to the Cleveland School District. The table on the following page summarizes the mandates of the Court's prior Orders.

| | Student Desegregation | Faculty & Staff Desegregation | Transportation | Services, Facilities, Activities, & Programs | New Construction |
|---|---|---|---|---|---|
| *1969 Order* Yearly reporting to the Court re: faculty/staff, school attendance, and record of transfers due to <ul><li>crowded school situation;</li><li>change of residency during school year;</li><li>to aid physically handicapped child; or</li><li>promoting desegregation.</li></ul> | Students must attend school in their zone of residency (approving zoning plan including west and east high schools with railroad tracks as dividing line). Introduce majority-to-minority transfer program. | Full faculty and staff desegregation, to such an extent that faculty at each school is not racially identifiable to majority race of students at any school. | Adhere to territorial zones with no unnecessary overlap. Treat students of all races substantially the same. | No race discrimination/segregation. | Locate any new school, and substantially expand existing schools with objective of eradicating vestiges of dual school system to extent consistent with proper operation of school system as a whole. |
| *1989 Consent Order* Yearly reporting to the Court and Government re: student enrollment of District by race, student enrollment of each school by race, majority-to-minority transfer program enrollment by race, number of private school returns by race, description of all construction, description of enrichment programs in operation, District's self-evaluation of its desegregation measures, faculty by race in District, faculty by race of each school, and administrative staff by race of each school. | Students must attend school in their zone of residency (upholding the west and east high school zones; amending the elementary zones). Directives for implementing majority-to-minority transfer program, including providing notice and developing transportation to facilitate program. | Full faculty and staff desegregation, to such an extent that faculty at each school is not racially identifiable to majority race of students at any school. <ul><li>Specifics: Faculty/staff at each school shall reflect districtwide ratio of minority and nonminority faculty and staff.</li></ul> | | Offer equivalent courses for all schools, improve curricula to attract majority-to-minority transfer students, provide textbooks, and equalize educational equipment at all District schools. Develop and implement plan for desegregating predominantly African-American Eastside High School. Develop and implement magnet school with enrollment for either race not to exceed 50%, plus or minus 5%, or provide detailed documentation to Government why, despite every effort, requirement could not be met. | Keep facilities up to Code; notify Government of intent to make other building improvements. Equalize facilities among all District schools. Construct track and baseball field at Eastside High School as soon as funds become available. |
| *1992 Consent Order* | | | | Develop junior high school level magnet school to further desegregate Margaret Green and Eastwood Junior High schools; obtain funding for same. | |
| *1995 Consent Order* | | | | Develop high school level magnet school to further desegregate both high schools; obtain funding for same. | |

## II.  DISCUSSION

### A.  Standing

As an initial mater, the Court addresses the standing of the parties to challenge the District's level of compliance with the Court's prior desegregation Orders and federal law. For the exercise of federal jurisdiction to be proper, the party seeking to invoke federal jurisdiction must have standing under Article III of the United States Constitution. *Bond v. United States*, —— ——U.S. ——, ——, 131 S. Ct. 2355, 2362, 180 L. Ed. 2d 269 (June 16, 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). The party seeking to invoke federal jurisdiction has the burden of establishing standing. *Osterweil v. Edmonson*, 424 F. App'x 342, 343 (5th Cir. 2011) (citing *United States v. Hays*, 515 U.S. 737, 743, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995)). The burden of standing is determined by the present stage of litigation; as a rule, standing becomes more difficult to establish as the litigation progresses. *See Lujan*, 504 U.S. at 561, 112 S. Ct. 2130. Standing requires "an injury in fact"; "a causal connection between the injury and the conduct complained of"; and a conclusion that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61, 112 S. Ct. 2130 (internal quotation marks omitted).

The Court requested briefing from the original Plaintiffs in the case *sub judice* on the standing issue. Counsel for the original Plaintiffs has located African-American citizens who have children enrolled in the District and are willing to be substituted or joined as party plaintiffs, and has filed a motion pursuant to Rule 17 of the Federal Rules of Civil Procedure [40]. Both the Defendants and the Government have informed the Court they have no objections to the motion. Rule 17(a)(1) requires that actions "be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). The Fifth Circuit has defined the real party in interest as "the

person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *In re Signal Int'l, LLC*, 579 F.3d 478, 487 (5th Cir. 2009) (quoting *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990)). "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3). The Court finds that substitution of plaintiffs is proper at this time pursuant to Rule 17, and thus that the motion to substitute party plaintiffs [40] should be granted. The new Plaintiffs have standing to enforce the Court's prior desegregation Orders. These new Plaintiffs have a cognizable injury, "a personal interest, created by law, in having the State refrain from taking specific actions." *See Allen v. Wright*, 468 U.S. 737, 763, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984). An injury in the context of school desegregation is "one of the most serious injuries recognized in our legal system." *See id.* at 755, 104 S. Ct. 3315. Also, "the injury alleged is fairly traceable to the Government conduct" challenged as unlawful, *see id.* at 756, 104 S. Ct. 3315, and the relief sought, if granted, could restore a denied right to the Plaintiffs. Thus, the Court concludes that the Plaintiffs have standing to proceed.

B.     Desegregation Case Law

In determining whether the District has complied with prior desegregation Orders, this Court must draw on its equitable jurisdiction to supervise various aspects of local school administration. *See Freeman v. Pitts*, 503 U.S. 467, 491–92, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992). *See also Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 337 n.4, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999); *Lewis v. Casey*, 518 U.S. 343, 386, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (dicta) ("[W]e have sometimes closed our eyes to federal

judicial overreaching, as in the context of school desegregation . . . . "). However, we recognize that "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *See Freeman*, 503 U.S. at 490, 112 S. Ct. 1430; *accord Missouri v. Jenkins*, 515 U.S. 70, 102, 115 S. Ct. 2038, 132 L. Ed. 2d 63 (1995) (ultimate goal in desegregation cases is "to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution"). Indeed, this Court "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *See Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977). "When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course." *Freeman*, 503 U.S. at 490, 112 S. Ct. 1430. Although "the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated," the ultimate duty and responsibility lies with the State and its subdivisions. *See id.*, 112 S. Ct. 1430.

