**Second Supplemental Report on
Cleveland, Mississippi's Integration Progress and Proposed New Plan**

Christine H. Rossell
Political Science Department
Boston University

A report prepared in the case of
*Cowan and U.S. v. Bolivar County Board of Education, et al.*,

October 2, 2012

**EXHIBIT A**

## Second Supplemental Report on
## Cleveland, Mississippi's Integration Progress and Proposed New Plan

The purpose of this report is to update the Cleveland, Mississippi School District's progress with regard to student integration, to further elucidate the type of plan the Cleveland School District (CSD) proposes, and to point out the problems of alternative plans suggested by the Department of Justice (DOJ). My conclusions are 1) that the Cleveland School District should not have a mandatory reassignment plan implemented at the secondary level as suggested by DOJ since those plans are self-defeating,  2) school integration continues to increase in the district with its neighborhood school plus choice plan, and 3) a restructuring of the current magnet plans at D.M. Smith and Eastside would be more equitable than mandatory reassignments for black students since less than a majority of black parents in other districts support mandatory reassignment. [1]  Moreover, the principals of Smith and Eastside believed that few of their families would support a mandatory reassignment of their children to a west side secondary school.  Finally, I conclude that the magnet restructuring proposed below would be more efficient in attracting white students to the program than the current structure and that these programs are constitutional.

The conclusions and opinions I offer in this report are based on my past experience--25 years of experience designing and analyzing school desegregation plans, 39 years of research on

---

[1] The dozen surveys I have conducted show that in only one year did a majority of black parents support mandatory reassignment. See Christine Rossell, "The Convergence of Black and White Attitudes on School Desegregation Issues During the Four Decade Evolution of the Plans," *The William and Mary Law Review*, January 1995, 36(2): 613-663; Christine Rossell, "The Convergence of Black and White Attitudes on School Desegregation Issues," in *Redefining Equality*, Neal Devins and Dave Douglas (eds.). New York: Oxford University Press; 1998; Christine H. Rossell, "An Analysis of the Court Decisions in *Sheff v. O'Neill* and Possible Remedies for Racial Isolation," *Connecticut Law Review*, vol. 29 (3), Spring 1997: 1187-1233; Christine Rossell and David J. Armor, "Attitudes on Race and Desegregation," in Rossell, Armor, and Walberg, (eds.), *School Desegregation in the 21st Century*, pp. 291-322.  Westport, Ct.: Praeger Publishers, 2002

**EXHIBIT A**

the impacts of school desegregation plans, 33 years of consulting for school districts across the U.S. in connection with educational equity court cases, 25 years of experience designing and analyzing opinion surveys, and 38 years of teaching courses on school desegregation, educational policy, public policy, and research methods. This experience is detailed in my Curriculum Vita which is attached to this report as Appendix 3. My conclusions and opinions, discussed in more detail below, are also based on my analysis of court documents and legal briefs in this and other cases, of reports to the court submitted by the Cleveland School District, and of enrollment by school and by race in the Cleveland School District from 1967-68 to 2011-12 available from the U.S. Office for Civil Rights Survey of Elementary and Secondary Schools (OCR), the Common Core of Data (CCD) maintained by the National Center for Educational Statistics, and the district's reports to the court. I also rely on student data in other school districts obtained from the districts themselves, the Office for Civil Rights and the Common Core of Data.

In addition, on Monday, April 16th, 2012, I, accompanied by school district counsel, visited Bell Elementary, Pearman Elementary, East Side High School, and Margaret Green Junior High School and on Tuesday, April 17th, Cleveland High School, D.M. Smith Junior High, Cypress Park, and Hayes Cooper. I not only toured the schools, looked into every classroom and visited all the common areas (libraries, cafeterias, auditoriums, playgrounds, and gymnasiums), but I talked extensively to the principals of each school about what they thought had made their magnet successful (if that was the case) or not successful. We also talked about what would make magnets in D.M. Smith and East Side successful and how black parents would feel about a mandatory reassignment plan. I, along with school district counsel, also talked to

2

**EXHIBIT A**

school board members and the superintendent, Dr. Jacquelyn C. Thigpen, about these and other issues on Monday, April 16th.

## Student Assignment and the Progress of School Desegregation

As detailed in my earlier reports,[2] the history of school desegregation in the Cleveland, Mississippi School District is similar to that of many other southern school districts. The first relevant court order pertaining to student desegregation occurred in 1969 and was a single neighborhood school plan (as opposed to the previous dual system) with Majority to Minority (M to M) transfers—any student could transfer from a school where his or her race was in the majority to a school where his or her race was in the minority. The court then approved a series of Consent Orders in 1989, 1992, and 1995 that did not change the 1969 neighborhood school plan, but added additional "choice" options and requirements.

Although the Department of Justice's initial motion for further relief implies that Cleveland's plan is unique and inadequate, as of 1991, 51 percent of southern school districts were still being allowed to fulfill their constitutional obligation to dismantle the dual school system by establishing a single set of neighborhood schools, often supplemented by voluntary transfer programs. Thus, the desegregation history of the Cleveland School District is not "unique" as DOJ alleges.

The research that I rely on for this conclusion is a study of 600 school districts randomly selected across the U.S., as well as other data referred to above. The 600 school district study,

---

[2] Christine H. Rossell, "An Analysis of the Department of Justice's May 2, 2011 Motion for Further Relief in Cleveland, Mississippi," a report prepared in the case of *Cowan and U.S. v. Bolivar County Board of Education, et al.*, August 16, 2011;  Christine H. Rossell, "A Supplemental Report on Cleveland, Mississippi's Integration Progress and Proposed New Plan, a report prepared in the case of *Cowan and U.S. v. Bolivar County Board of Education, et al.*, May 15, 2012.

**EXHIBIT A**

commissioned by the U.S. Department of Education (DOE), provides us with the largest national sample and most complete data on school desegregation ever assembled.[3]  The data were obtained from national data sources and extensive questionnaires completed by school administrators, followed up by telephone calls by David Armor or myself.[4]  The questionnaires focused on the source and prevalence of desegregation techniques used in the U.S. through 1991.[5]  This information was then coupled with local and national data sources on enrollment by race (OCR and CCD) to analyze the effectiveness of these desegregation techniques.

The constitutionality of a single set of neighborhood schools, such as the one that the Cleveland School District has, comes from the Supreme Court decision in *Brown v. Board of Education* (1954) that stated that the dual neighborhood school system in the South was a violation of the 14th amendment's equal protection clause[6] and in a 1955 decision, that a permissible remedy was the

> Revision of school districts and attendance areas in compact units to achieve a system of determining admission to the public schools on a nonracial basis.[7]

A slight majority of southern school districts dismantled their dual school system of neighborhoods schools by implementing a single set of neighborhood schools and that was true at least until 1991.  I have continued to follow the law and the research on these issues and I do

---

[3] See Lauri Steel, Roger Levine, Christine H. Rossell, and David Armor, "Magnet Schools and Issues of Desegregation, Quality and Choice, Phase I: the National Survey and In-Depth Study of Selected Districts," a report to the Department of Education, 1993.
[4] David J. Armor and I (Christine H. Rossell) were co-principal investigators on this study.
[5] The sample characteristics and data collection process are described in detail in the following publications: Christine H. Rossell, "The Effectiveness of Desegregation Plans," in C. Rossell, D. Armor, and H. Walberg, (eds.), *School Desegregation in the 21st Century*, pp. 67-118, Westport, Ct.: Praeger Publishers, 2002; David J. Armor and Christine H. Rossell, "Desegregation and Resegregation in the Public Schools," in Abigail Thernstrom and Stephen Thernstrom, (eds.) *Beyond the Color Line*, pp. 219-258. Palo Alto, CA: Hoover Institution Press, 2002;  Christine H. Rossell and David J. Armor, "The Effectiveness of School Desegregation Plans, 1968-1991," *American Politics Research*, (formerly *American Politics Quarterly*) July 1996, 24 (3): 267-302.
[6] *Brown v. Board of Education*, 347 U.S. 483.
[7] *Brown v. Board of Education*, 349 U.S. 294.

**EXHIBIT A**

not know of any mandatory reassignment plan implemented after 1989, perhaps because of the growing recognition that mandatory reassignment plans were self-defeating and perhaps because both black and white Americans had lost interest in being reassigned to a school they did not chose for the purposes of racially balancing it.

As shown in Table 1, the Cleveland School District became more integrated during the 2011-12 school year under its voluntary desegregation plan and maintained that integration in the 2012-13 school year. Not only has the number of whites in the school district increased under the current voluntary desegregation plan from 1047 in 2010-11 to 1107 in 2011-12 to 1111 in 2012-13, as shown in Table 1, but the gap between the percentage white in the school district as a whole and the percentage white in the average black child's school (labeled IEb in Table 1) narrowed in 2011-12 and that was maintained in 2012-13 as shown in Table 1 and Figure 1.[8] In other words, the school district has become more integrated. Perfect integration is when the two lines in Figure 1 meet which seems to be happening.

Table 1 and Figure 2 show that on another measure of integration, the level of racial imbalance (labeled Db in Table 1),[9] declined in 2011-12, but stayed about the same in 2012-13. Put another way, the Cleveland School District is not resegregating.

_____

[8] The formula for interracial exposure is

$$IEb = \frac{\sum_k Nkb\ Pkw}{\sum_k Nkb}$$

where Nkb is the number of black students in a school and Pkw is the proportion white in the same school. This is summed across schools and divided by the number of black students in all schools.

[9] The formula for the level of racial imbalance (called the index of dissimilarity in the school desegregation literature) is

$$Db = \frac{1}{2}\sum \frac{|Wi - Bi|}{|W - B|}$$

**EXHIBIT A**

Although the DOJ contends that Margaret Green JHS and Eastside High are white schools, that is no longer true.  Figure 3 shows the percentage white of Margaret Green Junior High School.  It has declined from 99 percent in 1967 to 50 percent in 2012-13.  For the last three years, it has been a predominantly minority school, but in 2012-13 it became 50-50.  Figure 4 shows the percentage white of Cleveland High School.  It has declined from 99 percent in 1967-68 to 48 percent in 2011-12 and then to 47 percent in 2012-13.

At Eastside High, there is more integration occurring than can be seen by just analyzing school enrollment.  All International Baccalaureate (IB), Advanced Placement (AP) math, and advanced math classes have been transferred to East Side High School as a result of the magnet programs there.  If a white student from Cleveland High wants to take these classes, he or she is bused to East Side High.  As shown in Table 2, White, Black, Hispanic, and Asian students from both East Side and Cleveland High attend these classes and so they are integrated, but this integration is not reflected in the Smith and Eastside school enrollment statistics because enrollment statistics only show the child's full-time school of residence.  There has been an increase in the number of students enrolled in the IB courses and Advanced Courses.  This includes an increase of 26 whites in the IB courses compared to last year.  There is a small decline in the number of white students enrolled in advanced classes, but this could change as more data comes in.  The data in this table show a rich array of advanced math and public speaking/debate courses available to black students and to white students who go to Eastside High School to enroll in these courses since they are not available at Cleveland High.

where Wi is the number of whites in a school and Bi (or Mi) is the number of black students (or minority students) in the same school, W is the number of whites in a school district and B (or M) is the number of black students (or minority students)  in the same school district.  This is summed down all schools and the total divided by 2.

**EXHIBIT A**

Another complaint of DOJ is that the CSD has placed its magnet programs only in black neighborhoods. Indeed, federal courts have approved such plans in Prince George's County, Maryland; Baton Rouge, Louisiana; Knox County, Tennessee; Stockton, California; San Jose, California; Yonkers, N.Y.; Savannah-Chatham County, Georgia; De Kalb, Georgia; Marion County, Florida; Kansas City, Missouri; and St. Louis, Missouri, to name just a few.

The rationale for placing magnet programs in black neighborhoods is two-fold. The first rationale is based on efficiency. Black students will transfer to white schools with only the promise of transportation--across the U.S., M to M programs are utilized almost entirely by black students. As of Fall 2010, the Cleveland School District had 229 black students transferring to white schools through the M to M program. That represents 10 percent of the black student population. There is only one other school district that I am aware of that has had as successful an M to M program and that is De Kalb County, Georgia. The De Kalb M to M program enrolled 13.6 percent of its black students in 1986-87, the year that the court was looking at when De Kalb was declared unitary on student assignment, but it still had many predominantly white schools.

I am not aware of any school district that has been successful in attracting more than a handful of white students to a school in a black neighborhood without putting a magnet program in it. Given limited resources and the goal of desegregation, a rational administrator in a school district under court order would put the magnet programs where they are needed to attract opposite race students. Another efficiency issue has to do with the fact that the motivation for a white to transfer to a black school is diminished if there is a magnet school in a white

7

**EXHIBIT A**

neighborhood. Indeed, my research has shown that there is such a thing as too many magnets and a major problem arises when they are placed in white neighborhoods.[10]

The second rationale for placing magnet programs in black neighborhoods is based on equity. In general, about 10-20 percent of whites express a willingness to enroll their child in a magnet program in a black neighborhood.[11] As of Fall 2012, the Cleveland School District has attracted 17 percent of its white students to magnets in predominantly black neighborhoods. If a magnet program in a black neighborhood is not successful in attracting white students, the program will at least enrich the curriculum of the school in which it is located. For example, Bell Elementary, which attracts more white students each year, (see Figure 5) has a Math, Science, Health, and Wellness program that will enrich the curriculum regardless of whether it attracted whites. Hayes Cooper has a Primary IB program that attracts more white students each year (see Figure 6) and will also enrich the curriculum of the students even if no whites enrolled. Nailor Elementary, Eastside High School, and D.M. Smith Junior High similarly have both an arts curriculum and an International Baccalaureate program[12] that will enhance the education of the students in that school even if no whites are enrolled full-time in the school.

As is suggested from the description of the programs implemented at formerly black schools, the Cleveland School District spends significantly more money on the formerly black schools than on the formerly white schools. Table 2 of my May 15, 2012 supplemental report shows that for elementary schools, the district spends about $1,000 more per pupil and for secondary

---

[10] Christine Rossell, "The Desegregation Efficiency of Magnet Schools," *Urban Affairs Review* (formerly Urban Affairs Quarterly), vol. 38, May 2003: 697-725.

[11] *Supra* note 1.

[12] See http://www.ibo.org/ for more information on the highly acclaimed international baccalaureate program.

**EXHIBIT A**

schools about $3,500 more per pupil in the formerly black schools and that has been true for at least the last three fiscal years.

**Mandatory Reassignment Plans**

It cannot be repeated often enough that there can be no integration without whites. The Cleveland School District is the only school district in the Mississippi Delta with more than a handful of whites.

DOJ's October reply brief once again touts Hattiesburg, Mississippi as an exemplary example of a desegregation plan. As shown in Figure 6 of my initial August 16, 2011 report, and repeated again in this report in Figure 7, Hattiesburg had extensive white flight as I had predicted (see Appendix 1)[13] and is now virtually an all black school system. It is about the same size as the Cleveland School District in enrollment, 5500 compared to Cleveland's 3700 and much smaller in square miles—Cleveland is 109 square miles and Hattiesburg is 40. Most schools in Hattiesburg were very close to each other. Regrettably, the Department of Justice's 1987 plan to mandatorily reassign white students to black schools to achieve racial balance resulted in less integration than when Hattiesburg was found in 1985 to have failed to dismantle the dual school system and ordered to implement a mandatory reassignment plan. Interracial exposure at the time of this finding in 1985 was 30 percent white in the average black child's school and the school district's percentage white was 43 percent. Only four years later in 1989, it was 29 percent white in the average black child's school and the district's percentage white had fallen to 31 percent white. The schools did maintain a fair amount of racial balance because when all

---

[13] Hattiesburg and Natchez-Adams, Mississippi are the only cases in Appendix 1 because they are the only cases where a mandatory reassignment was chosen by the court over a voluntary magnet school plan that I helped design.

**EXHIBIT A**

schools are black, all schools are racially balanced. That is, however, not what most people think of when they think of integration.

