## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

|  |  |  |
|---|---|---|
| DIANE COWAN *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil Action No. 2:65-cv-00031-DMB |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOLIVAR COUNTY BOARD OF | ) | |
| EDUCATION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF-INTERVENOR UNITED STATES' OBJECTIONS
## TO DEFENDANT CLEVELAND SCHOOL DISTRICT'S PROPOSED PLANS

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 4

II.  PRIOR REMEDIAL ORDERS .......................................................................... 6

III.  ARGUMENT ..................................................................................................... 10

  A.  Under Plan A, the District provides no evidence that the proposed minor
     modifications to its existing freedom-of-choice approach would desegregate
     East Side or D.M. Smith. ............................................................................. 11

    1.  The existing freedom of choice plan has failed to attract white
       students to East Side and D.M. Smith. ............................................ 11

    2.  The District has provided no evidence that the proposed
       modifications to its high school programs would result in
       desegregation of East Side. ............................................................. 13

  B.  Plan B is not reasonably calculated to meaningfully desegregate the District's
     high schools, and unnecessarily delays desegregation of the middle schools
     until at least the 2017-2018 school year. ................................................... 20

    1.  This high school plan suffers from a lack of detail and internal
       inconsistencies that would likely impede effective implementation
       of the plan as a desegregation remedy. .......................................... 21

    2.  The middle school plan unnecessarily delays school-wide
       desegregation, requires more resources to implement than the
       United States' Plan, and may result in impermissible within-school
       segregation in the consolidated middle school. ............................. 23

    3.  The Court should reject Plan B because the United States' Plan
       promises speedier and more effective desegregation of both the
       middle and high schools. .................................................................. 25

IV.  CONCLUSION ................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Beaumont Indep. Sch. Dist. v. Dep't of Health, Educ. & Welfare,*
    504 F.2d 855 (5th Cir. 1974) ................................................................................... 12

*Belk v. Charlotte-Mecklenburg Bd. of Educ.,*
    269 F.3d 305 (4th Cir. 2001) ..................................................................................... 4

*Cowan v. Cleveland Sch. Dist.,*
    748 F.3d 233 (5th Cir. 2014) ................................................................... 4, 6, 9, 10, 12

*Davis v. E. Baton Rouge Parish Sch. Bd.,*
    721 F.2d 1425 (5th Cir.1983) ................................................................................... 10

*Estes v. Metro. Branches of the Dallas NAACP,*
    444 U.S. 437 (1980)................................................................................................... 4

*Flax* v. *Potts,*
    915 F.2d 155, 161 n.8 (5th Cir. 1990) ....................................................................... 4

*Green v. Cnty. Sch. Bd. of New Kent Cnty.,*
    391 U.S. 430 (1968)............................................................................................... 6, 10

*Lee v. Marengo Cnty. Bd. of Educ.,*
    588 F.2d 1134 (5th Cir. 1979) ................................................................................. 12

*Tasby v. Wright,*
    713 F.2d 90 (5th Cir. 1983) ....................................................................................... 4

## I.        INTRODUCTION

This July, the school desegregation case against the Cleveland School District (the "District") will reach its fiftieth anniversary. Despite repeated attempts over the last half-century to adopt choice-based approaches to desegregation, those approaches have always failed. As a result, the District continues to operate several racially identifiable, one-race black schools,[1] including East Side High School ("East Side") and D.M. Smith Middle School ("D.M. Smith"). As this Court found in its March 28, 2012 Order [Doc. 42] ("March 2012 Order") and Memorandum Opinion [Doc. 43] ("March 2012 Opinion"), East Side and D.M. Smith have never been desegregated. Mar. 2012 Op. at 23, 25-26. Those schools are now, and have always been, virtually 100 percent black schools. The Court's finding in its March 2012 Opinion that the District has failed to meet its burden of eradicating the vestiges of *de jure* segregation in its schools has not been challenged. *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 238 (5th Cir. 2014). Therefore, the sole issue presently before the Court is which remedial plan the District must implement now to meet its long-overdue obligation to desegregate its middle schools and high schools.

On January 23, 2015, the Parties submitted separate desegregation plans for the Court's consideration. Plaintiff-Intervenor United States of America (the "United States") proposed a desegregation plan [Doc. 109-1] ("United States' Plan") under which the District would, using existing facilities, begin operating a consolidated high school and a consolidated middle school

---

[1] As this Court has noted, a "one-race" school is one in which 90 percent or more of a school's population is of the same race. *See* Mar. 2012 Op. at 22 (citing *Flax* v. *Potts*, 915 F.2d 155, 161 n.8 (5th Cir. 1990)). Under one definition, a school is racially identifiable where the proportion of students of one race is at least 75 percent. *See Estes v. Metro. Branches of the Dallas NAACP*, 444 U.S. 437, 442 (1980); *Tasby v. Wright*, 713 F.2d 90, 97 n.10 (5th Cir. 1983). Federal courts have also used a deviation of 15-20 percentage points from District-wide averages as a measure of racial identifiability. *See, e.g.*, *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 319 (4th Cir. 2001) ("[P]lus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination.").

in the 2016-2017 school year, following a one-year planning and implementation period during the 2015-2016 school year. United States' Plan at 13-14. The District could begin implementing the United States' Plan immediately and, within a year, reliable and permanent desegregation of the middle schools and high schools would be attained.

