**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

| | |
|---|---|
| DIANE COWAN *et al.*,          ) | |
|          ) | |
|       Plaintiffs,    ) | |
|          ) | |
|   and          ) | |
|          ) | |
| UNITED STATES OF AMERICA,          ) | |
|          )    Civil Action No. 2:65-cv-00031-DMB | |
|       Plaintiff-Intervenor,    ) | |
|          ) | |
|       v.          ) | |
|          ) | |
| BOLIVAR COUNTY BOARD OF          ) | |
| EDUCATION *et al.*,          ) | |
|          ) | |
|       Defendants.    ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE CERTAIN EXPERT OPINION TESTIMONY OF JEROME NORWOOD, DR. E.E. "BUTCH" CASTON, DR. CASSIE PENNINGTON, AND BEVERLY HARDY**

## I.     INTRODUCTION

On March 20, 2015, the Cleveland School District (the "District"), by and through its counsel, served the United States with reports prepared by those experts whom the District anticipates it may call at the May 2015 hearing on the parties' proposed desegregation plans. These materials included, among others, the expert reports of Jerome Norwood (attached hereto as Exhibit 1), Dr. Cassie Pennington (attached hereto as Exhibit 2), Dr. E.E. "Butch" Caston (attached hereto as Exhibit 3), and Beverly Hardy (attached hereto as Exhibit 4). The report of Jerome Norwood, who is deceased, proffers testimony on the demographic composition of the

District in 1969. Drs. Pennington and Caston proffer testimony on the likely impact of consolidation on desegregation of the District. Finally, Beverly Hardy proffers testimony – *inter alia* – on the importance of choice to parents (particularly white parents) of students enrolled in the District and the likely behavior of those parents under the proposed desegregation plans. For the reasons set forth below, the testimony described above either fails to satisfy Federal Rule of Evidence 702 and *Daubert* standards or is otherwise inadmissible. Accordingly, the United States respectfully requests that this Court enter an order excluding this opinion testimony from the May 2015 hearing.

## II.   LEGAL STANDARD

A motion *in limine* is a recognized method under Federal Rule of Civil Procedure 16 for obtaining a pretrial order "simplifying the issues" for trial and "ruling in advance on the admissibility of evidence." Fed. R. Civ. P. 16(c)(2)(A)-(C). These motions enable courts to define the facts and theories actually in contention in a case, as well as the range of evidence that may be admitted as proof.

Federal Rule of Evidence 702 articulates the circumstances under which a party may offer expert testimony in a federal proceeding. That rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court has explained, Rule 702 requires courts to function as gatekeepers, permitting the admission of expert testimony only where the expert is

qualified and where the testimony he or she proffers is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Brown v. Illinois Cent. R.R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).[1] This standard is designed to ensure that "an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The standard applies whether the proffered expert testimony is based on scientific knowledge or non-scientific knowledge that is nevertheless technical or otherwise specialized. *See id.* at 141, 147. For purposes of establishing an expert's qualifications and the relevance and reliability of his or her testimony, the party offering the expert testimony bears the burden of proof. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (proponent of expert testimony must prove reliability by a preponderance of the evidence); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (proponent of expert testimony must prove compliance with Rule 702 by preponderance of the evidence).

## III. ARGUMENT

### A. The Opinions of Jerome Norwood Constitute Inadmissible Hearsay and Fail to Satisfy Rule 702 and *Daubert* Standards

The District proposes to offer Jerome Norwood as a demographic expert. Not only does Mr. Norwood's testimony constitute inadmissible hearsay, but it also fails to satisfy Rule 702 and *Daubert* standards.

---

[1] The *Daubert* decision explained the court's "gatekeeping" role as one intended to screen evidence for juries, and it has been noted that this function may not be as critical when the court is keeping the gate for itself. *See In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 329 (5th Cir. 2013). Nevertheless, Rule 702 applies in civil bench trials as well as jury trials. *See Seaboard Lumber v. U.S.*, 308 F.3d 1283, 1302 (Fed. Cir. 2002); *Benchmark Res. Corp. v. U.S.*, 74 Fed. Cl. 458, 467 (Fed. Cl. 2006).

Sometime after completing his expert report in this matter, Jerome Norwood passed away. *See* Def. Designation of Expert Witnesses at 2 (attached hereto as Exhibit 5). Because Mr. Norwood cannot testify at trial, the opinions contained in his expert report constitute hearsay. *See* Fed. R. Evid. 801. As the report fails to satisfy any exception to the rule against hearsay, the report is inadmissible and should be excluded. *See* Fed. R. Evid. 802, 803, 804, 807.

