## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

DIANE COWAN, et al.                                        **PLAINTIFFS**

**and**

UNITED STATES OF AMERICA                    **PLAINTIFF-INTERVENOR**

v.                                          Civil Action No. 2:65-CV-00031-DMB

BOLIVAR COUNTY BOARD OF
EDUCATION, et al.                                          **DEFENDANTS**

---

### Proposed Findings of Fact and Conclusions of Law of the Cleveland School District

---

1.       This is a fifty-year-old school desegregation case involving the Cleveland School

District.  The District sits in Bolivar County and comprises the City of Cleveland and the towns

of Boyle, Renova, and Merigold.  The District's student enrollment for the 2014-15 school year

was 3,735, of which 66.2% was black, 29.5% white, and 4.3% other races.  *See* Figure 1, below.

The District has a long history of African-American leadership.  The District's Superintendent,

Dr. Jacquelyn Thigpen, is black as were her two predecessors.  Tr. 278, 811.  Two of the five

school board members are black.  Tr. 810.  The racial make-up of the school board has been

three white and two African-American for at least the last twenty-five years, (Tr. 810), and the

immediate past-president of the school board was African-American.  [78, p. 4].

2.       Forty-three years after the complaint was filed in this case, and almost two

decades since there has been any significant activity, the Government filed a Motion for Further

Relief, [5], arguing the District failed to dismantle the former *de jure* segregated school system

because some schools, among them East Side High and D.M. Smith Middle, were all black.

3.      The attendance zones for the District's schools were established in 1969 by Court Order.  [33, p. 2].  The railroad track that bisected the District was approved as the boundary line for the schools for grades 7-12, dividing the District into the east zone (East Side High and D.M. Smith Middle) and the west zone (Cleveland High and Margaret Green Junior High).  When the 1969 Order was entered, there were more than 1,400 white residents in the east attendance zone. [84-1, p. 3].  In 1970, however, only twenty-one whites enrolled at East Side.  [84-2].  By 1980, 19% of the population in the east zone remained white.  CSD Ex. 16, Figure 10.  However, only five whites enrolled for the 1980-1981 school term.  [84-4].  White residents now make up about 11% of the former east zone's population.  CSD Ex. 16, Figures 11, 12 and 13.

4.      Despite no whites in the east zone actually enrolling full time at East Side High, other desegregation initiatives by the District were successful.  The 1969 Order established a majority-to-minority (M-to-M) transfer policy allowing students whose race was in the majority at their school to transfer to a school in which their race was a minority.  [33].  Hundreds of students utilized this policy over the past forty-plus years, resulting in one of the most successful M-to-M programs in the country, as described by Dr. Christine Rossell.  CSD Ex. 11-A, p. 8. Dr. Smrekar, the Government's expert, agreed that the M-to-M program was a successful desegregation initiative. Tr. 486.

5.      Since 1969, the District has successfully attracted black students to all formerly historically 'white' schools, such that all formerly "white" schools are now majority black or nearly so.  The District has also successfully emptied and restructured two historically black elementary schools, Bell Academy and Hayes Cooper Elementary, turning these schools into dedicated magnet schools with racially diverse student enrollment.  *See* Figure 1, below. The

Government's expert, Dr. Smrekar, testified about the success of the magnet programs both academically and as desegregation tools. Tr. 353; 487-88.

      6.     The District operates ten schools with the following enrollment:

TABLE 1: CLEVELAND SCHOOL DISTRICT'S 2014-2015 STUDENT ENROLLMENT

| SCHOOL | BLACK | WHITE | OTHER | TOTAL |
|---|---|---|---|---|
| Bell Academy (Magnet elementary/PreK-6) | 193 (52.59%) | 153 (41.69%) | 21 (5.72%) | 367 |
| Cypress Park Elementary (3 – 5) | 264 (99.62%) | 1 (0.38%) | 0 | 265 |
| Hayes-Cooper Center (Magnet elementary/PreK-6) | 160 (43.36%) | 185 (50.14%) | 24 (6.50%) | 369 |
| Nailor Elementary (K-2) | 365 (98.65%) | 4 (1.08%) | 1 (0.27%) | 370 |
| Parks Elementary (K-5) | 163 (45.66%) | 179 (50.14%) | 15 (4.20%) | 357 |
| Pearman Elementary (K-5) | 173 (64.79%) | 72 (26.97%) | 22 (8.24%) | 267 |
| Margaret Green Junior High (6 – 8) | 262 (50.38%) | 224 (43.08%) | 34 (6.54%) | 520 |
| D.M. Smith Middle (6– 8) | 249 (99.6%) | 0 (0.00%) | 1 (0.4%) | 250 |
| Cleveland High (9– 12) | 290 (46.93%) | 285 (46.12%) | 43 (6.95%) | 618 |
| East Side High (9 – 12) | 352 (100%) | 0 (0.00%) | 0 (0.00%) | 352 |
| School District Total (as of 2/12/15) | 2471 (66.16%) | 1103 (29.53%) | 161 (4.31%) | 3735 |

      7.     The District worked in good faith to attract white students to D.M. Smith Middle and East Side High by implementing magnet programs at each. Tr. 30-31. Although the magnet themes did not attract white students to enroll full-time at these schools, white students do attend magnet classes at East Side High for part of their school day. Tr. 36. Further, since entry of the 1989 Court Order, East Side High and Cleveland High students have been transported to their

non-home school for certain classes each school day. *Id.* For the past school year, approximately 30 whites from Cleveland High attended class at East Side High. Tr. 35. These students are enrolled in classes alongside East Side High students. CSD Ex. 12.

8.　On March 28, 2012, Honorable Glenn Davidson found all of the District's elementary schools, Margaret Green Junior High, and Cleveland High fully integrated. [43, pp. 36-37]. He ordered the District to present a plan to improve integration at D.M. Smith Middle and East Side High: "Overall, the Court finds that with respect to student assignment, the District should submit a plan for improving integration in only Eastside High School and D.M. Smith Middle School."[1] *Id.*, p. 36.

9.　On May 15, 2012, the District proposed its plan to implement new magnet programs and refine current magnet programs at East Side High and D. M. Smith to attract more whites. [44]. The Government objected to the District's proposal, but did not present a plan of its own. Following extensive briefing, an evidentiary hearing, and a tour of the District's schools, Judge Davidson found that abolishing the attendance zones for the District's two high schools and two junior high/middle schools afforded all students in grades 6-12[2] the opportunity to attend the school of their choice and constituted a constitutional remedy. The Court referred to its plan as "open enrollment" or "true freedom of choice." [78, p. 8]. The Court did not find the District was operating a dual school system. The Court found the high school and junior high/middle school "attendance zones, as defined by the former railroad tracks in Cleveland, perpetuate vestiges of racial segregation." *Id.*

---

[1]　The Government did not appeal the Court's finding that all elementary schools were integrated despite Cypress Park and Nailor Elementary having mainly black enrollment. Therefore, all black schools are not *per se* unconstitutional.
[2]　All sixth-grade students with the exception of those enrolled in Hayes Cooper and Bell Academy.

10.     The Government appealed Judge Davidson's Order to the Fifth Circuit Court of Appeals. In its April 1, 2014, Opinion, the Fifth Circuit remanded the case for Judge Davidson to give a more "explicit explanation" as to why "freedom of choice" was the appropriate remedy in this decades-old desegregation case. [97, pp. 12-13]. Following remand, Judge Davidson recused himself and the case was re-assigned to this Court.

11.     From July 2014 through May 2015, the District and the Government unsuccessfully engaged in settlement negotiations. Under the Agreed Scheduling Order, the parties submitted separate plans for the Court's consideration. The District offered three plans: (1) Judge Davidson's open enrollment or "true freedom of choice" plan; (2) Plan A, which expands on Judge Davidson's plan; and (3) an alternative plan—Plan B. CSD Ex. 21; [108].

12.     Judge Davidson's open enrollment plan removed the old attendance zone boundary line for the high schools and middle/junior high schools so that all students and their parents in grades 6-12 could choose what schools they wished to attend. The District's Plan A calls for the continuation of Cleveland High and East Side High, but with caps on enrollment at these schools and at East Side High an early college program with Delta State University and the International Baccalaureate (IB) program, designed to attract more students, including whites, to that school. Under Plan A, Margaret Green Junior High and D.M. Smith Middle remain, allowing parents of students in grades 6-12 the ability to choose their school, regardless of race or resident address. *See* FN 2, above.

13.     Alternatively, under Plan B, the District would close D.M. Smith Middle, build an addition to Margaret Green Junior High, and send all middle school students to Margaret Green by August 2016. At the high school level, all students would be assigned to East Side High. Cleveland High would become a magnet school which any student may opt to attend through a

lottery system. The lottery system would be designed to create a racial mix of students at Cleveland High that approximates the District's overall racial makeup and, in turn, create a racial mix of students at East Side High more reflective of the District's overall student enrollment.

14.     The Government offered one plan: a single consolidated high school for grades 9-12 located at the current Cleveland High/Margaret Green Junior High campus and a single consolidated middle school for grades 6-8 at the current East Side High. USA Ex. 3. The Private Plaintiffs did not offer their own plan but endorse the Government's plan.

15.     The Court conducted an evidentiary hearing from May 18-22, 2015. During the hearing, the Court heard testimony from the District's experts, board members, and community members. The Government presented its own witnesses, both and lay and expert, and the Private Plaintiffs called several named Plaintiffs as well as two non-plaintiff community members. Following the hearing, the Court toured each of the District's elementary, middle and high schools.[3] Each tour was guided by the principal and/or assistant principal. The Court viewed each school's classrooms, gymnasium, cafeteria, library, and computer labs.