It should be noted that this litigation has been in progress for some 47 years. Thus, this Court looks to the case *sub judice* with a historical perspective. The first instruction comes in the seminal case *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954) (*Brown I*), and the subsequent mandate in *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S. Ct. 753, 99 L. Ed. 1083 (1955) (*Brown II*). In *Brown I*, the United States Supreme Court reframed the issue of equality in public education, abandoning the old inquiry as to whether the facilities in "white" and "black" schools were equal; the new inquiry was whether segregation in

public education was constitutional. *See Brown I*, 347 U.S. at 495, 74 S. Ct. 686. In answering

the inquiry, *Brown I* overruled the "separate-but-equal" doctrine espoused in *Plessy v. Ferguson*,

and did so with fury:

> We conclude that in the field of public education the doctrine of
> "separate but equal" has no place. Separate educational facilities
> are inherently unequal. . . . [T]he plaintiffs and others similarly
> situated for whom the actions have been brought are, but reason of
> the segregation complained of, deprived of the equal protection of
> the laws guaranteed by the Fourteenth Amendment.

*Id.* at 494–95, 74 S. Ct. 686. Relying in part on social science data on childhood development,

the Court concluded that "[t]o separate [both elementary and high school children] from others of

similar age and qualifications solely because of their race generates a feeling of inferiority as to

their status in the community that may affect their hearts and minds in a way unlikely ever to be

undone." *Id.* at 494, 74 S. Ct. 686.

*Brown II*, a call to action for progress in desegregation, directed each district court to

retain jurisdiction over any desegregation cases brought before them until the respective school

had come into compliance with court orders. *See Brown II*, 349 U.S. at 301, 75 S. Ct. 753. Even

in the days of widespread *de jure* segregation, *Brown II* imposed a good faith compliance

standard, recognizing that "although [s]chool authorities have the primary responsibility for

elucidating, assessing, and solving these problems[,] courts will have to consider whether the

action of school authorities constitutes good faith implementation of the governing constitutional

principles." *Id.* at 299, 75 S. Ct. 753.

Following *Brown II*, the United States Supreme Court was silent on the issue of

desegregation until *Cooper v. Aaron*, 358 U.S. 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958). In

*Cooper*, the United States Supreme Court held that student unrest in the wake of *Brown II* and

resistance on the part of Arkansas state authorities to the desegregation efforts of the Little Rock

School Board were insufficient reasons to stall desegregation efforts. *See Cooper*, 358 U.S. at 8, 78 S. Ct. 1401. Ten years later, in *Green v. County School Board of New Kent County, Virginia*, 88 S. Ct. 1689, 20 L. Ed. 2d 716 (1968), the United States Supreme Court held that "[i]n the context of the state-imposed segregated pattern of long standing," allowing students of either race to attend the previously desegregated schools "merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system." 391 U.S. at 436, 88 S. Ct. 1689. The goal in achieving desegregation, the Supreme Court explained, is "to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.* at 437–38, 88 S. Ct. 1689. The *Green* Court ordered the school board "to come forward with a plan that promises realistically to work, and promises realistically to work now" and "promises meaningful and immediate progress toward disestablishing state-imposed segregation." *Id.* at 439, 88 S. Ct. 1689. *Green* directed courts in desegregation cases to assess the cases before them "in light of the circumstances present and the options available in each instance" and to "weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief." *Id.*, 88 S. Ct. 1689.

*Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971), sheds further light on the duty of district courts in desegregation cases:

> Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

17

402 U.S. at 18, 91 S. Ct. 1267. *Swann* explained the duty of the school authorities is to first "eliminate invidious racial distinctions. With respect to such matters as transportation, supporting personnel, and extracurricular activities, no more than this may be necessary. Similar corrective action must be taken with regard to the maintenance of buildings and the distribution of equipment." *Id.*, 91 S. Ct. 1267. The *Swann* Court acknowledged that "[t]he construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex." *Id.* at 20, 91 S. Ct. 1267. "[I]t is the responsibility of local authorities and district courts to see to it that future construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." *Id.* at 21, 91 S. Ct. 1267.

School districts under desegregation orders must "take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Hull v. Quitman Cnty. Bd. of Educ.*, 1 F.3d 1450, 1453 (5th Cir. 1993) (quoting *Freeman*, 503 U.S. at 485, 112 S. Ct. 1430). In determining whether schools have reached good faith compliance with desegregation orders, courts look to the following factors: "problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of schools districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems," as well as "the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system." *Brown II*, 349 U.S. at 300–01, 75 S. Ct. 753. "To guide courts in determining whether the vestiges of *de jure* segregation have been eliminated as far as practicable, the Supreme Court has identified several aspects of school operations that must be considered,

18

commonly referred to as the *Green* factors: student assignment, faculty, staff, transportation, extracurricular activities, and facilities." *Anderson v. Madison Cnty. Sch. Dist.*, 517 F.3d 292, 298 (5th Cir. 2008) (internal footnote omitted); *see Freeman*, 503 U.S. at 483, 112 S. Ct. 1430 (in turn citing *Green*, 391 U.S. at 435, 88 S. Ct. 1689).

This Court notes that complete racial balance is not required to achieve good faith compliance. *See Anderson*, 517 F.3d at 298 (citing *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 227–28 (5th Cir. 1983)). Instead, courts must look to whether "the school district has done all that it could to remedy the segregation caused by official action." *See id.* (quoting *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991) (internal quotation marks omitted)).