Figure 7 looks at the Hattiesburg district as a whole. In Figure 8, I compare the schools in 1982[14] before the 1987 DOJ plan was implemented and in 2010, the latest year for which I have data. Of the 15 schools that existed in 1982, five were at or above 90 percent black. Among the 15 schools, half were closed over time and all but two of those were black schools. By 2010, seven schools (two more than existed in 1982) were at or above 90 percent black. Again, this is not what most people would think is an improvement in integration.

In short, Hattiesburg is one of the many examples of the tragedy of mandatory reassignment plans. Mandatory reassignment plans are only mandatory for the poorest people in a school district. Everyone else has a choice—private school or refusing to move into the school district if they have school age children (non-entrance).

Figure 9 shows another school district in Mississippi that was ordered to implement a DOJ mandatory reassignment plan. As shown in Figure 9, the Natchez-Adams School District was ordered to implement a plan in 1989 that racially balanced the schools, despite having implemented such a plan in 1969 (see the third page of Appendix 2) which produced extensive white flight. In 1968, when the first mandatory reassignment plan was drawn up, the school district was 43 percent white and 57 percent black. The 1969 mandatory reassignment plan produced white no-show rates[15] of an average 65 percent when a white student was reassigned to a formerly black school and 35 percent when a white student was allowed to stay at their

---

[14] I would have used enrollment data for 1986, but the data is from the semi-annual Office for Civil Rights Elementary and Secondary Schools Civil Rights Survey which is a sample of school districts. Hattiesburg was not in the sample for 1984 or 1986. The data for 2010 come from the Mississippi Student Information System.
[15] A no-show rate is the percentage of white students that did not show up at the school they were assigned to in the desegregation plan.

EXHIBIT A

formerly white school but black students were being bused in. White students whose school was not part of the 1969 mandatory plan lost only 2-3 percent of their projected white enrollment. DOJ ignored this past experience and argued that the Natchez School District had never dismantled the school system despite the obvious evidence that they had made a good faith effort to do so, but were defeated by extensive white flight. Having learned nothing from the past, they proposed a similar plan in 1988.

As I predicted, there was significant white flight (see Appendix 1). In 1988, the year that the Natchez-Adams School District was found to have failed to dismantle the dual school system and ordered to implement a mandatory racial balance plan, its level of interracial exposure was 18 percent white in the average black child's school and its percentage white was 36 percent. By 1999, 10 years later there was less interracial exposure in the school district that when it was found to have failed to dismantle the dual school system. There was 17 percent white in the average black child's school and 17 percent white in the school district. In 2009-10, the latest year available, there was 8 percent white in the average black child's school and the district was 8 percent white. There was a fair amount of racial balance in the schools since if all schools are virtually all-black, all schools are racially balanced. But again, this is not what most people think of as integration.

Figure 10 shows all the schools in the district in 1988, the year they were found to have failed to dismantle the dual school system. Five were all black and one was almost 80 percent black. Those schools were dispensed with by closing them or in the case of South and North Natchez high schools, closing the black high school and assigning everyone to the formerly white school and renaming it Natchez High. In 2009, after significant white flight and many

11

**EXHIBIT A**

black families losing their neighborhood school, there were still five all black schools and one almost all black as was the case in 1988, the year they were found to have failed to dismantle the dual school system. They now have a unitary school system that is all black.

The consolidation of the two high schools in Natchez, one 100 percent black and one 39 percent black, located not too far from each other, is a lesson to be taken seriously. Despite the fact that no whites were reassigned to the now closed black high school, when the school assignments were made, only 379 of the 646 whites who had attended the formerly predominantly white high school showed up—a bit less than half of the original white population in South Natchez High School. By 2009, Natchez High School was 94 percent black. Again, this is not what most people think of as an improvement in integration.

Figure 11 shows the trends in interracial exposure in the Indianola School District in the Mississippi Delta. The district was ordered to implement a DOJ mandatory reassignment plan with pairing and redrawing of attendance zones. Figure 11 shows little interracial exposure before or after the implementation of the DOJ mandatory reassignment plan.

As shown in Figure 12, in 1969, when the district was 26 percent white, there were three all black schools and two mostly all white schools with seven blacks in one and 5 blacks in another. The DOJ proposed a mandatory reassignment plan and the court approved it. There were 979 whites in the school district in 1969 and in 1970, the year of implementation, only 219 enrolled in the public schools. Of those 219 that enrolled in the public schools, 149 enrolled in Lockard, a formerly all white elementary school that in 1970, opened 60 percent black. Each year, it and the other Indianola schools became increasingly black until by 2010, there were virtually no whites left in Lockard or any other schools in Indianola. The school district went

12

**EXHIBIT A**

from a situation in which black students were allowed to enroll in white schools, although not many had done so by 1969, to one in which all schools were all black so there were no white schools to transfer to. There is no doubt in my mind that more integration would have been achieved if the district had been allowed to continue with its neighborhood school plan with voluntary transfers.

The DOJ also touts the success of the West Carroll desegregation plan which they claim used mandatory reassignments. In fact as shown in Figure 13, West Carroll was 79 percent white at the time of its minor 2007 rezoning plan in which two schools were closed, one of them the blackest school in the district at 51 percent black and the other an all white school. To accommodate this, some attendance zone lines were redrawn (see Exhibit A of the DOJ's October 6, 2011 reply brief). There seems to have been a temporary drop in the percentage white and interracial exposure, but the district quickly recovered. Louisiana school districts that are 79 percent white (of which this may be the only one) can close one 51 percent black school and do some minor redistricting with little effect. It is naïve, however, to believe that the West Carroll school district can be compared to the Cleveland School District, which is 30 percent white, or to other school districts that are overwhelmingly minority.

Figure 14 illustrates the difference between racial balance for its own sake and real integration—that is, blacks and whites going to school together. All but Hattiesburg and Natchez-Adams are in the Mississippi Delta. Every one of these school districts, with the exception of Cleveland, would be considered segregated by any sensible person's standard. The Greenville district is 99 percent black and the others are no less than 92 percent black. This appears to be the goal of the Justice Department and I draw this conclusion because Hattiesburg

13

**EXHIBIT A**

appears to be its shining symbol of a good plan (as well as an almost all white school district, West Carroll, which did some minor rezoning when it closed two schools).

Thus, the conundrum for predominantly black or minority school districts, no matter what kind of desegregation plan they implement is where are the whites to come from? One example of a school district that was able to attract whites into its district is Madison County, Mississippi. The Department of Justice is silent about this school district. Madison County was able to attract whites to its district and to maintain a reasonable level of racial balance for two reasons. First, it is near Jackson, Mississippi, a predominantly black school district that also includes the state capitol and other urban amenities, including being adjacent to the airport hub of Mississippi. The Cleveland School District does not have this advantage. The second advantage that Madison County had is the fact that DOJ and the district were able to come to an agreement to open new schools and to maintain the basic neighborhood concept adopted in 1970.

As shown in Figure 15, after starting with no interracial exposure in 1967, Madison County was allowed to adopt a single set of neighborhood schools in 1970 and has had continuing interracial exposure since then. The school district as of 2009 was 56 percent white with an interracial exposure of .40. The gap exists because several schools were allowed to remain all black. The district was nevertheless declared unitary in 2006 despite these all-black schools. The DOJ did object at the unitary hearing to the all-black schools, but the district court ruled in favor of the Madison County school district[16] and although DOJ appealed that decision,

---

[16] *Anderson, et al. and U.S. vs. Madison County School District*, Civil Action 3700, 2006.

14

**EXHIBIT A**

the Fifth Circuit upheld the district court's finding that the Madison County School District was unitary, despite its lack of perfection.[17]

I have updated Figure 16 of my August 16, 2011 report to reflect the 2012-13 data that I now have for the Cleveland School District. This figure shows that with regard to racial balance as measured by the index of dissimilarity, the Cleveland School District still compares favorably to other school districts that were declared unitary in student assignment.[18] In addition, racial imbalance in the CSD has decreased from .56 to .52 since 2010-11, the data shown in the original report.

In terms of the percentage of schools that are at or above 90 percent minority, Figure 17 shows there has been no change since 2010-11, depicted in my August 16, 2011 report. Again, the CSD has 40 percent of its schools at or above 90 percent minority which is better than Kansas City, Missouri; Dallas, Texas; Benton Harbor, Michigan; and Indianola, Mississippi at the time they were declared unitary. It is also comparable to Baton Rouge, Natchez, and Fulton County, Georgia. The schools that are above 90 percent minority in these districts include many schools that were above 90 percent minority before their court orders. In short, the courts do not require perfection. They require a good faith effort and that the Cleveland School District has shown in faithfully maintaining its court approved neighborhood school plan, implementing magnet programs in two formerly black elementary schools and two formerly black secondary schools, and supporting an M to M program so that any black child can transfer from a predominantly black school to a white school that is 50 percent white or more.

---

[17] *Anderson v. Sch. Bd. , 517 F.3d 292, 2008 U.S. App. LEXIS 2999 (5th Cir. Miss. 2008).*
[18] This measure was introduced into the unitary hearings of the school districts shown in Figure 14 by either me or David Armor. I do not, however, know if that was the case in Indianola, MS or Buffalo, N.Y.

**EXHIBIT A**

This is no longer possible at the elementary level since the one 50 percent white school (Hayes Cooper) is a magnet. It might be possible at the secondary level if the secondary schools are left alone.

Figure 18 is an updated version of Figure 16 in my August 11, 2012-13 report to reflect the 2012-13 enrollment for the CSD.   It compares the CSD's percentage white to the percentage white in the average black child's school and also does that for districts that have been declared unitary.[19]  The percentage white in the average black or minority child's school can be no higher than the percentage white in the district.  If the two are the same, the district is perfectly racially balanced, although that may be because as with Indianola, Benton Harbor, Natchez, Hattiesburg, Dallas, and Kansas City, there were virtually no whites left at the time of their unitary hearing. The utility of the interracial exposure index is that it tells you not only how racially balanced the schools are (the index would be zero if all schools were segregated), but also how much exposure black or minority students have to whites.

Figure 19 shows the gap between the percentage white in the district to the percentage white in the average child's school.  As shown, the gap for the CSD is .09 which is better than Hillsborough, Florida; Charleston, South Carolina; Muskogee County, Georgia; Madison County, Mississippi; DeKalb County, Georgia; and Mobile, Alabama and comparable to Charlotte-Mecklenburg, North Carolina; Baton Rouge, Louisiana; and Kansas City, Missouri at the time they attained unitary status.

---

[19] The extent of interracial exposure compared to the percentage white in the district has been introduced into evidence in every unitary case that I have worked on since about the 1990s and the interracial exposure introduced into every case I have worked on since 1986 to choose between alternative plans.  In all but two of those cases (Hattiesburg and Natchez), the court approved the plan that promised to produce the most interracial exposure—a voluntary, magnet school plan with magnet programs within a school.

**EXHIBIT A**

Although the index of dissimilarity and other continuous measures such as the relative interracial exposure index,[20] are superior to a categorical measure where a change in one student in enrollment can throw a school out of balance, it is easier to understand and thus courts and attorneys have tended to rely on it from time to time, if they use any standard at all.[21]  The DOJ May 2, 2011 motion for further relief suggests that one of two categorical standards should be imposed on the CSD: student enrollment in the Cleveland School District should not deviate more than +/- 15 percentage points or +/- 20 percentage points from the districtwide racial composition.  In fact, given the typically large differences between the racial composition of the elementary schools and that of the secondary schools, academics use the school level (elementary or secondary) racial composition.  The +/- 15 standard has not been used since the 1970s for student racial balance.  As school districts became less white and more minority during the busing era of the 1970s, new desegregation plans tended to use a +/- 20 percentage point standard, if they used any standard at all, to reduce unnecessary reassignments that might produce more white flight.

As shown in Figure 20, the Cleveland School District, even on this imprecise categorical measure that relies on whether a school is "in" or "out"—a status that can be affected by a change in only one student in enrollment--currently has more racial balance than six other school districts at the time they were declared unitary.  Only four districts had all of their schools

---

[20] The relative exposure index adjusts interracial exposure by the percentage white in the district and was used in my May 15, 2012 supplemental report to measure teacher racial imbalance.  Most statisticians believe it is superior to the index of dissimilarity.  Given the long history beginning in the 1950s of using the index of dissimilarity to measure school and residential racial imbalance, however, I typically use the dissimilarity index to measure school racial imbalance.

[21] It is surprising how many school desegregation plans have no racial balance standard at all.  In some of these cases, the court orders that the dual school system be dismantled and in the order specifies certain boundaries for the new unitary neighborhood schools, but there is no racial balance standard specified.  In other decisions, the court will order that certain schools be paired or clustered, but again does not say what the racial balance standard might be.

**EXHIBIT A**

racially balanced using this standard and three of them were virtually all-black (Indianola, Natchez and Hattiesburg). To reiterate, these data indicate that the standard for desegregation is not perfection, it is desegregation to the extent practicable.

Indeed, not only have courts awarded unitary status to school districts with all-black schools and out of balance schools, there have been plans in the South and across the U.S. that left some schools all-black in the original desegregation plan because there were not enough whites to integrate the schools at what many school desegregation experts (myself included) would consider a stable level of integration—no less than 50% white. Three important federal district court school desegregation decisions (Detroit, 1976; St. Louis, 1980; and Kansas City, 1985) have explained in detail why racial integration would not be stable if racial balance were sought in all schools in a predominantly black school district (Detroit, St. Louis, and Kansas City were 70-80% black) and have relied on experts to support their opinions. Moreover, these opinions have been upheld by the U.S. Supreme Court. The conclusion of the federal district court in 1985 in the Kansas City decision (see Appendix 2 of my May 2, 2011 report for the entire discussion of mandatory student reassignment in that decision) is similar to what other courts have also concluded when confronted with a predominantly black school district.

Recognizing the impact white flight can have on [**52] the effectiveness of a remedial plan is nothing more than recognizing that there is a difference between "catering to bias" and seeking to minimize patron resistance. *United States v. Board of Education*, 554 F.Supp 912, 924-25 (N.D. Ill. 1983). This difference has been recognized by the Eighth Circuit in *Clark v. Board of Education*, 705 F.2d 265, 269-72 (8th Cir. 1983) (in order to prevent white flight and stabilize the integration process in a system that was 65% black a district court may reduce the black population in some integrated schools and thereby maintain a number of all black schools); and in *Adams v. United States*, 620 F.2d 1277, 1291-97 [*38] (8th Cir.) (to prevent white flight in a school system with 75% black enrollment, a desegregation plan need not reassign additional black children to schools with at least 30% black enrollment even though all-black schools remain), *cert. denied*, 449 U.S. 826, 66 L. Ed. 2d 29, 101 S. Ct. 88 (1980), *on remand sub nom., Liddell v. Board*

EXHIBIT A

*of Education*, 491 F. Supp. 351, 356 (E.D. Mo. 1980) (adopting plan), *aff'd* 667 F.2d 643 (8th Cir.), *cert. denied*, 454 U.S. 1081, 102 S. Ct. 634, 70 L. Ed. 2d 614 (1981). [**53].

…The evidence is clear, further mandatory student reassignment at this time will only serve to increase the instability of the KCMSD and reduce the potential for desegregation.[22]

As shown in Figure 21, the plan that the court approved in Kansas City did in fact leave 38% of the schools greater than 90% black. The plans approved in Detroit and St. Louis left about half of the schools greater than 90% black. Cleveland's current numbers are comparable to Kansas City and lower than Detroit and St. Louis. The fact that it is a smaller school district than these does not negate the fact that there are not enough whites in the school district to racially balance all the schools at 50 percent white and 50 percent black, what the court in this case, *Cowan and U.S. v Bolivar County Board of Education, et al*., March 28, 2012 stated (p. 24) was, at least with regard to Cleveland High, "the educational utopia contemplated in Brown I…"

After almost 40 years of studying the impacts of school desegregation plans, the evidence is clear to me. School desegregation plans that have as their goal racial balance in all the schools and that involve pairing and clustering and rezoning are not stable solutions to racial isolation in predominantly minority school districts such as Cleveland, regardless of how close the schools are to each other. Indeed, Cleveland is not just slightly minority, it is overwhelmingly minority—70 percent black. School districts with that racial composition should never mandatorily reassign white students.