Also on January 23, 2015, the District submitted two proposed plans. Proposed Plans of the Cleveland Sch. Dist. [Doc. 108-1] ("Dist. Plans"). The District's preferred plan, Plan A, would maintain the status quo by continuing the existing "freedom of choice" system "by which all students in grades 9-12 may voluntarily choose which of the two high schools they wish to attend" and in which all students in grades 6-8 may choose Margaret Green Junior High School ("Margaret Green") or D.M. Smith as a middle school. Dist. Plans at 1, 4. Under Plan A, the District suggests that it may decide to close D.M. Smith at some point in the future, and, if it does so, would then assign all middle school students to Margaret Green. *Id.* at 4-5. The District's alternative plan, Plan B, would convert Cleveland High School ("Cleveland High") to a whole-school magnet high school focused on science, technology, engineering, and math ("STEM") and the arts, with students not admitted to that magnet high school assigned to attend East Side. *Id.* at 8. Under Plan B, the District would close D.M. Smith after the 2016-2017 school year and assign all middle school students to Margaret Green beginning in the 2017-2018 school year—over two full school years from now. *Id.* To accommodate all students in grades 6-8, the District would need to construct new classrooms at Margaret Green by August 2017, *id.*, although Plan B does not contain a detailed implementation plan for planning, financing, and completing this construction project by that date.

The United States respectfully objects to both of the District's proposed desegregation plans, each of which relies heavily on student choice to accomplish desegregation, an approach

5

that has consistently failed to work after several unsuccessful attempts over the last half-century.

Each of the District's two plans fails to meet the well-established constitutional requirement, reiterated by the Fifth Circuit in its April 1, 2014 decision in this case, that the District satisfy its "burden . . . to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Cowan*, 748 F.3d at 238 (citing *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 439 (1968)) (emphasis added). The United States' Plan would promise a "speedier and more effective conversion to a unitary, nonracial school system," *Green*, 391 U.S. at 441, than either of the District's two plans. Therefore, the Court should reject the District's proposed plans and order the District to implement the United States' Plan at the earliest practicable date.

## II.     PRIOR REMEDIAL ORDERS

The Court provided a full and detailed procedural history of this case in its March 2012 Opinion. *See* Mar. 2012 Op. at 1-12. In the interest of brevity, the United States will not repeat that lengthy history here. This section therefore only summarizes the prior remedial orders in this case to provide context for the Court's consideration of the Parties' proposed plans, as well as the recent procedural history since the Court's March 2012 Order and Opinion.

### A.  1969 Order

On July 24, 1969, after rejecting a plan proposed by the District to maintain its former "freedom of choice" system, this Court issued an order adopting the District's revised desegregation plan and entering a permanent injunction still in effect today. *See* July 24, 1969 Order ("1969 Order") [Doc. 33]. The 1969 Order specifically enjoins the District "from discriminating on the basis of race or color in the operation of [the District]. As hereinafter set out, [the District] shall take affirmative action to disestablish all school segregation to eliminate

6

the effects of the dual school system." *Id.* at 1. The 1969 Order replaced the "freedom of choice" system used by the District from 1966 to 1969, under which a number of black children had chosen to enroll in the District's formerly all-white schools, but "[n]o white child ha[d] chosen to attend a 'Negro' school." Findings of Fact, May 16, 1969, at 5. The Court found that "no longer may the effectiveness of any plan depend upon the wishes or choice of students or their parents," noting that "[a]ltogether too much on the whim or wish of individual students will be the continuing identity of these schools . . . as Negro and white schools." Hearing Tr., July 9, 1969, at 2, 4. The 1969 Order established geographic attendance zones, permitting "majority-to-minority" transfers for students assigned to attend a school in which their race was the majority to a school in which their race was the minority. 1969 Order at 3-4.

### B. 1989, 1992, and 1995 Consent Orders

Following the United States' intervention in this case in 1985, the Court entered a series of consent orders between the United States and the District in 1989, 1992, and 1995, intended to further desegregation in the District. With respect to student assignment in the middle and high schools, the September 21, 1989 Consent Order [Doc. 12] ("1989 Consent Order") maintained the existing attendance zones and reinforced the existing majority-to-minority transfer provisions. 1989 Consent Order at 4-7. The November 1, 1992 Consent Order [Doc. 13] ("1992 Consent Order"), noting the Parties' acknowledgement that Margaret Green and Eastwood Junior High School (now D.M. Smith) remained racially identifiable, permitted the District to develop and implement a magnet school program at the middle school level. 1992 Consent Order at 1-2. Similarly, the February 6, 1995 Consent Order [Doc. 14] ("1995 Consent Order") permitted the District to develop a magnet program at the high school level intended to further desegregation at the District's two high schools. 1995 Consent Order at 2.

### C. Recent Case History

In 2006, the United States initiated a periodic review of the District to determine whether the District was complying with the extant desegregation orders. This review revealed that nearly every school in the District remained racially identifiable as a black or white school, and that the District had failed to eliminate the vestiges of its former dual school system. U.S. Mot. for Further Relief, May 2, 2011, at 3 [Doc. 5]. Based on these violations, the United States moved for further relief in 2011. *Id.* at 4. The Court granted the United States' motion in part, and ordered the District to, *inter alia*, submit a desegregation plan for student assignment at the District's formerly *de jure* black middle and high schools. Mar. 2012 Order at 1. The Court observed that "[o]ne obvious remedy would be consolidation of the two high schools…and consolidation of the two junior high schools." Mar. 2012 Op. at 40 n.9.

The District still did not consider or propose a consolidation plan. Instead, in response to that Order, the District submitted a proposed plan on May 15, 2012 that sought to further desegregation at D.M. Smith and East Side by "revitaliz[ing]" existing magnet programs and introducing new magnet programs at D.M. Smith and East Side. Dist. Proposed Plan, May 15, 2012, at 2 [Doc. 44] ("District's 2012 Plan"). The United States objected to the District's 2012 Plan as constitutionally inadequate, arguing that the proposed magnet programs were "nearly indistinguishable from previous programs that failed to achieve any integration in Cleveland at the high school and middle school level." United States' Objections, Aug. 30, 2012, at 2 [Doc. 48].