Exclusion of Mr. Norwood's report is consistent with the well-established judicial preference for live testimony. *See, e.g.*, *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977) ("In both civil and criminal cases, our common law heritage has always favored the presentation of live testimony over the presentation of hearsay testimony by the out-of-court declarant."). Live testimony permits courts to assess the credibility and demeanor of witnesses, both of which are integral to deciding the weight to be given to witness testimony. *See generally id.* at 298-99. For this reason, the reading of a transcript or report is an inherently inferior alternative to live testimony. *See Griman v. Makousky*, 76 F.3d 151, 153 (7th Cir. 1996); *Am. Steel Works v. Hurley Constr. Co.*, 46 F.R.D. 465, 470 (D. Minn. 1969). Before permitting a party to make use of this inferior alternative, courts weigh the following five factors:

(1) offeror's need for the evidence to be presented through the deposition [transcript],
(2) opportunity provided the opponent to cross-examine the deposition witness on th[e] issues,
(3) nature of the evidence to be presented,
(4) [fact-finder's] need to observe the demeanor and credibility of the witness, and
(5) actual unavailability of the witness, as distinguished from mere geographic distance from the courthouse.

*In re Air Crash Disaster*, 720 F. Supp. 1493, 1502 (D. Colo. 1989).

In this case, the District proposes to offer demographic evidence from a deceased expert whom the United States has had no opportunity to depose. Further, the proposed evidence is – as discussed *infra* – plainly unreliable. Where, as here, the outcome of a case turns in part on a

4

"battle of the experts," admitting an expert report without the benefit of prior deposition testimony is uniquely prejudicial. *See Salsman v. Witt*, 466 F.2d 76, 79 (10th Cir. 1972) (observing common law principle that "testimony by deposition is less desirable than oral testimony" in court); *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939) (L. Hand, J) ("The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand.")

Even assuming, for purposes of argument, that Mr. Norwood's report satisfies an exception to the hearsay rule, the report fails to meet the requirements of expert testimony under Rule 702 and *Daubert*. While the report purports to answer the question, "What was the white population in the Cleveland School District east of the railroad tracks in 1969?", that question is not relevant to the issues presently before this Court. Even if it were, the report does not adequately identify Mr. Norwood's qualifications to answer as an expert. The report contains no information about Mr. Norwood's educational background and only limited information about his professional work experience. In particular, the report states that Mr. Norwood "[w]orked with 1975 special census, 1980 & 1990 census." Norwood Rpt. at 1. It also states that Mr. Norwood "[w]orked with 1980 redistricting and did 1990 redistricting for City." *Id.* The report does not, however, identify the positions that Mr. Norwood held. Nor does it provide any information about the specialized knowledge, skill, experience, training or education he obtained from these positions or the manner in which that specialized knowledge, skill, experience, training or education qualifies him to provide an expert opinion regarding the demographics of the District in 1969.

In addition to the foregoing, there is nothing in Mr. Norwood's report to establish that he lived or worked in Cleveland in 1969. While the report does note that Mr. Norwood lived in

Cleveland for 57 years, worked for the City of Cleveland for 29 years, was the Election Commissioner for 12 years, and was in charge of City elections for 20 years, the report does not specify which years he engaged in those activities and thus whether those activities could even qualify him to provide an opinion about the year 1969. *See* Norwood Rpt. at 1. Under these circumstances, the District has failed to meet its burden of demonstrating that Mr. Norwood has the knowledge, skill, experience, training, or education needed to qualify him as a demographic expert.

Not only does Mr. Norwood's report fail to establish that he is qualified as a demographic expert, but it also fails to establish that his opinions are based on sufficient facts or data and are derived from reliable principles and methods. Fed. R. Evid. 702. Mr. Norwood's report does not indicate how he calculated the 1969 racial composition of the City of Cleveland enumeration districts east of the railroad. Mr. Norwood states that "[t]he information provided [in the report] is based on [his] knowledge of the characteristics of this area, information from the City of Cleveland Enumeration Districts Maps submitted to the Justice Department in 1975 and a general knowledge of the housing in the county portion." Norwood Rpt. at 1. Because the report contains no indication that Mr. Norwood lived or worked in Cleveland in 1969, his "knowledge of the characteristics of this area" plainly cannot provide a sufficient factual basis for his opinions. Likewise, there is no basis for concluding that enumeration district information submitted to the Department of Justice in 1975 contains facts sufficient to identify the demographic makeup of the City of Cleveland in 1969. Mr. Norwood's report contains numerous other opinions that lack an adequate factual basis. For example, he makes several conclusions about the demographic makeup of Cleveland in 1972 and the early 1980s, despite the fact that there is no indication in his report that he lived or worked in Cleveland during those

6

years or that he had any other occasion to study the demographics of the area. *See* Norwood Rpt. at 1-2.