## I.     Findings of Fact

### A.     The District's Witnesses

### Beverly Hardy

16.     Ms. Beverly Hardy was accepted as an expert in educational programs for schools, in school choice matters, and in the formulation of educational plans for schools including magnet plans. Tr. 31-32. She testified regarding the District's proposed plans, her

---

[3]     The Court did not tour the Alternative School or Vocational Technical Center. These schools did not play a role in the matters before the Court and are not substantive parts of any proposed plans.

opinion concerning public support of the plans presented by the parties, and the feasibility of implementing the District's plans.

17.     Hardy began her career in education in Cleveland in 1972. Tr. 29. She served first as an elementary teacher, then as an assistant principal, and later as principal of Hayes Cooper Elementary for more than twenty years before retirement in 2013. *Id.* Hardy also served as the District's magnet coordinator for many years. Tr. 29-30. Following her retirement, she was engaged by the District in a part-time capacity as magnet coordinator. Tr. 30. During her career with the District, Hardy worked in many schools, including Nailor Elementary, Bell Elementary, Cypress Park Elementary, Eastwood Junior High (now D.M. Smith Middle), and East Side High. Tr. 29-30.

18.     Hardy received a bachelor's degree in elementary education, a master's degree in reading, and a specialist degree in education from Delta State University. She completed all coursework for a doctoral program in education. Tr. 29; USA Ex. 46. As magnet coordinator for the District, Hardy co-designed magnet programs, including the recent magnet program implemented at Bell Academy in 2010. Tr. 31. Hardy oversaw magnet grant programs at East Side, D.M. Smith, Nailor, and Hayes Cooper. *Id.*

19.     Hardy was a member of a team that put together focus groups in August 2014. Tr. 37-38. The purpose of the groups was to obtain feedback from parents and community members to be used in (a) making the District a positive experience for all and (b) assisting the District in formulating a plan to improve racial diversity in its schools. Tr. 38, 41; CSD Ex. 25. These groups consisted of parents (chosen by principals) and community members. Tr. 38-39. The groups were racially diverse. Tr. 39-40; USA Ex. 9. Hardy testified that the consensus from the focus group meetings was: (1) parents wanted more rigorous classes; (2) parents wanted

more choices in education; (3) and there was a strong desire for an early college program. Tr. 43. Based on this feedback and her years of experience both as a community member and educator, Hardy testified that her preferred plan and the plan she believed would be supported by the community was "freedom of choice" or, alternatively the District's Plan A. Tr. 45-46. Asked if she came away with an impression of any consensus for consolidation or a single high school, she testified:

> We have several people that brought up a single high school, but in every case, they wanted a single, brand-new high school built in a neutral location. At no time did anybody want to do away with either one of the high schools. That was never anything that I heard from any of the focus groups.

Tr. 44.

20.     Hardy testified she was not aware of any issues the District had experienced under Judge Davidson's open enrollment plan and there was no impediment to parents or students in grades 6-12 choosing to attend the school they preferred. Tr. 49-50.

21.     Hardy testified the District's Plan B is a viable alternative. Tr. 50. The District could support the magnet at Cleveland High and Margaret Green contemplated by Plan B. Tr. 71-72. She testified she hoped the community would support Plan B and reiterated that in all focus groups parents expressed a strong desire for choice in education. Tr. 54, 76-77. Mrs. Hardy testified she believed the community would accept the merging of the middle schools because D.M. Smith Middle had a poor academic record and low enrollment. Tr. 51. However, she warned that student loss might well occur under Plan B. Tr. 54.

**Dr. Christine Rossell**

22.     Dr. Christine Rossell was accepted as an expert in the area of public school desegregation plans and their outcomes, statistical analysis of desegregation plans, and potential attitudes associated with desegregation plans from parents. Tr. 88. She is a professor of political

8

science at Boston University. Tr. 84. Dr. Rossell has studied the subject of public school

desegregation for at least forty-three years. Tr. 85. She is the author of numerous publications

about desegregation. CSD Ex. 29. She has helped school districts in complying with

desegregation plans, has often provided testimony as an expert witness with regard to

desegregation plans, and frequently provides statistical analysis of desegregation plans. Tr. 87.

No one has done more in terms of designing desegregation plans than Dr. Rossell. *Id.* And no

one has done more research on public school desegregation plans and their outcomes. Tr. 88.

She has done parent surveys in connection with desegregation plans and has served as a court-

appointed expert with regard to desegregation plans. *Id.*

    23.    Dr. Rossell became involved in this case in 2011 and has issued five reports

regarding the case. CSD Exs. 11-A, 11-B, 11-C, 11-D, and 11-E. She testified that although the

court orders in this case have not prescribed racial balancing quotas with regard to student

assignment, the student enrollment of Cleveland High School was 100% white in 1967-68 and is

now about 47% white. Tr. 91-92. Moreover, Dr. Rossell testified the District overall is

becoming increasingly integrated. Tr. 94-95.

    24.    Dr. Rossell testified about two methods of statistical analysis, the index of

dissimilarity and the index of interracial exposure. Tr. 92. While the index of dissimilarity

shows racial imbalance in the schools, the index of interracial exposure demonstrates the actual

exposure of whites to blacks.[4] Tr. 96. Dr. Rossell concluded the District has declining racial

imbalance, a positive outcome from the perspective of desegregation. Tr. 95. She also

concluded the District is advancing in a positive direction in terms of interracial exposure.

_____

[4]     In formulating her analysis, Dr. Rossell emphasized the index of interracial exposure,
because it is superior to the older index of dissimilarity in assessing desegregation. CSD Exc. 11-
A, p. 4; Tr. 92. Thus, even if Dr. Rossell erred in certain calculations of the index of
dissimilarity, the outcomes of her analysis regarding the index of interracial exposure are
unaffected.

Assuming these trends continue, the District will achieve the maximum integration possible. Tr. 94.

25.     Dr. Rossell's research shows the District's current student enrollment percentages compare favorably to school districts declared unitary since 1986. "And as you can see, Cleveland, Mississippi is right in the middle of the pack--not quite in the middle of the pack – in terms of the percentage white in the Cleveland School District and the interracial exposure index." Tr. 99. With regard to the index of dissimilarity, Cleveland is actually more racially balanced than several other school districts when they were declared unitary, including Kansas City, Missouri; Fulton County, Georgia; Mobile County, Alabama; DeKalb County, Georgia; and Dallas, Texas. Tr. 99-100. The index is about the same as Muskogee County, Georgia; Baton Rouge, Louisiana; and Denver, Colorado. Tr. 100.

26.     Given these positive trends in improving desegregation, Dr. Rossell advocated the Court "stick with the open enrollment plan." Tr. 101. Dr. Rossell expressed concern regarding the potential for white enrollment loss, especially in circumstances involving mandatory student reassignment. Tr. 103. Dr. Rossell testified that school consolidation as advocated by the Government is a form of mandatory reassignment. Tr. 138. Dr. Rossell testified that no court has ordered a mandatory reassignment in the form of consolidation since the Natchez-Adams district was ordered to consolidate in 1988. Tr. 110.

27.     Dr. Rossell testified that a mandatory reassignment plan, especially in a school district like Cleveland with a 29% white student enrollment, is not going to be stable over the long-term. Tr. 94. She testified about the negative effects mandatory reassignment plans had on white student enrollment in school districts like Natchez-Adams, Hattiesburg, McComb, and others. Tr. 97-108. Because of mandatory reassignment plans, these districts have suffered

10

substantial white student departure and, today, many are virtually all-black. See exhibits associated with Tr. 97-108, including CSD 11-A (Figure 20); CSD 11-C (Figures 14 and 16). Dr. Rossell pointed to the Madison County School District in Mississippi as an example of a district achieving integration without mandatory student reassignment. Tr. 109; CAD 11-A (Figure 20). There, interracial exposure has never stopped increasing because there has been no mandatory reassignment. *Id.*

28.     Rossell advocated the Court continue the current open enrollment plan over the plans presented by either the District or the Government. Tr. 112. She testified, however, the District's plans have a greater likelihood of success than the Government's in maintaining student diversity. *Id.*

29.     Rossell testified about the lack of choice as being the primary cause of student enrollment loss under mandatory reassignment plans. This is so for students of any race. She described a phenomenon of "bright flight," in which not only white students but also students of other races with economic means exit the school system. Tr. 103; 827-28. "The major factor seems to be worries about losing control of their child." Tr. 140. Rossell cautioned that diverse school districts, like Cleveland, typically lose that diversity when mandatory reassignments are implemented in order to achieve racial balance. Tr. 130-131. In fact, she testified some courts had approved desegregation plans in Detroit and St. Louis that parceled out the whites at 50/50 until they ran out of white students and left the remaining schools all black. Tr. 107-108.

**Joseph Henderson**

30.     Joseph Henderson, a professional architect, was accepted by this Court as an expert in the field of architecture. Tr. 144. He testified that building a new high school with a full athletic complex would cost the District $35 to $37 million dollars, a figure far in excess of

11

the District's bonding capacity. Tr. 148; CSD Ex. 15. He testified it was feasible to construct an addition to Margaret Green Junior High under the District's Plan B within 12-18 months. Tr. 150. The addition to Margaret Green would cost approximately $2.4 million. CSD Ex. 18, p. 14. He also testified that, without a major addition, it would be impossible to house the nearly 800 middle school students at East Side High as proposed by the Government. Tr. 146-147. Henderson testified his East Side capacity calculation was based on a report by District educator Beverly Hardy of the list of rooms the middle school would utilize for certain classes and activities and the number of classrooms at East Side. Tr. 146, CSD 18. He did not include in the count "dedicated" spaces like the gym or cafeteria because students rotate in and out of these rooms during the day. Tr. 167-168. Henderson then multiplied the classrooms times students and concluded 600-675 was the educational capacity for East Side. Tr. 146. Even putting 27 students in a classroom, Henderson opined that East Side could not house all 800 middle school students the Government would mandatorily reassign to that campus. Tr. 146-147. Henderson testified that his normal practice is to only count the instructional classrooms when calculating educational capacity. Tr. 168. He also relied on Hardy, a long-time educator, for her opinion as what would be taught at the middle school and how it would be taught. Tr. 169. Henderson also noted that an optimum middle school size, according to the Mississippi Department of Education design guidelines, is 500-600 students. Tr. 147.