## C. Analysis

On May 2, 2011, the Government filed a motion for further relief [5], requesting that this Court enforce its prior desegregation Orders and federal law. The motion presently before the Court concerns only whether the District is in violation of extant desegregation Orders. The District has not moved to be declared unitary and for the Court to relinquish judicial control over all aspects of the District's efforts. Although the Court is not asked to determine whether the District has achieved unitary status, the Court must answer the same question posed in such a case; that is, is the District in good faith compliance with the prior desegregation Orders of this Court?

The Government maintains that, on September 12, 2006, it initiated a periodic review of the District to assess whether the District was in compliance with the Court's extant desegregation Orders. In furtherance of this review, the Government requested certain information from the District and conducted a site visit from May 11 to May 14, 2008. The

19

Government contends that the District's responses and information obtained during the site visit revealed numerous violations of the District's desegregation obligations, particularly in the areas of student assignment and faculty assignment. The Government issued the District a notice of violations letter and requested that the District take steps to comply with extant desegregation Orders and federal law. The Government maintains that the District has failed to dismantle racially identifiable and one-race schools that are vestiges of the District's former dual school system. The Government further asserts that although most schools in the District are within 2.5 miles of each other, 7 of the District's 10 schools are either racially identifiable as Caucasian schools or African-American schools traceable to the District's former dual school system. Also, the Government alleges that the District has reinforced the racial identity of its schools through the race-based assignment of faculty and staff to District schools. The Government maintains that a satisfactory realignment of the District's schools likely would remedy all perceived violations of the prior desegregation Orders.

On August 18, 2011, the District argued in response [26] that the Court should find the District in good faith compliance with prior desegregation Orders and dismiss the Government's motion for further relief. The District contends it has demonstrated good faith by its implementation of attendance zones, the magnet school program, and the majority-to-minority transfer program. The District contends that only one of its non-magnet schools is majority Caucasian and, further, that the District's desegregation obligations do not include maintaining a particular racial quota. The District contends that its overall racial balance is greater than 5 southern school districts already declared unitary. The District further argues that it "is one of the few school districts in the country with increasing interracial exposure, despite the fact that its overall percentage of white students has steadily declined." Dist.'s Resp. Opp'n to Gov't's

Mot. for Further Relief [26] ¶ 4. The District contends that "the long[-]term effect of any mandatory desegregation plan proposed by the [G]overnment would ultimately be the loss of desegregation." *Id.* ¶ 6. The District argues that it has made good faith efforts to comply with the faculty and staff assignment plan mandated by the prior desegregation Orders by taking certain measures, such as extensively recruiting minorities to faculty positions. Finally, the District argues that "the Government's proposals in this case evince a limited understanding of the Cleveland community and of the operation of its school system. This is precisely the reason the Supreme Court has placed significant emphasis on the need to return school districts under desegregation orders to local control." Dist.'s Mem. Br. Supp. Resp. Opp'n to Gov't's Mot. for Further Relief [27] at 21.

Because the Government solely challenges the District's compliance with respect to student assignment and faculty assignment, the Court will cabin its analysis to those two *Green* factors.

### 1. Student Assignment

First, the Court will examine the attendance patterns of the District's schools, as "a critical beginning point [in desegregation cases] is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole." *See Freeman*, 503 U.S. at 474, 112 S. Ct. 1430. Such an "inquiry is fundamental, for under the former *de jure* regimes racial exclusion was both the means and the end of a policy motivated by a disparagement of, or hostility towards, the disfavored race." *Id.*, 112 S. Ct. 1430. "A central purpose of desegregation decrees was to prevent, to the extent practicable and not attributable to demographic changes, the continued existence of one-race schools." *United States v. Texas*, 457

F.3d 472, 480 (5th Cir. 2006). The term "one-race schools" generally refers to schools with a student body of at least 90% African-American or 90% Caucasian students. *See Flax v. Potts*, 915 F.2d 155, 161 n.8 (5th Cir. 1990) (internal citations omitted). *See, e.g., Swann*, 402 U.S. at 26, 91 S. Ct. 1267; *Tasby v. Black Coal. to Maximize Educ.*, 771 F.2d 849, 851 n.3, 855 (5th Cir. 1985) (discussing predominantly African-American schools in school district comprised of 50% African-American students and 23% Hispanic students); *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 226 (5th Cir. 1983) ("[I]n seeking reduction in the number of one-race schools, the district court could not ignore diminished white enrollment in [the school district] and substantial immigration of Hispanic students."); *but see United States v. Texas*, 457 F.3d at 480 (noting that a school with no larger percentage of African-American students than 56% was "nowhere close to becoming a one-race school"). Racial imbalance in school attendance is "not tantamount to a showing that the school district [is] in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation." *Id.* at 494, 112 S. Ct. 1430 (citing *Swann*, 402 U.S. at 31–32, 91 S. Ct. 1267); *see also Anderson*, 517 F.3d at 299 (citing *Cavalier ex rel. Caddo Parish Sch. Bd.*, 403 F.3d 246, 260 (5th Cir. 2005) (racial imbalance is relevant to the inquiry, but "racial imbalance, without more, does not violate the Constitution")). With all this in mind, the Court turns its attention to the racial percentages of each school within the District for the 2011–2012 school year, as shown in the following table:

| SCHOOL | % AFRICAN AMERICAN | % CAUCASIAN | % HISPANIC | % ASIAN | % NATIVE AMERICAN |
|---|---|---|---|---|---|
| Cleveland High School | 46.9% 263 | 47.4% 266 | 3.6% 20 | 2.1% 12 | 0.0% 0 |
| Eastside High School | 99.7% 344 | 0.0% 0 | 0.0% 0 | .3% 1 | 0.0% 0 |
| Margaret Green Junior High School | 45% 224 | 49% 244 | 4.2% 21 | 1.4% 7 | .4% 2 |
| D.M. Smith Middle School | 99.7% 307 | .3% 1 | 0.0% 0 | 0.0% 0 | 0.0% 0 |
| Parks Elementary School | 43.8% 155 | 50% 177 | 4.5% 16 | 1.1% 4 | .6% 2 |
| Pearman Elementary School | 67.8% 192 | 24.4% 69 | 7.1% 20 | .7% 2 | 0.0% 0 |
| Cypress Park Elementary School | 99.3% 292 | 0.0% 0 | .7% 2 | 0.0% 0 | 0.0% 0 |
| Nailor Elementary School | 97.1% 299 | 1.6% 5 | 1.3% 4 | 0.0% 0 | 0.0% 0 |
| Bell Academy | 64.9% 214 | 33.6% 111 | .6% 2 | .6% 2 | .3% 1 |
| Hayes Cooper Center | 42% 152 | 52.5% 190 | 3.9% 14 | 1.6% 6 | 0.0% 0 |
| TOTAL: 3,643 students | 67% 2,442 | 29.2% 1,063 | 2.7% 99 | .9% 34 | .2% 5 |

As the above chart shows, the Cleveland School District is comprised of 67% African-American students, 29.2% Caucasian students, 2.7% Hispanic students, .9% Asian students, and .2% Native American students. The Court must compare the racial ratios at each individual school with the districtwide racial ratios to determine whether racial imbalance is present. Of course, the degree of racial imbalance is but one factor in the analysis; the focus must be on whether any racial imbalance is the result of demographic factors or a constitutional violation.

The Court will first analyze the District's high schools; second, the junior high schools; and third, the elementary schools.

High Schools

The District's two high schools are Cleveland High School and Eastside High School.[3] Cleveland High was a Caucasian school in the former *de jure* segregation system, positioned on the west side of the railroad tracks. The school was 75% Caucasian as late as 1983. Now, the school is attended by 46.9% African-American students and 47.4% Caucasian students. The District reports that between 2005 and 2008, 17 children in racially identifiable African-American schools transferred to the school. In the 2009–2010 school year alone, 23 children transferred from the all-African-American Eastside High to Cleveland High using the majority-to-minority policy. The Government contends that Cleveland High remains racially identifiable as a Caucasian school due to its student enrollment. Far from it; Cleveland High likely resembles the educational utopia contemplated by *Brown I*: African-American and Caucasian students coexist in a learning experience that should result in optimal social development, based on the social science data related in *Brown I*. However, Eastside High School is more troubling.

Eastside High was an African-American school in the former *de jure* segregation system, positioned on the east side of the railroad tracks. After the District received authority in the 1995 Consent Order to implement a magnet school at the high school level, the District applied for and received funding to establish a magnet program at Eastside High to increase desegregation of the high school. The District reports that the magnet program, which currently operates without funding from the Department of Education, consists of a visual and performing arts program for grades 9 through 12 and an international baccalaureate diploma program for grades 11 and 12.

---

[3] The District also has a high school level "votech" school, Cleveland Career Development and Technology Center.

Dist.'s FY 2007 Application for Grants [6-15] at 32. In addition to Eastside High's magnet program, in an effort to attract minority students to the school, the District "buses" students who attend Eastside High and Cleveland High to each other's schools to take certain classes in an attempt to enrich and equalize the educational experience of the two schools. Despite the District's attempts to attract Caucasian students to the majority-African-American Eastside High, today, the school is attended by 99.7% African-American students. The Court notes that demographic factors may affect the attendance pattern at Eastside High. However, no data before the Court shows that Eastside High was at any point desegregated and demographics intervened. Simply, Eastside High has never been anything other than a racially identifiable African-American school. Also troubling is the distinct racial composition of the District's two high schools despite the fact that the schools are only approximately 1.3 miles apart.

<u>Junior High Schools</u>

The District's two junior high schools are Margaret Green Junior High School and D.M. Smith Middle School[4]. Margaret Green Junior High was initially a *de jure* Caucasian school. The 1992 Consent Order required the District to develop a plan to desegregate the still-majority-Caucasian Margaret Green Junior High. In compliance with this directive, today, Margaret Green Junior High is essentially racially balanced with an attendance of 45% African-American students, 49% Caucasian students, 4.2% Hispanic students, 1.4% Asian students, and .4% Native American students. The District reported that between 2005 and 2008, 55 children transferred to Margaret Green Junior High from traditionally African-American schools, and in the 2009–2010 school year alone, 33 children in the D.M. Smith Middle School zone chose to attend Margaret Green Junior High by utilizing the majority-to-minority transfer policy.

---

[4] D.M. Smith Middle School was formerly known as Eastwood Junior High School.

The 1992 Order required the District to develop a plan to desegregate the traditionally African-American D.M. Smith Middle School, then known as Eastwood Junior High School. After the District received authority in the 1992 Consent Order to implement a magnet school program at the junior high level to promote greater desegregation, the District applied for and received funding to establish the magnet program at D.M. Smith Middle School. The magnet program, which currently operates without funding from the Department of Education, consists of an arts and international baccalaureate program that serves grades 7 to 8 in an attempt to reduce minority group isolation at the junior high level. *See* Dist.'s FY 2007 Application for Grants [6-15] at 32. Despite D.M. Smith Middle School's magnet program, the school remains a racially identifiable African-American school with an attendance of 99.7% African-American students. As with Eastside High School, no data before the Court shows that D.M. Middle School was ever meaningfully desegregated. Similar to the District's high schools, although the junior high schools are racially distinct, the two schools are only approximately 1.2 miles apart.

Elementary Schools

The District's six elementary schools are Parks Elementary School, Pearman Elementary School, Cypress Park Elementary School, Nailor Elementary School, Bell Academy, and Hayes Cooper Center.[5] Prior to the 1969 Order, Pearman and Parks were *de jure* Caucasian schools, while Nailor, Bell, and Hayes Cooper were *de jure* African-American schools. The 1989 Consent Order required the District to implement a magnet school at Hayes Cooper or one of the other predominantly African-American elementary schools; at that time, the District chose to implement a magnet program at Hayes Cooper. Later, the District implemented magnet programs at both Nailor and Bell.