The national study of 600 school districts randomly selected across the U.S. that I was co-principal investigator of indicates that, controlling for all the characteristics that might affect interracial exposure, voluntary plans produce a greater increase in interracial exposure than

---

[22] See *Jenkins v. Missouri*, 639 F. Supp. 19, 1985.

**EXHIBIT A**

mandatory reassignment plans. Furthermore, most school districts in the U.S. have declining interracial exposure and implementing racial balance plans only accelerates that. This is shown in Figures 18 through 22 in my August 16, 2011 report.

I have used interracial exposure as my standard for choosing among mandatory versus voluntary plans in the following court cases[23] and, as noted above, in only two (Hattiesburg and Natchez) has it not been accepted by the courts as a legitimate and constitutional measure for choosing among plans. In my reports and testimony, I used the following example to show the superiority of interracial exposure to any racial balance measure, including the continuous ones such as the index of dissimilarity and the relative interracial exposure index, as the standard for choosing among plans.

Consider a hypothetical segregated school system with six schools and the racial composition below.

|  | Minorities | Whites | Total |
|---|---|---|---|
|  | 100 | 0 | 100 |
|  | 100 | 0 | 100 |
|  | 100 | 0 | 100 |
|  | 0 | 100 | 100 |
|  | 0 | 100 | 100 |
|  | 0 | 100 | 100 |
| Sum | 300 | 300 | 600 |
| % of Total | 50% | 50% | |

Virtually all supporters of school desegregation would prefer a plan which produced outcome A (shown below) with considerable racial balance and 245 white students remaining in

---

[23] Prince George's County, MD, 2002; Baton Rouge, LA (1996); Knox County, TN (1991); Stockton, CA (1989); Natchez, MS (1988); San Jose, CA (1986); Hattiesburg, MS (1985); Yonkers, NY (1986); Savannah-Chatham County, GA (1986); De Kalb, GA (1986); and Marion County, FL (1983).

**EXHIBIT A**

the school system to outcome B with perfect racial balance, but only six white students remaining in the school system.

| | OUTCOME A | | | | OUTCOME B | | |
|---|---|---|---|---|---|---|---|
| | Minorities | Whites | Total | | Minorities | Whites | Total |
| | 50 | 20 | 70 | | 50 | 1 | 51 |
| | 50 | 45 | 95 | | 50 | 1 | 51 |
| | 50 | 40 | 90 | | 50 | 1 | 51 |
| | 50 | 50 | 100 | | 50 | 1 | 51 |
| | 50 | 45 | 95 | | 50 | 1 | 51 |
| | 50 | 45 | 95 | | 50 | 1 | 51 |
| Sum | 300 | 245 | 545 | | 300 | 6 | 306 |
| % of Total | 55% | 45% | | | 98% | 2% | |

Although outcome B has only one white in each school, it has a racial imbalance score (dissimilarity index) of 0, that is perfect racial balance and all schools within plus or minus 20 percentage points of the school district's racial composition (98 percent black and 2 percent white). If we calculate the interracial exposure index, we find only 2 percent white in the average black child's school. Outcome B thus has perfect racial balance, but very little interracial exposure.

Outcome A, by contrast, has an index of dissimilarity of 8.8—that is, it is more racially imbalanced than outcome B. It also has one school outside the plus or minus 20 percentage point categorical standard. Thus, if we have racial balance as our goal, we would be forced to choose the intuitively least desirable plan, that in which there was only one white in each school. It we have interracial exposure as our goal, however, we would choose the intuitively most desirable plan, outcome A where there is 44.2 percent white in the average black child's school.

Table 3 shows two estimates of what I think would happen if the Cleveland School District mandatorily reassigned black and white students between D.M. Smith Junior High and

**EXHIBIT A**

Margaret Green Junior High and between Eastside High School and Cleveland High School.  It assumes that the goal is to racially balance the schools at the secondary level racial composition of 30 percent white and 70 percent nonwhite, a racial composition that even if there were no white flight would be considered unstable.  The estimates of the white no-show rates are for the first two years of the plan.  Based on my research and evidence from other school districts, both are likely and both show less interracial exposure after the plan than before.

Although DOJ's reply contends that we have presented no evidence to show white flight would result in Cleveland since there have been no mandatory reassignments, Appendix 1 shows how accurate my predictions have been in the past and Appendix 2 shows other no-show rates in small and large school districts in the U.S.[24]  The size of the district does not seem to be an important factor.

I know of no desegregation expert who would argue that this racial composition is stable.  White enrollment decline will accelerate in the first two years because of white flight.  In the years after, the acceleration of the white enrollment decline will be primarily a function of non-entrance.  White families with school age children will not want to move into a school district where their child might be forced to be assigned to a school they did not choose or attend a formerly white school that is now predominantly black whose black students were forced to go there.  Nor in my experience will middle class or affluent blacks enroll in these schools.

---

[24] The reason the sample is small in Appendix 2 is because in order to compute a no-show rate it is necessary to find a detailed plan that shows how many white students are assigned to each school in the mandatory desegregation plan and compare this to the number that actually showed up at that school under the same plan.   Such projections are rarely made and even harder to find.

**EXHIBIT A**

**Magnet Programs**

There are three kinds of magnet structures and they vary in their success.  The most successful is what I term a "dedicated" magnet,[25] in which the school is emptied of its resident population or has been vacant for some time.  Students are then asked to apply from anywhere in the school district and the district provides transportation.  Thus, the entire school consists solely of students who chose the magnet.   This is a primary reason for the success of Bell Academy (see Figure 5) and Hayes Cooper (see Figure 6).  Hayes Cooper was vacant at the time it was turned into a "Primary Years" (PYP) International Baccalaureate (IB) magnet program and students were admitted on the basis of their desire to be in the program.  The students attending Bell Academy at the time it became a dedicated magnet were assigned to nearby elementary schools and there was enough capacity in those nearby schools that this could be accomplished.  Bell Academy was then advertised as a new magnet school specializing in math, science, health, and wellness in which everyone in the school would be there because of their interest in this program.

Although these kinds of magnet programs are very successful, they are also difficult to create.  I do not know of any school district that has more than two or three of them.  It is unusual for a school district to have a vacant facility that is suitable as a school or to have the resources and time to build a new school that could open as a magnet.  Emptying out a currently occupied school of its resident student population and reassigning them elsewhere is not only politically difficult, especially at the secondary level where there is strong school loyalty, but usually impossible to do since it is rare that nearby schools would have the capacity to accept these students.

---

[25] *Supra*, note 10.

**EXHIBIT A**

The least successful program is what I have termed a "whole school attendance zone" magnet.[26] These schools consist of students who live in the attendance zone of the school and as a result have been assigned to that school. Everyone in the school is enrolled in the magnet program whether they are interested in the theme or not. In short, they have no choice. If the school is in a black neighborhood, it will attract few whites, and probably only those who lived in the attendance zone to begin with. These are the kinds of magnet programs that Nailor, D.M. Smith and East Side High have and it may be part of the explanation for why whites do not enroll in those schools full-time.

In between these two types of magnet structures is something I have termed a "program-within-a-school" (PWS).[27] This is the most common magnet structure used in the U.S. because it is practical and it is acceptable to federal district and state courts.[28] In this magnet structure, the magnet theme is a separate part of the school. The students in the magnet theme have all chosen to be in that program because they are interested in it. There are no students in the magnet classes solely because they live in the attendance zone. At the middle and high school level, because of the size of the schools and students' varying interests, there are typically more than one magnet program within the same school. These programs are not only successful, but practical and that is why they are the most common type of magnet structure.[29]

---

[26] *Ibid.*
[27] *Ibid.*
[28] I have helped design voluntary magnet school desegregation plans in the following school districts, all of which contained program-within-school magnets that were approved by the federal district court as an acceptable remedy in Baton Rouge, LA, 1996; Knox County, Tennessee, 1991; Stockton, California, 1989; San Jose, California, 1986; Yonkers, New York, 1986; Savannah-Chatham County, Georgia, 1986; De Kalb County, Georgia, 1986; and Marion County, Florida, 1983. All of these school districts with PWS magnets have since attained unitary status, with the possible exception of Knox County on which I have no information. In addition, although I did not design the Kansas City, Missouri magnet school plan, it too had PWS magnets that were accepted by the federal district court as a remedy and it has also since attained unitary status.
[29] *Ibid.*

**EXHIBIT A**

**East Side High School.**  Therefore, I support the concept of an additional PWS magnet in East Side High School that focuses on science, technology and math (STEM) or science, math and health education, with particular emphasis on internships and other community work-related opportunities.  I also support restructuring the IB program at East Side as a PWS magnet.  The fact that white students are willing to be bused from Cleveland High to East Side High for the IB classes that are currently offered suggests that white students would be willing to enroll at East Side if the IB program were expanded and was a program within a school.  My hope, however, is that the growth in white enrollment will come from the whites that are currently attending private schools in the Cleveland School District or nearby counties.  The conundrum the district faces is that if too many Cleveland High whites transfer to East Side High, rather than from private schools or nearby districts, the court's description of Cleveland High as "the educational utopia contemplated by *Brown I*…"[30] will no longer be accurate.

I further support opening all remedial courses, the choral music program, and choirs, at East Side to Cleveland High students, for whom no such offerings are currently offered, as well as moving human anatomy and physiology from Cleveland High to East Side High.

**D.M. Smith Middle School.**  I also support the new science, technology, engineering and math (STEM) program, proposed for D.M. Smith.  Another option, a science, math, and health education magnet program is being investigated since it has attracted whites to Bell Elementary.  However, since some portion of Bell Elementary's success is undoubtedly due to the fact that it is a dedicated magnet—that is, the students were reassigned to other schools permanently so the

---

[30] *Cowan, et al. and U.S. v. Bolivar County Board of Education*, Civil Action No. 2:65-CV-00031-GHD, Filed March 26, 2012, p. 24

**EXHIBIT A**

school was essentially vacant and all students who are there now chose to attend the school—this issue will be investigated and analyzed further in the upcoming school year—2012-13.

I also support revitalizing the IB Middle Year Program (MYP) with primary emphasis on recruiting students from the Hayes Cooper PYP program. Hayes Cooper currently has a PK-6 grade structure. The district should explore changing this to a PK-5 grade structure as suggested by the principal, Beverly Hardy (also the district's magnet coordinator). [31]

If the MYP program at Hayes Cooper ends in grade 5, it will be easier to recruit these students to an MYP program at D.M. Smith, which has a 6-8 grade structure, than it would be if they were one year late to the program—that is having missed the 6th grade of the MYP IB program at D.M. Smith because they were in the 6th grade PYP program at Hayes Cooper. These are, however, all issues that should be explored in the upcoming 2012-13 school year.

I also support opening and advertising all classes in choral music and choir at D.M. Smith to all students at Margaret Green Junior High School. In addition, the renovations that I observed at D.M Smith, which are creating 12 traditional classrooms, need to be advertised extensively, not only because they expand the space for art and music, including the special music training currently available, and other extracurricular activities, but because they make the school more attractive. The district is clearly highly committed to the formerly and currently black schools on the east side.

The first program within a school magnet plan implemented in the South was in Savannah and was designed by me, David Armor and the district staff with information obtained from a parent survey that we conducted. The DOJ was worried about the amount of interaction that would occur between the magnet program students and the resident students not in the

---

[31] Personal communication, April 17, 2012.

**EXHIBIT A**

program.  Therefore, we designed an interaction plan which specified that in art, music, physical education, and sports, the PWS magnet school administrators would ensure that resident students (typically all black) and magnet program students (typically 50 percent black and 50 percent white) would come into contact with each other.  I no longer have the details of that interaction plan, but I do know that it turned out to be unnecessary.  Resident students and magnet program students naturally come into contact with each other in the non-magnet classes and in sports.  If one thinks about it, most high schools in the U.S. have different levels of classes (e.g. AP, advanced, standard, etc.) and different types of classes that are considered to be more or less academically challenging. Yet the students in the different classes do interact in the hallways, in art, music, and physical education, at lunch, on the playgrounds, and on the buses.  It would simply be impossible to not have that happen.  Therefore, I do not know of any PWS magnet programs after the Savannah plan, perhaps because it became apparent that this was unnecessary or perhaps because different attorneys were involved.

I have not made any predictions regarding magnet program enrollment as the current schedule does not allow enough time for that.  These parent surveys are not only potentially expensive, but they might have to include random digit dialing to find the private school parents, unless the private schools cooperate and give us their families' telephone numbers (which I doubt will happen).  Unless the magnet programs drew students from the private schools in the Mississippi Delta, we might still have the problem of Margaret Green and Cleveland High becoming predominantly black because of too many whites voluntarily going to D.M. Smith and

**EXHIBIT A**

Eastside High.  This has happened in a number of school districts that adopted magnet-voluntary desegregation plans.[32]


**<u>Conclusions</u>**

The Cleveland School District is not just slightly black, it is 70 percent black.  It has shown a good faith effort to integrate its schools using the neighborhood plan concept and the magnet school concept approved by all prior courts in this case and by a slight majority of courts in the South.  The CSD spends more money on the formerly or currently black schools than on the white schools.  I believe that most courts would approve unitary status for CSD on its current record since there are not enough whites in the public schools to racially balance the east side schools at a level that is both stable and educationally advantageous[33] and the Cleveland School District has certainly tried.  The proposed program within a school magnets are the only chance that the CSD has of improving integration at the east side secondary schools because they have the possibility of attracting whites out of private school.  Any mandatory reassignment plan would turn the Cleveland School District into an all black school district as has occurred in the rest of the Mississippi Delta.

---

[32] *Supra* note 10.
[33] The Department of Justice's citation of *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) where experts testified that integration was educationally beneficial is disingenuous since the case was about the University of Michigan's law school admissions policy that used race as one of many factors.  In addition, the University of Michigan's law school was 70 percent white and 7 percent black at the time of the Supreme Court's decision (see http://198.173.245.213/pdfs/UM%20Law%20final.pdf).  Moreover, all applicants voluntarily applied to the law school. There may be some educational benefits at that racial composition (although this is not a settled issue) for ambitious adults, but <u>no one</u> believes there are educational benefits from having a 20 percent white elementary or secondary school.

**EXHIBIT A**

**Compensation and Qualifications**

I am being paid at the rate of $200 an hour plus expenses.  The cases in which I have testified or been deposed and my publications are listed in my Vita which is attached as Appendix 1.