Following a hearing on December 10, 2012, the Court rejected the District's proposed student assignment plan as constitutionally deficient. *See* Order, Jan. 24, 2013 ("January 2013 Order"). In its place, the Court ordered its own plan, which abolished the existing middle school

8

and high school attendance zones and majority-to-minority transfer program, and created an "open-enrollment" or "freedom-of-choice" system for all middle and high school students. *Id.* at 8. The Court then denied the United States' Motion to Alter or Amend the January 2013 Order. Order, Apr. 30, 2013 [Doc. 90]. On July 1, 2013, the United States appealed that denial to the U.S. Court of Appeals for the Fifth Circuit. United States' Notice of Appeal, July 1, 2014 [Doc. 94].

On April 1, 2014, the Fifth Circuit reversed this Court's remedial order and remanded the case "for a more explicit explanation of the reasons for adopting the freedom of choice plan, and/or for consideration of the alternative desegregation plans proposed by the parties, as appropriate." *Cowan*, 748 F.3d at 240. While not rejecting freedom of choice outright, the Fifth Circuit cast significant doubt on the appropriateness of a freedom of choice plan in this case, noting that freedom of choice "has historically proven to be an ineffective desegregation tool." *Id.* at 238. The Court enumerated "apparent deficiencies in the plan that were not addressed by the district court," including, notably, that "there was no evidence or explanation indicating that the freedom of choice plan was likely to work, and all the available empirical evidence indicates that the plan is *not* likely to contribute to meaningful desegregation at D.M. Smith Middle School or East Side High School." *Id.* at 238-39 (emphasis added). The Fifth Circuit further noted that the District "has not sought a declaration of unitary status and has not challenged the district court's conclusion that further remedies are necessary." *Id.* at 239. Additionally, the Court expressly found that "the situation in Cleveland is distinguishable from those [cases] where we have found that the retention of some one-race schools did not preclude a declaration of unitary status." *Id.*

9

From June 2014 to January 2015, the Parties engaged in extensive discussions and negotiations, consistent with the June 18, 2014 Scheduling Order directing the Parties to attempt to resolve this matter voluntarily. During that time, the United States, with the participation and assistance of its consultants, visited the District and its schools on multiple occasions; sought, obtained, and reviewed information from the District; observed and participated in meetings with community members; and shared feedback on various proposals prepared by the District. However, the Parties were ultimately unable to reach agreement on a desegregation plan. Therefore, both the United States and the District submitted their separate plans to the Court on January 23, 2015.

## III.  ARGUMENT

After the District's many unsuccessful attempts to desegregate its middle and high schools, this Court must order a desegregation plan that promises to work at the earliest practicable date to eliminate the vestiges of segregation in the District. The Fifth Circuit stated this obligation plainly in its April 1, 2014 Opinion: "Now, six decades after *Brown v. Topeka Board of Education,* '[t]he burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.'" *Cowan*, 748 F.3d at 238 (citing *Green,* 391 U.S. at 439; *Davis v. E. Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1437 (5th Cir.1983)) (internal citation omitted). "The duty is not simply to eliminate express racial segregation: where *de jure* segregation existed, the school district's duty is to eliminate its effects 'root and branch.'" *Cowan*, 748 F.3d at 438 (citing *Green*, 391 U.S. at 437-38). Since neither of the District's proposed plans promise to meaningfully desegregate the District's middle and high schools, they do not meet constitutional requirements and should be rejected by this Court in favor of the United States' Plan.

10

A.  **Under Plan A, the District provides no evidence that the proposed minor modifications to its existing freedom-of-choice approach would desegregate East Side or D.M. Smith.**

   1.  *The existing freedom of choice plan has failed to attract white students to East Side and D.M. Smith.*

The District's latest iteration of a freedom of choice system has failed to desegregate East Side or D.M. Smith in the two school years in which it has been in effect.  As detailed in the United States' Plan, the racial composition of the student populations at the two high schools and two middle schools remain virtually identical to those in the 2012-2013 school year, the last year in which the attendance zones and majority-to-minority transfer system were in place.  United States' Plan at 4-7 & Tables 2-3.  In 2012-2013, East Side had 368 students, 99.2 percent of whom were black; in 2014-2015, the school has 360 students, 99.7 percent of whom are black.  Similarly, in 2012-2013, D.M. Smith had 307 students, 99.7 percent of whom were black; now, the school has 246 students, 99.6 percent of whom are black.  Although Margaret Green experienced an increase in enrollment, with D.M. Smith experiencing a corresponding loss of students, the overall percentages of students by race at both schools have remained virtually unchanged.

As detailed in the United States' February 21, 2013 Memorandum of Law in Support of its Motion to Alter or Amend Judgment [Doc. 81] ("U.S. Feb. 2013 Mem."), the Supreme Court and Fifth Circuit have consistently held that "freedom of choice" plans that have not worked, or do not promise to work, must be rejected when other workable desegregation alternatives are available that promise immediate desegregation.  U.S. Feb. 2013 Mem. at 7-12; *see Green*, 391 U.S. at 439-42.  The Fifth Circuit has recognized the principle that freedom-of-choice is a disfavored remedy in a long line of school desegregation cases, including, most recently, in this

11

one.  *See* U.S. Feb. 2013 Mem. at 8-11 (citing cases); *Cowan*, 748 F.3d at 238-39.  The Fifth

Circuit has reversed "freedom of choice" plans where they have failed, in practice, to

desegregate one-race schools.  *See, e.g., Lee v. Marengo Cnty. Bd. of Educ.,* 588 F.2d 1134,

1135-36 (5th Cir. 1979) (reversing district court's order of a "freedom of choice" plan where the

"plan is not working to achieve desegregation" and where one-race black schools continued to

exist in small, majority-black school district)*; Beaumont Indep. Sch. Dist. v. Dep't of Health,

Educ. & Welfare,* 504 F.2d 855, 857 (5th Cir. 1974) (rejecting "freedom of choice" plan "since it

is apparent that this method has not been successful in desegregating the schools" and directing

district court "to institute an effective plan which is constitutionally sound").