Finally, the methods described in Mr. Norwood's report are unreliable, as they do not reflect "the same level of intellectual rigor that characterizes the practice of an expert [demographer]." *Kumho*, 526 U.S. at 152. Mr. Norwood asserts that he calculated the "white count outside the city . . . based on [his] personal knowledge of the area and who lived there," including his experience traveling through the area, having family in "several parts," and visiting "most of the areas." Norwood Rpt. at 2. In addition, he maintains that he arrived at house counts used to generate his opinions about the demographic makeup of Cleveland in 1969 by using a 1972 NASA aerial photo of the city that is barely legible, together with a magnifying glass and the internet program Google Earth. *See id.* at 6. Because these approaches to conducting population counts are not "grounded in the methods and procedures of science," they cannot have produced an opinion that is reliable within the meaning of Rule 702. *Paz*, 555 F.3d at 388 (internal quotation marks and brackets omitted). Under these circumstances, Mr. Norwood's opinions are little more than "subjective belief or unsupported speculation" and should be excluded. *Id.* (internal quotation marks omitted); *see also Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 277 (5th Cir. 1998) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 766 (S.D. Miss. 2010) (noting that when the analytical gap between the data and the opinion is too great, "the opinion is speculative and should be stricken").

**B. Dr. Cassie Pennington and Dr. Butch Caston Are Not Qualified To Opine on the Likely Impact of Consolidation on Desegregation of the District**

It is well-established that "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937.[2] Because Dr. Cassie Pennington and Dr. Butch Caston lack the "knowledge, skill, experience, training, or education" necessary to qualify them as experts in the subject of school desegregation, Fed. R. Evid. 702, their testimony regarding the likely impact of consolidation on desegregation of the District (and "white flight" in particular) should be excluded.

*i. Dr. Cassie Pennington*

Dr. Cassie Pennington – a retired educator – has a bachelor's degree in social studies, a master's degree in physical education, and a doctorate degree in educational leadership. (Pennington Depo. Tr.[3] 10:10-16, 11:1-12:9; Pennington Depo. Ex. 23, attached hereto as Exhibit 7.) His educational training does not provide him with any specific expertise in the subject of school desegregation. Nor does he have any background that provides him with expertise in social science research. (Pennington Depo. Tr. 15:22-25 (noting that Dr. Pennington has published no research or scholarship in any field).) Not surprisingly, Dr. Pennington admits that he has never served as an expert in a school desegregation case, or in any other case for that matter. (Pennington Depo. Tr. 32:18-24.)

---

[2] The Court may hear fact testimony from any witness with relevant information. However, the District has designated the four witnesses at issue here as experts. Accordingly, it must establish the witnesses' expert qualifications and the reliability of the opinion testimony they proffer.

[3] The Pennington deposition transcript is attached hereto as Exhibit 6.

Dr. Pennington's professional experience is also insufficient to qualify him to provide the opinions he has been asked to offer. Dr. Pennington has worked in the field of education. However, his experience is limited to teaching and administration; he does not have any experience in school desegregation. (Pennington Depo. Tr. 12:10-14:20.) Although Dr. Pennington has experience on state-wide councils, task forces, and boards involved in educational matters, the educational matters at issue were primarily about staffing and administrative issues (*i.e.*, hiring, budgeting, personnel evaluation) not school desegregation. (Pennington Depo. Tr. 16:5-19, 16:24-18:19, 18:23-20:19, 20:24-21:20.)

### ii. Dr. E.E. "Butch" Caston

Dr. E.E. "Butch" Caston – Dean Emeritus at the College of Education at Delta State University – has a bachelor's degree in English education, a master's degree in school counseling, and a doctorate degree in guidance/counseling. (Caston Depo. Tr.[4] 15:12-18, 17:4-7, 17:11-13; Caston Rpt. Ex. A at 1.) Like Dr. Pennington, Dr. Caston has no educational training that provides him with specific expertise in the subject of school desegregation. Nor does he have a research background related to school desegregation. Instead, the scholarship that Dr. Caston has published is limited to issues regarding counselor education and school curricula. (Caston Depo. Tr. 23:6-13, 24:1-9; Caston Rpt. Ex. A at 9-10.)