**Obie James**

31.     Obie James, an African-American Cleveland native, is a teacher and parent in the District. Tr. 182-183. He graduated from East Side High, moved to Arkansas, but returned to teach at East Side High because he wanted his daughter to graduate from his alma mater. Tr. 182.

He testified of the strong tradition and pride associated with East Side High, stating the school has one of the biggest fan bases he has seen. Tr. 185.

32.     James coaches football and softball at East Side High. Tr. 183. He testified that, currently, students are not cut from teams at either East Side High or Cleveland High. Tr. 186. He is concerned that with a consolidated high school, fewer players will be chosen for athletic teams and, as a result, there will be fewer opportunities for college scholarships. Tr. 186-187. James testified football saved his life. Tr. 186. He is concerned that consolidation will put kids "back on the street." *Id.* He testified that sometimes "sports are the only thing that saves these kids." *Id.*

33.     Regarding Judge Davidson's open enrollment plan, James testified students now transfer back and forth between Cleveland High and East Side High with no problems. Tr. 187. All students have a choice and removal of choice would be "a hard pill to swallow." *Id.* If the two high schools are consolidated, he would probably leave Cleveland. Tr. 195. He knows of only a single East Side High parent favoring consolidation. Tr. 198.

**Todd Fuller**

34.     Fuller, white, has lived in Cleveland since 2000 and has been a school board member for the last eight years. Tr. 200. His two children attended Cleveland High but took classes at East Side High. Tr. 200, 208. This past school year, his son spent 3 periods at East Side High and 2 to 3 periods at Cleveland High. Tr. 208.

35.     After listening to constituents and parents, the School Board chose freedom of choice as its preferred plan because parents and students want choice. Tr. 201. He testified two high schools allow students more opportunities for extra-curricular activities and their participation in such activities keeps them on track academically. Tr. 202. He had spoken with

13

East Side High parents who were offended that anyone might suggest they could not make good school choices for their children. Tr. 211.

36.    District Plan B, formulated as an alternative to Plan A, was built on the principle that worked well at Hayes Cooper and Bell – whole school magnets.  Tr. 204.  Fuller testified the danger of Plan B is parents and students who do not get their first choice of schools may leave the District. Tr. 205. If people do not have choice, they will find other school options. Tr. 205. There are many options beside the public school because there are least 8 to 10 private schools within 45-50 miles of Cleveland.  Tr. 205.

**Dr. Jacqueline Thigpen**

37.    Dr. Thigpen, an African American, has served as the District's superintendent for eight years.  Tr. 221. She has lived in Cleveland for 57 years, and both her children went to District schools, graduating from East Side High. Tr. 220-221.

38.    Dr. Thigpen supports both Plans A and B. Tr. 221. She supports the idea of a con-solidated middle school but opposes consolidation of the high schools because "we have to be able to give our students choice." Tr. 222.  There is no uniform community consensus regarding consolidation, with some favoring and others opposing consolidation.  Tr. 222.   She testified the District has both the financial and staff resources to support its plans.  Tr. 222-23.

**Dr. Chresteene Seals**

39.    Dr. Seals, African-American, has lived in Cleveland 47 years.  Tr. 243.  She is an East Side High alumna and a long time educator with a doctorate in developmental education and higher education.  Tr. 243. She has served as a school board member since January, 2015, representing District 4 on the east side of Cleveland. Tr. 243-244.

40.     In a perfect world, Dr. Seals' plan would be to build a brand new high school in a centralized location. Tr. 245. However, the District does not have the funds to build a new high school.  Tr. 245.  If the District cannot afford a new school, she does not favor closing any schools and supports Plan A because it gives parents and students real choice.  Tr. 245. She does not favor converting East Side High into a middle school as the Government proposes.  Tr. 245. She is concerned about "bright flight" – losing good students of all races. Tr. 252-53.

41.     Dr. Seals testified Judge Davidson's ruling, where he removed the old railroad track attendance zone line, made her feel "jubilant."  Tr. 246. She testified the old railroad track historically served as a racial divide in Cleveland. Tr. 246.

42.     Prior to becoming a board member, Dr. Seals attended meetings to discuss the potential school consolidation where representatives of the Department of Justice were present. Tr. 257. She testified some 10 to 12 other community members attended those meetings. Tr. 257. No white citizens were present at any of these meetings. Tr. 257.

**Cindy Holtz**

43.     Holtz has served as the District's business manager since 2012.  She was a business manager for two other school districts from 1981-2012. Tr. 260-263.

44.     Holtz testified for the last few years, the per pupil expenditure at East Side High was higher than at Cleveland High. Tr. 263.  The staff at East Side High had a higher overall level of education, so salaries are higher there. Tr. 271-272.

45.     Holtz testified the District has the financial means to pay for the early college magnet at East Side High as contemplated by Plan A and Plan B.  Tr. 275.  The District could issue a 3-mil note to pay for construction at Margaret Green under the District's Plan B. Tr. 275.

**The Government's case**

**Karen Fioranelli**

46.     Ms. Fioranelli is the District's IB coordinator. Tr. 289.   She testified both white and black students take IB courses at East Side High. Tr. 294.   The District recently discontinued the Middle Years ninth and tenth grade IB program because students needed to be better prepared academically for the program. Tr. 292. The District is targeting current sixth graders to prepare them for entry into the Middle Years Program (MYP) in the ninth grade. Tr. 292. The District requested the MYP ninth and tenth program be dissolved and submitted an action plan on how the program could be improved. Tr. 304.

**Dr. Claire Smrekar**

47.     Dr. Claire Smrekar is an associate professor in the Department of Leadership Policy and Organization in Vanderbilt University's Peabody College of Education.  The Court recognized Dr. Smrekar as an expert in the areas of social context of school desegregation policy, school choice, family, school, and community relations, and school diversity.  Tr. 331, 341.

48.     Smrekar described Cleveland as a "vibrant, asset-laden community with really committed educators and school leaders who are eager to move forward, who are committed to doing the very best for kids . . . ." Tr. 360.

49.     Smrekar confirmed white student departure is a legitimate concern and that the potential loss of students, especially whites, is a proper inquiry for this Court in analyzing potential changes to the District's desegregation plan. Tr. 361, 384-85, 440-41, 898-901.  She testified about the challenges of "maintaining a student body, maintaining this current enrolled student body, which is 65 percent black and 35 percent nonblack." Tr. 361.  She agreed that

maintaining District's diversity is a challenge. Tr. 482. Efforts to achieve racial balance must be "sustainable," according to Smrekar. Tr. 385. And it is important for a school board to make decisions that will maintain diversity. Tr. 482.

50.     Although Smrekar disagreed with Dr. Rossell regarding white student departure under the various plans, Smrekar admitted she performed no statistical analysis of white student departure. Tr. 337. She also admitted she had no knowledge of the various desegregation cases about which Rossell testified demonstrating white student departure following implementation of mandatory student reassignment. Tr. 508-09.

51.     Smrekar attempted to discount Rossell's analysis by saying the Government's plan to consolidate the schools is not a "consolidation" or mandatory reassignment plan but a "merger." Tr. 436,439-40. But Smrekar admitted the Government's counsel had referred to the combination of the two high schools as a "consolidation," and not a "merger." Tr. 532, 331. (See also, Tr. 822 in which Government counsel Mr. Wardenski asks about consolidated high schools). See also [9, p. 20] "United States Proposed Desegregation Plan," referring to its plan as a "consolidation."

52.     Dr. Smrekar opposed enrollment caps at the high school level because "you are forcing decisions on students." Tr. 509. She expressed concerns that white students who historically attended Cleveland High would not enroll in East Side High if assigned there as a result of the enrollment cap. Tr. 509-10. Despite her prediction that white high school students would not attend East Side High, Smrekar believes white middle school students would attend the consolidated middle school at the current East Side High facility in direct contradiction to Leroy Byars, another witness called by the Private Plaintiffs. Byars, a long-time coach at East

Side High for whom the football stadium is named, testified white middle school students would not attend a consolidated middle school located at East Side:

> Q:    You understand that plan would assign every student white and black to East Side High for middle school?
> A.    Yes.
> Q.    Do you believe that white students will actually attend the middle school when they are assigned there?
> A.    No.

Tr. 800.

53.    Smrekar did not explain how Byars was wrong in his opinion regarding white student departure following mandatory reassignment to a consolidated middle school at East Side.  In fact, Smrekar did not address Byars' testimony at all.

54.    Smrekar's analysis of potential white student departure following a consolidation was limited to community "context" and the private school supply, tuition costs, and the racial composition of public schools in the contiguous counties." Tr. 440-41.

55.    Regarding the community context, Smrekar initially testified about the economic vibrancy of Cleveland.  Tr. 360, 443.  She testified with respect to white departure as a result of the Government's plan that "the specific contextual evidence . . . suggests that … this school district will defy [such white departure]; but no one knows for sure."  Tr. 502.  She went on to testify the district "may defy, may likely defy."  Tr. Tr. 502   However, two of the Government's non-black parent witnesses, Blake and Nandula, testified that they are currently considering exiting the District and are investigating other options such as homeschooling, public boarding schools, other public school districts, and private schools.  Tr. 662, 675, 678.