---

[5] The District also has an elementary-level alternative school, Walter C. Robinson Achievement Center.

Parks, a former *de jure* Caucasian school, was 94% Caucasian as late as 1983, but is currently attended by 43.8% African-American students, 50% Caucasian students, 4.5% Hispanic students, 1.1% Asian students, and .6% Native American students. In the 2009–2010 school year, 13 African-American children transferred from their neighborhood zone to Parks. Although more Caucasian than African-American students attend Parks (177 to 155, respectively), overall, the District has made strides in achieving racial balance at Parks.

Pearman, a former *de jure* Caucasian school, is currently attended by 67.8% African-American students, 24.4% Caucasian students, 7.1% Hispanic students, and .7% Asian students. The school is now attended by more African-American than Caucasian students, making it no longer recognizable as a Caucasian school. Also, the school has achieved near-perfect racial balance according to the 67% African-American/29.2% Caucasian districtwide racial split, a testament to its desegregation success.

Nailor was a former *de jure* African-American school. After the District received authority in the 2006 Consent Order to implement a magnet school program at the elementary school level, the District applied for and received funding to establish the magnet program at Nailor. The grant funded programs in art, dance, theatrer, and music, and also included funding for capital improvements at Nailor. The magnet program was designed "to bring students of different social, economic, racial[,] and ethnic backgrounds together in an educational environment [to] be of benefit to all students" and "ensure that there is a racially integrated student body." H.M. Nailor Magnet Center Proposal [6-16] at 2. On January 15, 2010, the District's Board of Trustees unanimously voted to close one of the two classroom wings at the original Nailor and reassign the school's third, fourth, and fifth grade students to Cypress Park Elementary School. The District maintained that the original Nailor school should be closed

because the building "[was] in deplorable condition and [was] not worth saving." *See* Dist. Letter to Gov't [6-19] at 2. After the implementation of the magnet program at Nailor, the school is now attended by 97.1% African-American students, 1.6% Caucasian students, and 1.3% Hispanic students. The magnet program currently operates without funding from the Department of Education. Despite the District's efforts to attract Caucasian students to Nailor, the school remains a racially identifiable African-American school.

Cypress Park was a school built on the east side of the tracks after the Court ordered desegregation. It is attended by 99.3% African-American students and .7% Hispanic students.

Hayes Cooper, a former *de jure* African-American school, was reopened as a magnet school in an attempt to promote desegregation in accordance with the 1989 Consent Order. Hayes Cooper was required to establish an attendance policy of a 50% African-American and 50% Caucasian student body, with an allowable deviation of ± 5%. The theme chosen for the school was math, science, and technology, and the school became an authorized international baccalaureate primary years program. The school is now attended by 42% African-American students, 52.5% Caucasian students, 3.9% Hispanic students, and 1.6% Asian students. The District reported that Hayes Cooper operated without the aid of any Department of Education magnet funding from 2007–2010 cycle. Despite this fact, the school is no longer a racially identifiable African-American school and has achieved racial balance. Additionally, the school has scored in the highest percentile on state tests in the last several years and was named a Department of Education Blue Ribbon School. The Government concedes: "As the District's enrollment data indicates, the Hayes Cooper Center is a magnet school success. The school annually attracts more applicants than available slots, and it has maintained a diverse student

body" in accord with prior desegregation Orders. *See* Gov't's Mem. Br. Supp. Mot. for Further Relief [6] at 16.

The original Bell Elementary was a former *de jure* African-American school that remained an all-African-American school in the wake of desegregation efforts. On the District's own initiative, it closed Bell at the conclusion of the 2009–2010 school year for the purpose of later reopening the school as a "dedicated" magnet to enhance integration, replicate the success at Hayes Cooper, and create more diversity districtwide. *See* Dist. Letter to Gov't [6-19] at 2; Dist.'s Mem. Br. Supp. Resp. Opp'n to Gov't's Mot. for Further Relief [27] at 7. Students at the original Bell Elementary had the choice to remain at Bell as part of the newly developed magnet program or be reassigned to any of the District's other elementary schools, with the exception of Hayes Cooper. Students were dispersed to three other elementary schools: Parks, Pearman, and Cypress Park. When the District reopened Bell as a magnet in the fall of 2010, it was without the assurance of magnet funds from the Department of Education. However, by the close of the 2010–2011 school year, the District had received a sizeable three-year magnet grant from the Department of Education. The District reports that Bell is currently open to all children of the District on a lottery basis, with a student population intended to be reflective of the District's overall student population ±15%. Its student body was 80% African-American and 20% Caucasian in the 2010–2011 school year, but is currently 64.9% African-American, 33.6% Caucasian, .6% Hispanic, .6% Asian, and .3% Native American. Although the school is still attended by more African-American than Caucasian students, the racial percentages constitute racial balance according to the 67% African-American/29.2% Caucasian districtwide racial ratio.