*Christof Brosell*

October 2, 2012

29

**Table 1**
**Trends in Enrollment and Desegregation in the Cleveland School District, Mississippi,**
**1967-68 through 2012-2013**

| Source | Year | Plan | Black | White | Other | Total | % White Enroll Change | % White | % Black | Deseg. Indices | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | IEb | Db |
| OCR | 67-68 | | 2821 | 2275 | 0 | 5096 | | 44.6% | 55.4% | 1.4% | 0.986 |
| OCR | 68-69 | | 2811 | 2184 | 55 | 5050 | -4.0% | 43.2% | 55.7% | 1.4% | 0.986 |
| OCR & Report | 69-70 | C.O. | 2902 | 1797 | 53 | 4752 | -17.7% | 37.8% | 61.1% | 4.8% | 0.938 |
| OCR | 70-71 | | 2953 | 1765 | 52 | 4770 | -1.8% | 37.0% | 61.9% | 11.7% | 0.834 |
| OCR | 71-72 | | 3068 | 1767 | 48 | 4883 | 0.1% | 36.2% | 62.8% | 11.4% | 0.839 |
| OCR | 72-73 | | 2984 | 1694 | 59 | 4737 | -4.1% | 35.8% | 63.0% | 9.7% | 0.868 |
| OCR | 73-74 | | 3072 | 1694 | 52 | 4818 | 0.0% | 35.2% | 63.8% | 9.8% | 0.865 |
| Report to Court | 74-75 | | 3054 | 1718 | 51 | 4823 | 1.4% | 35.6% | 63.3% | 11.4% | 0.840 |
| Report to Court | 75-76 | | 2951 | 1761 | 48 | 4760 | 2.5% | 37.0% | 62.0% | 12.0% | 0.830 |
| OCR | 76-77 | | 2917 | 1723 | 51 | 4691 | -2.2% | 36.7% | 62.2% | 11.9% | 0.831 |
| Report to Court | 77-78 | | 2809 | 1790 | 36 | 4635 | 3.9% | 38.6% | 60.6% | 12.9% | 0.826 |
| OCR | 78-79 | | 2829 | 1755 | 64 | 4648 | -2.0% | 37.8% | 60.9% | 12.3% | 0.831 |
| Report to Court | 79-80 | | 2832 | 1688 | 39 | 4559 | -3.8% | 37.0% | 62.1% | 12.2% | 0.833 |
| OCR & Report | 80-81 | | 2803 | 1610 | 31 | 4444 | -4.6% | 36.2% | 63.1% | 11.7% | 0.840 |
| Report to Court | 81-82 | | 2777 | 1587 | 30 | 4394 | -1.4% | 36.1% | 63.2% | 12.1% | 0.833 |
| OCR & Report | 82-83 | | 2784 | 1501 | 28 | 4313 | -5.4% | 34.8% | 64.5% | 12.1% | 0.825 |
| Report to Court | 83-84 | | 2795 | 1534 | 28 | 4357 | 2.2% | 35.2% | 64.1% | 12.4% | 0.822 |
| Report to Court | 84-85 | | 2829 | 1420 | 23 | 4272 | -7.4% | 33.2% | 66.2% | 12.0% | 0.824 |
| Report to Court | 85-86 | | 2906 | 1415 | 24 | 4345 | -0.4% | 32.6% | 66.9% | 12.5% | 0.808 |
| Report to Court | 86-87 | | 3131 | 1498 | 29 | 4658 | 5.9% | 32.2% | 67.2% | 13.1% | 0.789 |
| Report to Court | 87-88 | | 3153 | 1528 | 30 | 4711 | 2.0% | 32.4% | 66.9% | 12.9% | 0.793 |
| Report to Court | 88-89 | | 3181 | 1478 | 35 | 4694 | -3.3% | 31.5% | 67.8% | 13.3% | 0.780 |
| Report to Court | 89-90 | C.D. | 3202 | 1392 | 22 | 4616 | -5.8% | 30.2% | 69.4% | 14.5% | 0.761 |
| CCD | 90-91 | | 3202 | 1280 | 17 | 4499 | -8.0% | 28.5% | 71.2% | 13.9% | 0.765 |
| CCD | 91-92 | | 3230 | 1318 | 23 | 4571 | 3.0% | 28.8% | 70.7% | 15.3% | 0.738 |
| OCR | 92-93 | C.D. | 3186 | 1304 | 38 | 4528 | -1.1% | 28.8% | 70.4% | 14.8% | 0.747 |
| Report to Court | 93-94 | | 3177 | 1255 | 38 | 4470 | -3.8% | 28.1% | 71.1% | 15.8% | 0.716 |
| Report to Court | 94-95 | | 3178 | 1233 | 32 | 4443 | -1.8% | 27.8% | 71.5% | 16.5% | 0.698 |
| Report to Court | 95-96 | C.D. | 3086 | 1180 | 38 | 4304 | -4.3% | 27.4% | 71.7% | 16.4% | 0.686 |
| CCD | 96-97 | | 3112 | 1170 | 41 | 4323 | -0.8% | 27.1% | 72.0% | 15.7% | 0.695 |
| CCD | 97-98 | | 3049 | 1157 | 37 | 4243 | -1.1% | 27.3% | 71.9% | 15.0% | 0.729 |
| Report to Court | 98-99 | | 2910 | 1103 | 35 | 4048 | -4.7% | 27.2% | 71.9% | 14.9% | 0.732 |
| Report to Court | 99-00 | | 2806 | 1057 | 41 | 3904 | -4.2% | 27.1% | 71.9% | 14.7% | 0.735 |
| CCD | 00-01 | | 2771 | 1114 | 43 | 3928 | 5.4% | 28.4% | 70.5% | 15.1% | 0.735 |
| CCD | 01-02 | | 2660 | 1103 | 51 | 3814 | -1.0% | 28.9% | 69.7% | 15.0% | 0.732 |

Table 1-1

**EXHIBIT A**

**Table 1**
**Trends in Enrollment and Desegregation in the Cleveland School District, Mississippi,**
**1967-68 through 2012-2013**

| Source | Year | Plan | Black | White | Other | Total | % White Enroll Change | % White | % Black | Deseg. Indices | |
|--------|------|------|-------|-------|-------|-------|------------------------|---------|---------|------|------|
| | | | | | | | | | | IEb | Db |
| Report to Court | 02-03 | | 2518 | 1114 | 64 | 3696 | 1.0% | 30.1% | 68.1% | 15.3% | 0.731 |
| Report to Court | 03-04 | | 2474 | 1087 | 50 | 3611 | -2.4% | 30.1% | 68.5% | 15.2% | 0.731 |
| Report to Court | 04-05 | | 2393 | 1123 | 53 | 3569 | 3.3% | 31.5% | 67.0% | 16.5% | 0.700 |
| Report to Court | 05-06 | | 2385 | 1094 | 71 | 3550 | -2.6% | 30.8% | 67.2% | 17.2% | 0.669 |
| Report to Court | 06-07 | | 2376 | 1096 | 84 | 3556 | 0.2% | 30.8% | 66.8% | 17.1% | 0.669 |
| Report to Court | 07-08 | | 2329 | 1098 | 95 | 3522 | 0.2% | 31.2% | 66.1% | 17.5% | 0.661 |
| Report to Court | 08-09 | | 2349 | 1019 | 99 | 3467 | -7.2% | 29.4% | 67.8% | 17.8% | 0.641 |
| Report to Court | 09-10 | | 2354 | 1032 | 105 | 3491 | 1.3% | 29.6% | 67.4% | 18.7% | 0.623 |
| Report to Court | 10-11 | | 2301 | 1047 | 115 | 3463 | 1.5% | 30.2% | 66.4% | 20.9% | 0.564 |
| School District | 11-12 | | 2512 | 1107 | 115 | 3734 | 5.7% | 29.6% | 67.3% | 21.3% | 0.517 |
| School District | 12-13 | | 2490 | 1111 | 152 | 3753 | 0.4% | 29.6% | 66.3% | 21.3% | 0.524 |

KEY:
IEb = Interracial Exposure -- the % white in the average black child's school.
Db = Racial Imbalance -- 100 is complete segregation; 0 is perfect racial imbalance.
OCR=Office for Civil Rights Elementary and Secondary School Survey.
CCD=Common Core of Data, National Center for Educational Statistics.

Table 1-2

**EXHIBIT A**

**Table 2**

**Change in White Enrollment at Eastside High School IB and Advanced Classes, Offered at ESHS to ESHS and CHS Students from 2011-12 to 2012-13**

| IB Courses at ESHS | 2011-12 | | | | 2012-13 | | | | TOTAL CHANGE | WHITE CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sending School | | | | Sending School | | | | | |
| | CHS | ESHS | TOTAL STUDENTS | TOTAL WHITE | CHS | ESHS | TOTAL STUDENTS | TOTAL WHITE | | |
| IB Psychology | | | | | 4 Black 1 Asian 4 White | 4 Black | 13 | 4 | | |
| IB Math I | 12 White 4 Black 2 Hisp. | 4 Black | 22 | 12 | 7 White | 4 Black | 11 | 7 | | |
| IB Math I | | | | | 4 White 1 Hisp. | 3 Black | 8 | 4 | | |
| IB Math II | | | | | 12 White 3 Black 1 Hisp. | 10 Black | 26 | 12 | | |
| IB Biology I | 0 White 3 Black 2 Hisp. 1 Asian | 4 Black | 10 | 0 | 11 White 3 Black 1 Hisp. | 8 Black | 23 | 11 | | |
| **SUM OF IB COURSES** | | | 32 | 12 | | | 81 | 38 | 49 | 26 |

| Advanced Courses at ESHS | 2011-12 | | | | 2012-13 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CHS | ESHS | TOTAL STUDENTS | TOTAL WHITE | CHS | ESHS | TOTAL STUDENTS | TOTAL WHITE | | |
| AP Calculus | 3 White 5 Black 1 Asian | 3 Black | 12 | 3 | 1 White 1 Black | 8 Black | 10 | 1 | | |
| AP Calculus | 3 White 4 Black 1 Hisp. 2 Asian | 8 Black | 18 | 3 | | | | | | |
| Pre Calculus | 14 White 5 Black 1 Hisp. 2 Asian | 4 Black | 26 | 14 | 9 White 8 Black 1 Hisp. | | 18 | 9 | | |
| Pre Calculus | 1 White 4 Black 1 Hisp. | 1 Black | 7 | 1 | 6 White 5 Black 1 Hisp. 1 Asian | | 13 | 6 | | |
| Trigonometry | 14 White 5 Black 1 Hisp. 1 Asian | 4 Black | 25 | 14 | 9 White 8 Black 1 Hisp. | 12 Black | 30 | 9 | | |
| Trigonometry | 1 White 4 Black 1 Hisp. | 1 Black | 7 | 1 | 6 White 6 Black 1 Asian | 6 Black | 12 | 6 | | |
| Public Speaking /Debate | 6 White 15 Black | 22 Black | 43 | 6 | 6 White 24 Black | 19 Black | 30 | 6 | | |
| **SUM OF ADVANCED COURSES** | 95 | | | 42 | | | 113 | 37 | 18 | -5 |
| **SUM OF ALL COURSES** | 127 | | | 54 | | | 194 | 75 | 67 | 21 |

**EXHIBIT A**

**Table 3**
**Effect of Varying White No-Show Rates on % White and Interracial Exposure (Ieb) Pre and Post Mandatory Reassignments**
**in First Two Years Using Fall 2012-2013 Enrollment Data**
**Secondary Schools of Cleveland School District, Mississippi**

| Scenario 1: 50% White No-Show Black Schools | | | | | Whites | | Nonwhites | | | | | % | PRE | POST |
| 25% White No-Show White Schools | Whites | Nonwhites | Total | % White | In | Out | In | Out | Whites | Nonwhites | Total | White | IEb | IEb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D.M Smith Junior High | 0 | 305 | 305 | 0% | 121 | 0 | 0 | 49.2 | 60 | 256 | 316 | 19% | 0 | 49 |
| Margaret Green Junior High | 241 | 238 | 479 | 50% | 0 | 121 | 0 | 0 | 90 | 238 | 328 | 28% | 120 | 66 |
| Eastside High | 0 | 380 | 380 | 0% | 147 | 0 | 0 | 61.3 | 73 | 319 | 392 | 19% | 0 | 60 |
| Cleveland High | 293 | 327 | 620 | 47% | 0 | 147 | 110 | 0 | 110 | 437 | 547 | 20% | 155 | 88 |
| Total | 534 | 1250 | 1784 | 30% | 267 | 267 | 110 | 110 | 334 | 1250 | 1583 | 21% | 22% | 21% |

Interracial Exposure (Ieb)--% White in the Average Non-White Child's School

| Scenario 2: 65% White No-Show Black Schools | | | | | Whites | | Nonwhites | | | | | % | PRE | POST |
| 35% White No-Show White Schools | Whites | Nonwhites | Total | % White | In | Out | In | Out | Whites | Nonwhites | Total | White | IEb | IEb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D.M Smith Junior High | 0 | 305 | 305 | 0% | 121 | 0 | 0 | 49.2 | 42 | 256 | 298 | 14% | 0 | 36 |
| Margaret Green Junior High | 241 | 238 | 479 | 50% | 0 | 121 | 0 | 0 | 78 | 238 | 316 | 25% | 120 | 59 |
| Eastside High | 0 | 380 | 380 | 0% | 147 | 0 | 0 | 61.3 | 51 | 319 | 370 | 14% | 0 | 44 |
| Cleveland High | 293 | 327 | 620 | 47% | 0 | 147 | 110 | 0 | 95 | 437 | 532 | 18% | 155 | 78 |
| Total | 534 | 1250 | 1784 | 30% | 267 | 267 | 110 | 110 | 267 | 1250 | 1517 | 18% | 22% | 17% |

Interracial Exposure (Ieb)--% White in the Average Non-White Child's School

**EXHIBIT A**

**Figure 1**
**Interracial Exposure (IEb) and % White in the Cleveland School District,**
**1967-68 through 2012-13**



**EXHIBIT A**



**Figure 2**
**Trends in Racial Imbalance, Cleveland School District,**
**Fall 1967-68 to 2012-13**



**Figure 3**
**Percentage White of Margaret Green Junior High Enrollment,**
**1967-68 to 2012-13**

EXHIBIT A



**Figure 4**
**Percentage White of Cleveland High Enrollment,**
**Cleveland School District,**
**1967-68 to 2012-13**

**EXHIBIT A**



**Figure 5**
**Percentage White of Bell Elementary Academy Enrollment,**
**1967-68 to 2012-13**

**EXHIBIT A**

**Figure 6
Percentage White of Hayes Cooper Elementary Enrollment,
1967-68 to 2012-13**



**EXHIBIT A**

**Figure 6**
**Percentage White of Hayes Cooper Elementary Enrollment,**
**1967-68 to 2012-13**



**Figure 7**
**Interracial Exposure (IEb) in Hattiesburg, Mississippi,**
**1967-2010**



**EXHIBIT A**



**Figure 8**
**% Black Before and After Implementation of the 1987 DOJ Mandatory Reassignment Plan, Hattiesburg, MS**

Note: If there is no dark bar for 2010, the school was closed between 1982 AND 2010. If there is no light bar, a new school was opened or renamed..

**EXHIBIT A**



**Figure 9**
**Interracial Exposure in the Natchez-Adams School District,**
**1967-68 through 2009-10**

**EXHIBIT A**



**Figure 10**
**% Black Before and After Implementation of the 1989 DOJ Mandatory Reassignment Plan, Natchez, MS**

Note: If there is no dark bar for 2010, the school was closed between 1982 AND 2010. If there is no light bar, a new school was opened or renamed..

**EXHIBIT A**



**Figure 11**
**Interracial Exposure in the Indianola School District,**
**1967-68 through 2010-11**

**EXHIBIT A**



**Figure 12**
**% Black Before and After Implementation of the 1970 DOJ Mandatory Reassignment Plan, Indianola, MS**

Note: If there is no dark bar for 2010, the school was closed between 1969 and 2010. Indianola High was 0 percent black in 1969 and then closed as a high school in 1972 after almost no whites showed up at the school when asssigned there in 1970.

**EXHIBIT A**

**Figure 13**
**The % White and Interracial Exposure (% White in the Average Black Child's School)**
**in West Carroll Parish School District, Lousiana and Cleveland School District,**
**Mississippi, 1967-2012**



**EXHIBIT A**



**Figure 14**
**Amount of Interracial Exposure (% White in the Average Black Child's School) in the Cleveland, Mississippi School District Compared to a Sample of Surrounding School Districts in the Mississippi Delta Plus Hattiesburg and Natchez-Adams, Fall 201**

*Note: Natchez is 2009-10 data, and Cleveland is 2012-13, but that was also its level in 2010.

**EXHIBIT A**

**Figure 15**
**Interracial Exposure and % White in the Madison County, MS School District,**
**1967-68 through 2009-10**



**EXHIBIT A**

**Figure 16**
**School Racial Imbalance of Black and White Students in Cleveland, MS, 2012-13,**
**and in School Districts Declared Unitary Since 1986***



*The years of these data are 1986 DeKalb; 1988 Boston and Charleston; 1992 Dallas; 1993 Muskogee, Savannah, and Wilmington; 1994 Buffalo, Cleveland, and Denver; 1995 Hillsborough; 1996 Mobile, Hattiesburg, and Prince George's County; 1997 Charlotte; 1998 Woodland Hills; 1999 Rockford; 2000 Dayton, Benton Harbor, and Kansas City; ; 2002 Fulton County, Natchez and Baton Rouge; 2005 Madison Co., and 2006 Marion County. In each district, this is the fall of the year before their unitary finding on student assignment.