At the time of the 2013 appeal in this case, the record before the Fifth Circuit only

included the pre-enrollment projections for the 2013-2014 school year provided to this Court by

the District in April 2013.  That data indicated that the freedom of choice plan was *likely* to fail

to attract any white students to East Side or D.M. Smith.  Now, however, the student enrollment

data from the last two school years demonstrate conclusively that the freedom of choice plan *has*

failed.  *See* Table 1.  This result is not surprising:  both the original freedom of choice plan

employed by the District from 1966 to 1969, as well as the longstanding majority-to-minority

transfer system in which nearly all white students residing in Cleveland had the opportunity to

transfer to East Side or D.M. Smith but under which none chose ever to do so, similarly failed to

eradicate the racial identifiability of East Side and D.M. Smith as one-race black schools.  *See*

U.S. Feb. 2013 Br. at 12-18.

**Table 1: Student Enrollment Before and After Freedom of Choice Plan**

| School | 2012-2013 (Before Freedom of Choice Plan) | | | | 2013-2014 (Year 1 of Freedom of Choice) | | | | 2014-2015 (Year 2 of Freedom of Choice) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Black | White | Other | Total | Black | White | Other | Total | Black | White | Other | Total |
| **Margaret Green** | 203 *51.1%* | 163 *41.1%* | 31 *7.8%* | 397 | 263 *49.3%* | 235 *44.0%* | 36 *6.7%* | 534 | 267 *50.3%* | 229 *43.1%* | 35 *6.6%* | 531 |
| **D.M. Smith** | 306 *99.7%* | 0 *0.0%* | 1 *0.3%* | 307 | 257 *99.6%* | 0 *0.0%* | 1 *0.4%* | 258 | 245 *99.6%* | 0 *0.0%* | 1 *0.4%* | 246 |
| **MS TOTAL** | 509 *72.3%* | 163 *23.2%* | 32 *4.5%* | 704 | 520 *65.7%* | 235 *29.7%* | 37 *4.7%* | 792 | 512 *65.9%* | 229 *29.5%* | 36 *4.6%* | 777 |
| **Cleveland HS** | 278 *45.4%* | 289 *47.2%* | 45 *7.4%* | 612 | 284 *46.1%* | 287 *46.6%* | 45 *7.3%* | 616 | 292 *46.2%* | 300 *47.5%* | 40 *6.3%* | 632 |
| **East Side HS** | 365 *99.2%* | 0 *0.0%* | 3 *0.8%* | 368 | 348 *99.7%* | 0 *0.0%* | 1 *0.3%* | 349 | 359 *99.7%* | 1 *0.3%* | 0 *0.0%* | 360 |
| **HS TOTAL** | 643 *65.6%* | 289 *29.5%* | 48 *4.9%* | 980 | 632 *65.5%* | 287 *29.7%* | 46 *4.8%* | 965 | 651 *65.6%* | 301 *30.3%* | 40 *4.0%* | 992 |

  2. *The District has provided no evidence that the proposed modifications to its high school programs would result in desegregation of East Side.*

  The District posits that the freedom of choice approach under Plan A would, at the high school level, be modified in three ways: (a) instituting a new requirement that all students who seek to participate in the existing International Baccalaureate ("IB") program at East Side enroll at that school full time; (b) offering an "Early College Program" at East Side; and (c) instituting a 550-student cap on enrollment at both East Side and Cleveland High. Dist. Plans at 1-2. These limited changes are unlikely to attract sufficient numbers of white students to East Side to alter the racial identifiability of that school as a one-race black school.

  a. <u>The District's existing IB program at East Side has never attracted white students to enroll at that school.</u>

  The District "proposes placing two of the most academically rigorous programs, the International Baccalaureate program and the Early College Program," at East Side. *Id.* at 2. The IB program is *already* housed at East Side, and has been for a number of years. In 2012, the District proposed a plan to "revitalize and restructure" the IB programs at East Side and D.M. Smith (which had previously been supported by nearly $12 million in federal Magnet School

Assistance Program grants from 2004-2010). Cleveland Sch. Dist.'s Proposed Plan, May 15, 2012 [Doc. 44] ("District 2012 Plan"), at 1-2. The United States objected to that plan as largely indistinguishable from the previous middle and high school magnet plans that had failed to desegregate those schools. United States' Objections, Aug. 30, 2012, at 4-5. This Court agreed, finding "that Defendant Cleveland School District's proposed desegregation plan does not meet the constitutional requirements for desegregation." Jan. 2013 Order at 1. The District did not appeal that finding.[2]

With respect to the IB program, there is no appreciable difference between the District's 2012 plan and the plan presently before the Court. Under the 2012 plan, Cleveland High students who wished to participate in the IB program would have been required to enroll at East Side in the 2014-2015 school year, what would have been the third year of that plan's implementation. Dist. Proposed Plan, May 15, 2012 ("2012 District Plan"), at 2. Under the District's current proposed plan, students would likewise be required to enroll at East Side, albeit in the first year of proposed implementation. Dist. Plans at 2.