Dr. Caston's professional experience – which is limited primarily to educational instruction, counseling, and administration (Caston Depo. Tr. 15:18-16:17; Caston Rpt. Ex. A) – is also insufficient to render him an expert in the subject of school desegregation. The only formal professional role related to school desegregation he has held involved reviewing grant

---

[4] The Caston deposition transcript is attached hereto as Exhibit 8.

proposals submitted to the Department of Health Education and Welfare ("HEW") in the 1970s. In that role, Dr. Caston determined whether school districts should be awarded grants for desegregation projects that had already been approved by HEW. (Caston Depo. Tr. 103:5-24.) Although Dr. Caston served as Assistant Superintendent of the Hattiesburg Municipal Separate School District from 1970 to 1983 and Hattiesburg was under a desegregation order at the time, he admits that the high schools in that district were not consolidated until after his departure. (Caston Depo. Tr. 97:2-9; Caston Rpt. Ex. A.) He also admits that Hattiesburg and Cleveland are two very different towns. (Caston Depo. Tr. 98:18-22 ("[T]his is a very small community. Hattiesburg is a pretty large community. . . . [I]t's quite different, two different – quite – they don't have much in common.").) For these reasons, Dr. Caston's experience in Hattiesburg does not provide him with the specific expertise needed to opine on the likely impact of consolidation in Cleveland.

In light of the foregoing, Drs. Pennington and Caston lack the "knowledge, skill, experience, training, or education" necessary to qualify them as experts in the subject of school desegregation, particularly on issues regarding the effects of consolidation. They should therefore be precluded from offering expert opinion testimony on the likelihood of "white flight" following consolidation of the District's middle and high schools. *See Wilson*, 163 F.3d at 938 (affirming the lower court's conclusion that a witness lacked the requisite qualifications to testify as an expert where he had never taught courses, conducted studies or experiments, or published on the subject about which he intended to testify).

## C. Even Assuming that Dr. Cassie Pennington and Dr. Butch Caston Are Qualified, Their Opinions Do Not Bear the Indicia of Reliability Required Under Federal Rule of Evidence 702

Even assuming, for purposes of argument, that Dr. Cassie Pennington and Dr. Butch Caston are qualified to provide expert testimony on the subject of school desegregation, the opinions they proffer are not reliable and therefore should not be admitted into evidence.

The Supreme Court announced the standard for reliability of expert testimony in *Daubert*, where it made clear that the testimony an expert proffers must be "ground[ed] in the methods and procedures of science" and constitute "more than subjective belief or unsupported speculation." 509 U.S. at 590; *see also id.* at 592-93 (noting that reliability turns on "whether the reasoning or methodology underlying the testimony is scientifically valid"). In assessing reliability, courts have adopted a flexible analysis that considers – among other things – "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Paz*, 555 F.3d at 388 (internal quotation marks omitted). As the Supreme Court recognized in *Kumho*, a court may give the various *Daubert* factors more or less weight depending on the field of expertise at issue and the nature of the expert's testimony. *See* 526 U.S. at 152.

In this case, the opinions of Drs. Pennington and Caston rest – at least in large part – on discussions that occurred in focus groups that they facilitated. To establish that these opinions are reliable, the District must provide some "objective, independent validation of the [experts'] methodology." *Moore*, 151 F.3d at 276. Because the focus groups on which Drs. Pennington

and Caston rely did not conform to generally-accepted standards governing focus group methodology,[5] however, the District cannot meet its burden.

> i. *Drs. Pennington and Caston Failed to Keep Systematic and Detailed Records of the Focus Group Discussions on Which Their Opinions Are Based*

It is well-established that a researcher seeking to use focus groups to generate social science data must ensure that there are detailed recordings of the substance of the focus group discussions. *See* Robert K. Merton, et al., THE FOCUSED INTERVIEW 140 (2d ed. 1990) (noting that arrangements should be made to record the substance of a group interview and discussing various options, including the use of electronic recording devices and notetakers other than the interviewer/facilitator), attached hereto as Exhibit 9. These detailed recordings provide a record of the data generated in the focus groups and are the basis for the researcher's subsequent analysis and conclusions. *See* Jane T. Bertrand, et al., *Techniques for Analyzing Focus Group Data*, 16 EVALUATION REVIEW 198, 203-208 (1992) (noting that transcriptions or notes of focus group discussions provide the reference point for the various forms of focus group data analysis), attached hereto as Exhibit 10.