56.    Smrekar reviewed the local private school marketplace to determine whether private schools might attract white students following consolidation or "one-school model," as she refers to the Government's consolidation plan.  Tr. 436; 439; 441-42. On cross examination,

18

she was not able to name the private schools within forty miles of Cleveland she considered: "I'm not prepared to respond adequately or the way I would want to." Tr. 498.

57.     Dr. Smrekar provided no testimony indicating she had studied parent surveys conducted in connection with desegregation cases.  She conducted no parent survey regarding potential for student loss following consolidation in Cleveland.  Tr. 477-78, 536.  Yet she claimed a district-wide survey is "best practice." Tr. 477-78, 536.

58.     Dr. Smrekar attempted to undermine the District's focus group analysis by criticizing the size of the groups (Tr. 367-68), the location of the meetings (Tr. 368), attendance of counsel, (Tr. 369), and comments by counsel made at the meetings (Tr. 369).

59.     Smrekar assumed up to 15 people per group participated.  Tr. 367-68.  A focus group facilitator testified not all of the people listed on the forms attended the meeting, making the relative size of each group closer to 10 or 12 participants.  Tr. 369.   This actual number is also closer to the size of the focus groups Smrekar conducted, 4 to 8.  Tr. 377.

60.     On cross-examination, Smrekar admitted she did not lodge any timely objection to the District's process of conducting the focus groups.  Tr. 475.  She also admitted that, although invited to attend the District's focus groups, she attended only two meetings and both by telephone, not in person. T. 449.  She did not know if Private Plaintiffs were invited to attend the District's focus group meetings.  Tr. 448.  She did not know if the Government's counsel was invited to attend the District's focus group meetings.  Tr. 449.  She was not able to say whether having the focus group meetings at a District facility hampered the parents' ability to express their opinions. Tr. 449 ("So it's unknown right?").

61.     Smrekar criticized the District's focus groups, in part, because the District's counsel spoke at certain of the meetings. Tr. 369.  On cross examination, however, she admitted

the Government's counsel also spoke at a community meeting held by the Government. Tr. 454-459. According to notes of the meetings taken by Smrekar's assistant, counsel for the Government, "Gives our views of desegregation, whether or not it is segregated in the past, and whether the same segregation lasts to this day. . ." Tr. 454. Government's counsel also gave a "legal perspective" to the participants. Tr. 454. In fact, the notes reflect counsel for the Government talked about the possibility of white student departure "going viral," about the need to "convince people it's a good idea," the need to get "community buy in, not force," the need to "get the community behind it in order to get the town behind it," and "talked about a similar case where everybody stayed," among other comments. Tr. 459-60. Smrekar admitted counsel for the Government participated in the discussion at the group meeting and that the meeting was "very beneficial" in helping her understand "parents' concerns, issues, perspectives, values, and commitment to this community." Tr. 463.

62. Smrekar also conducted her own focus groups. In the focus groups she conducted there was "no firm, delineated, specific, unanimous opinion" that emerged. Tr. 505. And no consensus on consolidation of the two high schools emerged:

Q:    . . . you didn't suggest that a consensus had emerged with respect to
      consolidation, is that right?
A:    I—that's right. I believe that's right. Yes.

Tr. 505.

63. Regardless of the process and any alleged shortcoming of the District's focus group process, the outcomes of the District's and Smrekar's focus groups were virtually the same: There was no consensus on consolidation of the two high schools into an existing facility (Tr. 505; Tr. 846-847) and parents wanted more choice and greater academic rigor. Tr. 505; Tr. 847.

20

64.     Smrekar's primary criticism of the current open enrollment plan and the District's proposed Plan A is that schools are not guaranteed a racial balance within +/- 15% of District-wide enrollment. Tr. 361-62. Yet Smrekar does not explain how Plan B, calling for enrollment at both high schools within +/- 15% of District-wide enrollment, will not result in desegregated schools. She further criticizes Plan B for the impracticability of the STEM magnet concept, while acknowledging she did not consider whether other alternatives are feasible. Tr. 490-92. She acknowledged the District had a solid track record of developing and implementing first-rate magnet programs. Tr. 480. She acknowledged a magnet theme other than STEM might "take off the table the immediate problem of hard to staff and the need for those kinds of facilities in the short term." Tr. 508.

65.     Smrekar testified the District cannot qualify for magnet program grants at any school level, unless it has at least two schools to choose between. Tr. 480.

66.     Smrekar did not know how many athletic scholarships would be lost if the two high schools were consolidated. Tr. 499.

**John Poros**

67.     John Poros is an associate professor at the School of Architecture at Mississippi State University. Tr. 545. He was retained by the Government as an expert witness regarding the District's secondary school facilities. *Id.* Poros agreed that the District's architect, Joseph Henderson, is a good architect and had more recent experience in actually estimating the cost of buildings. Tr. 610.

68.     Poros concluded the District's facilities would work for the Government's consolidation plan of a single middle school at East Side High and a single high school at the combined Margaret Green and Cleveland High. Tr. 563. His testimony did not clearly establish

estimates based on educational activities. Additionally, he acknowledged the District's facilities would support the District's Plan A, which retains the two high schools and two middle schools. Tr. 603-604. Consequently, the facilities also support Judge Davidson's open enrollment plan.

69.     Poros' criticized District Plan B (moving all middle school students to Margaret Green Junior High) as difficult to enact by the 2016-2017 school year. Tr. 605. He estimated the cost of the addition at Margaret Green at $3.9 million. *Id.* A large portion of estimate was for a new cafeteria. Tr. 563. On cross examination, Poros acknowledged the cafeteria capacity issue could be solved by adding another lunch period to the student schedule. Tr. 616-617.

70.     Poros was principal editor and an author of the Mississippi School Design Guidelines. Tr. 607-608. Under these guidelines, the Cleveland District would be considered a "small" school district. *Id.* Under the guidelines, the ideal school population size for a small school district is 300 to 600 students for middle school and 400 to 800 for a high school. Tr. 608-09. The guidelines also cite the advantages of smaller schools over larger schools. Tr. 609-10. The open enrollment plan and the District's plans A and B satisfy the guidelines. The Government consolidation plan results in schools larger than recommended by the guidelines.

71.     Poros failed to consider if the two high schools were consolidated under the Government's plan that the combined high school would be a 5-A school for athletics. Tr. 612. He acknowledged he did not know if the District had the necessary athletic facilities for a 5-A school. *Id.*

**Arthur "Tim" Holbrook**

72.     Arthur Holbrook retired from the District in 2012 as principal of D. M. Smith Middle. Tr. 622.

73. Holbrook believes there is no better school district than Cleveland within 100 miles. Tr. 624. He thinks a consolidated high school would make the athletic teams stronger and enhance extracurricular activities. Tr. 634-35. He clarified that the concept of consolidation that he advocated was for one brand new high school, not consolidation in either of the existing high schools. Tr. 653.

74. When he was a teacher at East Side High, he recalled a discussion with students who were enthusiastic about consolidation. Tr. 637-38. And, while principal at Cleveland High, he spoke with a racially mixed student group, predominantly white, who were enthusiastic about consolidation. Tr. 638. However, these student discussions focused on a brand new high school facility. Tr. 653.

75. Holbrook's three children graduated from Cleveland High. Tr. 644. At the time, he was living on the east side of town and was a teacher at Cleveland High. Tr. 645. If he had been working at East Side High, he would have enrolled his children at East Side. *Id.*

**Vickie Blake**

76. Vicki Blake is a white parent who has lived in Cleveland for ten years; she has an eleven-year-old and twin eight-year-olds who attend Hayes Cooper Elementary. Tr. 659-60. She has been very involved in the Booster Club at Hayes Cooper for the last four years. Tr. 660-61.

77. Her children's experience at Hayes Cooper has been excellent. However, her family is considering leaving the District for middle school either to home-school, moving to a nearby district, or moving to another state. Tr. 662. The Blakes are not considering either of the District's middle schools because they want a more enhanced educational experience than the District offers. *Id.* She testified the District's middle schools are not ranked high academically.

23

Tr. 662-63. Her family was considering moving to Olive Branch, Mississippi, because it was one of the higher rated school districts in the state. Tr. 675.

78.  Blake supported the Government's consolidation plan because she hopes consolidation would provide extra funds to improve the school system. Tr. 667-68.

79.  On cross-examination, Blake agreed the Government's consolidation plan did not guarantee improved academics. Tr. 674-75. She admitted she has not studied the District's budget to see if consolidation would actually yield cost savings. She merely assumed there would be savings. Tr. 674. Blake likes the idea of the STEM program proposed in District Plan B. *Id.*

80.  Blake participated in the District focus groups and was aware parents had concerns about consolidation. Tr. 671. Some parents were concerned about the loss of athletic programs through consolidation. Tr. 673.

**Aparna Nandula**

81.  Aparna Nandula has lived in Cleveland for eight years. Tr. 676-77. Her daughter attends Margaret Green Junior High, and her son attends Hayes Cooper Elementary. *Id.* Nandula's daughter also attended Hayes Cooper for elementary school. The elementary school was excellent, but she has not been satisfied with the middle school. Tr. 678.

82.  Her family has been thinking about where to send her daughter to high school and has considered Cleveland High, East Side High, and two private schools, Washington School in Greenville, and Indianola Academy in Indianola, Mississippi. *Id.* Cleveland High does not meet her expectations; East Side High is cleaner and has better parent/teacher interactions. Tr. 680.