Overall Assessment of Student Assignment

Acknowledging the continuing racial identifiability of certain District schools, the District has taken several steps to remedy the vestiges of past discrimination, including the implementation and further development of the majority-to-minority transfer program and the magnet program. Despite the District's efforts at achieving integration, some of its stalled progress may be the result of demographic factors outside its control. However, other stalled progress may be the result of having never successfully eradicated the vestiges of the dual school system.

i.     *Majority-to-Minority Transfer Program*

In accordance with the 1969 Order, the District implemented the majority-to-minority transfer program, whereby a student whose race is in the majority at his or her assigned school may transfer to a school where his or race is in the minority. Over the ensuing decades, the District has improved the transfer program in accordance with subsequent desegregation Orders. In 1971, only 26 students had utilized the majority-to-minority transfer program. By 1975, that number had risen to 162 students, a six-fold increase. By 1980, 192 students had utilized the transfer program. In 1995, 417 students utilized the transfer program. In the 2010–2011 school year, 229 students utilized the transfer program. In accordance with the desegregation Orders, the District has published annual notices and newspaper advertisements explaining the majority-to-minority transfer program, as well as its application process and transportation policy.

ii.    *Magnet School Program*

The District has a superb magnet school program that stretches across five district schools at the high school, junior high, and elementary school levels. Although the Government claims that the magnet school program is insufficient to fix the perceived *de facto* segregation

problem, the Court notes that a magnet program's failure to attract a significant number of minority students is not necessarily dispositive of the issue. *See Anderson*, 517 F.3d at 298, 300 (stating that a school district's good faith compliance with prior desegregation orders was illustrated in part "by the fact it has devoted a considerable amount of resources to renovating [a high school] and implementing a new magnet program there," despite the school's failure to attract Caucasian students due to "demographic and cultural factors"). The magnet school program is particularly strong evidence of the District's effort to comply with prior desegregation Orders and federal law.

    *iii.    Demographic Factors*

A school district is under no duty to remedy racial imbalance caused by demographic factors. Although demographics can dictate the racial composition of schools, *see generally Freeman*, 503 U.S. 467, 112 S. Ct. 1430, so, too, can the racial composition of schools dictate "the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods," *Swann*, 402 U.S. at 21, 91 S. Ct. 1267. *See also Ross v. Houston Indep. Sch. Dist.*, 669 F.2d 218 (5th Cir. 1983). Because "[t]he demographic changes that occurred during the course of the desegregation order are an essential foundation for the District Court's analysis of the current racial mix of [the District], *see Freeman*, 503 U.S. at 476, 112 S. Ct. 1430, the Court now turns its attention to the demographics of the District.

Since 1980, the District's overall population has steadily declined, though the percentage of Caucasians has decreased at a faster pace than the percentage of African Americans. The Caucasian population situated to the west of the railroad tracks has steadily declined after integration. This demographic change cannot be the fault of the District and *de jure* segregation, as the change occurred subsequent to Court-ordered integration. According to 2000 Census

31

data, the population of the District's territory was 47.3% Caucasian and 50.9% African-American. The total population in the District's geographical territory as of 2010 was approximately 51.6% African American and 45.5% Caucasian. During the 2011–2012 school year, the District's total student enrollment was 3,643, of which 67% (2,442) were African American; 29.2% (1,063) were Caucasian; 2.7% (99) were Hispanic; .9% (34) were Asian; and .2% (5) were Native American.[6]

The Government contends that the District is committed to operating the east side and west side schools as separate entities. All prior desegregation Orders have upheld the District's original high school and junior high school zones positioned east or west of the railroad tracks, and located approximately 1.3 miles from each other. But certainly, the Court finds it somewhat peculiar that the District at one point proposed merging D.M. Smith Middle School (a traditionally African-American school) with Eastside High School (a traditionally black school dating back to the days of *de jure* segregation) to "save the District considerable funds in teachers and administrators." Dist. Letter to Gov't [6-19] at 2. The 1989 Consent Decree mandates that "[t]he Cleveland School District shall not engage in any conduct or activity that will reestablish the dual school structure." *See* Senter 1989 Consent Order [12] at 17. The Court notes that in the days of *de jure* segregation, Eastside High School included grades 7 through 12, and the District's proposed merger likely would have resulted in a revival of a one-race school for grades 7 through 12. This is alarming in light of applicable United States Supreme Court precedent guiding us that

> [s]chools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation . . . . [I]t should be clear that the existence of some small number of one-

---

[6] The District's Board of Trustees is comprised of two African-American members and three Caucasian members. Both the President of the Board and the Superintendent of schools are African American.

race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No per se rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

*Swann*, 402 U.S. at 25–26, 91 S. Ct. 1267 (emphasis added). Due to an outpouring of concern by the parents of D.M. Smith Middle School students, the Board of Trustees elected, wisely, not to implement the plan to consolidate the junior high school and high school located on the east side of the tracks, and to instead conserve funding by allowing one principal to oversee Margaret Green Junior High and Cleveland High.

It is notable that despite a Caucasian population in the attendance zones of the African-American D.M. Smith Middle School and Eastside High School, neither has attracted a significant Caucasian enrollment. In 1969, there was at least a 17% Caucasian population in the City of Cleveland on the east side of the railroad tracks and an additional 365 Caucasians living to the east of the railroad tracks in areas within the District but outside the city limits. *See* Norwood Report [27-3]. In 1970, there was at least a 15-to-20% Caucasian population on the east side of the railroad tracks. According to 1975 Census data, a 26% Caucasian population lived in the city limits east of the railroad tracks. The District acknowledges that the Caucasian

students projected to attend school on the east side never enrolled. The District contends that the reason is that those students instead chose to enroll in private schools. However, the Government maintains, and verifies with deposition testimony from school officials, that a likely reason for the lack of Caucasian enrollment was instead that "for years, the District violated the 1969 Order by allowing Caucasian families residing on the east side to establish a fictitious 'weekday residence' on the west side of the railroad tracks so that their children could attend the predominantly white west side schools." *See* Gov't's Reply Br. Supp. Mot. for Further Relief [31] at 12 n.5; Direct Examination of John J. Arnold, Sch. Superintendent, Evidentiary Hr'g [6-5] at 76–80; Test. of Willie Simmons, Sch. Trustee [6-6]. The District maintains it has fully rectified this problem and now requires each student to attend the school in his or her permanent zone of residence. However, Eastside High School and D.M. Smith Middle School have remained unable to attract Caucasian student enrollment, despite the District's recent demonstrated efforts to do so. Racial balancing is, of course, not to be achieved solely for its own sake; also, complete racial balance is not necessary for the District to achieve good faith compliance. The importance of racial balancing is debated among desegregation scholars, as summarized by the United States Supreme Court:

> Some [scholars] have concluded that black students receive genuine educational benefits. *See, e.g.*, Crain & Mahard, *Desegregation and Black Achievement: A Review of the Research*, 42 LAW & CONTEMP. PROBS. 17, 48 (Summer 1978). Others have been more circumspect. *See, e.g.*, HENDERSON, GREENBERG, SCHNEIDER, URIBE, & VERDUGO, HIGH–QUALITY SCHOOLING FOR AFRICAN AMERICAN STUDENTS, IN BEYOND DESEGREGATION 162, 166 (M. Shujaa ed. 1996) ("Perhaps desegregation does not have a single effect, positive or negative, on the academic achievement of African American students, but rather some strategies help, some hurt, and still others make no difference whatsoever. It is clear to us that focusing simply on demographic issues detracts from focusing on improving schools"). And some have concluded that there are no demonstrable educational benefits. *See, e.g.*, ARMOR

& ROSSELL, DESEGREGATION AND RESEGREGATION IN THE PUBLIC SCHOOLS, IN BEYOND THE COLOR LINE: NEW PERSPECTIVES ON RACE AND ETHNICITY IN AMERICA 219, 239, 251 (A. Thernstrom & S. Thernstrom eds. 2002).

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 761, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007). Dr. Rossell, whom the District has retained as an expert, reports that she analyzed the degree of racial imbalance in the District, both districtwide and within each of the attendance zones, using indices of dissimilarity and interracial exposure. Both of these indices are commonly utilized tools in the desegregation analysis.[7]

Rossell explains that the dissimilarity index is a common measure of racial balance which indicates how races in a school district are distributed across schools. The interracial exposure index measures the average percent Caucasian enrollment in the typical African-American school. Rossell reports that the District far outpaces all other Delta school districts in the percentage of Caucasian students in the average African-American child's school. Rossell further reports that the District has more than four times the interracial exposure of the second-best school in the region, and currently has an overall racial balance greater than five southern school districts already declared unitary, including Mobile, Alabama; DeKalb County, Georgia; Fulton County, Georgia; Kansas City, Missouri; and Dallas, Texas. Rossell reports that Cleveland School District is one of the few school districts in the country with increasing interracial exposure, despite the fact that the overall percentage of Caucasian students has steadily declined. Rossell calculates that if trends continue, the difference between the percentage of Caucasians in the school system as a whole, and the percentage of Caucasians in

---

[7] The Court notes that despite the Government's protestations to the contrary, Dr. Rossell has been hired by both the Government and various school districts in other school desegregation cases to provide data and analysis and is considered a desegregation scholar. *See, e.g., Anderson*, 517 F.3d 292 (5th Cir. 2008); *United States v. Pittman*, 808 F.2d 385 (5th Cir. 1987); *Davis v. E. Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425 (5th Cir. 1983). Although the Court does not rely solely on Dr. Rossell's data in reaching its decision, the Court has reviewed her report along with the other data and arguments presented by parties.

the average African-American child's school, will soon disappear. She states that the Madison County School District was declared unitary in 2006, despite the presence of four schools in that district with more than 90% African-American students and the lack of a plan implemented since 1970. The District argues strenuously against mandatory desegregation plans, stating that studies have shown declines in both racial balance and interracial exposure within a decade of implementing mandatory desegregation plans. The District contrasts this possible result with the result from continuing to utilize voluntary neighborhood schools, which the District maintains is stable race enrollments.

Taking all this into account, the Court finds the progress the District has made towards eradicating the vestiges of past discrimination, particularly with its magnet school program, is nothing short of remarkable. As the District points out, none of this Court's prior desegregation Orders established a racial quota for student assignment. A school district is "entitled to a rather precise statement of its obligations under a consent decree." *Missouri v. Jenkins*, 515 U.S. 70, 101, 115 S. Ct. 2038, 132 L. Ed. 2d 63 (1995) (internal citation omitted). Also, "the presence of several schools in a district with a high percentage of students of a particular race does not preclude a finding of unitary status." *Anderson*, 517 F.3d at 299 n.5; *see Ross*, 699 F.2d at 226–28 (school district declared unitary despite fact that 55 of school district's 226 schools had 90% or more African-American students). All desegregation case law shows that control should be returned to the District as soon as possible, as the District itself is in the best position ultimately to determine what is best for the success of its school system as a whole. Overall, the Court finds that with respect to student assignment, the District should submit a plan for improving integration in only Eastside High School and D.M. Smith Middle School. The Court finds the District has demonstrated a good faith effort to comply with prior desegregation Orders and

federal law with respect to its elementary schools. The Court acknowledges that "courts should withdraw supervision of school districts as quickly as possible because local autonomy of school districts is a vital national tradition." *Cavalier*, 403 F.3d at 265–66 (quoting *Freeman*, 503 U.S. at 490, 112 S. Ct. 1430) (internal quotation marks omitted). The Court is of the opinion that the District has taken significant measures to comply with the previous Court Orders insofar as student assignment to elementary schools is concerned. Accordingly, the Court does not find that further adjustment is required at this time relative to elementary school student assignment.