**EXHIBIT A**

**Figure 17**
**% of Schools At or Above 90% Minority Enrollment in Cleveland, MS, 2012-13**
**and in School Districts Declared Unitary since 1986\***



\*The years of these data are 1986 DeKalb; 1988 Boston and Charleston; 1992 Dallas; 1993 Muskogee, Savannah, and Wilmington; 1994 Buffalo, Cleveland, and Denver; 1995 Hillsborough; 1996 Mobile, Hattiesburg, and Prince George's County; 1997 Charlotte; 1998 Woodland Hills; 1999 Rockford; 2000 Dayton, Benton Harbor, and Kansas City; 2002 Fulton County, Natchez and Baton Rouge; 2005 Madison Co., and 2006 Marion County.  In each district, this is the fall of the year before their unitary finding on student assignment.

**EXHIBIT A**

**Figure 18**
**Percentage White in District and Percentage White in the Average Black Child's School in Cleveland, MS, 2012-13**
**and in School Districts Declared Unitary since 1986\***



*The years of these data are 1986 DeKalb; 1988 Boston and Charleston; 1992 Dallas; 1993 Muskogee, Savannah, and Wilmington; 1994 Buffalo, Cleveland, and Denver; 1995 Hillsborough; 1996 Mobile, Hattiesburg, and Prince George's County; 1997 Charlotte; 1998 Woodland Hills; 1999 Rockford; 2000 Dayton, Benton Harbor, and Kansas City; 2002 Fulton County, Natchez and Baton Rouge; 2005 Madison Co., and 2006 Marion County.  In each district, this is the fall of the year before their unitary finding on student assignment.

**EXHIBIT A**

**Figure 19**
**Difference Between the Proportion White in a District and Proportion White in the**
**Average Black Child's School in Cleveland, MS, 2012-13**
**and in School Districts Declared Unitary since 1986\***



\*The years of these data are 1986 DeKalb; 1988 Boston and Charleston; 1992 Dallas; 1993 Muskogee, Savannah, and Wilmington; 1994 Buffalo, Cleveland, and Denver; 1995 Hillsborough; 1996 Mobile, Hattiesburg, and Prince George's County; 1997 Charlotte; 1998 Woodland Hills; 1999 Rockford; 2000 Dayton, Benton Harbor, and Kansas City; 2002 Fulton County, Natchez and Baton Rouge; 2005 Madison Co., and 2006 Marion County. In each district, this is the fall of the year before their unitary finding on student assignment.

**EXHIBIT A**

**Figure 20**
**% of Students in Schools Within ± 20% Pts. of School Level % Minority in Cleveland, MS, 2012-13 and in School Districts Declared Unitary since 1986***



*The years of these data are 1986 DeKalb; 1988 Boston and Charleston; 1992 Dallas; 1993 Muskogee, Savannah, and Wilmington; 1994 Buffalo, Cleveland, and Denver; 1995 Hillsborough; 1996 Mobile, Hattiesburg, and Prince George's County; 1997 Charlotte; 1998 Woodland Hills; 1999 Rockford; 2000 Dayton, Benton Harbor, and Kansas City; 2002 Fulton County, Natchez and Baton Rouge; 2005 Madison Co., and 2006 Marion County.  In each district, this is the fall of the year before their unitary finding on student assignment.

**EXHIBIT A**



**Figure 21**
**% of Schools Approved At or Above 90% Black in Court Ordered Desegregation Plans**
**Compared to Cleveland, MS, 2012-2013**

**EXHIBIT A**

Appendix 1

Accuracy of Rossell Predictions of White Flight and Interracial Exposure
Hattiesburg and Natchez-Adams, Missippi

ROSSELL PREDICTIONS FOR WHITE FLIGHT AND INTERRACIAL EXPOSURE [a]
WITH ELEMENTARY SCHOOL MANDATORY REASSIGNMENT PLAN
HATTIESBURG, MI

| | % White Enrollment Decline | | Racial Imbalance | | Interracial Exposure | |
|---|---|---|---|---|---|---|
| | Rossell Prediction* | Actual | Rossell Prediction | Actual | Rossell Prediction | Actual |
| YEARS 1 & 2 | −28.0 | −29.6 | 14.7 | 13.7 | 32.9 | 27.2 |

a
Source: C. Rossell, Exhibit G-2, "The Effectiveness of Alternative Desegregation Plans for Hattiesburg, MI," a report to the U.S. Department of Justice, March 21, 1985. Filed in court in the case of U.S. and Pittman v. Mississippi and Hattiesburg Municipal Separate School District.

* Prediction is for the Foster Plan. The actual plan implemented had one voluntary magnet school while none of the mandatory plans proposed to the court and analyzed by Rossell had magnet schools. The Foster Plan comes closest to this, however.



DEFENDANT'S EXHIBIT
42

PENGAD-Bayonne, N. J.

EXHIBIT A

**Rossell Predictions for Natchez 1989-1993 Compared to Actual Outcomes**

| | | % White Enrollment Change | | Interracial Exposure | |
|---|---|---|---|---|---|
| | | Rossell Prediction for Mand. Plan (Winecoff Alt. 4) | Actual | Rossell Prediction for Mand. Plan (Winecoff Alt. 4) | Actual |
| | 1988-87 | | -6% | | 18.1 |
| **Plan Implemented** | 1989-88 | -20% | -20% | 30.5 | 30.8 |
| | 1991-89 | -16% | -11% | 26.9 | 28.0 |
| | 1993-91 | 2% | -7% | 27.2 | 26.7 |
| | 5 Year Total | -32% | -34% | -3.3 | -4.2 |

Source: for predictions, Defendant's Exhibits 22, 27, and 32; for enrollment, Natchez school district and/or CCD data.

**EXHIBIT A**

Appendix 2

White No-Show Rates in Small and Large School Districts

**EXHIBIT A**

**White No-Show Rates at Schools Reassigned to
in Small\* and Large\*\* Area School Districts in Implementation Year**



\*Boston, 1975; Stockton, CA, 1977.
\*\* Savannah-Chatham Co, GA, 1971; Los Angeles, CA, 1978; Baton Rouge, LA, 1981

**EXHIBIT A**

WHITE FLIGHT IN THE NATCHEZ 1969-70 DESEGREGATION PLAN

| School of Assignment | Grades | 1969-70 W. Enrollment Projected* | Actual | Percent White Loss (no-shows) |
|---|---|---|---|---|
| FORMERLY BLACK SCHOOLS | | | | |
| Central | 3-4 | 237 | 119 | 50% |
| Prince | 1 | 68 | 13 | 81% |
| Northside | 3-5 | 204 | 38 | 81% |
| Brumfield | 2-3 | 178 | 88 | 51% |
| West | 4-5 | 197 | 105 | 47% |
| Thompson | 7-9 | 234 | 14 | 94% |
| Anchorage | 10 | 402 | 161 | 60% |
| | | | | |
| TOTALS | | 1520 | 538 | 65% |
| | | | | |
| | | | | |
| FORMERLY WHITE SCHOOLS AS PART OF CLUSTERS** | | | | |
| Morgantown | 1-2 | 237 | 176 | 26% |
| Washington | 5-6 | 237 | 154 | 35% |
| Carpenter I | 2 | 68 | 19 | 72% |
| Carpenter II | 1 | 97 | 90 | 7% |
| Braden | 6 | 180 | 125 | 47% |
| Martin | 7-9 | 255 | 171 | 33% |
| Morgantown | 7-9 | 301 | 209 | 31% |
| Natchez HS | 11-12 | 685 | 402 | 41% |
| | | | | |
| TOTALS | | 2060 | 1346 | 35% |
| | | | | |
| | | | | |
| FORMERLY WHITE SCHOOLS NOT PART OF CLUSTERS | | | | |
| McLaurin Elem | 1-6 | 437 | 428 | 2% |
| McLaurin JHS | 7-9 | 287 | 279 | 3% |
| | | | | |
| TOTALS | | 724 | 707 | 2% |
| | | | | |
| | | | | |
| TOTAL DISTRICT | | 4304 | 2591 | 40% |

\* Taken from the December 11, 1969, District Court Decision

\*\* Including Junior Highs fed from elementary clusters



DEFENDANT'S EXHIBIT
16

EXHIBIT A

Appendix 3

Christine Rossell's Curriculum Vita

**EXHIBIT A**

9-28-12                          **Christine H. Rossell**
                                      Curriculum Vita

**ADDRESS:**
Political Science Department
Boston University                         Email: crossell@bu.edu
Boston, MA 02215
Tel: 617-353-2776; Fax: 353-5508     Web Page: http://www.bu.edu/polisci/people/faculty/rossell/rossell.html

**EDUCATION**: Ph.D., Political Science, University of Southern California, January 1974;
M.A., Political Science, California State University, Northridge, June 1969;
B.A., International Relations (area specialization: Latin America), UCLA, June 1967.

**FIELDS OF CONCENTRATION**: Public policy; public policy analysis; school desegregation and educational
policy; racial discrimination in student and teacher/staff assignment, transportation, student discipline,
extracurricular activities, facilities, and employment; bilingual education; urban politics and policy; methodology.
Dissertation: "The Electoral Impact of School Desegregation in 67 Northern Cities," University of Southern
California, 1973.

**ACADEMIC POSITIONS**
   **Boston University, Political Science Department, 1975-present**
      Professor, 1989-present (Maxwell Chair in U.S. Citizenship); Associate Professor (tenured), 1982-1989;
      Assistant Professor, 1975-1982.
      Administrative Responsibilities: Director of Graduate Studies, 2007-2008; Director of Undergraduate
      Studies, 2006-2007, 1985-1992; Chair, 1992-1995; Assistant Chair, 1982-1985.

   **Public Policy Institute of California**, Visiting Fellow, Jan. 1-June 1, 1999.

   **University of Canberra** (Canberra, Australia)
      (formerly CCAE), Visiting Lecturer, Fall 1985.

   **University of California, Berkeley, Graduate School of Public Policy**
      Visiting Assistant Professor, Jan. - June 1981.

   **Duke University, Institute of Policy Sciences**
      Visiting Assistant Professor, 1977-78.

   **University of Maryland, College Park**
      Research Associate, Bureau of Governmental Research; Lecturer, Institute for Urban Studies; 1974-75.

   **Pitzer College** (the Claremont Colleges, Claremont, Calif.)
      Assistant Professor, Political Studies, 1973-74.

   **Johns Hopkins University**
      Research Assistant, Prof. Robert Crain, Center for Metropolitan Planning and Research, 1972-73.

**ACADEMIC AWARDS AND RESEARCH GRANTS**
Who's Who in America, 1995-present; Who's Who in the World, 1995-present; Who's Who in American
Education, 1994-present.

Dean's Award for Outstanding Teaching, College of Arts and Sciences, Boston University, 2000.

One of 52 individuals listed in Jeffrey Raffel, the *Historical Dictionary of School Segregation and
Desegregation: the American Experience*. Westport, Ct.: Greenwood Press, 1998.

Fellowship, Public Policy Institute of California, San Francisco, CA, Jan. 1-June 1, 1999.

Research Grant with Keith Baker, "Bilingual Education Reform in Massachusetts," Pioneer Institute, 1992-95.

**EXHIBIT A**

Research Grant with Keith Baker, "Bilingual Education as a Civil Rights Policy," Smith Richardson Foundation, 1991-92.

Research Grant, "Magnet Schools and Issues of Public School Desegregation, Quality, and Choice," (contract LC 90043001) awarded to American Institutes for Research by the Magnet Schools Assistance Program, U.S. Department of Education, subcontracted to me as co-principal investigator, 1990-93.

Research Grant, "The Effectiveness of Desegregation Plan Characteristics in Producing Interracial Exposure," funded by the U.S. Department of Education, 1987-88.

Research Grant, "The Long-Term Impact of Magnet Schools as Desegregation Tools," funded by the National Institute of Education, U.S. Department of Education, 1983-1985

Research Grant with Willis Hawley and others, "Assessment of Current Knowledge About the Effectiveness of School Desegregation Strategies," funded by the National Institute of Education, U.S. Department of Education, 1979-81.

Abt Associates award for the best essay on social policy, 1979.

Research Grant with J. Michael Ross, "The Long-Term Effect of Court-Ordered School Desegregation on White Withdrawal from Central City Public School Systems: the Case of Boston, 1974-79," funded by the Ford Foundation and the Carnegie Corporation, 1978-79.

Research Grant, "The Social Impact of School Desegregation," funded by the National Institute of Education, 1973-76.

Graduate School Awards: Haynes Foundation Graduate Research Fellowship, 1972-73; Teaching Fellowship, Political Science Dept., 1970-72; University Grant, 1971; Graduate Tuition Award, 1970; University of Southern California.

## PUBLICATIONS

**Books**

Christine H. Rossell, David J. Armor, and Herbert Walberg, (eds.) School Desegregation in the 21st Century, Westport, Ct.: Praeger Publishers, 2002.

Christine H. Rossell and Keith Baker, Bilingual Education in Massachusetts: the Emperor Has No Clothes. Boston, MA: Pioneer Institute, 1996.

- **Chapter 3 reprinted** in Nicholas Capaldi, Immigration: Debating the Issues.  (Amherst, N.Y.: Prometheus Books, 1997)

Christine H. Rossell, The Carrot or the Stick for School Desegregation Policy: Magnet Schools vs. Forced Busing. (Philadelphia: Temple University Press, 1990).

Christine H. Rossell and Willis D. Hawley (eds.).  The Consequences of School Desegregation. (Philadelphia: Temple University Press, 1983).

Willis D. Hawley, Robert L. Crain, Christine H. Rossell, Janet Schofield, Janet Eylor, and others.  Strategies for Effective Desegregation. (Lexington, Ma.: Lexington Books, 1983).

**Journal Articles, Book Chapters, and Monographs** (technical reports in subsequent section)

"Does Bilingual Education Work?  The Case of Texas." [Monograph] Austin, TX: Texas Public Policy Foundation, 2009. [76]

"The Legal Aspects of Magnet Schools" in M. Berends, M.G. Springer, D. Ballou, and H.J. Walberg, Eds. The Handbook of Research on School Choice, Hillsdale, New Jersey, Lawrence Erlbaum Associates, 2009. [75]

2

**EXHIBIT A**

"Disordered Data and Murky Models: a Critique of Wayne P. Thomas and Virginia P. Collier, 'A National Study of School Effectiveness for Language Minority Students' Long-Term Academic Achievement, Center for Research on Education, Diversity and Excellence, 2002," [monograph] Arlington, VA: Lexington Institute, 2008. [74]

"Bilingual Education," "Education Reforms: Magnet Schools," and "English as Second Language (ESL)" (3 entries) in M. E. Rushefsky, Ed. Encyclopedia of Issues in U.S. Public Policy, Farmington Hills, MI：Gale/Cengage Learning, 2008. [73]

"Segregation/Resegregation," "Zoning," and "Magnet Schools," [3 entries] in G. McCulloch and D. Crook, Eds. The International Encyclopedia of Education. Oxfordshire, United Kingdom, Routledge, 2008. [72]

"The Flawed Requirements for Limited English Proficient Children of the No Child Left Behind Act," The Journal of Education, 186 (3), journal date 2005 (actual publication Nov. 2006), pp. 29-40. [71]

[*] with Julia Kuder, "Meta-Murky: a Rebuttal to Recent Meta-Analyses of Bilingual Education," in Janina Soehn, Ed., The Effectiveness of Bilingual School Programs. Berlin, Germany, Wissenschaftszentrum Berlin für Socialforschung (WZB), 2005, pp. 43-76. [70]

"Making Uneven Strides: State Standards for Achieving English Language Proficiency Under the No Child Left Behind Act," September 2005, [monograph] Arlington, VA.: Lexington Institute. [69]

"Whatever Happened to Magnet Schools?" Education Next, 5(2) Spring 2005: 44-49. [68]

"Learning a Second Language Through a Second Language," Educational Leadership, Dec. 2004/January 2005: 32-36. [67]

"Brown and Its Impact on Schools and American Life, Focus on Law Studies, 19(2), Spring 2004, 1-19. [66]

"The Evolution of School Desegregation Plans Since 1954" in Stephen Caldas and Carl Bankston (eds.), The End of School Desegregation? pp. 51-72.  New York: Nova Science Publishers, 2003. [65]

"The Near End of Bilingual Education," Education Next, vol. 3(4), Fall 2003: 44-52. [64]

"The Desegregation Efficiency of Magnet Schools," Urban Affairs Review (formerly Urban Affairs Quarterly), vol. 38, May 2003: 697-725. [63]

"Christine H. Rossell, "Dismantling Bilingual Education, Implementing English Immersion: The California Initiative," [monograph], San Francisco: Public Policy Institute of California, revised 2002. [62]

*with David J. Armor and Herbert J. Walberg, "Introduction: Assessing the Promise of *Brown*," in Rossell, Armor, and Walberg, (eds.), School Desegregation in the 21st Century, pp. 1-16.  Westport, Ct.: Praeger Publishers, 2002. [61]

"The Effectiveness of Desegregation Plans," in Rossell, Armor, and Walberg, (eds.), School Desegregation in the 21st Century, pp. 67-118. Westport, Ct.: Praeger Publishers, 2002. [60]

"Ability Grouping and Classroom Desegregation," in Rossell, Armor, and Walberg, (eds.), School Desegregation in the 21st Century, pp. 189-234. Westport, Ct.: Praeger Publishers, 2002. [59]

*with David J. Armor, "Attitudes on Race and Desegregation," in Rossell, Armor, and Walberg, (eds.), School Desegregation in the 21st Century, pp. 291-322.  Westport, Ct.: Praeger Publishers, 2002. [58]

---

[*] I am first author.