The District speculates that the 48 Cleveland High students who currently take IB courses at East Side would, if required to do so under its plan, enroll at East Side to participate in that program. Dist. Plans at 3. Of those 48 students, 18 are black and 30 are white. *Id.* As indicated in Table 2, even if all 48 of those students chose to enroll at East Side, East Side would remain a racially identifiable black school if all other students remained at their current high school.

---

[2] Notably, the District's rejected plan in 2012 would have gone even further than what is now proposed in Plan A. Specifically, the plan would also have created a within-school STEM magnet program at D.M. Smith and East Side. Dist. 2012 Plan at 1, 3. Even with that additional component, the Court agreed with the United States that the plan failed to meet constitutional requirements. Jan. 2013 Order at 1.

**Table 2: Effect of Requiring All IB Students to Attend ESHS**
**(Based on 2014-2015 Enrollment)**

|  | Cleveland High School | | | | East Side High School | | | |
|---|---|---|---|---|---|---|---|---|
|  | Black | White | Other | Total | Black | White | Other | Total |
| Current configuration (IB students at CHS not required to enroll at ESHS) | 292 *46.2%* | 300 *47.5%* | 40 *6.3%* | 632 | 359 *99.7%* | 1 *0.3%* | 0 *0.0%* | 360 |
| All 48 IB students (30 white; 18 black*) at CHS enroll full-time at ESHS | 274 *46.9%* | 270 *46.2%* | 40 *6.8%* | 584 | 377 *92.4%* | 31 *7.6%* | 0 *0.0%* | 408 |
| All 18 black* IB students at CHS enroll full-time at ESHS, but no white students do | 274 *44.6%* | 300 *48.9%* | 40 *6.5%* | 614 | 377 *99.7%* | 1 *0.3%* | 0 *0.0%* | 378 |
| All 30 white IB students at CHS enroll full-time at ESHS, but no black students do | 292 *48.5%* | 270 *44.9%* | 40 *6.6%* | 602 | 377 *92.1%* | 31 *7.9%* | 0 *0.0%* | 408 |

*\* Note: In its plans, the District noted that 30 of the 48 students who are enrolled at Cleveland High but take IB classes at East Side are white, but did not indicate whether the other 18 students are black or another race. For this table, the non-white students are assumed to be black, which may overstate the number of black students in these hypothetical scenarios.*

There is no assurance that any current Cleveland High student who is required to enroll at East Side to participate in the IB program would do so. Ironically, the District has repeatedly argued in this case that a remedy that would result in mandatory reassignment of students from Cleveland High to East Side would be unpopular, particularly among white families. The United States' observations during the parent focus groups it conducted in October suggest that at least some white families would choose to keep their children at Cleveland High, even if it meant not participating in the IB program.

      b.  <u>The proposed Early College Program is a modified version of the existing dual enrollment option and offers little likelihood of contributing to desegregation at East Side.</u>

The only "new" program proposed by the District for East Side is the "Early College Program," in which some eligible East Side students could receive college credit for classes taken at Delta State University. Dist. Plans at 2. The District would pay tuition for one or two college courses per semester for those students. *Id.* The District's proposal characterizes the "Early College Program" as a magnet program. *Id.* at 3. In actuality, it would only be a coursework option for some high-achieving students who are already well into their high school careers. It would not, as proposed, offer any unique programming for students in the 9th and

15

10th grades, nor be a guaranteed option for 8th grade students interested in taking college coursework later in high school.

The District does not demonstrate how the program would result in desegregation of East Side. First, students in the District who obtain a composite score of 18 or higher on the ACT already have the option to earn dual enrollment credit at local colleges and universities, no matter which high school they attend. *See* 2012-2013 Curriculum Guide at 15.[3] The District does not suggest in its proposal that this dual enrollment option would be discontinued. Second, the District's proposed eligibility criteria would likely limit participation in the program to a small number of students. To be eligible, students would need to be in the 11th or 12th grade, score a minimum compose score of 21 on the ACT, *and* have completed all high school core courses prior to participation. Dist. Plans at 2-3. The ACT score requirement will ensure only a limited number of students would benefit: In 2013, the average composite ACT score for all graduating seniors in the District was 17.9, below the State and national averages. *See* Table 3. Moreover, the District has provided no data on students' eligibility by race that would indicate whether black students would benefit proportionately from this program.

Table 3: Six-year comparison of ACT average composite scores[4]

| Location | Year | | | | | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| National | 21.1 | 21.0 | 21.1 | 21.1 | 20.9 | 21.0 |
| Mississippi | 18.7 | 18.5 | 18.4 | 18.5 | 18.9 | 19.0 |
| Cleveland, MS | 17.8 | 17.5 | 17.9 | 17.1 | 17.9 | NA |

---

[3] This document is available at
http://www.cleveland.k12.ms.us/Default.asp?PN=DocumentUploads&L=2&DivisionID=4859&DepartmentID=10684&LMID=442924&ToggleSideNav= (click on link for "Curriculum Guide 2012-2013"). This is the most recent curriculum guide available on the District's website.
[4] Source: *ACT Scores for Graduating Seniors, Kids Count Data Center*,
http://datacenter.kidscount.org/data/tables/3801-act-scores-for-graduating-seniors?loc=26&loct=2#detailed/2/any/false/36,868,867,133,38/128,129,130,131,132/10231.