Here, Drs. Pennington and Caston admit that they did not keep any detailed records of the focus group sessions for subsequent review, including such information as the racial

---

[5] Although Dr. Pennington maintains that he has experience conducting focus groups, he could not describe with any specificity training he had received on focus group methodology or the seminal authorities governing such methodology. (Pennington Depo. Tr. 30:8-31:9, 91:8-95:10.) Indeed, he admitted that it had been years since he reviewed any of the literature pertaining to focus groups. (Pennington Depo. Tr. 95:11-16.) Likewise, Dr. Caston maintains that he has held several focus groups in the context of conducting superintendent searches. (Caston Depo. Tr. 16:15-23.) However, he testified that very few of those searches had occurred in the last 10 years and that the focus groups he conducted in connection with those searches differed in several ways from the focus groups in this case. (Caston Depo. Tr. 21:22-22:9, 66:18-68:2.) He further testified that he could not identify specific authorities pertaining to the manner in which focus groups should be conducted and that the focus groups sessions he and Dr. Pennington conducted "were not scientific, by any means." (Caston Depo. Tr. 45:8-46:7, 46:11-12.)

compositions of the groups, the number of participants in each group, which participants responded to which questions, the comments made in response to those questions, or the frequency with which participants voiced the sentiment that consolidation of the District's middle and high schools would lead to reduced racial integration.[6] (Pennington Depo. Tr. 27:16-20, 42:21-25, 45:21-46:11, 55:24-56:5, 75:19-24; Caston Depo. Tr. 14:6-14, 35:25-36:17.) Although they understood that minutes of the focus groups were being kept by one or more District officials in attendance, they testified that they did not have those minutes when drafting their reports and therefore did not rely on them. (Pennington Depo. Tr. 34:11-17, 43:1-44:19; Caston Depo. Tr. 14:19-15:7.) Their reports were instead based on their own recollections of the focus group discussions. (Caston Depo. Tr. 78:12-17 (noting that Dr. Caston did not generate any summary of his observations or conclusions from the focus groups before drafting his expert report), 99:9-14; Pennington Depo. Tr. 34:11-17, 43:1-44:19, 51:13-16.)

The fact that Drs. Pennington and Caston did not have a record of the focus group discussions when they drafted their reports alone undermines the reliability of their conclusions. Absent such records, particularly those regarding the racial composition of the focus groups and which participants held which views, neither Dr. Pennington nor Dr. Caston can credibly conclude that white flight will result from consolidation. The reliability of their conclusions is further undermined by the fact that there was a nearly seven-month delay between the time that they conducted the focus groups and when they wrote their reports. (Pennington Depo. Tr. 34:4-

---

[6] After first testifying that he did not review any documents in preparing his expert report and that he did not keep any notes of the focus groups, Dr. Pennington later testified that he jotted down approximately 2-3 pages of "highlights" of the groups and that he used those notes to prepare his report. (Pennington Depo. Tr. 34:11-17, 42:21-25, 44:20-45:20.) After obtaining this testimony, the United States requested that the District provide the notes that Dr. Pennington referenced, and which he maintained he kept. To date, the District has refused to produce any such notes.

10 (Dr. Pennington drafted expert report around March 19th or 20th, 2015); Caston Depo. Tr. 81:7-12 (Dr. Caston drafted expert report around March 19, 2015); Caston Depo. Tr. 55:9-16; Caston Depo. Ex. 6 (showing focus groups occurred in August 2014), attached hereto as Exhibit 11.)  In addition, the failure to keep detailed records of the focus group discussions precluded Drs. Pennington and Caston from undertaking the type of systematic analysis of focus group discussions generally accepted as best practice in social science research.  *See* Bertrand, et al., *supra* at 203-208 (describing several methods of focus group data analysis, including the use of transcriptions or notes of focus group discussions to facilitate inventorying of responses and margin coding (*i.e.*, coding responses according to theme), or to confirm the facilitator's recollection of the primary responses elicited in connection with each subject raised).  Nowhere, for example, does Dr. Pennington or Dr. Caston reference even a single quotation from the focus groups supporting their analysis and conclusions.  *See id.* at 203-204 (noting the value of incorporating actual quotations from focus group discussions into reports of focus group results).

  ii. *The Focus Groups Were Not Structured to Assess the Likely Impact of Consolidation and Were Skewed by the Improper Introduction of Opinions Held by the Facilitators and Other District Officials*

    Even if Drs. Pennington and Caston had kept systematic and detailed records of the focus group discussions, the manner in which the focus groups were conducted renders them an unreliable basis for assessing whether consolidation of the District's middle and high schools will lead to "white flight" or will otherwise diminish racial integration.