83.     Nandula believes consolidation would be good because it would create more competition. Tr. 683. She likes the District's Plan B, but it would be too late for her daughter, who wants to attend the Mississippi School for Math and Science in Columbus. Tr. 685-86. Her top priority for her children is an environment where they can excel. Tr. 688-89.

**Reverend Edward Duvall**

84.     Edward Duvall, African American, lived on the east side of Cleveland his entire life except during his military service from 1977 to 1998. Tr. 697. He attended Nailor Elementary and East Side High. His son, 15, was in the ninth grade and his daughter, 18, was a senior at East Side High. Tr. 698-99.

85.     Duvall admitted he had a choice of which schools his children could attend in the District. Tr. 711. He chooses East Side High, the all-black school. His children have attended several other schools, many of which are racially diverse. His daughter attended Hayes Cooper for grades 3 through 6, Margaret Green Junior High for grades 7-8, and Cleveland High for grade 9. Tr. 699. His son went to Hayes Cooper for elementary school, D.M. Smith for grade 6, Margaret Green for grade 8, before going to East Side High. Tr. 700.

86.     Duvall testified his daughter moved from Cleveland High to East Side High because she was "losing her identity." Tr. 702. He testified he moved his daughter to East Side High because he wanted her to know if she was smart because of her God-given talent and not because she was "rubbing elbows with white folks." *Id.*

87.     Duvall supports the Government's consolidation plan because, he says, the only way to achieve true integration is to have one school and because he thinks consolidation will save money. Tr. 705-06. However, Duvall is satisfied with his son's education at East Side High. Tr. 710-11.

**Private Plaintiffs' case**

**Keith White**

88.    Keith White, African American, has lived in Mississippi all his life.  Tr. 718.  He grew up in Drew where he attended public school with whites.  Tr. 718-19.  He testified attending a racially integrated school helped him though life.  However, on cross-examination, he acknowledged his Drew high school graduating class was only 5% white.  He testified his school in Drew lost 10% of its white population during his high school years because of economics. Tr. 736.

89.    White's daughter currently attends East Side High.  However, she has attended racially diverse schools in Cleveland.  She chose to attend Hayes Cooper Elementary and Margaret Green Junior High before transferring to D.M. Smith Middle.  She chose East Side High over Cleveland High.  Tr. 720.  His son also attends East Side High. His son attended Nailor, Cypress Parks, and Hayes Cooper during his elementary grades and went to Margaret Green Junior High for middle school.  Tr. 720-21.

90.    Although White testified he wishes his children had the opportunity to attend racially integrated high schools, in his deposition, he acknowledged race played no role in choosing a school for his daughter.  Tr. 740.  Further, he was aware of the District's open enrollment policy where any student in the 6-12 grades may attend any school they choose.  Tr. 738.

91.    White advocates building a new state-of-the art high school.  Tr. 732.

**Lenden Sanders**

92.    Mrs. Sanders, an African American, is a life-long resident of Cleveland and a graduate of East Side High.Tr. 751.  She has three children; her sons were seniors at East Side at

26

the time of the hearing. Tr. 751-752. Her sons participated in the IB program at East Side. Tr. 752. She knew of no disparity in the resources between East Side High and Cleveland High. Her sons have been active in extra-curricular activities, holding leadership positions in various school clubs and organizations. Tr. 753-754. She supports the Government's consolidation plan because it will allow every student to participate in all programs. Tr. 754-755.

93.    Sanders participated in the recent focus groups held by the District. Tr. 757. She testified the focus group leaders gave the participants questions, but "they also left the floor open" for participants to discuss "different things." Tr. 757-758.

94.    Sanders testified the value in having a "racially integrated" school environment is all programs "will be under one roof." Tr. 759-760. However, Sanders testified she chose East Side High for her sons because she felt like the school "had just as much to offer as Cleveland High." Tr. 761-762. She also testified she chose East Side High for her children because it was where she attended school. *Id.* She acknowledged that every student in junior high and high school in the Cleveland School District had a choice as to where they went to school. Tr. 762. Sanders was cross-examined with her deposition testimony where she admitted having a racially diverse experience for her sons at the high school level "didn't matter" because her sons had integrated experiences in elementary school and would have those experiences again in college. Tr. 766-768.

**Antonio Lewis**

95.    Antonio Lewis, African American, has a daughter who currently attends East Side High. Tr.781. He testified his daughter chose East Side High. *Id.*

**Leroy Byars**

96.     Mr. Byars, African American, is a former teacher and coach who worked at East Side beginning in 1972. Tr. 784-785. He served as principal of East Side High starting in 1988. Tr. 787. He worked at the school for twenty-four years. Tr. 796. He has not been employed at East Side High in any capacity since 1997. Tr. 799.

97.     Byars testified there was a practice of separating East Side High and Cleveland High fans at games, but he acknowledged the Mississippi High School Activities Association mandated that team fans be separated during sports contests. Tr. 790-791, 798.

98.     Byars testified he supports the Government's plan of placing all middle school students at East Side High. Tr. 800. However, he does not believe that white students would actually attend the new middle school at East Side High. Tr. 800.

**The District's rebuttal case**

**Beverly Hardy**

99.     Hardy testified there are 13 private schools within a 50 mile radius of Cleveland. Tr. 803-804. She testified children in the District are being homeschooled and that number of homeschoolers is increasing. Tr. 805-806.

100.     Hardy clarified that the STAR program at Margaret Green currently has enrollment of 58 % white and 42 % non-white. Tr. 806.

101.     Hardy testified the District has been awarded five magnet grants since 1990 and grants were for programs at Hayes Cooper, East Side High, D.M. Smith Middle, Nailor Elementary and Bell Elementary. Tr. 807. Hardy testified the District is willing to fund all of the magnet programs presented in Plan A and Plan B regardless of whether federal funds are awarded. *Id*. She testified under federal magnet grant funding rules, if the District went to a single high school and single middle school, no further magnet grants could be awarded to the

District for high school and middle school programs because there would be no "choice" involved for students. Tr. 808.

102.    Mrs. Hardy testified that if busing of students from East Side High to Cleveland High were to continue under any plan, that scheduling could be modified to ensure the students were not missing any class time.  Tr. 809.

103.    Hardy testified that the District has won many awards. East Side High was recently recognized by *U.S. News and World Reports* as one of the top high schools in the United States and, in 2006, when Hayes Cooper was named a Blue Ribbon School. Tr. 810.  East Side is currently a B ranked school in Mississippi, while Cleveland High is a C.  Tr. 811.

104.    Mrs. Hardy also testified that the current District school board is composed of three white and two black members. Tr. 810.  Dr. Seels is African American; Todd Fuller is white.  Tr. 810.  The District has had a black superintendent for the last 13 years.  Tr. 811.

**Dr. Christine Rossell**

105.    Dr. Rossell opined that "approximately half of the white students assigned to the East Side schools will not show up in the first two years or the first three years." Tr. 821.  This estimate is consistent with her research findings of school districts suffering from declines in white student enrollment following mandatory reassignment plans. Tr. 821.

106.    Dr. Rossell testified that "parents want choice whether they are poor or middle class or upper class and regardless of the race, and they don't want to lose control of their child's education." Tr. 828.

**Dr. E.E. "Butch" Caston**

107.    During his career in education, Dr. Caston served first as a school counselor and

29

assistant superintendent; he was also the Dean of the College of Education at Delta State University and on the faculties of William Carey College and the University of Southern Mississippi. Tr. 829-830. Dr. Caston has recently served as provost and academic vice-president at both Delta State and Mississippi University for Women. Tr. 830. During his training, he studied group counseling and focus groups and Dr. Caston has extensive experience leading focus groups, facilitating approximately 70 focus groups during his career. Tr. 830. Dr. Caston has his doctorate in counseling. Tr. 829.

108. Dr. Caston, who is white and Dr. Pennington, a retired African American educator, were asked by the District to facilitate the August 2014 focus groups. Tr. 837. The groups each met twice and had two hour-long sessions for each meeting. Tr. 838. There were six groups made up of about 10 participants consisting of parents and various community members and representing a diverse cross-section of the District. Tr. 839-840. The Government was invited to attend the focus groups; however, no representative from the Government attended in person. Tr. 842.

109. Dr. Caston testified that District Superintendent Dr. Thigpen opened each meeting with a greeting and then left the room. Tr. 843.

110. Dr. Caston testified that, for participants, race was not a priority; they were more interested in discussing quality programs and teaching. Tr. 844. Dr. Caston testified all participants were free to express their opinions. Tr. 845. Dr. Caston testified that any discussion in the focus groups about a consolidated high school centered around a new building at a neutral site. Tr. 846-847. There was a consensus of enthusiasm for the magnet programs in the District and a desire to improve Margaret Green. Tr. 847.

30

**Gary Gainspoletti**

111.     Gary Gainspoletti, white, is an accountant, business owner, and the alderman-at-large for the City of Cleveland, a position elected by all voters in the city. Tr. 876. He has lived in the area for more than 60 years (Tr. 884) and in Cleveland for 34 years. Tr. 876. He has served on the Board of Directors of the Chamber of Commerce Board of Directors for 25 years and worked with the Industrial Development Foundation. Tr. 877. He also spent 16 years auditing other municipalities. Tr. 881.

112.     Gainspoletti testified Cleveland's economy is good and the public school system is "absolutely essential" to the maintenance of Cleveland's financial position. Tr. 877. He testified in recruiting businesses to Cleveland, the first question a potential newcomer asks is whether there is a viable public school system. Tr. 878.