### 2. Faculty and Staff

The Government contends that the District "has reinforced the racial identity and reputation of the east side and west side schools through its race-based assignment of faculty and staff" in violation of prior desegregation Orders. *See* Gov't's Mem. Br. Supp. Mot. for Further Relief [6] at 41. The District argues in response [26] that it has made good faith efforts to comply with desegregation mandates and has extensively recruited minorities to faculty and staff positions. The 1969 Order set forth the requirement that for the 1969–1970 school year, at least one of every six classroom teachers (or 16.7%) was required to be of a different race than the majority race of the school, within the full extent of the District's ability, including the availability of qualified personnel. Subsequent to that school year, the District was required simply to have full faculty and staff desegregation, to such an extent that the faculty at each school is not identifiable to the race of the majority of the students in any such school. This directive was expounded in the 1989 Consent Order as follows: "Specifically, the faculty and professional staff at each school to the extent feasible shall reflect the districtwide ratio of minority and nonminority faculty and professional staff." Senter 1989 Consent Order [12] at 2 (emphasis added). The District was to make any transfers necessary to achieve the proper

37

desegregation of the faculty, staff, and administrators by the fall of 1990, and if subsequent encouragement of voluntary transfers were insufficient to achieve the required desegregation, reassignments were to be made at the start of the 1990–1991 school year. The District was further ordered not to discriminate on the basis of race, color, or national origin in hiring, and to develop a plan to recruit qualified African-American professionals.

The Government contends that the District's "schools with a racially identifiable white student body have a disproportionately high percentage of white faculty and administrators, while schools with an overwhelmingly African-American student population have a disproportionately high percentage of African-American teachers and administrators." Gov't's Mem. Br. Supp. Mot. for Further Relief [6] at 42. Certainly, the Court acknowledges that "where it is possible to identify a 'white school' or a '[black] school' simply by reference to the racial composition of teachers and staff . . . a prima facie violation of substantive constitutional rights under the Equal Protection Clause is shown." *See Swann*, 402 U.S. at 18, 91 S. Ct. 1267. The Court's prior desegregation Orders require that the District have a faculty and staff ratio that reflects the districtwide ratio to the extent feasible, and that no school be racially identifiable to the race of the majority of the students at the particular school. Data for the 2010–2011 school year indicates that districtwide, 36% of teachers were African American, and 64% of teachers were Caucasian. Thus, each individual school must, to the extent feasible, have a faculty ratio that reflects this districtwide faculty ratio of 36% African-American/64% Caucasian. Not a single school within the District reflected the districtwide faculty ratio in the 2010–2011 school year. However, the District is fully desegregated with respect to the composition of administrative staff, as 53% of all building-level staff are African American. Also, the District's pay scale ensures that there is no disparity of pay among schools. The District has noted there

38

are three African-American principals and three Caucasian principals in elementary education and five African-American principals and one Caucasian principal in secondary education. *See* Dist. Letter to Gov't [6-12] at 65. The District points out that it has a 35% African-American instructional staff, while the State of Mississippi as a whole has only 25% African-American teachers. The District also points out that "using a ± 20% measure of deviation, 60% of the District's schools strictly comply" with the 1989 Consent Order, thus conceding that 40% of the District's schools do not comply with the Order even considering the ± 20% measure of deviation, which is not accounted for in any of the prior desegregation Orders. *See* Dist.'s Resp. Opp'n to Gov't's Mot. for Further Relief [26] ¶ 8.

The Court finds that the District has <u>attempted</u> to comply with the prior desegregation Orders by hiring and retaining minority teachers and administrators and engaging in activities to recruit qualified African-American applicants, including targeting predominantly African-American colleges and universities. *See Anderson*, 517 F.3d at 298 (stating that school district's good faith compliance with prior desegregation orders was evidenced in part by the fact that school district "implemented procedures to recruit minority teachers"). The Court recognizes the difficulties the District faces in attempting to achieve a racially balanced faculty in each school. For instance, the District has been ordered to seek out qualified minority applicants, but at the same time, not to discriminate in hiring practices by preferring race. However, despite these inherent difficulties, the District could transfer faculty members across the District to achieve a more racially balanced faculty or propose some other idea to achieve this end. Accordingly, the District should propose a plan to achieve the mandated racial balance among faculty in the District, keeping in mind the plan should provide real prospects for achieving a ratio of African-

American to Caucasian teachers and administrators in each school to approximate the race ratio throughout the districtwide school system.

### III.    CONCLUSION

In sum, the Court notes that it is not our office to fashion a remedy at this juncture. Instead, the Court has been asked to determine whether the Cleveland School District is in violation of extant desegregation Orders and federal law. The Court finds that the District has made great progress towards desegregating its schools and eliminating the vestiges of the dual school system. However, the District's efforts must currently remain under judicial control.[8] The Court orders the District to submit a proposed plan to further integrate Eastside High School and D.M. Smith Middle School.[9] The Court further orders the District to submit a proposed plan to achieve racial balance among its faculty. The District's plan shall be filed no later than May 15, 2012.

Once the District files its plan, the Government shall have thirty (30) days to review the plan and confer with the District to resolve any objections to the plan. If the Government and the District are unable to agree on a plan, the Government shall file written objections within twenty (20) days of the expiration of the resolution period. If necessary, the Court will schedule a hearing to resolve the Government's objections to the plan. Once the Court approves the plan, the District shall implement the plan before the commencement of the next school year.

---

[8] The District should note that it can jointly move with the Government for the District to be declared unitary once it operates the school system for a period of 3 years in full compliance with the provisions of the Orders and engages in no instances of intentional discriminatory activity. The motion for unitary status should state that the District has attained unitary status, eliminated all vestiges of any past discrimination, and fully satisfied the judgment of this Court, and that accordingly the injunction entered should be dissolved, the judgment discharged, the jurisdiction terminated, and the case closed and dismissed with prejudice.

[9] One obvious remedy would be consolidation of the two high schools, Eastside High School and Cleveland High School, and consolidation of the two junior high schools, Margaret Green Junior High School and D.M. Smith Middle School.

Thus, the Government's motion for further relief [5] is GRANTED in part and DENIED in part; the Plaintiff's motion to substitute party plaintiffs [40] is GRANTED.

A separate Order in accordance with this opinion shall issue this day.

All Orders not inconsistent herewith remain in full force and effect.

THIS the _28th_ day of March, 2012.

Glen H. Davidson

SENIOR JUDGE