**EXHIBIT A**

with David J. Armor and Herbert J. Walberg, "The Outlook for School Desegregation," in Rossell, Armor, and Walberg, (eds.), School Desegregation in the 21st Century, pp. 323-334. Westport, Ct.: Praeger Publishers, 2002. [57]

with David J. Armor, "Desegregation and Resegregation in the Public Schools," in Abigail Thernstrom and Stephen Thernstrom, Beyond the Color Line, pp. 219-258. Palo Alto, CA: Hoover Institution Press, 2002. [56]

"All That Glitters is Not Gold: the Limits of the California Department of Education's English Learner Achievement Data," *Read Perspectives,* vol. 8, Fall 2001: 151-168. [55]

"Is One Year Enough?," in The ABCs of English Immersion: a Teacher's Guide. Washington, D.C.: Center for Equal Opportunity, 2000. [54]

"Educating Limited English Proficient Students," American Language Review, September/October 2000 (4): 15-19. [53]

"Different Questions, Different Answers: A Critique of the Hakuta, Butler and Witt Report, 'How long does it take English learners to attain proficiency?'," READ Perspectives, Volume VII, October 2000: 134-154. [52]

"The Federal Bilingual Education Program: Title VII of the Elementary and Secondary Education Act," in Brookings Papers on Education Policy, 2000, edited by Diane Ravitch, Washington, D.C.: Brookings Institution, 2000: 215-244. [51]

"Teaching Language Minorities: Theory and Reality," in City Schools: Lessons From New York, edited by Diane Ravitch and Joseph Viteritti, Baltimore: Johns Hopkins University Press, 2000: 187-218. [50]

"Mystery on the Bilingual Express: a Critique of the Thomas and Collier Study," Read Perspectives, V (2), Fall 1998: 5-32.
- **Reprinted** in Rosalie Porter (ed.), Educating Language Minority Children, Vol. 6 of Read Perspectives, 2000 [49]

"The Convergence of Black and White Attitudes on School Desegregation Issues," in Redefining Equality, Neal Devins and Dave Douglas (eds.). New York: Oxford University Press, 1998. [48]

"An Analysis of the Court Decisions in *Sheff v. O'Neill* and Possible Remedies for Racial Isolation," Connecticut Law Review, vol. 29 (3), Spring 1997: 1187-1233. [47]

*with Keith Baker, "Response," Research in the Teaching of English, October 1996, 30 (3): 70-86 (symposium). [46]

"Is Bilingual Education an Effective Tool?" in Jorge Amselle (ed.), The Failure of Bilingual Education, Washington, D.C., The Center for Equal Educational Opportunity, 1996. [45]

*with Keith Baker, "The Educational Effectiveness of Bilingual Education," Research in the Teaching of English, February 1996, 30 (1): 7-74. [44]

*with David Armor, "The Effectiveness of School Desegregation Plans, 1968-1991," American Politics Research, (formerly American Politics Quarterly)July 1996, 24 (3): 267-302. [43]

"The Convergence of Black and White Attitudes on School Desegregation Issues During the Four Decade Evolution of the Plans," The William and Mary Law Review, January 1995, 36(2): 613-663. [42]

"Controlled Choice Desegregation Plans: Not Enough Choice, Too Much Control?" Urban Affairs Review (formerly Urban Affairs Quarterly), September 1995, 31(1) 43-76. [41]

"The Progeny of Brown: From the Old Freedom of Choice to the New Freedom of Choice in Four Decades," Urban Geography, 15 (5), July-August 1994: 435-453. [40]

**EXHIBIT A**

- **Reprinted** in Readings on Equal Education, Charles Teddlie and Richard Fossey (eds.), vol. 15, 1996.

*with Christine Bachen, "Advertising on Channel One: Are Students a Captive Audience?" The High School Journal, February 1993, 76 (2): 100-109. [39]

"Using Multiple Criteria to Evaluate Public Policies: the Case of School Desegregation," American Politics Research, April 1993 (21): 155-184. [38]

"Nothing Matters? A Critique of the Ramirez, et. al. Longitudinal Study of Instructional Programs for Language Minority Children," Bilingual Research Journal, 16 (1 & 2), Winter & Spring 1992: 159-186. [37]

"Bilingual Education and Bilingual Certified Teachers: Are They Necessary?" in Keith Baker (ed.), Bilingual Education: Legal Issues, Bloomington, IN: Phi Delta Kappa, 1991. [36]

"The Effectiveness of Educational Alternatives for Limited English Proficiency Children," in Gary Imhoff (ed.), The Social and Cultural Context of Instruction in Two Languages: From Conflict and Controversy to Cooperative Reorganization of Schools. (New York: Transaction Books, 1990). [35]

"The Research on Bilingual Education," Equity and Choice, 6 (2), 1990, 29-36. [34]

"The Carrot or the Stick for School Desegregation Policy?" Urban Affairs Quarterly, 25 (3), 1990, 474-499.[33]

with Robert Crain, "Catholic Schools and Racial Segregation" in Public Values, Private Schools, Neal Devins (ed.). (Stanford: Falmer Press, 1989). [34]

"How Effective are Voluntary Plans with Magnet Schools?" Educational Evaluation and Policy Analysis, 10 (4), 1989, 325-342. [33]

*with Charles Glenn, "The Cambridge Controlled Choice Plan," The Urban Review, 20 (2), 1988, 75-94. [32]

*with Keith Baker, "Selecting and Exiting Students in Bilingual Education Programs," Journal of Law and Education, 17 (4), Fall, 1988, 589-624. [31]

"The Problem with Bilingual Education Research: A Critique of the Walsh and Carballo Study of Massachusetts Bilingual Education Programs," Equity and Excellence, 23 (4) Summer 1988, 25-29. [30]

"Race and Ethnic Relations Among High School Youth: Perspectives From Political Science," International Journal of Group Tensions, 18, Spring 1988, 44-55. [29]

"Is it the Busing or the Blacks?," Urban Affairs Quarterly, 24, September 1988, 138-148. [28]

"The Buffalo Controlled Choice Plan," Urban Education, 22, October 1987, 328-354. [27]

"Does School Desegregation Policy Stimulate Residential Integration? A Critique of the Research," Urban Education, 21, Jan. 1987, 403-420. [26]

with Keith Baker, "An Implementation Problem: Specifying the Target Group for Bilingual Education," Educational Policy, 1 (2), 1986-87. [25]

*with J. Michael Ross, "The Social Science Evidence on Bilingual Education." The Journal of Law and Education, 15, Fall 1986, 385-419. [24]
- **Reprinted** in M. Yudof, D. Kirp, and B. Levin, Educational Policy and the Law (St. Paul: West Publishing Company, 1992.

"Estimating the Net Benefit of School Desegregation Reassignments," Educational Evaluation and Policy Analysis, 7, Fall 1985, 217-227. [23]

**EXHIBIT A**

"What is Attractive About Magnet Schools?" <u>Urban Education</u>, 20, April 1985, 7-22. [22]

"Applied Social Science Research: What Does It Say About the Effectiveness of School Desegregation Plans?" <u>Journal of Legal Studies</u>, 12, January 1983, 69-107. [21]

*with W.D. Hawley, "Introduction:  Desegregation and Change," in Christine H. Rossell and Willis D. Hawley (eds.), <u>The Consequences of School Desegregation</u>. (Philadelphia: Temple University Press, 1983). [20]

"Desegregation Plans, Racial Isolation, White Flight, and Community Response," in Christine H. Rossell and Willis D. Hawley (eds.), <u>The Consequences of School Desegregation</u>. (Philadelphia: Temple University Press, 1983). [19]

with W.D. Hawley and Robert L. Crain, "Directions for Future Research," in Christine H. Rossell and Willis D. Hawley (eds.),  <u>The Consequences of School Desegregation</u>. (Philadelphia: Temple University Press, 1983).[18]

*with Robert L. Crain, "The Importance of Political Factors in Explaining Northern School Desegregation," <u>The American Journal of Political Science</u>, 26, November 1982, 772-796.  [17]

*with W.D. Hawley, "Policy Alternatives for Minimizing White Flight," <u>Educational Evaluation and Policy Analysis</u>, 4, Summer 1982, 205-222.   [16]

*with W.D. Hawley, "Understanding White Flight and Doing Something About It," in W.D. Hawley, (ed.), <u>Effective School Desegregation</u> (Beverly Hills, Ca.: Sage Publications, 1981) pp. 157-184. [15]

"The Atheoretical Nature of Desegregation," <u>Educational Evaluation and Policy Analysis</u>, 3, May-June 1981, 95-97.  [14]

"Social Science Research in Educational Equity Cases: a Critical Review," <u>Review of Research in Education</u>, 8, 1980, 237-295. [13]

"Magnet Schools as a Desegregation Tool: the Importance of Contextual Factors in Explaining Their Success," <u>Urban Education</u>, 20, October 1979, 303-320.  [12]

"School Desegregation and Community Social Change," <u>Law and Contemporary Problems</u>, 42, Summer 1978, 133-183. [11]

"White Flight: Pros and Cons," <u>Social Policy</u>, 9, November/December 1978, 46-51.[10]

"A Response to 'The White Flight Controversy,'" <u>The Public Interest</u>, 53, Fall 1978, 109-111. [9]

"The Effect of School Integration on Community Integration," <u>Journal of Education</u>, 160, May 1978, 46-62.[8]

"The Effect of Community Leadership and the Mass Media on Public Behavior," <u>Theory Into Practice</u>, 17, April 1978, 131-139. [7]

"Boston's Desegregation and White Flight," <u>Integrated Education</u>, January-February 1977, 36-39.[6]

"The Mayor's Role in School Desegregation Implementation," <u>Urban Education</u>, 12, Fall 1977, 247-270.[5]

- "School Desegregation and White Flight,"  <u>Political Science Quarterly</u>, 92, Winter 1975-76, 675-696; [4]
- **Reprinted** in N. Mills, ed., <u>Busing USA</u>, (N.Y.: Columbia University Teacher's College Press, 1979);
- **Reprinted** in D. Caraley and M. Epstein, ed., <u>The Making of American Foreign and Domestic Policy</u>, (Farmingdale, N.Y.: Dabor Social Science Publications, 1978).

**EXHIBIT A**

"School Desegregation and Electoral Conflict," in F. Wirt, ed., The Polity of the School (Lexington, Ma.: Lexington Books, 1975) pp. 49-64. [3]

"Measuring School Desegregation," Chapt. 12 in Political Strategies in Northern School Desegregation, D.J. Kirby, T.R. Harris, R.L. Crain, and C.H. Rossell (Lexington, Ma.: Lexington Books, 1973) pp. 171-203. [2]

*With Robert L. Crain, "Evaluating School Desegregation Plans Statistically," [monograph] (Baltimore, Md.: The Johns Hopkins University Center for Metropolitan Planning and Research, 1973). [1]

**Book Reviews**

Joshua M. Dunn, Complex Justice: the Case of Missouri v. Jenkins, Chapel Hill: the University of North Carolina Press, in Political Science Quarterly, 123 (4), Winter 2009-2010, 764-765. [10]

Lorraine M. McDonnell, P. Michael Timpane, and Roger Benjamin (Eds.) Rediscovering the Democratic Purposes of Education. Lawrence, Kansas. The University Press of Kansas, 2000 in American Political Science Review, 96 (02) June 2002, 429-430. [9]

Steven Taylor, Desegregation in Boston and Buffalo: the Influence of Local Leaders, (Albany, N.Y.: The State University of New York Press, 1998, in American Political Science Review, June 2000. [8]

Ronald P. Formisano, Boston Against Busing: Race, Class, and Ethnicity in the 1960s and 1970s (Chapel Hill and London, The University of North Carolina, 1991 in Political Science Quarterly, 107, Fall 1992, 558.[7]

Mark A. Chesler, Joseph Sanders, and Debra Kalmuss, Social Science in Court (Madison: The University of Wisconsin Press, 1988) in Contemporary Sociology, 19 (2), March 1990, 263-264. [6]

Charles V. Willie, School Desegregation Plans That Work (Westport, CT.: Greenwood Press, 1984) in Contemporary Sociology 14, May 1985, 392-394. [5]

Emmett H. Buell, Jr., School Desegregation and Defended Neighborhoods (Lexington, Ma.: Lexington Books, 1982) in Political Science Quarterly, 98, Winter 83-84. [4]

Robert H. Salisbury, Citizen Participation in the Public Schools (Lexington, Ma.: Lexington Books, 1980) in Political Science Quarterly, 96, Spring 1981, 169-171. [3]

Florence H. Levinsohn and Benjamin D. Wright, eds., School Desegregation, Shadow and Substance, (Chicago: University of Chicago Press, 1976) in Political Science Quarterly, 92, Spring 1977, 136-137. [2]

Howard D. Hamilton and Sylvan H. Cohen, Policymaking by Plebiscite: School Referenda (Lexington, Ma.: Lexington Books, 1974) in The American Political Science Review, 71, Sept. 1977, 1181-1182. [1]

**TECHNICAL REPORTS FOR COURT CASES, GOVERNMENT AGENCIES, AND PUBLIC POLICY ORGANIZATIONS**

"A Supplemental Report on the Effect of Intradistrict Student Transfers at the Secondary Level in the Richardson Independent School District," May 20, 2012. [100]

"An Analysis of Intradistrict Student Transfers and Student Desegregation in the Richardson Independent School District, a report prepared in the case of U.S. v. Richardson Independent School District, May 20, 2012. [99]

"Expanding the Pearl Public School District to the Annexed Areas," a report submitted in the case of Adams, et al. and U.S. vs. Rankin County Board of Education, et al., May 7, 2012. [98]

**EXHIBIT A**

"An Analysis of the Department of Justice's May 2, 2011 Motion for Further Relief in Cleveland, Mississippi," a reported submitted *in the case of Cowan and U.S. v. Bolivar County Board of Education, et al*., August 16, 2011. [97]

"Rossell Supplemental Report in Flores v. Arizona," a report submitted in the case of *Flores v. Horne*, December 21, 2010. [96]

"Rossell Rebuttal Report in the *Flores* Case," a report submitted in the case of *Flores v. Horne*, August 2, 2010. [95]

"An Analysis of Racial Disparities in Student Discipline in the Pulaski County Special School District, Arkansas" a report prepared in the case of *Little Rock School District V. Pulaski County Special School District, et al., Mrs. Lorene Joshua, et al., Interveners, Katherine W. Knight, et al. Interveners*, December 23, 2009. [94]

"Analysis of the Plummer Report, Oct. 24, 2008 and Plaintiffs' 'Preliminary Report,'" a report prepared in the case of *Enderby et al. v. California Public Utilities Commission*, January 14, 2009. [93]

"Attainment of the Green Factors by the Louisville School District, Mississippi" , a report prepared in the case of U.S. v. Louisville Municipal Separate School District, et al., March, 26, 2007. [92]