In sum, the proposed early college program may benefit a few high-achieving students who have satisfied the stringent eligibility criteria by the time they reach 11th grade. However, the remote prospect of participating in the program later in high school is unlikely to induce any student, including white students who would otherwise choose to attend Cleveland High, to opt to enroll at East Side when faced with that choice in the 8th grade. In short, the program is unlikely to contribute meaningfully to desegregation at East Side.

        c.   <u>Capping student enrollments at both high schools at 550 students, under the existing "first-come, first-served" admissions approach, may exacerbate rather than reduce segregation in the high schools.</u>

The proposed 550-student cap on student enrollment at both Cleveland High and East Side will not contribute to meaningful desegregation of East Side. Currently, 632 students are enrolled at Cleveland High and 360 students are enrolled at East Side. Assuming all students who currently go to each high school would opt to continue to attend that school next year, approximately 82 current students would not get their first choice school (Cleveland) and would be mandatorily assigned to East Side.

Because the proposed enrollment system is "first-come, first-served," which the District does not explain in its proposal, there is no assurance that any white students would be compelled to attend East Side who do not already do so. In that scenario, the racial disparities in enrollment between the two high schools would grow significantly. As illustrated in Table 4 below, if all 82 students barred from Cleveland High because of the enrollment cap were black, the percentage of black enrollment at Cleveland High School would drop from 46.2 percent to 38.2 percent, and the percentage of white enrollment would increase from 47.5 percent to 68.0 percent. At Cleveland High, the deviation from the District-wide average enrollment for black students would increase from 20.2 percentage points below the District-wide average to 28.2

17

percentage points below average. East Side, of course, would see an increased student population but would remain almost 100 percent black. The black student population at East Side would exceed District-wide averages by 33.4 percentage points.

Even if the 82 students barred from enrolling at Cleveland High because of the cap were precisely distributed in the same proportions as the current Cleveland High demographics, such that 46.2 percent (38 students) were black, 47.5 percent (39 students) were white, and 6.3 percent (5 students) were another race, the resulting changes at East Side would be minimal. Even if *all* 39 white students required to enroll at East Side actually chose to do so, white students would still only be 9.1 percent of the student population. East Side would remain a racially identifiable, one-race black school even with this limited increase in white enrollment.

**Table 4: Enrollment scenarios with 550-student cap at both high schools**
**(Based on 2014-2015 student enrollment figures)**

| Scenario: | Cleveland High School | | | | East Side High School | | | | District-wide 9th-12th grade | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *B* | *W* | *O* | *Total* | *B* | *W* | *O* | *Total* | *B* | *W* | *O* | *Total* |
| Current 2014-2015 Enrollment (No changes) | 292 *46.2%* | 300 *47.5%* | 40 *6.3%* | 632 | 359 *99.7%* | 1 *0.3%* | 0 *0.0%* | 360 | 659 *66.4%* | 301 *30.3%* | 40 *4.0%* | 992 |
| (1) Only black students reassigned from CHS to ESHS because of cap | 210 *38.2%* | 300 *68.0%* | 40 *7.3%* | 550 | 441 *99.8%* | 1 *0.2%* | 0 *0.0%* | 442 | 659 *66.4%* | 301 *30.3%* | 40 *4.0%* | 992 |
| (2) Students reassigned to ESHS from CHS in same proportion as the current CHS pop. | 254 *46.2%* | 261 *47.5%* | 35 *6.4%* | 550 | 397 *89.8%* | 40 *9.1%* | 5 *1.1%* | 442 | 659 *66.4%* | 301 *30.3%* | 40 *4.0%* | 992 |

In sum, Plan A assumes that the 550-student enrollment cap at each high school would function to "move" white students to East Side in sufficient numbers to eliminate the racial identifiability of East Side as a black school. The basis for this assertion and assumption,

however, remains unclear and unsubstantiated by the empirical evidence described in these Objections.

        d.  <u>The proposed plan to continue operating Margaret Green and D.M. Smith as "freedom of choice" schools, with no other changes, will ensure that no further desegregation of D.M. Smith occurs.</u>

Plan A "call[s] for the continuation of both middle schools, D.M. Smith and Margaret Green, under the 'open enrollment' concept with the *consideration of* a merger of the two schools" after the 2016-2017 school year. Dist. Plans at 4 (emphasis added). Since the District does not commit to consolidating the two middle schools, this plan simply memorializes the status quo. The STAR program for academically high achieving students, now housed at Margaret Green, would continue to operate there. *Id.* Unlike the District's 2012 Plan, which the Court rejected as constitutionally inadequate and under which the District would have created a new magnet program and "revitalized" the IB program at D.M. Smith, no new programs would be introduced at D.M. Smith under this proposal.

Nothing in this new plan suggests that any white students would choose to enroll at D.M. Smith during the next two school years—or any time later if the school were to remain open. Even if the District later chose to close D.M. Smith and reassign its students to Margaret Green later, the District admits that it would "need sufficient time to plan, bid and build an addition to the Margaret Green campus to house the 250 students currently attending D.M. Smith." Dist. Plans at 5. Given the work involved in constructing new classrooms at Margaret Green, this hypothetical middle school consolidation scenario would, if pursued, delay desegregation of the middle schools for at least several more years.

3. *The freedom-of-choice approach contained in Plan A is constitutionally inadequate and should be rejected.*

The Court should reject the District's attempt to repackage its existing freedom-of-choice system as a new "plan" sincerely intended to desegregate the District's middle schools and high schools. As discussed above, all available evidence shows that freedom of choice has wholly failed in desegregating East Side and D.M. Smith. There is no evidence that Plan A, yet another version of freedom of choice, would be any more likely to desegregate these two schools. The United States' Plan is a reasonably available alternative that will, if ordered by the Court, effectively and finally desegregate the District's middle schools and high schools within a year. For this reason, the Court should reject Plan A and order the United States' Plan.