    First, the purpose of the focus groups was plainly to generate ideas for alternative educational programming that would promote diversity within the District's schools, not to assess what ultimately became the subject of the witnesses' final reports – whether white families would pull their children out of the District if it contained only one middle school and

14

one high school.  Letters sent to focus group participants ahead of time confirm this.  (Caston Depo. Ex. 8, attached hereto as Exhibit 12.)  Those letters – which were designed to ensure that participants would come to the focus groups prepared to discuss the issues of interest – included guiding questions related to the District's strengths and weaknesses, magnet programs, and grade configuration but did not contain a single question regarding school consolidation.  (Pennington Depo. Tr. 85:12-19, 86:8-19, 86:24-87:16; Caston Depo. Ex. 8 at 4-5.)  They also contained detailed background information on magnet programs but no such information on school consolidation.  (Caston Depo. Ex. 8 at 5-6.)  With respect to the focus groups themselves, Dr. Pennington admits no systematic effort was made to ask participants whether they would leave the District if there were only one middle school and one high school.  (Pennington Depo. Tr. 41:22-42:20, 50:14-51:5.)  Dr. Caston's testimony confirms this fact.  (Caston Depo. Tr. 87:16-20 ("There was never ever one reference [during the focus groups] to Cleveland High School, Margaret Green becoming a high school and East Side becoming a junior high.  That was never – I never heard that from anywhere, anybody, including the parent groups.  It just wasn't – no awareness about that concept.").)

Even assuming the focus groups were appropriately structured to assess participants' likely reaction to consolidation, the data generated by the focus groups is unreliable because non-participants – including the focus group facilitators and District officials – violated the generally accepted rule that those conducting focus groups should not interject their own thoughts or opinions.  As explained in one of the seminal authorities on focus group methodology, "[t]he rule that the interviewer should not indicate his own attitudes toward the subject matter under discussion or toward the interviewee is now so well established that it is described as a cardinal principal of the interviewing art."  Merton, et al., *supra* at 183.  "When an interviewer agrees or

15

disagrees with what an interviewee has said, he . . . turn[s] attention to the correctness of responses. He invites proper, rather than authentic, reports. Interviewees become progressively less oriented toward the responses they have actually had and progressively more oriented toward what they have been given to understand is the appropriate response." *Id.* at 179. In this way, a focus group facilitator or other observer who interjects his or her own thoughts and opinions into a focus group discussion alters the resulting data and undermines the reliability of any conclusions drawn from that data.

Here, minutes of the focus groups maintained by the District indicate that – on numerous occasions – the focus group facilitators and others who were observing the focus groups improperly interjected their own thoughts and opinions into focus group discussions. Following one exchange in which a focus group participant questioned why the District had two middle schools and two high schools and other participants raised the issue of consolidation in response, Beverly Hardy (the District's grant coordinator) commented: "It's history and tradition. It's been that way for a long time. At East Side HS they have huge trophy cases of history. It's the way people want it." Focus Group Minutes at 9, attached hereto as Exhibit 13. Shortly thereafter, Dr. Caston listed various school districts that had undergone consolidation and said, "they don't have a white population in their schools. These other districts are now struggling with their test scores and these other districts and towns want to know about Cleveland. I'm not arguing or debating this, but when you look at how can you make it better, we do have arguably the most integrated school systems [sic] in the district [sic]." *Id.* at 9-10.

The facilitators and other District officials in attendance offered many other opinions. At one point, for example, the District's legal counsel provided the following commentary:

16

[W]hat we know after engaging an expert who studies this, and when you have a district that is less that [sic] 35% white and you force the consolidation you lose 14% of your white population in the first year and a little more each year until it's a black district. So, as the attorney trying to study and learn plans, when you force consolidation and the statistics are telling us another story (and we all want to think this won't happen here) we don't want that to happen here we need to be interested in preserving what we have. What appears to be the easy answer to consolidate is maybe not as easy as it appears. And we don't have a school that could handle 1 high school and we don't have the money to build one. I totally hear from the ladies who have spoken on this that it seems like "Why not?"

*Id.* at 10.

Given that focus group facilitators and District officials actively contributed their opinions to the focus groups discussions that Drs. Pennington and Caston relied upon, and that many of the opinions offered directly or indirectly questioned the need for and efficacy of consolidation, the focus group methodology employed by Drs. Pennington and Caston was neither valid nor reliable. Any conclusions derived from that methodology should therefore be excluded.

> iii. *To the Extent the Opinions of Drs. Pennington and Caston are Based on Their Historical Knowledge and Experience, that Knowledge and Experience Provides No Objective Support for Their Conclusions*

Dr. Pennington and Dr. Caston rely partially on their own experience in Mississippi to support their conclusions that consolidation will undermine efforts to desegregate the District. Courts, however, have "long held that without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Brown*, 705 F.3d at 536-37 (internal quotation marks and brackets omitted).