113.     Gainspoletti testified a large number of his clients and other community members have visited with him about the possibility of school consolidation. Tr. 879-880, 883-884. He stated the community is fearful and nervous about the outcome of this case. Gainspoletti testified the general sentiment is for the current system to be left alone because it has worked in Cleveland while it "obviously hasn't worked in other communities in the Delta." Tr. 879. His opinion, based on his knowledge of the community and facts about surrounding communities, is that if the public school systems lose support, the result will be a decline in population that will adversely impact the local economy. Tr. 881.

114.     Mr. Gainspoletti testified the Cleveland District works because it is the most diverse school district in the Mississippi Delta. Tr. 884.

**Cindy Holtz**

115.    The District receives funding for students from two primary sources--State of Mississippi Adequate Education Funds and local ad valorem taxes; the majority of funds come through the State. Tr. 885.

116.    For every student enrolled in the District, the State of Mississippi will fund $5,535.00 per student. Tr. 887. If the District lost one student, its financial loss would be $5,500.00. If the District lost 20 students, its financial loss would be $110,000.00. Tr. 887. A loss of 50 students would mean a lost of state funding of $276,000.00 and a loss of 100 students would mean a loss in state funding of $500,000. Tr. 887.

117.    Ms. Holtz testified she has reviewed the Government's consolidation plan and the only savings the District would realize under the plan is the present cost of transporting students back and forth from East Side to Cleveland High. Tr. 886. The total savings under the Government's Plan would be $29,600.00. Tr. 886.

**The Government's rebuttal case**

**Dr. Smrekar**

118.    On rebuttal, Smrekar further confirmed that white student departure is a legitimate concern in this case. She testified that socio-economic factors including the child poverty rate and the median household income as well as private school market in the area "suggests that this is not going to lead to white student departure . . . ." Tr. 900. Her rebuttal testimony contradicted her earlier testimony that some whites would depart (Tr. 442, ln. 22-23) and that the community economy was stable. (Tr. 347-348; 443).

**II.    Conclusions of law**

**A.    Open enrollment is constitutional.**

32

119.    The Court finds that the appropriate remedy is Judge Davidson's "true freedom of choice" plan, or open enrollment plan, as refined by the District in its Plan A but without enrollment caps.

120.    District Plan A proposes two refinements to Judge Davidson's open enrollment plan: (1) a college partnership between East Side High and Delta State University to attract white students to East Side High where they may take courses at Delta State with all fees paid by the District and (2) enrollment caps at both high schools to alleviate any potential overcrowding. Dr. Rossell opined that enrollment caps at the middle and high schools would produce less diversity because of white loss. She, therefore, endorsed Plan A without enrollment caps. Likewise, Hardy supported removal of the caps. The Court finds Plan A should be implemented without enrollment caps. If any school does not have the capacity to accommodate all students wishing to enroll, then the District shall return to this Court for further proceedings.

121.    Both Judge Davidson's open enrollment plan and the District's Plan A are constitutional. They satisfy the core mandate of *Brown II* that a school district's constitutional desegregation obligation is "to achieve a system of determining admission to public schools on a non-racial basis." *Brown v. Bd. of Educ. of Topeka, Kansas*, 349 U.S. 294, 300-301 (1955). An open enrollment process is non-racial. All students, no matter their race or resident address, may select which middle and high school they wish to attend for grades 6-12.

122.    Freedom of choice is an acceptable tool to achieve a unitary school system. *Green v. County School Bd. of New Kent County, Virginia,* 391 U.S. 430, 439 (1968). However, certain obstacles, which do not exist in Cleveland today, were present during the 1960s that impeded black students from exercising their choices. *Green*, 391 U.S. 430 at 441, FN 5. These impediments were a fear of retaliation by the white community which would deter black families

33

from choosing all white schools, violence against black families attending white schools, improper influence by whites to keep black children in black schools, embarrassment by black families because of their poverty, and improvement of black facilities so that black children will not leave the historically black schools. *Id.*

123.    Cleveland today is different from the New Kent County, Virginia, of some fifty years ago.   The Government does not argue that any impediment to a meaningful choice by black students and their parents exists in Cleveland.  The facts show the opposite.  Nearly 70% of the District's students already enroll full-time in a school with students of other races, and increasing numbers of them have diverse daily classroom experiences through the International Baccalaureate ("IB") and Advanced Placement ("AP") programs at East Side.  When comparing opportunities for a truly integrated classroom experience, the Cleveland District stands virtually alone in the region.

124.    The Government presented no evidence of violence against or intimidation of black children or their parents who choose to attend schools of their choice.  The majority-to-minority transfer provision has contributed successfully to desegregation, showing that blacks have freely transferred without incident to the formerly white schools, Margaret Green and Cleveland High.  CSD Ex. 11-A, p. 8.  In fact, Keith White testified his children were encouraged or "pushed" by District personnel to attend Margaret Green Junior High.  Tr. 722, 730.  Parents who testified for the Government and/or the Private Plaintiffs admitted they were able to freely choose among the District's middle and high schools, and nearly all parents who testified had chosen Hayes Cooper for elementary school. Tr. 645, 660, 677, 781.   Additionally, even after a student enrolled at one school, he or she could transfer freely to a different school if he or she so desired. Tr. 699, 781. Some parents testified their children had attended both D.M.

Smith and Margaret Green and also both Cleveland High and East Side. Tr. 699-700, 711-714, 720, 752. In short, black parents and students are choosing their school in Cleveland with no road blocks.

125.    As this Court found previously, the progress the District has made in its integration efforts has been nothing short of remarkable. As the Government's expert, Dr. Clair Smrekar testified, this District has achieved twenty years' of stable racial balance. Tr. 445. That stability "is something to be proud of. That is something to honor here. That is remarkable." Tr. 445. There is no evidence that facilities have not been improved to prevent integration or that black students are hindered by poverty in making school choice. Tr. 898. This Court, as Judge Davidson did, toured nearly every school in the District. Judge Davidson found facilities were comparable across the District. In sum, the 1969-70 arguments against freedom of choice have no relation to or relevancy in the Cleveland District in 2015.

126.    Formerly "white schools"—Pearman Elementary, Parks Elementary, Margaret Green Junior High and Cleveland High—all have majority or near majority African American enrollment. Two of the historically "black schools"—Hayes Cooper Elementary and Bell Academy—now have significant white enrollment. Hayes Cooper has approximately a 50/50 minority/white enrollment. Bell's student population mirrors the overall racial composition of the District and is majority black (52.59%). *See* Figure 1, above.

127.    Judge Davidson's open enrollment plan is not, as the Government argues, a relic of the past. In the cases of the late 1960's and 1970's rejecting the old freedom of choice plans, those school districts, unlike Cleveland, were doing little or nothing to actually implement *Brown*.

35

128.    As Rossell observed, the Cleveland District will, if left to operate under full and free choice, accomplish maximum integration within the next few years:

> The Cleveland School District is one of the few school districts in the country with increasing interracial exposure. Although the percentage white in the Cleveland school system has declined since 1969, the percentage white in the average black child's school has continued to increase a little bit each year including the last year under the school reorganization plan. The difference between the percentage white in the school system and the percentage white in the average black child's classroom is only about 9 points. If there is no disruptive intervention and current trends continue, we should expect to see no difference between the two in only a few years. In other words, the Cleveland School District will have accomplished all the integration it can.

CSD Ex. 11-A, p. 13.

129.    As Rossell opined and Judge Davidson previously noted, the District far surpasses all other Mississippi Delta schools in the percentage of white students attending the average black child's school.  CSD Ex. 11-A, p. 16 and Figure 9.  The District has more than four times the interracial exposure of the second best school in the region.  *Id.*  The District also compares favorably to schools outside the Delta.  According to Dr. Rossell, the District has an overall racial balance greater than five southern school districts already declared unitary including Kansas City, Missouri; Fulton County, Georgia; Mobile County, Alabama; DeKalb County, Georgia; and Dallas, Texas.  Tr. 99-100; CSD Ex. 11-A, Figure 14.  The District is one of the few systems in the nation with increasing interracial exposure.  CSD Ex. 11-A, p. 13.  "It cannot be emphasized enough how unique it is to have a school district with increasing interracial exposure, particularly in Mississippi, but also in the rest of the U.S."  *Id.*

130.    This level of interracial exposure did not exist in *Green*.  There, only 15% of the school district's black students attended formerly "white schools," and no white student attended a formerly "black school."  *Green v. County School Bd. of New Ken County, Virginia*, 391 U.S. 430, 441 (1968).  The racial composition of the Cleveland District's schools is markedly

36

different from *Green* and from every other school district examined in the cases where courts rejected freedom of choice plans.

131.    For example, in *Marshall*, only sixty of the 1,868 Holly Springs black students opted to attend a "white school," and only sixty-four of the 3,606 black students in Marshall County chose to attend a "white school." *Anthony v. Marshall Co. Bd. of Education*, 409 F.2d 1287, 1288-1289 (5th Cir. 1969). In *Greenwood*, six schools remained all one race and the remaining three schools only had eighteen black students between them, resulting in only 0.6% of black children receiving a desegregated experience. *United States v. Greenwood Separate School District, et al*. 406 F.2d 1086, 1091-1092 (5th Cir.1969). In *Hinds County*, the twenty-five school districts examined had no white children in formerly "black schools" and only a small number of black students in "white schools." *United States v. Hinds County School Board*, 417 F.2d 852, 855 (5th Cir. 1969). In these cases, freedom of choice was rejected not because freedom of choice plans are unconstitutional per se, but because these districts continued to operate dual school systems in defiance of court orders to integrate and had taken only the most minimal steps to integrate.