"Rebuttal Report on the Impact of the Marina Station Development on the North Monterey County Unified School District and the Monterey Peninsula Unified School District," a report prepared for Ruiz and Sperow, Nov. 9, 2007.[91]

"The Impact of the Marina Station Development on the North Monterey County Unified School District and the Monterey Peninsula Unified School District," a report prepared for Ruiz and Sperow, Sept. 24, 2007.[90]

"Attainment of the Green Factors by the Marion County School District, FL," A report prepared in the case of *U.S. v. Marion County School District*, Florida, December 1, 2006. [89]

"Declaration," April 20, 2006  in the case of *Valenzuela v. O'Connell (State of California)*. [88]

"Analysis of the Justice Department's Proposals for Further Relief in the Covington County School District, Mississippi, Desegregation Case, February 22, 2006. [87]

"Attainment of the Green Factors by the Madison County School District," A report prepared in the case of *Anderson et al. and U.S. v. Madison County School District*, Miss., March 3, 2005. [86]

"Enrollment Projections for the Yonkers School District from Fall 2005 through Fall 2015," November 10, 2005, A report to the Interim Superintendent of Schools**,** Bernard P. Pierorazio**,** Yonkers Public Schools.[85]

"Exhibits" Prepared and Introduced into Court in the case of U.S. V. Marion County, Florida School District, May 23-25, 2005 [84]

"An Analysis of the Desegregation Effect and Compliance of Student Transfers Between the Dublin City School District and Other Georgia Districts, 1997-98 to 2004-05," October 31, 2005, a report prepared in the case of *U.S. v. State of Georgia (Dublin School District)*. [83]

"The Adequacy of the Smith and Mueller Survey of "Learning Opportunities Provided to the North Dakota Public School Students," September 30, 2005, a report prepared in the case of *Williston Public School District No. 1 et al. v. State of North Dakota, et al*. [82]

"Attainment of the Green Factors, March 3, 2005, a report prepared in the case of *Anderson et al. and U.S. v. Madison County School District*. [81]

**EXHIBIT A**

Report to the Madison County School Board, January 8, 2005, prepared in the case of *Anderson et al. and U.S. v. Madison County School District.* [80]

"Declaration," January 9, 2004  in the case of *Pazmiño v. State of California*. [79]

"Declaration," July 9, 2003 in the case of *Vasquez v. San Jose Unified School District.* [78]

"Equity and Efficiency in California Schools," a report prepared in the case of *Williams v. State of California*, Sept. 30, 2003. [77]

"Declaration, April 23, 2003 in the case of *Hernandez v. Stockton Unified School District.* [76]

"A Rebuttal Report on the Desegregation of the Fulton County Schools," a report prepared in the case of *Hightower v. West*, March 2, 2003. [75]

"The Desegregation of the Fulton County Schools," a report prepared in the case of *Hightower v. West*, January 22, 2003. [74]

Rebuttal Report on the Student Assignment Plan of the Lynn Public Schools," a report prepared in the case of Comfort v. Lynn and Commonwealth of Massachusetts and Bollen v. Lynn, May 10, 2002. [73]

 "Opinions on the Secondary Student Assignment Policy in San Jose Unified School District," a report to the San Jose Unified School District, April 25, 2002. [72]

"Declaration of Christine H. Rossell," prepared for the Stockton Unified School District in the case of Hernandez v. Stockton Unified School District, April 23, 2002. [71]

"Dismantling Bilingual Education, Implementing English Immersion: the California Initiative," February 20, 2002. [70]

"Desegregation Issues in the Dayton Public Schools," a report prepared in the case of *Brinkman v. Gilligan*, February 8, 2002. [69]

"The Desegregation of the Benton Harbor Area School District," a report prepared in the case of *Berry, et al. v. School District of the City of Benton Harbor, et al.*, July 6, 2001. [68]

"The Desegregation of the Kansas City, Missouri School District, From Brown to 2000-01," a report prepared for the case of Jenkins, et al. v. State of Missouri, et al., February 7, 2001. [67]

"Supplemental Report on Tracking and Ability Grouping in the Woodland Hills School District," a report prepared for the case of Hoots, et al. v. Commonwealth of Pennsylvania, et al., May 9, 2000. [66]

"Bilingual Education in California Before and After Proposition 227," a report to the Public Policy Institute of California, March 17, 2000. [65]

"Compliance with the Green Factors in Woodland Hills, Pennsylvania," a report prepared for the case of Hoots, et al. v. Commonwealth of Pennsylvania, et al., March 1, 2000.[64]

" Rebuttal Report on Within-School Integration in the Rockford School District, " a report prepared for the case of People Who Care, et al. v. Rockford Board of Education, School District No. 205 (Rockford, IL), February 20, 2000.[63]

"Is it Possible to Detrack?" a report to the San Jose Unified School System, January 10, 2000 . [62]

"Report on Proposed Modifications to the Consent Decree," a report to the Court in the case of Davis et al., v. East Baton Rouge Parish School Board, January 18, 2000. [61]

**EXHIBIT A**

"Within-School Integration in the Rockford School District, Fall 1999," a report prepared for the case of <u>People Who Care, et al. v. Rockford Board of Education, School District No. 205</u> (Rockford, IL), December 10, 1999.[60]

"Improving the Voluntary Desegregation Plan in the Baton Rouge School System," a Report to the Court in the case of <u>Davis, et al. v. East Baton Rouge Parish School Board, et al.</u>, October 28, 1999. [59]

"Testimony Of Christine Rossell at January 20, 1999 Administrative Law Hearing in the Matter of the Proposed Adoption Of Rules Relating To Desegregation (Minn. Rule, Parts 3535.0100 to 3535.0180) on Behalf of Dept. of Children, Families, and Learning, State Board of Education". [58]

"A Report on Educational Equity Issues in the St. Paul School District" prepared for the state of Minnesota in the case of <u>Independent School District No. 625, St. Paul, MN, et al v. State of Minnesota, et al.</u>, December 27, 1998. [57]

"Declaration of Christine H. Rossell," prepared for the U.S. District Court in the case of <u>Valeria G. et al. v. Pete Wilson [Governor of State of California] et al.</u>, July 15, 1998. [56]

"The Compliance of the St. Louis Special School District with Desegregation and Vocational Educational Goals," a report to the Federal District Court in the case of <u>Liddell et al. vs. the Board of Education of the City of St. Louis, Missouri and the State of Missouri, et al.</u>, Dec. 12, 1997. [55]

"A Rebuttal Report Analyzing the Cleveland City School District's Compliance with Remedial Components," a report to the Federal District Court in the case of <u>Reed v. Rhodes</u>, Oct. 6, 1997. [54]

"The Effectiveness of Magnet Schools and Programs in the Cleveland City School District," a report to the Federal District Court in the case of <u>Reed v. Rhodes</u>, Sept. 15, 1997. [53]

with R. Peterkin, R. Shoenberg, and W. Trent, "Report of the Court-Appointed Panel in <u>Vaughns et al. v. Prince George's County Board of Education, et al.</u> Submitted to Judge Peter J. Messitte, June 30, 1997. [52]

"Declaration of Christine H. Rossell," prepared for the U.S. District Court in the case of <u>Quiroz et al. v. Orange Unified School District and the State of California,</u> September 9, 1997. [51]

"Declaration of Christine H. Rossell," prepared for the Orange Unified School District for presentation to the California State Board of Education, June 8, 1997. [50]

"School Desegregation in the Kansas City, Missouri School District 1954-1996" a report to the U.S. District Court in the case of <u>Jenkins, et al v. State of Missouri, et al.</u>, January 2, 1997. [49]

"Declaration of Christine H. Rossell," prepared for the Magnolia School District for presentation to the California State Board of Education, 1996. [48]

"An Analysis of the San Jose Unified School District's Compliance with its Remedial Orders on Student Assignment and Transportation," a report to the U.S. District Court, Northern District of California in the case of <u>Vasquez, et al. v. San Jose Unified School District, et al.</u>, June 14, 1996. [47]

"Supplemental Report on School Desegregation in the St. Louis Public Schools, 1995," a report to the U.S. District Court in the case of <u>Liddell, et al. v. St. Louis Board of Education, et al.</u>, December 29, 1995. [46]

"School Desegregation in the Rockford Public Schools," a report to the U.S. District Court in the case of <u>People Who Care, et al. v. Rockford Board of Education, School District #205</u>, November 29, 1995. [45]

"School Desegregation in the St. Louis Public Schools, 1967-1995," a report to the U.S. District Court in the case of <u>Liddell, et al. v. St. Louis Board of Education, et al.</u>, November 30, 1995. [44]

**EXHIBIT A**

"Enrollment Projections for the Yonkers School District from Fall 1995 through Fall 2005," a report to the Superintendent of Schools, Reginald F. Marra, Yonkers Public Schools, April 4, 1995. [43]

*with Peggy Davis-Mullen, Boston City Council, "A Proposal for Transitioning the Boston Public Schools from the Current Controlled Choice Desegregation Plan to Community/Neighborhood Schools," June 2, 1994. [42]

"School and Classroom Desegregation in the New Castle County, Delaware Desegregation Area (Brandywine, Red Clay, Christina, and Colonial School Districts), a report to the federal district court in the case of Coalition to Save Our Children v. State Board of Education, November 30, 1994. [41]

"Results of the San Jose Unified School District's 1994 Phase II Parent Registration Survey," a report to the San Jose Unified School District, San Jose, California, November 15, 1994. [40]

"Enrollment Projections for the Yonkers School District from Fall 1994 through Fall 2004," a report to the Superintendent of Schools, Reginald F. Marra, Yonkers Public Schools, June 1, 1994. [39]

"Results of the San Jose Unified School District's Phase II Parent Registration Survey in Spring 1993," a report to the San Jose Unified School District, San Jose, California, February 2, 1994. [38]

"Enrollment Projections for the Yonkers School District from Fall 1994 through Fall 2004," a report to the Superintendent of Schools, Donald M. Batista, Yonkers Public Schools, April 19, 1993. [37]

"Supplemental Report Analyzing the San Jose Unified School District's Compliance With the Court Order in the Area of Student Assignment (School and Classroom Segregation), a report to the U.S. District Court, Northern District of California in the case of Vasquez, et al., v. San Jose Unified School District, et al., November 1, 1993. [36]

"An Analysis of the San Jose Unified School District's Compliance With the Court Order in the Areas of Student Assignment (School and Classroom Segregation), Transportation and Bilingual Education," a report to the U.S. District Court, Northern District of California in the case of Vasquez, et al., v. San Jose Unified School District, et al., June 29, 1993. [35]

with David J. Armor, William Clark, and the Dallas Independent School District, "Data and Analysis in Support of the Dallas Independent School District's Unitary Status Motion to the Court," a report to the U.S. District Court in the case of Tasby, et al. v. Woolery, et al., 1993. [34]

with Lauri Steel, Roger Levine, and David Armor, "Magnet Schools and Issues of Desegregation, Quality and Choice, Phase I: the National Survey and In-Depth Study of Selected Districts," a report to the Department of Education, 1993. [33]

"An Analysis of the Segregation of Alternative Proposals for the Reorganization of the Grant Union High School District and Its Feeder Elementary Schools," a report to the Robla School District, Sacramento County, CA, Aug. 3, 1992. [32]

"Advertising on Channel One: Are Students a Captive Audience?" Report to the Superior Court of the State of California in and for the County of Santa Clara, July 29, 1992. [31]

"Enrollment Projections for the Yonkers School District from Fall 1992 through Fall 2001," a report to the Superintendent of Schools, Donald M. Batista, March 23, l992. [30]

"Estimating the Effectiveness of a Voluntary Magnet School Desegregation Plan for the Stockton Unified School District.  A report to the Superior Court of the State of California in the case of Hernandez v. Stockton Unified School District, September 19, 1991. [29]

"White Flight and Elementary Classroom Segregation" in Report on the Desegregation of the San Jose Unified District, a report to the U.S. District Court, April 30, 1991. [28]

**EXHIBIT A**

"An Analysis Of White Flight, Enrollment Trends, and Classroom and District Segregation in the San Jose Unified School District," October 1, 1990. [27]

"Enrollment Projections for the Yonkers School District," A report to the Superintendent of Schools, Donald M. Batista, May 4, 1989. [26]

"Enrollment Projections for the Yonkers School District for the 1992-93 School Year," A report to the Superintendent of Schools, Donald M. Batista, January 25, 1990. [25]

"Declaration of Christine H. Rossell," prepared for the U.S. District Court in the case of <u>Zambrano et al. v. Oakland Unified School District, et al.</u>, May 30, 1989. [24]

"Exhibits" prepared for the Natchez-Adams School District, <u>U.S. and Nichols v. Natchez Special Municipal Separate School District</u>, 1988-1989.[23]

"An Analysis of Enrollment Trends in the Yonkers School District," A report to the Superintendent of Schools, Donald M. Batista, Yonkers Public Schools, December 29, 1988. [22]

"The Effectiveness of Educational Alternatives for Limited English Proficient Children in the Berkeley Unified School District," a report to the U.S. District Court in the case of <u>Teresa P., et al. v. Berkeley Unified School District</u>, July 29, 1988. [21]

*with Ruth Clarke, "The Carrot or the Stick in School Desegregation Policy?" a report to the National Institute of Education, Washington, D.C., Grant NIE-G-83-0019, March 1987. [20]

"Estimating the Effectiveness of a Magnet School Desegregation Plan for the Savannah-Chatham County School District," a report to the U.S. District Court in the case of <u>Stell and U.S. v. Board of Public Education for the City of Savannah and the County of Chatham,</u> Sept. 23, 1986. [19]

"Estimating the Effectiveness of a Magnet School Desegregation Plan for the Yonkers School District," a report to the U.S. District Court, in the case of <u>U.S. and NAACP v. Yonkers Board of Education, et al.,</u> March 17, 1986. [18]

"Desegregating Estacado High School in the Lubbock Independent School District," a report to the U.S. Department of Justice, Jan. 18, 1986. [17]

"Estimating the Desegregation Effectiveness of the San Jose Unified School District's Plan and "The Cambridge Plan," a report to the U.S. District Court in the case of <u>Vasquez, et al. v. San Jose Unified School District, et al.</u>, filed December 11, 1985. [16]

"The Effectiveness of Alternative Desegregation Plans for Prince George's County, Maryland," a report prepared for the Laurel Amici in the case of <u>Vaughns v. Prince George's County</u> (Maryland) June 4, 1985. [15]

"The Effectiveness of Alternative Desegregation Plans for Hattiesburg, Mississippi," a report to the U.S. Department of Justice in the case of <u>U.S. and Pittman v. Mississippi and Hattiesburg Municipal School District</u>, March 21, 1985. [14]

"The Effectiveness of School Desegregation Plans as Determined by Community Response," a report to the U.S. Commission on Civil Rights, Feb. 1985. [13]

"What Is Attractive About Magnet Schools?" a report to the U.S. Department of Justice, March 15, 1984.[12]

"Options for Desegregating Howard and Madison Street Elementary Schools, Marion County, Florida," a report to the U.S. District Court, Middle District of Florida, Jacksonville, Florida, in the case of <u>U.S. v. Marion County School District</u>, Nov. 5, 1983. [11]

**EXHIBIT A**

"A School Desegregation Plan for East Baton Rouge Parish," a report prepared for the U.S. Department of Justice, Washington, D.C., February, 1983. [10]

*with J. Michael Ross, "The Long-Term Effect of Court-Ordered Desegregation on Student Enrollment in Central City Public School Systems: the Case of Boston, 1974-79," a report prepared for the Boston School Department, 1979. [9]

"Statistical Measures of Effective Net Reduction in Segregation," a memo to Shirley McCune, Associate Commissioner of Equal Educational Opportunity, Office of Education, February 1980. [8]

Memo to Patricia Harris, Secretary of Health, Education and Welfare, on the causes of white flight, its characteristics, and policy options, August 1979. [7]

"Assessing the Unintended Impacts of Public Policy: School Desegregation and Resegregation," a report to the National Institute of Education, Washington, D.C., 1978. [6]

"Monitoring Report of the Boston Public School System," prepared for the U.S. District Court by the Citywide Coordinating Council, August 1977. [5]

Reports to the Court in Carlin v. San Diego Unified School District, 1977, 1979;[3, 4]

Report to the Court in Seattle School District No. 1 v. State of Washington, 1979 [2]

Report to the Court in U.S. v. Port Arthur Independent School District, 1979. [1]

## PROFESSIONAL ACTIVITY
Advisory Board, READ, Washington, D.C., 1999-2000.
Advisory Board, Center for Equal Opportunity, Washington, D.C. 1996-1999.
Advisory Board, U.S. Commission on Civil Rights study on school desegregation, 1986-1987 (Welch and Light, "New Evidence on School Desegregation").
Member, The National Review Panel on School Desegregation Research, an 11 member panel of experts funded by the Ford Foundation, 1977-1980.
Participant, "Ethics and Public Policy: Social Inquiry" project sponsored by the Hastings Center Institute of Society, Ethics and the Life Sciences, 1979-80.
Article reviewer for The American Political Science Review, American Journal of Political Science, Urban Affairs Quarterly, Social Science Quarterly, Sociology of Education, American Politics Quarterly; Review of Education Research; and many other journals.
Member, American Political Science Association; American Educational Research Association.