**B. Plan B is not reasonably calculated to meaningfully desegregate the District's high schools, and unnecessarily delays desegregation of the middle schools until at least the 2017-2018 school year.**

In submitting its plans, the District requested that this Court consider a second plan, Plan B, "should this Court find [Plan A] constitutionally unacceptable," Dist. Proposed Plan at 2 [Doc. 108], as the United States urges in these Objections. As discussed above, Plan B would convert Cleveland High to a whole-school STEM and arts magnet school serving 450 to 550 students, to which students would be admitted under a "computer lottery similar to the lottery utilized at the District's two magnet elementary schools, Hayes Cooper Elementary and Bell Academy." Dist. Plans at 9-10. The District would set a "diversity goal" for each high school that would be "65% black and 35% non-black with a +/- 15% deviation." *Id.* Other students would be mandatorily assigned to East Side. *Id.* at 8. As in Plan A, East Side would continue offering the IB program and introduce the "Early College Program" described above, *id.*, with no other changes at that school. As discussed below, this high school plan suffers from numerous

20

design flaws, internal inconsistencies, and an overreliance on student choice that will likely impede effective implementation of this plan as a desegregation remedy.

For the middle schools, the District would close D.M. Smith after the 2016-2017 school year and assign all middle school students to an expanded Margaret Green beginning in the 2017-2018 school year. *Id.* at 10-11. The consolidated middle school at Margaret Green would have three within-school programs: a continuation of the existing STAR program for academically high-achieving students, a STEM and arts program into which students would be admitted through a lottery, and a regular education curriculum for all other students. *Id.* at 10.

This middle school plan, although ultimately accomplishing desegregation of the middle schools through a consolidation approach that would not be put in place for at least two years, requires more planning, resources, and implementation time for school construction than the proposed middle school consolidation in the United States' Plan, which can be implemented by the beginning of the 2016-2017 school year. Moreover, as discussed further below, the District's proposal to create three program "tracks" within the consolidated middle school may, without adequate precautions, contribute to within-school segregation in violation of the District's obligations in this case.

> 1. *This high school plan suffers from a lack of detail and internal inconsistencies that would likely impede effective implementation of the plan as a desegregation remedy.*

Plan B calls for the continued operation of Cleveland High and East Side as separate high schools. The plan relies on a combination of student choice and mandatory assignment to reach certain "diversity goals" at the two high schools. Namely, the District would convert its already oversubscribed, disproportionately white high school (Cleveland High) to a whole-school magnet school focused on a popular theme (STEM) with an enrollment cap (450-550 students)

below its current level of enrollment. All other students would be assigned to East Side, either because they choose to enroll there or because they are not admitted to Cleveland High through the admissions lottery.

To desegregate East Side, the District asks the Court to assume that a sufficient number of white students will either: (1) opt to enroll at East Side, when virtually no white students have ever made that choice before; or (2) be denied admission to Cleveland High and therefore be mandatorily assigned to East Side, despite their preference to attend Cleveland High and/or participate in the STEM program there. Based on the District's underdeveloped proposal, it is unclear what the STEM and arts programs at Cleveland High would look like, and many students are likely to wish to continue to attend Cleveland High because of their loyalty and existing connections to that school, even if they have limited interest in the proposed theme.[5]

In addition, for the reasons discussed in the United States' objection to Plan A above (*see supra* Section III.A.2.a.-b.), continuing the IB program and introducing a new dual enrollment option through the proposed Early College Program are unlikely to attract sufficient numbers of white students to East Side to meaningfully desegregate that school. Although some additional number may choose to go to East Side because they are not interested in the STEM/arts theme at Cleveland High, there is nothing in the record or the District's proposal to indicate that white students would choose East Side under those circumstances. Therefore, Plan B could only succeed if a sufficient number of white students are required to go to East Side because they are not admitted to Cleveland High through the proposed lottery and choose to enroll at East Side. Given the District's previous objections to mandatory reassignment of students and concerns

---

[5] Notably, although the District points to its parent surveys and focus groups from summer 2014 in support of the "popular" STEM theme, participation in the parent survey was voluntary and the survey did not solicit respondents' race in order to determine whether different themes would be equally popular between racial groups.

about students withdrawing from the school system, the Court should not rely on these weak assumptions in support of the District's plan because it will not actually desegregate East Side.

Additionally, the District does not specify how the admissions lottery for the magnet high school at Cleveland High would operate, other than to say that it would be "similar" to the system used at its two magnet elementary schools, Dist. Plans at 10, which are now both disproportionately white relative to District averages. *See* United States' Plan at 4, Table 1. Even assuming the lottery is planned in a manner that would ensure Cleveland High's student enrollment is 50 to 80 percent black and 20 to 50 percent black, as the District proposes, the resulting enrollment at East Side is likely to remain disproportionately black, depending on the number of students who ultimately choose to enroll there.

The District also does not explain how the anticipated lottery will ensure that students interested in STEM or the other programs will get their school of choice, even if they previously participated in the STEM programs in elementary or middle school. The District's proposal provides no preference for students who apply for the STEM program coming out of the middle-school science magnet program, or for students who attended the elementary magnet schools. Conceivably, the lottery could exclude some students (both black and white) from programs in which they have previously participated, which is not an effective educational strategy or sound approach to maintaining desegregation throughout the school system.

       2. *The middle school plan unnecessarily delays school-wide desegregation, requires more resources to implement than the United States' Plan, and may result in impermissible within-school segregation in the consolidated middle school.*

In Plan B, the District proposes consolidating its middle schools beginning in the 2017-2018 school year, closing D.M. Smith and assigning all students to Margaret Green. The District would need to build a sufficient number of new classrooms to accommodate the projected

enrollment increase, which, as the District admits, would require sufficient time to plan, fund, and build. Dist. Plans at 12. Given the costs and uncertainties involved with major capital improvements and construction, particularly on an older facility like Margaret Green that may require other improvements and repairs, the addition of classrooms could delay opening the consolidated middle school even later than the 2017-2018 school year. According to the United States' facilities consultant, accommodating 250 new students would require at least ten to twelve new classrooms, in addition to addressing any structural deficiencies and adding appropriate facilities to support the intended STEM and arts programs, since Margaret Green currently has no science labs or art rooms.