Drs. Pennington and Caston specifically opine that consolidating the middle and high schools in Cleveland will lead to less racial integration than currently exists because other school districts in Mississippi that consolidated experienced a similar loss of integration. Dr.

17

Pennington, however, admits that consolidation in the other Mississippi school districts to which he refers occurred in or around 1970 – some 45 years ago. (Pennington Depo. Tr. 54:3-55:21, 61:1-16.) Given the markedly different circumstances that existed in 1970, the impact of consolidation in those districts cannot – without more – reliably be used to predict the likely impact of consolidation in Cleveland in 2015. This is particularly so where, as here, Dr. Pennington and Dr. Caston fail to consider or account for changed circumstances in the intervening 45 years, including important changes in racial attitudes and social norms. For these reasons, this Court should reject any attempt by Drs. Pennington or Caston to rely on their personal history and experience in Mississippi to bolster their otherwise unreliable conclusions.[7] *See Brown*, 705 F.3d at 537 (affirming lower court's exclusion of expert testimony where the expert's findings lacked objective support and – in the absence of such support – the expert attempted to ground his findings in his own "education and experience").

As explained above, neither Dr. Pennington nor Dr. Caston has grounded his conclusions on sufficient facts and data and reached his conclusions using a valid and reliable methodology. Accordingly, their testimony – which cannot be deemed "expert" – should be excluded.

### D. Beverly Hardy's Opinions Regarding the Importance of Choice and the Likely Behavior of Parents Under the Proposed Desegregation Plans Does Not Satisfy Rule 702

The expert report of Beverly Hardy – the District's Coordinator of Magnet Programs – largely duplicates (verbatim) the District's proposed desegregation plans. *See* Hardy Rpt. at 1-8, 10-13. Although Ms. Hardy testified that she could not readily distinguish those portions of the

---

[7] To the extent that Beverly Hardy similarly attempts to rely on her own historical knowledge and experience in Mississippi (Hardy Depo. Tr. 115:1-23) to bolster the conclusions identified as unreliable in Section III.D. *infra*, her efforts are equally unavailing.

report that she wrote and those that were written by others (Hardy Depo. Tr.[8] 33:2-37:5), the United States' review of Ms. Hardy's report reveals a small number of places where she includes annotations reflecting her opinions.[9] *See* Hardy Rpt. at 8-9, 14-15. Those annotations indicate that Ms. Hardy is proffering testimony on the importance of choice to parents (particularly white parents) in Cleveland and the likely behavior of those parents under the proposed desegregation plans. *See id.* at 14-15. That testimony, however, suffers from many of the flaws identified *supra* in Section III.C and otherwise fails to satisfy Rule 702.

As noted above, Ms. Hardy proffers testimony regarding the importance of freedom of choice to parents in Cleveland. She notes, in particular, that the Cleveland community prefers freedom of choice and that white parents will leave the District if the District has only one middle school and one high school. In reaching these conclusions, Ms. Hardy relies on data from the focus groups conducted by Drs. Pennington and Caston. (Hardy Depo. Tr. 105:8-21, 108:23-109:8.) Because those groups were not appropriately structured to measure the impact of consolidation on desegregation of the District, however, Ms. Hardy's use of the groups – like that of Drs. Pennington and Caston – renders her conclusions unreliable. *See supra* Section III.C.

Insofar as Ms. Hardy purports to offer the more general opinion that desegregation plans employing freedom of choice are superior to those that do not, this opinion also is unreliable. In her deposition, Ms. Hardy testified that the opinion is based on her experience as a parent of

---

[8] The Hardy deposition transcript is attached hereto as Exhibit 14.

[9] The remainder of Ms. Hardy's report consists of factual information regarding the District's historical enrollment, the history of the District's magnet programs, the nature and amount of grant funds received by the District in the last 15 years, the availability of magnet grants going forward, the selection process the District currently uses for its magnet programs, and the selection process the District proposes to use for magnet programs that will operate under its proposed desegregation plans. *See* Hardy Rpt. at 13-14, 16-27 & Ex. A.

three children and her understanding that the United States "is built on . . . freedom of choice." (Hardy Depo. Tr. 38:20-39:18.) These "facts" do not, however, provide an adequate basis for Ms. Hardy's opinion under Rule 702. *See* Fed. R. Evid. 702(b). Even if they did, Ms. Hardy cannot credibly claim to be an expert on the effectiveness of particular school desegregation strategies. Ms. Hardy admits that she has never been involved in any other school desegregation case and has not conducted any research or published any scholarship on the subject. (Hardy Depo. Tr. 27:11-14.)