132.    Cleveland is nothing like the school districts in those old cases. *Raney v. Bd. of Educ. of Gould School Dist.,* 391 U.S. 443 (1968) (finding only 15% of black students attending white schools); *Bivins v. Bibb County Bd. of Educ.*, 424 F.2d 1330 (5th Cir. 1970) (finding low percentage of black students in formerly white schools and no white students enrolled in formerly black schools); *Hall v. St. Helena Parish School Board*, 417 F.2d 801 (5th Cir. 1970) (finding only two white students in formerly black schools and most schools had less than 10% black students); *Hilson v. Ouzts*, 425 F.2d 219 (5th Cir. 1970) (finding only forty-four of the district's 5,270 black pupils attended "white schools" and only eighty-five white students

attended "black schools"); *United States v. Bd. of Educ. of Baldwin County*, 423 F.2d 1013 (5th Cir. 1970) (finding only 16% of black students in formerly "white schools"); *United States v. Bd. of Educ. of Webster Co.*, 431 F.2d 59 (5th Cir. 1970)(finding old dual system was perpetuated in district with two schools where only 5 blacks attended school with 129 whites and no whites attended school with 525 blacks and school board did not address integration of facilities, staff, faculty, or transportation).

133.    This Court defers to the District's stated preference for the open enrollment plans because for decades the District has been working in good faith under the Court's orders. *Green v. County School Board of New Kent County*, Va., 391 U.S. 430, 439 (1968). "When a plan devised by local authorities crosses the threshold of achieving actual desegregation, it is not for district courts to overstep local prerogatives and insist on some other alternative." *Wright v. Council of City of Emporia*, 407 U.S. 451, 479 (1972) (Justice Berger, joined by Blackmun, Powell, and Rehnquist, dissenting). Cleveland has been working steadily in good faith to fulfill the orders in this case. Importantly, it has taken additional steps, not ordered by the Court, to improve integration. For example, in 2010, the District closed formerly all-black Bell and re-opened it as a dedicated magnet. [43, p. 29]. Bell now has student enrollment mirroring the District's overall racial percentages. The District has also encouraged black and white students from Cleveland High and Margaret Green to take courses at East Side and D. M. Smith.

134.    Judge Davidson described his plan as "true freedom of choice," because he implicitly recognized the Cleveland District has acted in good faith to integrate its schools and the facts and circumstances of the old cases rejecting freedom of choice plans are not present in Cleveland today. In his March 2012 decision, Judge Davidson asked the District for a plan to improve integration at East Side High and D.M. Smith Middle. [43]. Subsequent to his ruling,

however, he conducted a hearing, heard testimony, and considered additional information from Dr. Rossell, and toured the schools. He then endorsed a "true freedom of choice plan" as the appropriate remedy for the case. [78] He did not adopt racial quotas or racial percentages at the two schools.

135. The Government sought re-hearing, placing before the Court the racial makeup of the schools. The Government argued the Court should abandon the freedom of choice plan because no whites had enrolled full time at D.M. Smith Middle or East Side High. The Court, however, did not do so and held to its freedom of choice plan, demonstrating that the Court did not regard white full-time enrollment at either school as a necessary complement of its plan. Similarly, the Fifth Circuit, knowing that no whites had enrolled full-time at either school, did not declare Judge Davidson's plan unconstitutional but remanded the case to this Court to give more explanation as to why the freedom of choice plan is the appropriate remedy. The Fifth Circuit left open that potential white student departure could form a legitimate rationale for a freedom of choice plan: "We do not hold that the freedom of choice plan is constitutionally inadequate or could form no part of a desegregation plan." *Cowan v. Cleveland School District*, 748 F.3d 233, 240 (5th Cir. 2014). The district court should explain why it selected the remedy it ordered. *Id*.

**B.      Open enrollment is an appropriately tailored remedy.**

136. Open enrollment is the best plan because it addresses the constitutional issue at hand with an appropriate remedy while giving deference to the District, which has been operating in good faith. In fashioning an appropriate desegregation remedy, this Court must focus on three factors: (1) the nature and scope of the constitutional violation; (2) the remedial objective of restoring, as nearly as possible, the victims of discrimination to the position they

would have occupied in the absence of the illegal conduct; and (3) the interests of state and local authorities in managing their own affairs, consistent with the Constitution. *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977); *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 1239, 1241 (9th Cir. 1979).

137.    The open enrollment plan is a proper remedy because the "scope of the constitutional violation" does not stem from unconstitutional action by the District. Rather, the attendance zone line was imposed by order of this Court in 1969. Judge Davidson found the line itself "perpetuated the vestiges" of the former *de jure* system. [78, p. 8].

138.    In 1969, this Court approved as the attendance zone line for East Side and Cleveland High the old Illinois Central Railroad track. The tracks, now taken up, once served, as in many towns across the country, as a racial divide. Judge Davidson found that the railroad track attendance zone line put in place by Court Order in 1969 continued to cause a division in Cleveland. That division was best cured, both constitutionally and logically, by removing the line itself, and allowing all students and their parents, regardless of where they live and regardless of their race, to select the school they wish to attend.

139.    There was no evidence presented at the hearing that students because of their race are being unfairly denied access to magnet schools and programs, that open enrollment is not affording all students a choice at the middle and high school level, or that students are being denied access to their neighborhood elementary schools. This Court agrees with Judge Davidson that the only remnant of the former *de jure* system in the Cleveland School District was the railroad track attendance zone line separating the Cleveland High and East Side High zones. Removing the line was the appropriate legal remedy.

140.     Open enrollment is appropriate here because "true freedom of choice" puts all students in the position where school assignment is based on their personal choice, not race. Open enrollment also allows the local school board to manage its own affairs. There is nothing unconstitutional about a plan allowing students to choose freely between two high schools and two middle schools. Moreover, after meeting with dozens of parents and community members and examining school resources and student needs, the District is confident that open enrollment gives it the best option in sustaining enrollment District-wide while providing a solid education for all students.

141.     Open enrollment is a practical, workable remedy. At the hearing, Private Plaintiffs and other individual witnesses admitted they currently have the right and opportunity to choose freely between the District's middle and high schools. They freely determined to send their children to all-black schools. Tr. 711-12, 738, 762. Many testified their choice was based on tradition and where they or other family members had gone to school. Tr. 761-62, 781. Black Plaintiffs admitted in deposition that having their children attend classes with white students is not a priority for them. Tr. 766-768.

142.     The District's witnesses, Obie James (an African American parent and East Side High teacher), Dr. Chresteene Seals (an African American board member), Todd Fuller (a white board member) and Dr. Jacquelyn Thigpen (District Superintendent who is African American) testified that the District's system works because of choice, that there is no impediment to any student who wishes to attend any of the District's secondary schools, and that having two high schools and middles schools affords not only diversity in programming but also smaller class sizes and greater opportunities for participation in extra-curricular activities. Tr. 187, 202-203,

41

221-222, 245-246. Dr. Thigpen further testified that the District had the financial ability and the staff to implement the plans it advanced at the hearing. Tr. 222-23.

C. **Open enrollment promises to maintain diversity.**

143. Open enrollment as modified by the District's Plan A (without enrollment caps) is the most appropriate remedy because it is the only plan promising to maintain racial diversity in student enrollment. Based on the evidence presented at the May 2015 hearing, this Court finds that Plan A without enrollment caps has the best chance of providing the District with stability in its overall racial composition.

144. When choosing among constitutionally acceptable remedies in desegregation cases, a court may take into consideration a plan's potential impact on retaining white students. *Flax v. Potts,* 864 F.2d 1157, 1162, FN 11 (5th Cir. 1989). The *Flax* court held that while white flight cannot be used as a justification for avoiding the affirmative duty to desegregate, a school district has a legitimate interest in retaining a sufficient number of white students to provide an integrated educational experience for students. *Id.*

145. As Dr. Rossell explained, if the goal is to have children of all races learning together, then open enrollment can be the only real remedy. Tr. 112, 121-122. The Government's expert, Dr. Smrekar, agrees with Dr. Rossell that white flight is a concern, but offers her unsubstantiated opinion that white flight will not occur in Cleveland, because people are generally open to the concept of desegregation and Cleveland is different because of its "context." Tr. 440-441. Dr. Smrekar's opinion is not based on any studies or data but is formed by having driven around the town a few times and by her conversations with a few parents and community members, as well as some black Plaintiffs. USA Ex. 1, p. 18. Regarding loss of enrollment, Dr. Smrekar's predictions that Cleveland will not suffer the same fate as so many

42

other districts implementing mandatory reassignment plans are in direct conflict with Dr. Rossell's forty plus years of statistical analysis. Dr. Smrekar's testimony is also in direct conflict with the Plaintiffs' own witnesses who admitted white students would not enroll at East Side if forced to attend that school.

146.    Dr. Christine Rossell is the only expert in this case who has conducted any statistical analysis of the results of court-ordered desegregation plans. Her findings are set out in her five reports. A mandatory plan like the Government's will result in a significant loss of white enrollment. Dr. Rossell's opinion is that the plan providing the best chance of continuing the integrated experience in the District is Judge Davidson's "true freedom of choice" or open enrollment. Voluntary plans, like open enrollment, produce greater increases in interracial exposure, while mandatory reassignment plans result in significant white enrollment loss. CSD Ex. 11-A, pp. 23-24 and Figures 19, 20 and 21. In one study, Dr. Rossell found that in districts with 35% or greater minority populations, mandatory re-assignment plans lead to a 65% loss of white enrollment. *Id.* The Government has not produced a single example of a school district with Cleveland's racial enrollment that has experienced more integration or anything close to stabilized integration under a mandatory reassignment plan.