## PUBLIC SERVICE
Member of the Massachusetts Bilingual Advisory Council, 2000-03.

Co-Chair of "English for the Children," (Question 2) Campaign, Massachusetts, passed November 5, 2002.

Member of the Citywide Coordinating Council of Boston, 1976-77, a 15 member body appointed by Judge W. Arthur Garrity to monitor school desegregation and minority sub-committee representation. I was on the working sub-committee which helped develop and train the nine parent-citizen community district councils in Boston.

## CONSULTING [numbers reflect court litigation]
State of Arizona, Office of the Attorney General, analysis of ethnic studies courses and achievement, in the case of *Fisher, et al.(Plaintiffs) v. U.S. (Plaintiff-Intervenors) v. Lohr, et al.(Defendants) and Sutton (Defendant-Intervenors)/ Mendoza, et al.(Plaintiffs) and U.S. (Plaintiff-Intervenors) v. Tucson Unified School District No. One, et al. (Defendants).,* 2012-present. [76]

State of Connecticut, analysis of ESL and other issues in the case of *Connecticut Coalition for Justice in Education Funding, et al. v. M. Jodi Rell, et al.*, 2012-present. [75]

**EXHIBIT A**

Richardson Independent School District, Richardson and Dallas, Texas, analysis of interdistrict transfers and student desegregation in the case of U.S. v. Richardson Independent School District, May-June 2012. *[includes Court Testimony]* [74]

Office of the Attorney General, State of Arkansas, analysis of charter school transfers in Little Rock School District in the case of *Little Rock School District v. Pulaski County Special School District, et al., Mrs. Lorene Joshua, et al., Interveners, Katherine W. Knight, et al. Interveners*, Jan. 2012 -present, [73]

Meridian School District, MS, analysis of student discipline by race, in the case of *Barnhardt, et al.,and U.S. v. Meridian Municipal Separate School District, et al.,* December 2011-present. [72]

Pearl School District, MS, analysis of unitary status and other issues in the case of *Adams, et al. v. Rankin County Board of Education*, October 2011-present. [71]

Cleveland School District (formerly Bolivar County School District, Number 4), MS, analysis of the Department of Justice's motion for further relief *in the case of Cowan and U.S. v. Bolivar County Board of Education, et al* July 1, 2011-August 31, 2011.[70]

Burch & Cracchiolo, P.A., analysis of plaintiffs reports and issues for the Arizona Department of Education in the case of *Flores v. Horne*, 2010-present. *[bilingual]* [69]

Office of the Attorney General, State of Arkansas, student discipline analysis, in the case of *Little Rock School District v. Pulaski County Special School District No. 1, et al. and Joshua Interveners*, 2009-present. *[includes Court TestimonyCourt Testimony]* [68]

Ruiz and Sperow, age discrimination analysis for the California Public Utilities Commission, 2009. [67]

Office of Legal Services, school desegregation issues, Louisiana Department of Education, 2008-09. [66]

North Monterey School District on the issue of the Marina Station Development area annexation by Monterey Peninsula School District, 2007. [65]

State of Nebraska in the case of Douglas County School District 001 A/K/A Omaha Public Schools et al. v. Dave Heineman, et al., 2007-2008. [64]

Louisville Municipal School District, Mississippi, in the case of  U.S. v. Louisville Municipal Separate School District, et al., 2006-07. [63]

State of California in the case of Valenzuela v. O'Connell, 2006. [62]

Covington County School District, MS, in the case of U.S. v. Covington County, MS, 2005-present. [61]

State of North Dakota in the case of Williston Public School District No. 1 et al. v. State of North Dakota, et al., 2005-2006. [60]

Laurens County School District, Georgia, in the case of U.S. and Ridley v. State of Georgia et al. (Dublin City School District), 2005-2006. [59]

Yonkers Public Schools, Yonkers, NY, 2005 to present. [58]

Marion County, Florida, in the case of U.S. v. Marion County School District, 2005-2007. *[includes Court Testimony]* [57]

State of California in the case of Pazmiño v. State of California, 2003. *[bilingual]* [56]

**EXHIBIT A**

Madison County (Mississippi) School District in the case of <u>Anderson and U.S. v. Madison County School District</u>, 2002-06. *[includes Court Testimony]* [55]

Stockton Unified School District, in the case of <u>Hernandez v. Stockton Unified School District</u>, 2003. [54]

State of California in the case of <u>Williams v. State of California,</u> 2002-03. [53]

Magnet Program Expert Panel, Prince George's County, Maryland in the case of <u>Vaughns v. Prince George's County (Maryland)</u>, 2002. *[includes Court Testimony]* [52]

Fulton County (Georgia) School District in the case of <u>Hightower et al. v. West et al.</u>, 2001-2003. [51]

Citizens for the Preservation of Constitutional Rights in the case of <u>Comfort v. Lynn and Commonwealth of Massachusetts and Bollen v. Lynn</u>, 2002. *[includes Court Testimony]* [50]

State of Ohio, in the case of <u>Brinkman v. Gilligan</u>, 2001-02 [49]

Kansas City, Missouri School District in the case of <u>Jenkins v. Missouri</u>, 2000-01. *[includes Court Testimony]* [48]

State of Michigan in the case of <u>Berry, et al. v. Benton Harbor, et al.</u>, 2000-01. *[includes Court Testimony]* [47]

Natchez-Adams (Mississippi) School District in the case of <u>U.S. and Nichols v. Natchez Special Municipal Separate School District</u>, 2000-03. [46]

Rockford School District, in the case of <u>People Who Care, et al. v. Rockford Board of Education, School District No. 205 (Rockford, IL)</u>, 1999-2000. *[includes Court Testimony]* [45]

State of Pennsylvania, Attorney General, in the case of <u>Hoots et al. v. Commonwealth of Pennsylvania, et al.</u>, [Woodland Hills] 1998-2000. *[includes Court Testimony]* [44]

State of New York, Attorney General, in the case of <u>CFE, et al. v. State of New York</u>, 1998-99. *[includes Court Testimony]* [43]

Plaintiffs (Mexican-American Parents) <u>Carbajal v. Albuquerque Public School District</u>, 1998-1999. *[bilingual]* [42]

State of California, Attorney General, in the case of <u>Valeria G. et al. v. Pete Wilson</u> [in his official capacity as Governor of the State of California] et al, 1998-2000. *[bilingual]*[41]

State of Minnesota on state desegregation rule, 1998-1999. [40]

State of Connecticut, Office of the Attorney General, in the case of <u>Sheff v. O'Neill</u>, 1990-91, 1998, 2002 *[includes Court Testimony]* [39]

Orange Unified School District, in the case of <u>Quiroz, et al. v. State Board of Education</u>, et al., 1997. *[includes Court Testimony] [bilingual]* [38]

State of Ohio and the Cleveland School District, in the case of <u>Reed v. Rhodes</u>, 1997-1998. *[includes Court Testimony]* [37]

Court-Appointed Expert to Federal District Court Judge Peter Messite, in the case of <u>Vaughns v. Prince George's County (Maryland)</u>, 1996-1997. *[includes Court Testimony]* [36]

State of Minnesota, in the case of <u>NAACP v. Minnesota</u> and <u>Saint Paul School District v. Minnesota</u>, 1996-1999. [35]

**EXHIBIT A**

East Baton Rouge Parish School Board, in the case of <u>Davis v. East Baton Rouge Parish School Board</u>, 1996-2000. [34]

State of Missouri, in the case of Liddell et al. vs. the Board of Education of the City of St. Louis, Missouri, et al. (St. Louis Special School District), 1996-97 *[includes Court Testimony]* [33]

State of Missouri, in the case of <u>Jenkins v. Missouri,</u> (Kansas City) 1996-1997. *[includes Court Testimony]*[32]

Rockford Education Association, in the case of <u>People Who Care, et al. v. Rockford Board of Education, School District No. 205 (Rockford, IL)</u>, 1995. *[includes Court Testimony]* [31]

State of Delaware and the Boards of Education of the Brandywine, Christina, Colonial, and Red Clay School Districts in the case of <u>Save Our Children v. State Board of Education of the State of Delaware, et al.</u>, 1995. *[includes Court Testimony]* [30]

State of Missouri, in the case of <u>Liddell v. St. Louis Board of Education, et al.</u>, 1994-1995. *[includes Court Testimony]* [29]

Dallas Independent School District, in the case of <u>Tasby, et al. v. Woolery, et al</u>. September 1993. *[includes Court Testimony]* [28]

San Jose Unified School District, <u>(Diaz) Vasquez v. San Jose Unified School District</u>, July 1985-2003 *[includes Court Testimony in 1986]* [27]

Robla School District, Sacramento County, CA, in the case of <u>Robla School District v. California State Board of Education</u>, 1992. [26]

Department of Education, on reauthorization of Elementary and Secondary Act, May 1992.

East Side High School District, San Jose, CA, in the case of <u>Honig et al. v. East Side Union High School District</u>, 1992. [25]

Duvall County, Florida Public Schools, Fall 1991.

Knox County Public Schools, Knoxville, TN, in the case of <u>Middlebrook v. School District of the County of Knox, Tennessee,</u> Jan. 1991-92. *[includes Court Testimony]* [24]

Oakland Unified School District, in the case of <u>Zambrano et al. v. Oakland Unified School District,</u> 1989. *[bilingual]*[23]

Savannah-Chatham County School District, <u>Stell v. Board of Public Education for the City of Savannah and the County of Chatham</u>, Jan. 1986-93. *[includes Court Testimony]* [22]

Yonkers School District, <u>U.S. and NAACP v. Yonkers Board of Education; City of Yonkers; and Yonkers Community Development Agency</u> Jan. 1986-present. *[includes Court Testimony]* [21]

Stockton Unified School District, <u>Hernandez v. Stockton Unified School District</u>, 1989-91, 2003. [20]

De Kalb County School District, <u>Pitts v. Freeman</u>, Nov. 1986-88. *[includes Court Testimony]* [19]

Ocean View School District, Huntington Beach, CA, Dec. 1990-1991.

Topeka School District, <u>Brown v. Board of Education</u>, 1990. [18]

Natchez-Adams School District, <u>U.S. and Nichols v. Natchez Special Municipal Separate School District</u>, 1988-1989. *[includes Court Testimony]* [17]

**EXHIBIT A**

Berkeley Unified School District, <u>Teresa P. v. Berkeley Unified School District</u>, 1987-1988. *[includes Court Testimony] [bilingual]*[16]

City of St. Louis, <u>Liddell v. Board of Education of the City of St. Louis, Mo., et al.</u>, 1987-1989. *[includes Court Testimony]* [15]

U.S. Department of Justice, <u>U.S. v. Texas Education Agency</u> (Lubbock Independent School District) Aug. 1985-1986. [14]

The U.S. Commission on Civil Rights, "The Effectiveness of Various School Desegregation Plans in Reducing Student Racial and Ethnic Isolation Between and Within Public Schools" awarded to Unicon Corporation, Los Angeles, CA., June 1985-1987; System Development Corporation, Santa Monica, CA., Sept. 1984-May 1985; testimony at hearings, June 11, 1987.

The Laurel Amici, <u>Vaughns v. Board of Education of Prince George's County</u>, May-June 1985. [13]

Fort Wayne Community Schools, consultant to the school district on a magnet school plan, 1986.

The U.S. Department of Justice, <u>U.S. and Pittman v. Mississippi and Hattiesburg Municipal School District</u>, 1985-1986, and 1998. *[includes Court Testimony, 1986]* [12]

The U.S. Dept. of Justice, <u>U.S. v. Charleston County School District and the State of South Carolina</u>, 1982. [11]

Court-appointed expert, <u>U.S. v. Marion County</u> ,(Florida), 1983-1984. [10]

Mediator for Community Relations Service, U.S. Department of Justice, in <u>Little Rock School District v. Pulaski County, Special School District, et al.</u>, 1983. [9]

The U.S. Dept. of Justice, <u>Davis and U.S. v. East Baton Rouge Parish School District</u>, 1982-83. [8]

Contributor to the legal brief presented by the Legal Defense Fund, Inc. to the Supreme Court on behalf of <u>Crawford v. Board of Education of Los Angeles</u>, and <u>Seattle School District v. the State of</u> Washington, Feb. 1982. [7]

Expert witness, Committee on the Judiciary, Subcommittee on Civil and Constitutional Rights, U.S. House of Representatives, Washington, D.C., September 23, 1981.

Expert witness for and consultant to the U.S. Dept. of Justice, <u>U.S. v. Port Arthur Independent School District</u>, 1980. *[includes Court Testimony]* [6]

Educational Policy Center, Duke University, conducting a meta-analysis of research studies on community reaction to school desegregation and issues of resegregation, interviewing in several cities, and co-authoring the final report on the effectiveness of desegregation strategies, 1979-80.

Educational Policy Center, Institute of Policy Sciences, Duke University, interviewing and providing information on court appointed advisory monitoring panels, 1979-80.

Member of the Advisory Board for the Associate Commissioner of Equal Educational Opportunity Programs (Shirley McCune), 1980.

Training Equal Educational Opportunity Program staff (HEW) on the causes and consequences of white flight and policy options, October 17-18, 1979.

Plaintiffs' expert witness, <u>Crawford v. Board of Education of Los Angeles</u>, 1979-80. *[includes Court Testimony]* [5]

Educational Policy Development Center - Desegregation, Institute of Policy Sciences, Duke University, 1979-80.

**EXHIBIT A**

The U.S. Dept. of Justice, <u>Ross v. Houston Independent School District</u>, June 1979. [4]

Plaintiffs' expert witness, <u>Seattle School District No. 1 v. the State of Washington</u>, April - May 1979. *[includes Court Testimony]* [3]

The U.S. Dept. of Justice, <u>Liddell v. Board of Education of St. Louis, Mo.</u>, March 1978. [2]

Plaintiffs' expert witness, <u>Carlin v. San Diego Unified School District</u>, January 1977, 1979. *[includes Court Testimony]* [1]

Abt Associates, writing a research proposal to study magnet schools as a desegregation tool, May-June 1977; analyzing data, Summer 1978.

Rand Corporation, designing questionnaire to collect data on school desegregation actions in a national sample, 1976-77.

Office of Education, panel reviewing public service grants and fellowship applications, Spring 1975; Spring 1976; and Spring 1977.

Rand Corporation, Winter 1973-74, longitudinal design to study school desegregation.

**DESEGREGATION PLAN DESIGN ASSISTANCE**: Prince George's County, MD, 2002; Baton Rouge, LA (1983 & 1996); Knox County, TN (1991); Ocean View, CA (1990); Stockton, CA (1989); Natchez, MS (1988); San Jose, CA (1986); Yonkers, NY (1986); Savannah-Chatham County, GA (1986); De Kalb, GA (1986); Marion County, FL (1983).

**PARENT SURVEYS CONDUCTED**: Hattiesburg, MS (1998); Rockford, IL (1995); Knox County, TN (1991); De Kalb, GA (1990); Stockton, CA (1990); Topeka, KS (1990); Natchez, MS (1988); Yonkers, NY (1986); Savannah-Chatham County, GA (1986).

**EXHIBIT A**