In addition concern over these facilities concerns, the United States also has major concerns that the proposed within-school programs at the consolidated middle school could result in impermissible within-school segregation. Plan B calls for the continuation of the STAR program for academically high-achieving students. Currently, based on information provided by the District in a letter dated January 9, 2015, 28 of the 97 Margaret Green students (28.9 percent) in the STAR program are black, well below the school-wide and District-wide black enrollment.[6] If similar trends continued at the new consolidated middle school, the STAR program could remain a disproportionately white program within the new middle school. The regular education curriculum and the STEM program would then necessarily be disproportionately black. Such within-school segregation would run afoul of the District's desegregation obligations in this case. Without specific measures intended to ensure desegregation of students within the consolidated middle school, the District's Plan B does not adequately ensure that the current between-school segregation under the current freedom of choice system is not effectively replaced by within-

[6] This letter potentially contains students' identifiable information and is therefore not enclosed as an exhibit to these Objections.

school segregation under this proposed approach. The United States' Plan contains specific provisions intended to prevent within-school segregation and ensure the educational opportunities available at a consolidated middle school are available to all students, regardless of race. United States' Plan at 15, 22.

Finally, the District cites a potential loss of funds from the three-year School Improvement Grant ("SIG") it has received to support improvements at D.M. Smith as one reason to delay consolidation of the middle schools until the 2017-2018 school year. Dist. Plans at 4-5. Closing the school before then would, the District contends, result in the loss of SIG funds "which total more than 1 million dollars." *Id.* at 5. The District is correct that some SIG funds may be forfeited if a recipient school is closed. *See* U.S. Dep't of Educ., Guidance on Fiscal Year 2010 School Improvement Grants, at 35 (Mar. 1, 2012), *available at* http://www2.ed.gov/programs/sif/sigguidance03012012.doc. On information and belief, however, SIG grant recipients may continue receiving SIG funds if a school is merged or consolidated with another school, provided that the new school serves the same students as before and that the recipient school district petitions the state educational agency administering the funds to amend its original application and receives approval from that agency. Consequently, the District's receipt of SIG funds for D.M. Smith should not prevent it from consolidating D.M. Smith and Margaret Green by the beginning of the 2016-2017 school year, as the United States has proposed.

> 3. *The Court should reject Plan B because the United States' Plan promises speedier and more effective desegregation of both the middle and high schools.*

For the reasons detailed above, Plan B, like the existing freedom of choice plan and the District's previous magnet proposal rejected by this Court in 2013, relies heavily on the choices

of white parents and students to attend East Side in order to desegregate that school. The District cannot show with any degree of certainty that East Side would experience significant gains in white enrollment under its proposals. The United States' Plan, which would create a consolidated high school on the existing Cleveland High and Margaret Green campus beginning in the 2016-2017 school year, carries none of this uncertainty.

The United States' Plan would ensure speedy desegregation of the high schools, while permitting the District to introduce or continue popular and educationally attractive academic options to its students in the consolidated high school. In a consolidated high school, all students, regardless of race, would benefit from the programs identified in the District's proposal and any others it might introduce later. Providing all students access to challenging curricula and programs will enable the District to finally and fully dismantle the vestiges of a dual system. Consolidation of the middle and high schools permits an efficient use of resources and provides the District with an opportunity to maximize curricular offerings and other educational opportunities. A consolidated District-wide high school will be the single best solution to curing the lasting harms of the former dual system of schools, but also to supporting and nurturing the potential futures of all students in Cleveland, regardless of race.

Although the District's middle school proposal comes closer to meeting constitutional requirements, the District's proposed timeline would delay implementation of this plan for at least two more years. The United States' Plan, which would consolidate the middle schools into one school at the East Side facility, would guarantee desegregation by the beginning of the 2016-2017 school year.

In keeping with the constitutional command in *Green* and its progeny that the District must implement a plan that promises realistically to work now, only the United States' Plan meets that standard. Therefore, the Court should reject Plan B and adopt the United States' Plan.

## IV. CONCLUSION

Both plans proposed by the District, Plan A and Plan B, fail to meet the constitutional requirements of a desegregation plan that offers reasonable promise of working now to eliminate the vestiges of segregation in the Cleveland School District. Because the United States' Plan offers a reasonable, effective remedy to desegregate the District's middle and high schools—and therefore a clearly defined path to unitary status and ultimate dismissal of this case—the Court should reject the District's Plans and order the District to begin implementing the United States' Plan at the earliest practicable date.


Respectfully submitted this 13th day of February, 2015,

FELICIA C. ADAMS
United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS  38655-3608
Telephone: (662) 234-3351
Facsimile: (662) 234-4818

VANITA GUPTA
Acting Assistant Attorney General

s/ Joseph J. Wardenski
ANURIMA BHARGAVA
RENEE WOHLENHAUS
JOSEPH J. WARDENSKI (NY #4595120)
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW, PHB 4300
Washington, D.C.  20530
Telephone: (202) 514-4092
Facsimile: (202) 514-8337
joseph.wardenski@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 13, 2015, I electronically filed a copy of the foregoing Objections to the Cleveland School District's Proposed Plans with the Clerk of the Court using the Court's CM/ECF system. Notice of this filing was sent by operation of the CM/ECF system to all counsel of record.

<u>s/ Joseph J. Wardenski</u>
JOSEPH J. WARDENSKI (NY #4595120)