In addition to proffering the opinions described above, Ms. Hardy opines that white and black parents would enroll their children at East Side High School if participation in specialty programs like the International Baccalaureate Program were contingent on such enrollment. (Hardy Depo. Tr. 58:24-59:11.) This opinion, too, is unreliable. Ms. Hardy admits that focus group participants did not uniformly agree on this issue and that she failed to keep a record (and otherwise has no sense) of the number of parents who would enroll their children at East Side for this reason versus the number who would not. (Hardy Depo. Tr. 58:24-60:13.)

To the extent Ms. Hardy proffers other opinions about parents' response to, and likely behavior under, the proposed desegregation plans (*see, e.g.*, Hardy Depo. Tr. 88, 111-112; Hardy Rpt. at 14-15), that testimony is also based on focus groups and is thus no more reliable than the testimony described above. First, Ms. Hardy has no educational background or expertise in social science research. Her educational background and professional experience are instead limited to the areas of educational instruction/curricula and administration. (Hardy Depo. Tr. 6-9, 15, 17-19; Hardy Depo. Ex. 1, attached hereto as Exhibit 15.) She therefore lacks the qualifications to interpret and analyze focus group data in any reliable way. Second, the opinions are based on data obtained using a flawed methodology. As previously explained, the

20

data from numerous focus groups were tainted as a result of the focus group facilitators and other District officials interjecting their own thoughts and opinions into the group discussion. *See supra* Section III.C. Conclusions based on that data therefore cannot be considered reliable.

In light of the foregoing, the opinions Ms. Hardy proffers regarding the importance of choice to parents in Cleveland and those parents' likely response to and behavior under the proposed desegregation plans fail to satisfy the requirements of Rule 702 and should be excluded.

## IV. CONCLUSION

For the reasons discussed, the above-described opinion testimony of Jerome Norwood, Dr. E.E. "Butch" Caston, Dr. Cassie Pennington, and Beverly Hardy does not satisfy Federal Rule of Evidence 702 and *Daubert* standards or is otherwise inadmissible. The testimony should therefore be excluded from the May 2015 hearing on the parties' proposed desegregation plans.

Dated: May 4, 2015

Respectfully submitted,

FELICIA C. ADAMS
United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS  38655-3608
Telephone: (662) 234-3351
Facsimile: (662) 234-4818

VANITA GUPTA
Principal Deputy Assistant Attorney General

EVE HILL
Deputy Assistant Attorney General

ANURIMA BHARGAVA
Chief
RENEE WOHLENHAUS
Deputy  Chief
Educational Opportunities Section
Civil Rights Division

s/ Kelly Gardner
KELLY GARDNER (NY # 4494142)
JOSEPH J. WARDENSKI
AZIZ AHMAD
Trial Attorneys
Educational Opportunities Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW, PHB 4300
Washington, D.C.  20530
Telephone: (202) 305-3753
Facsimile: (202) 514-8337
kelly.gardner@usdoj.gov

Attorneys for Plaintiff-Intervenor

22

**APPENDIX**

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit 1 | Expert Report of Jerome Norwood |
| Exhibit 2 | Expert Report of Dr. Cassie Pennington |
| Exhibit 3 | Expert Report of Dr. E.E. "Butch" Caston |
| Exhibit 4 | Expert Report of Beverly Hardy |
| Exhibit 5 | Excerpt of Defendant's Designation of Expert Witnesses |
| Exhibit 6 | Pennington Deposition Transcript |
| Exhibit 7 | Pennington Deposition Exhibit 23 (Pennington Curriculum Vitae) |
| Exhibit 8 | Caston Deposition Transcript |
| Exhibit 9 | Excerpts of Robert K. Merton, et al., THE FOCUSED INTERVIEW (2d ed. 1990) |
| Exhibit 10 | Jane T. Bertrand, et al., *Techniques for Analyzing Focus Group Data*, 16 EVALUATION REVIEW 198 (1992) |
| Exhibit 11 | Caston Deposition Exhibit 6 (Focus Groups Schedule) |
| Exhibit 12 | Caston Deposition Exhibit 8 (Sample Focus Group Participant Letter) |
| Exhibit 13 | Caston Deposition Exhibit 2 (Focus Group Minutes) |
| Exhibit 14 | Excerpts of Hardy Deposition Transcript |
| Exhibit 15 | Hardy Deposition Exhibit 1 (Hardy Curriculum Vitae) |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2015, I electronically filed a copy of the foregoing Motion in Limine with the Clerk of the Court using the Court's CM/ECF system.  Notice of this filing was sent by operation of the CM/ECF system to all counsel of record.


/s/ Kelly Gardner
KELLY GARDNER (NY # 4494142)
Attorney for Plaintiff-Intervenor