147.    The Government and Private Plaintiffs did not object to the introduction of evidence about potential white or black departure under the various plans. In fact, the Government's expert Dr. Smerkar testified about her opinion on the subject. Therefore, the Government may not now contend that the Court may not consider evidence of potential white student departure or non-enrollment in formulating its remedy.

**D.    Racial balancing at every school is not required.**

43

148.    The Government's plan advocates that a certain racial quota, the District-wide racial breakdown, must be met at D.M. Smith and East Side. Neither the Constitution nor the District's desegregation orders require racial quotas at any school. The District has no constitutional duty to achieve maximum desegregation. *Hull v. Quitman County Bd. of Educ.*, 1 F.3d 1450, 1455 (5th Cir. 1993)

149.    Dismantling an old dual-school system does not require a particular racial balance in each school, grade, or classroom. *Milliken v. Bradley*, 418 U.S. 717, 740-741 (1974). The Supreme Court has rejected any requirement of a particular degree of racial balance. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 12 (1971). *Swann* found that, while mathematical formulas can be a starting point, there is no "per se rule" which "can adequately embrace all of the difficulties in reconciling the competing interests involved." *Id.* at 25-26. It also found that the "constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Id* at 22.

150.    The Constitution does not require the District to "guarantee" or prove that that a certain number of whites will enroll full time at East Side High or D. M. Smith. Even in the context of mandatory desegregation plans, racial proportionality is not required. *Parents Involved in Community Schools v. Seattle School Dist. No. 1 et al*, 551 U.S. 701, 732 (2007). "[A desegregation] order contemplating the substantive constitutional right [to a] particular degree of racial balance or mixing. . . is infirm as a matter of law." *Id.* The Constitution does not require every school in every community reflect the racial composition of the school system as a whole. *Id.* Further, none of the orders entered in this case requires racial quotas to be achieved at every school.

151.     What Judge Davidson ordered was a system where all students in grades 6-12, no matter their race or where they live, may freely choose what school they wish to attend. Students and parents select schools for many reasons—friends, sports programs, teachers, coaches, principals, academic programs.

152.     In the context of the facts and circumstances of the Cleveland School District today, the Court must also be mindful of black students' constitutional right to free association. "No more invidious discrimination, or improper government objective, can be imagined than national power setting aside the valid exercise of choice by members of a class in the name of the constitutional objective for which the choice was granted to the class in the first place. *United States v. Jefferson County Bd. of Educ.*, 380 F.2d 385, 424 (5th Cir. 1967) (Justice Godbold *dissenting*).

### E.     Open enrollment is especially appropriate given the poor results of mandatory integration efforts.

153.     The Court prefers to permit voluntary open enrollment over more drastic mandatory reassignment plans, especially since those plans have failed to produce and sustain an integrated educational experience.  In this case, the east zone, encompassing roughly half the District, had a significant percentage of white residents, virtually none of whom elected to send their children to public school over the last twenty years. See above, paragraph 3, p. 2 of Findings of Facts.  The Court sees no reason to force the District to re-try a mandatory remedy that did not work and has produced a steady decline in the number of whites attending District schools.  *See* CSD Ex. 11-A, Table 1 (1969-70, 1797 white students; 1980-81, 1610 white students; 1989-90, 1392 white students; 1999-00, 1057 white students, and; 2010-11, 1047 white students).

154.    Cleveland, like the Savannah-Chatham County School District, has seen mandatory assignment fail. *Stell v. Savannah-Chatham Co. Bd of Educ.*, 724 F. Supp. 1384 (S.D. Ga. 1988); *Stell v. Savannah-Chatham County Bd. of Educ.*, 888 F.2d 82, 86 (11th Cir. 1989) (adopting voluntary plan that "would lead to an effective and stable desegregation if given an opportunity to succeed"). Over the last two decades, white students residing in the east attendance zone simply have not shown up at East Side and D. M. Smith.

155.    Given the failure of this prior mandatory assignment and given Dr. Rossell's testimony that further mandatory measures will lead to less, not more, actual integration, the Court finds the appropriate remedy to be the voluntary plan endorsed by Judge Davidson and offered by the District. The plan best serves to desegregate the school district as a whole.

### F.    Plan B is also constitutional and creates schools within the District-wide racial makeup.

156.    The District formulated an alternative plan, Plan B. Plan B calls for a single middle school at Margaret Green for grades 6-8 and two high schools for grades 9-12. Cleveland High will become a science, technology, engineering, and mathematics magnet school (STEM) and East Side High will maintain two programs within the school—the current IB program and the new Delta State University partnership. Plan B will create two high schools with a racial composition mirroring the District's overall composition within a reasonable deviation.

157.    Plan B is constitutional. One middle school is constitutional. A plan calling for two high schools with enrollment criteria creating diversity at both schools is constitutional.

158.    Plan B is superior to the Government's plan because it is the District's plan, formulated by its own staff, and uniquely designed for this District. Plan B is also superior to the

Government's plan because, as Dr. Rossell testified, on a continuum, Plan B offers the next best chance of maintaining the most white student enrollment after Plan A. Tr. 111-112.

159.  The Government's expert could not explain why Plan B, calling for a single middle school and enrollment at both high schools within +/- 15% of District-wide enrollment, does not result in desegregation.  She only criticized Plan B for the impracticability of the STEM magnet concept.  Tr. 490-92.  But, Superintendent Thigpen and Ms. Hardy both testified that the District had the staff to implement the proposed magnet concept (Tr. 222-223; 71-72) and the Superintendent and business manager testified that the District had the funds to do so (Tr.222-223; 275).  Further, Smerkar admitted that a magnet theme other than STEM might "take off the table" the problem of staffing and facilities.  Tr. 508.  Further, the District has had a very good track record in implementing magnet programs.

160.  The District estimated the cost of the addition to Margaret Green Junior High to serve grades 6-8 is $2.4 million, which the Superintendent and the business manager testified the District can afford.  CSD Ex 18, p. 14; Tr. 222-223; 275.  Government expert Poros' opinion that the cost of the addition could be as much as $3.9 million was increased primarily upon the need to expand the cafeteria, an expansion he admitted could be eliminated by adding another lunch period to the student schedule.  Tr.  616-617. Further, he admitted the District's architect had more experience in making such cost estimates.  Tr. 610.

**G.**     **The Government's consolidation plan is a mandatory re-assignment plan.**

161.  The Government's consolidation plan, although constitutional, is not the most appropriate remedy in this particular case.  The Government's plan is a mandatory re-assignment plan, which Dr. Rossell and the history of results in other school districts in the Delta and across the state demonstrate will almost certainly produce loss of white students, and maybe blacks as

well. Presently, Cleveland stands in sharp contrast to other districts in the Mississippi Delta, and beyond, because it is actually diverse, with students of all races attending school together every day. That diversity should not be jeopardized by imposing a mandatory plan that, in the name of achieving better integration, will actually result in a re-segregation of schools.

162.    Dr. Rossell's research was confirmed by Plaintiffs' own witness, Leroy Byars. Byars, a black long time educator and coach in Cleveland, testified unequivocally that white middle school students would never enroll at East Side High under the Government's plan. Tr. 800. Although consolidation as a remedy may look good on paper, if whites do not enroll in the middle school, diversity will be lost and these students will not return to the District for high school.

163.    Several individual witnesses and Private Plaintiffs, but not any Government expert, based their support of the Government's consolidation plan upon their unproven assumptions that it would achieve economic savings and improved academics or athletic programs or create more competition. Tr. 683; 705-06; 754-55. They offered no proof of their assumptions. The District business manager testified savings from consolidation would be no more than $29,600. Tr. 886.

164.    Some individual witnesses and Private Plaintiffs also misunderstood consolidation to be premised upon a new high school at a neutral site. Tr. 653, 732. District expert Henderson testified a new high school with full athletic facilities would cost $35 to $37 million and was beyond the bonding capacity of the District. Tr. 148; CSD Ex. 15. A brand new high school is financially impossible.

165.    The Government's plan results in a high school that is larger than the Mississippi guideline for school size, written by the Government's expert Poros. See, paragraph 70, above.

48

**Conclusion**

166.    As Judge Davidson found, Cleveland is an "oasis" in the Mississippi Delta.  There is no vestige of the former *de jure* system left in Cleveland; the final vestige was removed when Judge Davidson removed the attendance zone lines for the middle and high schools.  This Court should approve an open enrollment plan as refined in District Plan A without caps. Alternatively, the Court should adopt District Plan B.

Respectfully submitted, this 27th day of July 2015.

/s/  Jamie F. Jacks

OF COUNSEL:

Gerald H. Jacks                         Jacks Luciano, P.A.
Miss. Bar No. 3232                      Post Office Box 1209
Jamie F. Jacks                          Cleveland, Mississippi 38732
Miss. Bar No. 101881                    Telephone: (662) 843-6171
                                        Facsimile:  (662) 843-6176

And

Holmes S. Adams                         Adams and Reese LLP
Miss. Bar No. 1126                      1018 Highland Colony Parkway
John S. Hooks                           Suite 800
Miss. Bar No. 20708                     Ridgeland, Mississippi 39157
Lindsey N. Oswalt                       Telephone: (601) 355-3234
Miss. Bar No. 103329                    Facsimile: (601)355-9708

## CERTIFICATE OF SERVICE

I, Jamie Jacks, do hereby certify that I have this date served a true and correct copy of the above and foregoing document by electronically filing via the ECF system to:

Joseph J. Wardenski
Joseph.Wardenski@usdoj.gov

Renee Wohlenhaus
Renee.wohlenhaus@usdoj.gov

Ellis Turnage
eturnage@tecinfo.com
turnagelaw@tecinfo.com

Shakti Belway
Shakti.belway@gmail.com

This, the 27th day of July 2015.

/s/ Jamie F. Jacks