**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

| | |
|---|---|
| DIANE COWAN *et al.*, )<br><br>Plaintiffs, )<br><br>and )<br><br>UNITED STATES OF AMERICA, )<br><br>Plaintiff-Intervenor, )<br><br>v. )<br><br>BOLIVAR COUNTY BOARD OF<br>EDUCATION *et al.*, )<br><br>Defendants. ) | Civil Action No. 2:65-cv-00031-DMB |

PLAINTIFF-INTERVENOR UNITED STATES AND PLAINTIFFS' JOINT PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

On May 18-22, 2015, this Court held an evidentiary hearing (the "Hearing") regarding

proposed secondary school desegregation plans filed by the Cleveland School District (the

"District") and the United States on January 23, 2015. At the conclusion of the Hearing, the

Court ordered the parties to file Proposed Findings of Fact and Conclusions of Law. *See* Dkt.

#206 at 1.[1] In accordance with the Court's order, the United States and Plaintiffs jointly submit

the following:

PROCEDURAL HISTORY

The Court provided a comprehensive and detailed procedural history of this case in its

March 2012 Opinion. *See* Dkt. #43 at 1-12. The United States summarized the prior remedial

---

[1] All references to exhibits admitted during the Hearing are formatted in the following manner: The United States:
US-#:page / The Defendant Cleveland School District: D-#:page. Initial references to exhibits with corresponding
docket entries and references to additional documents from the docket are formatted as Dkt. #:page.

orders and the procedural history of this case since March 2012 in its Objections to the District's plans, filed on February 13, 2015. *See* Dkt. #113 at 6-10. The sole issue presently before the Court is what remedial plan the District must now implement to meet its outstanding obligation to desegregate its middle and high schools. *See Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 240 (5th Cir. 2014).

<u>PROPOSED FINDINGS OF FACT</u>

**I.      BACKGROUND**

1.      The United States provided a detailed overview of the District, including current and historical student enrollment and demographic patterns, in the "Background" section of its Proposed Desegregation Plan. *See* Dkt. #109-1 at 3-8/US-3:5-10.

2.      The District currently enrolls 3,799 students in grades pre-K through 12. US-3:6. The District-wide student population is 65.7% black, 30.0% white, and 4.3% other. *Id.*[2] All 6th-8th graders in the District attend Margaret Green Junior High School ("MG") or D.M. Smith Middle School ("DMS"), except for those 6th graders who attend the elementary magnet programs at Bell Academy and the Hayes Cooper Center. *Id.* at 8. All 9th-12th graders in the District attend Cleveland High School ("CHS") or East Side High School ("ESHS"). *Id.* at 6.

3.      MG, which is located on the same campus as CHS in an adjoining facility, is 1.4 miles from DMS. ESHS, located across the street from DMS, is approximately 1.2 miles from CHS. *See* Tr. 579:20-580:8; US-31:b26.

4.      Virtually all white students in the District attend, and historically have attended, MG and CHS. US-3:6-8. The student bodies at DMS and ESHS have historically been and continue to be virtually 100 percent black. *Id.* In 2014-2015, ESHS enrolled 360 students, 99.7

---

[2] According to the District's annual report, filed after the Hearing, total pre-K through 12 student enrollment at the end of the 2014-2015 school year stands at 3,723 students. *See* Dkt. #200-1 at 1.

percent of whom were black. *Id.* at 7. Similarly, in 2014-2015, DMS enrolled 246 students, 99.6 percent of whom were black. *Id.* at 8.

5.     The racial compositions of the student populations at the two high schools and two middle schools in 2014-2015 are virtually identical to those for 2012-2013, the last year in which secondary attendance zones and the majority-to-minority transfer system were in place. *Id.* at 7-8. No white student has chosen to enroll at either DMS or ESHS under the freedom of choice plan. *Id.* at 5-7.

## II.     THE UNITED STATES PLAN

### A.     The United States Plan Uses Consolidation as a Remedy to Desegregate the District's Middle and High Schools.

6.     Under the United States Plan, the District's middle schools are consolidated into a single middle school on the ESHS campus, and the District's high schools are consolidated into a single high school at the MG/CHS campus. Tr. 427:23-428:21; US-3:15. The United States Plan provides for a one-year planning process during which the District will take the steps necessary to consolidate its middle and high schools in time for the 2016-2017 school year. Tr. 436:24-437:5; US-3:16.

7.     The United States Plan contemplates that all middle school students attend a single facility and all high school students attend a single facility. Accordingly, the resulting middle and high school student bodies will necessarily reflect the District-wide racial composition for middle and high school students. Tr. 382:5-13.

                    i.   <u>The United States Plan uses existing facilities to desegregate DMS and ESHS by the start of the 2016-2017 school year.</u>

8.     In its plan, the United States projected the student enrollment in grades 6-12 through the 2016-2017 school year using 2014-2015 enrollment figures in grades 4 through 10. US-3:10-11. The United States retained educational facilities expert Professor John Poros,

3

Associate Professor at Mississippi State University School of Architecture, to assess the capacity, condition, and pedagogical adequacy of the District's schools. US-27:3. After conducting multiple site visits, meeting with principals and facilities personnel, and reviewing floor plans, photos, and District curriculum requirements, Mr. Poros concluded that existing facilities are suitable (in terms of both program needs and student capacity) to support the consolidated middle school and the consolidated high school proposed by the United States. Tr. 562:14-563:15; 563:25-567:13; US-27:2-3, 9-11.

9.     Mr. Poros calculated optimal and maximum capacity for ESHS, CHS, DMS and MG by multiplying the number of instructional classrooms in each school by the "optimal" (24) and "maximum" (30) number of students per classroom under the Mississippi School Design Guidelines ("MSDG"). Tr. 572:2-15; 572:23-573:5; US-27:4; US-28:286. He also assessed the adequacy of the buildings' existing support spaces, such as band rooms, gyms, and theaters. US-27:4-8.

10.     As Mr. Poros concluded, a single consolidated high school using the existing CHS and MG facilities would have an optimum capacity of 1,144 students, which exceeds the projected 2016-2017 District-wide high school enrollment of 1,098 students. US-27:9. In addition, the buildings' two existing cafeterias would easily support the projected consolidated high school enrollment, and CHS's single science lab would be sufficient to meet current curriculum requirements. Tr. 587:22-589:4; US-27:9-10. A second lab could be added by converting existing classrooms to support additional science course offerings. US-27:10-11.

11.     The existing ESHS facilities could house a consolidated middle school program immediately. US-27:11. In its current configuration and with a good classroom utilization rate, ESHS can accommodate 870 students, well above the District's estimated enrollment of 770.Tr.

4

33:18-34:10; US-27:25-26. The United States projects enrollment of just 692 students in the 2016-2017 school year, which is well under the ESHS building's capacity. Tr. 591:11-20; US-3:11. In his analysis of ESHS, Mr. Poros accounted for all instructional areas and those areas' typical utilization rates at middle schools in order to determine a range of student capacity. Tr. 569:13:24, 592:23-597:15; US-27:25-27.

12.     Under the United States Plan, the District retains the flexibility to host separate school-within-school programs or develop other academic configurations (*e.g.*, grade-level or themed academies) that could promote academic choices. MG is organized into two separate wings, while CHS is a two-story building. This physical layout allows for grade levels, themes academies, or other programs to be housed in a dedicated wing of the combined campus. US-27:10. ESHS has a gymnasium, band room, art studio, and science labs that allow for broader curricular opportunities than are supported by the current middle school facilities. Tr. 590:22-591:4; US-27:11.

13.     The planning year included in the United States Plan provides time to complete any modifications to the facilities, including adjustments required to provide specific curricular options or those designed to promote accessibility in accordance with the Americans with Disabilities Act ("ADA"). Tr. 589:5-590:15 (ADA issues at CHS can be remedied within a year without significant cost); Tr. 597:24-598:7 (recommended corrections to CHS could be completed for 2016-2017 school year); US-27:5, 9.

      ii.     The United States Plan promotes efficient use of District facilities and resources.

14.     The United States Plan also eliminates many of the inefficiencies that characterize the District's current allocation of resources. As a District board member testified, under

consolidation the District "could take that money that [it is] using in both schools and put it in one." Tr. 250:5-22.

15.     At present, DMS and ESHS are significantly underutilized, operating at 45% and 46% of optimal capacity, respectively. Tr. 574:2-11; 578:17-579:2; US-27:6-7. In stark contrast, CHS is over-enrolled at 110% of optimal capacity. Tr. 572:16-22; US-27:4.

16.     Consolidating schools at the middle and high school levels would "maximize [the District's] ability to offer a full array of academic and extracurricular programs, while still maintaining a sense of familiarity, a sense of community, and the socio-emotional supports that we know have been well documented now for decades in terms of effective high schools." Tr. 433:4-434:2. In their current state, both high schools – particularly ESHS – are too small and lack "efficiency of scale." Tr. 434:3-13. The District's own board member acknowledged this when discussing the benefits of having a single high school in Cleveland. Tr. 249:16-250:4.

17.     Current students do not have equal access to course offerings and extracurricular activities. For example, CHS has a drama club but ESHS does not; DMS has visual arts while MG does not. Tr. 234:21-25; 235:6-9. Consolidation of the middle and high schools would ensure students have equal access to all course offerings and extracurricular activities. Tr. 235:1-5, 10-22.

18.     For the last 26 years, the District has bused students between CHS and ESHS for curricular offerings on a daily basis (and during every period except the final period). Tr. 36:8-16; 232:5-233:19; 235:6-19; 625:3-627:10. If a student elects to take multiple classes that are offered only at the high school where he/she is not enrolled, he/she must commute back and forth multiple times a day. Tr. 240:16-22. Students bused from one high school to the other often miss significant instructional time because the class for which they are being bused begins before they

can travel between the two high schools. Tr. 233:20-234:2; 373:16-21. These bus-related delays often cause students to be 15, 20, or even 30 minutes late for class. Tr. 629:18-21. The loss of instructional time is compounded by slightly different bell schedules at CHS and ESHS. Tr. 234:2-16. Although the District's magnet coordinator, Beverly Hardy, testified that problems pertaining to bus schedules could be corrected by coordinating the two high schools' schedules and adjusting the time allotted between classes, the District has not made such changes in the nearly three decades it has conducted inter-school busing. Tr. 233:5-19; 809:16-25. Busing also consumes financial resources that could be used to improve academic programs. Tr.276:3-15.

19. The United States Plan does not require outside magnet funding, other external funding, or significant expenditures of additional resources. Instead, the District can implement the plan using existing teacher, staff, and other resources. US-3:15-16.

iii. Consolidation is supported by a cross-section of the Cleveland community.

20. There is significant community support for a consolidated middle school and high school, as expressed by parents and community members during the Hearing, Tr.637:15-638:23; 694:19-22, and in focus groups and community meetings. *See* US-8:9, 39-42; US-10A:4-5, 10, 15, 25-27. Even the District's own witnesses acknowledged community support for consolidation, though they noted that this support is not universal. Tr. 222:13-17; 852:2-10.

21. Parents and community members in the District support consolidation because it eliminates unequal access to educational programming (real or perceived), increases competition, and provides for more effective use of resources – all of which community members expressed will benefit their children and the community as a whole. Tr. 625:9-12; 683:11-22 ("When you merge schools, there are pockets of excellence that come out and all this come[s] into a single school, which my daughter can compete with. As a parent that is important to me. . . .

[Competition would make her] better prepared for the world."); 755:1-4 ("[Consolidation] will allow every student to participate in all the programs and whatever they have to offer. Every child will have the opportunity to participate in it if they qualify."); 759:22-760:4; 772:5-10. One white parent who was considering sending her child to a middle school outside of the District testified that consolidation would encourage her to keep her child in the District because she would expect the consolidation of resources to lead to improved educational quality at the middle and high schools. Tr. 667:16-25, 670:11-25.

22.     Consistent with their support of consolidation, a number of parent witnesses indicated that they would willingly participate on the multiracial advisory panel contemplated by the United States Plan. *See* Tr. 673:23-674:16; 687:4-8. The advisory panel would develop community and business partnerships, organize public engagement efforts, and market the new combined school to prospective students and parents. US-3:23. Several witnesses also testified to the importance of exposing students to those who are different from themselves to prepare them for success in college and the workplace; many favorably contrasted this exposure with their own experience of attending racially segregated schools in Cleveland and elsewhere. Tr. 775:20-776:3; 779:12-23; 782:18-783:11.

23.     Coaches and school board members emphasized the important role that athletics play in the Cleveland community. Tr. 186:19-22; 201:23-202:12; 794:1-17. Both the current and former ESHS football coaches acknowledged that a consolidated football team would be stronger and more competitive than either of the existing high school teams standing alone. Tr. 192:24-193:11; 194:5-9; 793:18-794:6; *see infra* II.B.v.

24.     Even those community members with deep pride in the separate traditions of the two schools have embraced consolidation. "This is about not so much things [that] occurred in

the past but things we look forward to the future for. [This is] about our children. [This is] about getting them the best opportunities for success. And I would think no matter what the tradition is, no matter what the loyalty of the alumni and boosters, that we should look at what is best for the children." Tr. 642:9-15 (Arthur Holbrook, former. District educator and principal at DMS and CHS); *see also* Tr. 797:8-19 (Leroy Byars, former ESHS football coach— "I want what is best for the kids. Although my name is on this field . . . I feel that, regardless of what happened here, that the legacy of East Side High School will always be carried on. . . [because] the pride for East Side High School will always be within the hearts of East Side graduates. . . . I'm willing to substitute or sacrifice the name of this field or to just see Cleveland -- East Side and Cleveland High School become one high school.").

25.     A consolidated school system could unify the entire community and end decades-long feelings of racial stigma. Tr. 706:12-15 ("We can break down this wall of racism that divides us and keeps us separated, and we could create a new culture in our school system that's going to unite us and unite our whole city."); Tr. 710:25-711:2 ("I think . . . a unified high school[] would unify the whole City of Cleveland."). Parents and community members, including one school board member, spoke about the long-standing racial stigma associated with having two separate schools on different sides of the railroad track. Tr. 246:3-12 (Dr. Chresteen Seals—"[The removal of the old attendance line] was a jubilant time because those railroad tracks when I was at East Side meant something that was very dim for me because it meant on the East Side I belonged and on the west side you belonged."); 704:4-25 (Rev. Duvall—"I think for the past 40-something years, East Side has been demonized as being a bad school."); 732:8-13 (Keith White—"[W]e actually want to be able to find some way to get involved in Cleveland School District instead of being outcast because we are the track schools, a school on this side of

the track and a school on that side of the track. How modern is that in our society?"); 790:4-19

(Leroy Byars—"[S]tudents on the east side of town, which are at East Side and at D.M. Smith . .

. felt . . . that they were inferior.").

26.    To eradicate the stigma that parents and community members described, the

United States Plan contemplates rebranding the single middle school and single high school by

renaming each school and creating new mascots. Tr. 434:22-435:18; US-1:12; US-3:22.

Rebranding is an essential element of school consolidation because it signals to the community

that the District is not simply folding one school into another, retaining the identity of the

remaining school and erasing the identity of the non-remaining school. Tr. 435:24-436:23;

673:7-22. Further, this rebranding is part of a "coordinated, comprehensive strategy [that]

reflects design principles gleaned from community and economic development research . . . and

classic organizational theory." US-1:12-13 (citations omitted). Instead, the District will serve all

students by developing a new middle school and a new high school, both of which will be

housed at an existing campus. US-3:15. While the United States Plan contemplates the resulting

middle school and high school will bear new names and mascots, it allows room to memorialize

the history, traditions, and legacies associated with CHS and ESHS. Tr. 438:9-439:5; US-1:12-

13.

### B.    District Objections to the United States Plan.

#### i.    Impact on white student enrollment.

27.    The District's primary objection to the United States Plan is that consolidation of

the middle and high schools will cause white families to leave the District (referred to by the

District as "white flight") and this loss of enrollment will translate to an overall loss in district

funding. Tr. 110:20-111:9, 821:7-16, 887:9-21; D-11E:9.

28.     The District relies almost exclusively on the research and opinions of Dr. Christine Rossell to justify unfounded claims of future white flight. Although Dr. Rossell testified that under the United States Plan half of white students assigned to ESHS will leave the District in the first two or three years, Tr. 821:7-16, she confirmed that this assertion is not based on any specific information about Cleveland. Tr. 826:22-827:8. Dr. Rossell neither interviewed nor surveyed any parents in this case; she made just one trip to Cleveland prior to her April 2015 deposition. Tr. 125:22-126:14; 823:20-824:3. In addition, she testified that she has not examined any socioeconomic data related to Cleveland. Tr. 827:9-828:6.

29.     Dr. Rossell provided testimony regarding parent attitudes on school choice in the late 1960s and 1980s, but admitted that she does not know parents' current attitudes or feelings with regard to school choice. Tr. 826:9-21. The most recent parent survey on school choice that Dr. Rossell conducted was in Hattiesburg, MS in 1989—26 years ago—regarding that district's plans after the desegregation case there was closed. Tr. 125:15-25; 105:20-106:13. The only other parent survey she conducted in Mississippi was in 1988 in the Natchez-Adams School District. Tr. 126:1-4; 823:20-824:3.

30.     Dr. Rossell's testimony is replete with predictions of white flight based on school districts with distinguishable circumstances. Dr. Rossell provided testimony regarding Detroit, St. Louis, and Kansas City, all of which are large urban school districts that are radically different from Cleveland. Tr. 131:2-132:6. The examples that Dr. Rossell cites in Mississippi— including Hattiesburg, Natchez-Adams, and Indianola—are equally inapplicable to the circumstances in Cleveland. For example, in the Mississippi Delta, Dr. Rossell cites Indianola, but its desegregation plan went into effect 45 years ago when the district was already 90% black. Tr. 136:8-22. The desegregation plan in Natchez-Adams (the nature of which Dr. Rossell does

11

not describe) went into effect 25 years ago, in 1989. Tr. 133:12-14. By Dr. Rossell's own

preferred measure, the level of integration in that district remained at or above 1988-89 levels

until the early 2000s. D-11A at Fig. 7; Tr. 133:12-19. Dr. Rossell's parent survey in Natchez-

Adams was conducted before the 1989 desegregation plan went into effect. She testified that she

reviewed no other information—such as demographic data or economic factors—to help explain

the decline in white population in that community over time. Tr. 135:8-14.

      31.     Dr. Rossell provided three reasons for white flight: racial prejudice; fear of not

knowing the school/community where one's child is being bused; and a desire for the community

created by neighborhood schools. Tr. 140:10-141:23. She testified that she believes the first

reason, racism, is undercut by survey data that white parents are not prejudiced in this way. *Id.* In

support of the second and third reasons, Dr. Rossell relied on anecdotal information from Boston. *Id.* No witness provided any testimony that Boston was similarly situated to Cleveland.

Indeed, Dr. Rossell testified that she believes Boston has about 80 public schools;[3] Cleveland has

only ten. Tr. 128:2-4; US-3:14. The geographic compactness of Cleveland renders proximity to

school a non-issue in this case. Tr. 343:18-24, 533:21-534:5.

      32.     Dr. Rossell's analysis relies heavily on the Interracial Exposure Index to gauge

the level of integration in a district, *see* Tr. 94:3-10, 97:10-98:21, but the measure is ill-suited to

a two-high school district such as Cleveland. The Interracial Exposure Index illustrates the

percentage of white students in the average black student's school. Tr. 92:6-24. Dr. Rossell

testified that the average black student in the District goes to a school that is 21.6 percent white.

However, no such "average" student exists in Cleveland, where a black high school student

either attends a school that is nearly 50% white (CHS) or 100% black (ESHS). Tr. 114:23-116:4.

---

[3] In fact, there are 128 schools in the Boston Public Schools system. "School Listings," Boston Public Schools, http://www.bostonpublicschools.org/domain/175 (last visited Jul. 20, 2015).

In reality, white students in the District attend secondary schools that are racially integrated; black students who attend DMS and ESHS do not. Tr. 137:1-14; US-3:6.

33.     Dr. Rossell relies on a second measure, the Index of Dissimilarity, which has been used since the late 1950s in the school and housing context, to measure racial balance. Tr. 92:6-16. The measure goes from 0 to 1, with 1 being complete segregation and 0 being perfect integration. Tr. 99:13-19.

34.     In her report, Dr. Rossell calculates the Index of Dissimilarity (Db) measures for the secondary schools in the District. D-11E:Table 2b. However, these calculations were performed incorrectly. As per her testimony at the hearing, Db for secondary schools is calculated by using the total number of students *in secondary schools* as the denominator, Tr. 124:1-4. However, in her report, Dr. Rossell incorrectly calculated the Db using the total number of students *in the entire district* as the denominator. While Rossell calculated the Db measure as .245 for the 2012-2013 school year, the United States, using her formula, calculated the Db as .579. Rossell's miscalculation grossly underestimates the extent of segregation in the District's secondary schools. Tr. 824:4-21; D-11E:Table 2b.

35.     Every other witness for the District, including community and school board members, who testified about white flight, testified that they based their opinions on that of Dr. Rossell. Tr. 211:9-13; 212:20-25; 252:15-253:8; 253:19-25; 880:24-881:13. The magnet coordinator, the school board representatives, community members, and the Chief Financial Officer ("CFO") all said that their opinion was based upon Dr. Rossell's advice. Tr. 50: 8-11; 211:9-13; 212:20-25; 252:15-253:8; 253:19-25; 880:24-881:13. This was also true for each of the District's other purported experts, whose analyses all depended on Dr. Rossell's advice. Tr. 50: 8-11; 866:8-18. None of the District's experts presented an independent reliable conclusion

13

regarding white flight; indeed, none of them had any scholarly or practical expertise regarding white flight. *See* US-41/D-29; US-46; US-50; US-58. Not one of the District's witnesses, including its experts, conducted a systematic survey of Cleveland residents to assess their opinions about consolidation. Tr. 217:25-219:13; 881:23-882:3.

ii.  District focus groups and parent survey.

36.     In August 2014, the District conducted six focus groups and issued a survey to parents of students in the District. That survey did not address consolidation of the District's middle or high schools. Tr. 218:21-219:13. Tr. 374:11-24; US-7:9; US-11:1-2. Instead, the survey was designed to gauge interest in different magnet themes. Tr. 68:24-69:1. The survey was not scientific, was voluntary in nature, and—for persons who did not participate in the focus groups—was only available online. Tr. 69:3-9, 17-18, 19-25; 80:19-81:10. Inexplicably, the survey did not ask respondents to identify their name, race, or the school(s) their children attended. Tr. 70:1-11. Aside from the focus groups and the single survey, the District employed no other methods to solicit parent opinions on enrollment or consolidation. Tr. 68:24-69:21; 218:21-22.

37.     For purposes of facilitating its focus groups, the District engaged Dr. Butch Caston and Dr. Cassie Pennington, both retired educators. Tr. 837:6-838:2; 838:11-15. Each focus group met twice for sessions lasting approximately two hours. Tr. 838:3-10. The District's magnet coordinators and board attorney were also present for the focus groups. Tr. 842:17-843:3. Focus group participants were not selected at random, but instead were recommended by District school administrators, the mayor's office, the local ministerial association, and the chamber of commerce. Tr. 839:22-840:19.

38.     Before conducting its focus groups, the District sent participants a letter outlining the issues that would guide the group discussion. The District's letter contains no reference to the

14

consolidation of the District's middle schools or high schools. US-7. According to Dr. Caston, the issue of consolidating the middle or high schools into *existing* facilities was not discussed during the focus groups at all. Tr. 846:4-846:20. The only discussion of consolidation, raised by participants, involved consolidating high schools into a *new* facility sited at a neutral location. Tr. 846:21-847:2.

39. Given the absence of facilitated discussion about consolidating schools into existing buildings, the focus groups conducted by the District do not provide any reliable evidence that white parents would remove their children from the District should the Court adopt the United States Plan. In fact, Dr. Caston testified that there were white parents who expressed the view that if their child's school had strong academic programs, the race of students attending the school would not matter. Tr. 852:11-853:9.

40. To the extent Dr. Caston's written report concludes that "the consolidation of the two high schools will cause major problems for the District and the community," that conclusion is not persuasive, as Dr. Caston himself testified that the issue of consolidating schools into existing facilities was not a part of the focus group discussions. US-59:2; Tr. 846:4-846:20. Although Dr. Caston's report suggests that this conclusion is also based on his "near 50 years experience in public education in Mississippi," neither the report nor his testimony is sufficiently detailed to explain the connection between that experience and the resulting conclusion. US-59:2.

41. Dr. Caston's conclusion is without basis. Dr. Caston testified that he did not keep any detailed notes of the focus groups and that he did not have access to minutes of the focus groups kept by the District at the time he wrote his report. Tr. 854:3-855:11. Accordingly, he had no record of which participants responded to which questions, much less the nature or details of

those responses. Tr. 854:11-855:24. By itself, Dr. Caston's inability to reference a record of the comments made during the 12 hours of focus group discussions he facilitated undermines the reliability of any conclusions he drew from those discussions. That nearly seven months elapsed between the time Dr. Caston facilitated the focus groups and the time he was asked to draw those conclusions and memorialize them in a report also renders his conclusion unreliable. Tr. 851:10-852:1; 859:8-16. Moreover, Dr. Caston was unaware at the time he facilitated the focus group discussions that he would be asked to interpret the results of those discussions. Tr. 855:19-857:16.

42.     Dr. Caston has no background in qualitative social science research and he did not rely upon any seminal authorities in focus group methodology. Tr. 832:20-23; 835:7-12; US-58. He has not taught any courses on social science research, nor has he published any social science research related to school desegregation. Tr. 833:19-24; US-58. He has primarily conducted focus groups in the context of superintendent searches, whose purpose was to assist in selecting candidates for employment, not to generate data from which to draw conclusions. Tr. 833:25-834:6; 835:2-6.

            iii.  Suitability of District facilities.

43.     The District's facilities expert, Joseph Henderson, testified that ESHS lacks the capacity in its current configuration to accommodate a consolidated middle school, as contemplated by the United States Plan. Tr. 146:5-13. In particular, Mr. Henderson calculated the school's educational capacity as 600-675, using a minimum of 25 and maximum of 27 students per classroom, with 25 classrooms in total. Tr. 146:14-19. Hearing testimony demonstrates that Mr. Henderson's analysis is flawed in two key ways.

44.     First, the Mississippi School Design Guidelines, adopted by the Mississippi Department of Education, allow a maximum of 30 students per instructional classroom, not 27.

16

US-27:26. The MSDG are a well-accepted statewide resource covering school facility planning and use, and were developed with significant input from administrators, educators, architects and engineers. *Id*. at 3. Mr. Henderson testified that he uses the MSDG in his work designing schools, and even participated in the planning of those guidelines. Tr. 152:9-24. Had he used the proper maximum number of students per classroom provided in the MSDG, 30, he would have arrived at a maximum capacity of 750 students at ESHS.

45.     Second, in determining the educational capacity of ESHS, Mr. Henderson chose to ignore all non-traditional classroom space, including specialized classrooms such as laboratories, art rooms, and music spaces. Tr. 154:2-21. At ESHS, these specialized classrooms currently include four computer labs, two science labs, an art room, a library conference room, a band hall, and a choral music room. US-51/D-18:16-17. Notwithstanding his failure to account for specialized classrooms, Mr. Henderson acknowledged that these spaces are used throughout the school day. Tr. 154:22-155:7.

46.     Mr. Henderson testified that he knew of no other way to count educational capacity besides simply multiplying traditional classrooms by the desired number of students per classroom. Tr. 156:11-14. He testified that to account for use of non-traditional classrooms, he would need input from the educators in a given building, which in this case he neither requested nor received. Tr. 156:20-23. Mr. Henderson did not consult with any educators or ESHS facilities staff, nor did he conduct a site visit before preparing his expert report. Tr. 156:24-157:22. In addition, he neither sought nor received any other guidance on how non-traditional classrooms would or would not be used at ESHS. Tr. 157:23-158:1.

47.     By contrast, the United States' expert, Mr. Poros undertook a rigorous ESHS capacity analysis, factoring in the typical utilization rates of the non-traditional classrooms

17

ignored by Mr. Henderson. US-27:25-27. The more rigorous analysis shows that ESHS has ample capacity – calculated at high, medium, and low utilization rates – to accommodate the middle school enrollment projected by the United States. *See* Tr. 569:13-24; 592:23-597:15. Assuming the District's middle school enrollment projection of 770 students, Tr. 33:18-34:10, ESHS still has sufficient capacity at all utilization rates. US-27:25-27; *see supra* II.A.ii.

48.     Even if Mr. Henderson's flawed assumptions about class size and the availability of non-traditional classrooms are taken as true, ESHS would only need one to four additional classrooms to accommodate the U.S.-projected middle school student enrollment. Tr. 158:2-10. Mr. Henderson himself testified that ESHS has many options to accommodate the additional students within the existing facility. Tr. 158:25-159:3; 159:23-160:1. He noted, for example, that two of the school's four computer labs could be converted to traditional classrooms without significant expense, and that the existing music room could be converted into another two classrooms. Tr. 159:4-22; 160:2-15. In addition, the District has noted that it could convert the library conference room into a classroom. US-51/D-18:17. In the event the District chose to accommodate additional students by constructing new classrooms as an addition to the existing ESHS facility, Mr. Henderson testified that the District could do so without any particular challenges or obstacles. Tr. 160:16-161:3.

49.     Mr. Henderson also noted that an addition of one to four new classrooms at ESHS (if needed to accommodate middle school students under the United States Plan) would be both cheaper and faster to complete than the proposed expansion of MG under the District's Plan B. Tr.164:18-165:8.

iv.   Impact on District funding.

50.     Testimony by the District's CFO that the District would save no more than $29,600 by consolidating schools is not credible. Tr. 886:16-21. The CFO testified that neither

she nor anyone on her staff had conducted a financial analysis of the costs relating to the desegregation proposals before the Court. Tr. 268:4-18; 891:24-892:3. Although the CFO claimed, on rebuttal, to have undertaken such an analysis after giving her initial testimony, the District provided no documentary evidence reflecting the manner in which the analysis was conducted, the results of the analysis, or the source(s) underlying the conclusions. Tr. 892:4-19. During rebuttal, the CFO testified that the only savings she could identify in the event of consolidation was $29,600, reflecting the salaries of four bus drivers who would no longer be needed. Tr. 886:2-21. However, she provided no basis for her testimony that consolidation would not result in any other reductions or efficiency in staffing. Even her accounting of transportation costs is incomplete, at best; while it accounts for the reduction in personnel costs for the four bus drivers, it omits savings related to fuel costs and wear and tear on the buses. *Id.*

51.     The District's magnet coordinator testified that the District is prepared to cover the expenses of programs for which it is unable to obtain grant funding. Tr. 817:11-16; *see also* Tr. 817:17-818:5 (Ms. Hardy confirming that the board would also consider funding programs in a consolidated school). Although she believes the District would not be eligible to apply for a federal magnet grant at the secondary level if the District had only one high school or one middle school, the magnet coordinator acknowledged that external grant sources are available to the District, as well as corporate sponsorships like the one used to finance Bell Academy's playground. Tr. 808:2-11; 814:14-815:1; 815:8-17.

v.   Impact on District athletics.

52.     The concerns raised by the District that increasing the size of athletic teams under consolidation will lead to a loss of scholarship opportunities are little more than speculation. No evidence was admitted regarding the number of students who received scholarships in recent years, much less the manner in which that number would change – if at all – under consolidation.

19

Moreover, District witnesses acknowledged that students who are truly talented will shine regardless of the size of the team on which they play. Tr. 193:5-8.

53.      Neither the District nor the Mississippi High School Activities Association imposes any limits on the number of students who can be on the roster for a given sports team. Tr. 236:8-14. Accordingly, in the event of consolidation, the District is free to increase the size of its athletic teams. This conclusion is consistent with testimony that football coaches at ESHS do not "cut" students but instead expand the team roster to accommodate all interested students. Tr. 191:9-192:8. Similar increases in other extra-curricular opportunities, such as having multiple leaders for student organizations or adding extracurricular activities to the school program, are feasible. Tr. 444:1-24.

        vi.  Community assets and demographics of Cleveland.

54.      The United States presented the expert testimony of Dr. Claire Smrekar, Associate Professor of Public Policy and Education at Vanderbilt University, an expert in the areas of school desegregation, school choice, community relations, and school diversity. Tr. 315:9-16; 331:5-18; 341:15-17. Dr. Smrekar provided credible testimony that the geography and economic stability of Cleveland do not support the finding that white flight is likely to occur on any significant scale. Tr. 440:7-441:20. In reaching this conclusion, she considered strong community ties to the District schools, the economic and other community assets unique to Cleveland, the limited surrounding private school market, the neighboring public school systems, and the degree of integration already present in the District. Tr. 440:7-443:25. As Dr. Smrekar explained, numerous families within the District, including participants in the District's focus groups, have voiced a commitment to public schooling in Cleveland. Tr. 442:14-23. This commitment is reinforced by Cleveland's stable economy and work force, which are tied to the community's economic assets, including Baxter Health Care, Delta State University, Cleveland

School District, Bolivar Medical Center, Delta Arts Alliance, and Faurecia Seating Company, among others. Tr. 442:14-443:12; US-1:19.

55.     The District's own witnesses corroborated Dr. Smrekar's findings regarding the District's economic assets. For example, Gary Gainspoletti, a long-time resident of Cleveland and alderman at-large, testified that "Cleveland has a very, very good economy." Tr. 877:13-19. He also noted that, "[c]ompared to the rest of the Delta, there is no comparison. We – I think are pretty much light years ahead of them." Tr. 877:19-21.

56.     In addition to relying on Cleveland's attractive economy in reaching her conclusion regarding white flight, Dr. Smrekar cited limited private school supply and demand given the socioeconomic demographics of District families. Tr. 441:21-443:16. In particular, she testified that families with salaries typical in the District were not likely to "entertain the kind of commutes or tuition that private school enrollments would involve." Tr. 443:22-25; *see also* Tr. 898:2-901:7. She further explained that white families were unlikely to enroll their children in neighboring public school districts, as those districts lack sizable white student populations and would therefore be unlikely to draw white students from Cleveland. Tr. 443:17-23.

57.     Finally, white students in the District have attended schools with substantial black student populations for many years. As Dr. Smrekar testified, the District has "had 20 years of stable racial balance. . . . There has been no tipping out of that 65/35 [black/non-black student population] since about 1990." Tr. 445:13-20. All white families in the District currently send their children to schools with significant black enrollments, including the majority-black Pearman Elementary, Bell Academy, Nailor Elementary, and Margaret Green. US-3:6.

58.     The District's magnet coordinator (Ms. Hardy) testified that the number of students who live in the District but are being homeschooled was increasing in 2013 when she

was still employed at Hayes Cooper. Tr. 813:13-16. She cited no specific data to support her claim. Tr. 805:21-806:6; 813:13-814:2; 818:11-13; 819:20-25. She also noted that she has no understanding of the reasons those students are homeschooled other than their parents not being satisfied with the District's high school programs. Tr. 820:1-14. At no point did the District offer any testimony indicating that students are being homeschooled because their parents are opposed to or fear consolidation.

59.     Some opposition to the United States Plan does not mean that the plan will fail. The District has previously taken action to satisfy its desegregation obligations despite some opposition among those affected by the proposed action, and ultimately the opposition the District faced had no significant detrimental effect on the success of the changes. For example, several years ago the District reassigned various faculty to ensure the racial composition of faculty at certain schools would be reflective of the District-wide racial composition of faculty serving that type of school. Tr. 236:22-237:3. Although some faculty members resisted the prospect of reassignment, once the reassignments were made the majority of the reassigned faculty accepted those reassignments and are doing well. Tr. 237:4-19.

## III.    DISTRICT PLAN A

### A.    Plan A Lacks Capacity To Desegregate DMS and ESHS.

60.     District Plan A for the most part continues the status quo of freedom of choice. Tr. 227:13 ("Plan A is things as they are . . . ."); Dkt. #108-1:1-7/D-21:4-10; US-1:10-11. Plan A contemplates no enrollment or facilities changes for middle schools. D-21:7-9. At the high school level, the District retains freedom of choice but imposes enrollment caps of 550 students on both schools. Plan A also adds an "Early College Program" at ESHS and limits IB Programme participation to full-time ESHS students. D-21:4-5.

61.     Because Plan A leaves both middle schools intact and makes no changes to the schools' existing educational programming or enrollment policies, it is unlikely to desegregate DMS. Tr. 394:12-14; 395:9-17; D-21:7-10. As Dr. Smrekar testified, DMS has "a historic legacy, an identity associated with [a] predominantly black neighborhood or section of town. No white students have ever enrolled there [,]" and "[i]t has had severe academic performance issues." Tr. 395:13-22; *see also* Tr. 394:15-395:8; *see* Tr. 51:8-12 (District magnet coordinator: "last year [DMS] was a failing school. It is now a D school."). In the absence of any change to that school, there is no plausible reason to believe that the District will have any more success in attracting white students than has historically been the case. Tr. 395:9-22.

62.     Plan A may increase rather than decrease segregation in the high schools. US-1:7-8, 11. Plan A, like the existing freedom of choice plan, takes a first-come, first-served approach to enrollment. D-21:4. Assuming the same level of interest in CHS from future District high school students and the new enrollment cap of 550 students at both schools, implementation of Plan A would result in approximately 80 students who want to enroll at CHS being assigned to ESHS instead. Tr. 397:23-398:20. If at least some of those students were black, the net result would be a decrease in black enrollment at CHS and a corresponding increase in black enrollment at ESHS. Even if all of the students who were forced by the enrollment caps to enroll at ESHS were white, ESHS still would not reflect the District-wide racial composition within a margin of 15 percentage points. Tr. 397:23-399:15.

63.     The District's own expert agrees that enrollment caps are unlikely to desegregate ESHS. In particular, Dr. Rossell explained that under Plan A the interracial exposure index, her preferred measure of desegregation, might worsen because some black students who currently choose to attend CHS may be required to attend ESHS instead. Tr. 113:23-114:9; 116:5-16.

23

        i.      <u>IB Programme.</u>

64.     Under Plan A, the IB Programme remains a program within a school ("PWS") at ESHS. Tr. 401:4-7; 403:11-13. Although Plan A modifies the criteria for participating in the IB Programme so that students who want to take IB courses are required to enroll full-time at ESHS, there is no plausible evidence that a significant number of white students would enroll full-time at ESHS to participate in the program, or that the IB Programme will be any more successful in desegregating that school than it has been in the past. As Dr. Smrekar testified, for purposes of achieving desegregation, PWS magnets are less effective than whole-school ("dedicated") magnets when placed in minority neighborhoods. Tr. 401:11-402:21.

65.     The District's IB Programme has proved ineffective in desegregating ESHS. Tr. 403:11-16.  At present, students in the IB Programme select either the course track or the diploma track. Tr. 289:21-290:2. The course track allows students from either high school to take one or more IB courses ad hoc; the diploma track requires that students take all of the IB courses and satisfy certain other requirements for earning an IB diploma. Tr. 289:21-291:4. The District's IB coordinator confirmed that while the purpose of the IB course track was to introduce white students enrolled at CHS to ESHS so they would develop a comfort level and later choose to enroll full-time, white enrollment at ESHS has not occurred; indeed, no white students chose to enroll in the Diploma Program in 2013-2014 or 2014-2015. Tr. 289:13-20; 291:5-11; 295:7-297:3; 403:11-16; US-18; *see also* Tr. 65:7-66:11. Instead, those white students who took IB courses traveled to ESHS for the courses and then returned to their home school (CHS). Tr. 291:12-19; 403:17-404:9; US-18. In 2014-2015, there were 30 white course-track IB students. Tr. 403:17-20; US-1:8; 17:2. Even assuming 30 white students chose to enroll at ESHS full-time under Plan A's modified participation criteria, that change in enrollment would not

meaningfully desegregate ESHS. Tr. 404:18-405:15. Approximately 90 to 110 white students would need to enroll full-time at ESHS– nearly four times the current part-time participation rates – to accomplish that goal. Tr. 404:18-405:15; US-1:8, 10. Not even the District's expert could testify to the effectiveness of the new IB Programme full-time enrollment requirement, stating that it "may or may not produce a large increase in integration at these schools." D-11E:7; Tr. 117:6-118:5.

66.     Given the loyalty that white students have shown to CHS, and that none of the white students who have participated in the IB Programme in recent years have chosen to enroll at ESHS, Plan A's IB Programme is not likely to draw sufficient numbers of white students to ESHS to result in meaningful desegregation. Tr. 405:16-407:20; US-1:10. Indeed, in focus groups held in 2014 white parents indicated that if forced to choose between enrolling their child full-time at ESHS to participate in the IB Programme and enrolling their child full-time at CHS without IB Programme participation, they would keep their children at CHS. *See* US-10A:14; US-8/D-23:2; Tr. 68:1-4.

                    ii.     Early College Program.

67.     Plan A's Early College Program would function as a second within-school program at ESHS. Tr. 401:4-9; 411:7-11. To participate in the program, students would be required to earn an ACT score of 21 or above, have and maintain a GPA of at least 3.0, and be in the 11th or 12th grade. Tr. 408:1-18; D-21. Students who meet the eligibility criteria would be permitted to accrue up to 12 college credit hours at Delta State University in 11th or 12th grade while also attending classes at ESHS. Tr. 408:19-409:6; D-21. District students make high school selections while in the eighth grade and, at that time, could not know whether they would later qualify for the Early College Program. Tr. 414:1-415:17. According to the District's own data,

only 44 seniors in the District during the 2014-2015 school year would have met the program's ACT eligibility requirement. Tr. 411:13-413:16; US-15; US-1:13-14. Of those 44 seniors, 50% were white. Tr. 413:17-19; US-15; US-1:13-14. When the GPA requirement is applied, the number of eligible students decreases. Tr. 413:20-25. Although the District magnet coordinator testified on rebuttal that larger numbers of students would be eligible for the Early College Program if the District changed the ACT score requirement from 21 to 18, the lower cutoff score is not part of Plan A as filed with the Court on January 23, 2015. D-21:5; Tr. 808:12-25.

68.     A true early college program is "robust and . . . multi-facet[ed]," often beginning with a summer bridge program, which to increase the pipeline of potential participants includes access to college facilities and faculty mentoring. Tr. 409:7-411:2. Often early college programs also include apprenticeship opportunities. Tr. 410:21-411:2. Unlike true early college programs, Plan A's Early College Program includes little more than an opportunity to earn dual credit. As the Superintendent testified, the District already offers students this opportunity under less restrictive participation criteria. Tr. 228:13-231:1. For example, students are not required to take the ACT prior to enrolling in the existing dual credit courses, and the ACT score they will eventually need in order to claim the college credit from these courses is below 18. Tr. 231:2-231:12. The primary differences between the existing opportunities and the one proposed under Plan A is that students will not be required to pay a course fee (currently $60); students will be able to take dual credit courses on Delta State University's campus; and, the District will provide transportation to the campus. Tr. 231:13-24; 238:21-239:24. These differences are not significant enough to drive large numbers of white students, who already enjoy dual credit opportunities, to enroll at ESHS. Tr. 414:1-415:23. Qualified CHS students would continue to enjoy dual credit opportunities under Plan A.

69.     Plan A's modified IB Programme and its introduction of an Early College Program, whether considered separately or in tandem, are not likely to result in meaningful desegregation of ESHS. Tr. 414:1-415:23.

**B.      The District Has Not Evaluated the Financial Viability of Plan A.**

70.     Although the Superintendent claimed that she does not see any financial impediments to implementing either of the District's proposed plans, she acknowledged that the District has not undertaken a financial analysis to determine how it will allocate resources to support Plan A's Early College Program. Tr. 222:18-21; 227:22-228:12. In particular, she noted that the District does not know the number of students who will enroll in the program or its cost structure given the early stage of the District's negotiations with its proposed partner, Delta State University. Tr. 228:4-12. The District's CFO confirmed that neither she nor anyone on her staff has prepared a financial analysis of the cost of Plan A. Tr. 268:4-269:8.

**C.      Plan A Lacks the Support of District Experts, Key District Officials, and the Community.**

71.     Although the District has put forth two proposed desegregation plans, D-21, and made an untimely attempt to submit a third, Dkt. #182-1, there is no agreement among District officials or experts as to which of its proposed plans is preferred or would best accomplish desegregation. One board member testified that he prefers Plan A because it preserves "freedom of choice." Tr. 201:10-18; 215:4-16. Another board member testified that, if the District cannot construct "a brand new school in a central location," she prefers Plan A because Plan A does not require school closures. Tr. 244:24-245:13. The District's superintendent, however, prefers Plan B and noted that she is unaware whether the school board has even agreed as a group on a preferred plan. Tr. 221:23-222:3; 237:20-238:1.

72.     It is noteworthy that the District's own experts do not support Plan A, as currently formulated. Dr. Rossell testified that her preferred plan is "true freedom of choice" without enrollment caps – a plan not proposed by the District. Tr. 101:3-101:10; 111:23-112:9. Ultimately, Dr. Rossell opposes enrollment caps because they can result in mandatory reassignment of students to schools that they have not chosen, which she believes leads to a decrease in white enrollment and a loss of dignity for all students. Tr. 103:11-16; 111:23-112:9, 113:5-22. Dr. Rossell surmised that, in her view, only a true freedom of choice plan "respects the dignity of African Americans to decide for themselves." D-11E:12; several black parents of ESHS students testified to the contrary, describing the indignities of the current freedom of choice system. Tr. 701:1-702:17; 722:17-724:4.

73.     In her expert report, the District's magnet coordinator, Ms. Hardy, discussed Plan A's enrollment caps without any suggestion that the caps are problematic. At the hearing, however, she testified that she does not support the District's plan to cap enrollment at CHS and ESHS under Plan A because it limits full choice for all students. Tr. 50:3-11; 58:9-14. Ms. Hardy explained that she came to this position only after speaking with and reading reports generated by Dr. Rossell. Tr. 50:3-11.

74.     The District has provided no reliable evidence of community support for Plan A. No specific desegregation plans were considered or discussed at the focus groups, Tr. 68:17-23, which were not prepared until months later. And while Ms. Hardy opined that parents support Plan A, she testified that there was no unanimity among white parents at the focus groups about sending their children to ESHS if they were required to do so. Tr. 67:20-68:8. Indeed, she testified that several white parents said they probably would not send their students to ESHS even if required to do so. *Id.*

28

## IV. DISTRICT PLAN B

### A. Plan B Lacks Capacity To Desegregate DMS and ESHS.

#### i. High Schools.

75. Under Plan B, the District would continue to operate two high schools but would implement a choice-based model in which students have the opportunity to gain admission via lottery to a dedicated STEM/Arts (science, technology, engineering, and math with arts partnerships) magnet at CHS, and all other students are assigned to ESHS. Tr. 417:20-418:2; 421:18-22; D-21; US-1:12. The target student enrollment at CHS would be 65% black, 35% non-black (plus or minus 15 percentage points). Tr. 417:20-418:12. As with Plan A, both high schools would have enrollment caps. *Id.*

76. A successful STEM program has several components and is resource intensive. First, it requires a curriculum that is "well specified" and demonstrates that the school is "somehow different, amplified, more intense in terms of science, technology, engineering, and math." Tr. 422:11-21. Second, it requires specialized facilities that reflect a STEM program. Tr. 422:11-423:11. These facilities should be distinct and different from ordinary science facilities in a traditional high school. Tr. 423:6-11; 425:18-426:9. Next, a successful STEM program requires specially trained science and math teachers, particularly in the engineering and technology curricula. Tr. 422:11-423:5. Finally, a successful STEM program requires effective marketing that appeals to parents. Tr. 423:12-16.

77. The District has not demonstrated the capacity to develop and maintain a successful STEM magnet at the high school level. Tr. 423:20-424:24.

78. For CHS to host a successful STEM program, the District must provide additional laboratories and spaces for project-based learning. US-27:13. STEM education is not the disconnected teaching of science, technology, engineering, and math, but the integrated teaching

29

of these subjects through project-based learning or other integrated learning methods. *Id.* For this integrated learning to occur, there must be spaces that allow for previously distinct classes to interact and combine around a particular question or problem. Tr. 599:25-601:12; US-27:14.

79. The District's magnet coordinator testified that the STEM/Arts program would require updated science labs and new materials at CHS. Tr. 71:21-72:10. In order to offer science laboratories as a shared resource to the proposed 450-550 STEM students at CHS, the District would need to add a minimum of four ADA-accessible science classrooms, assuming five periods of science are taught each day and each classroom holds 24 students. US-27:134-14.

80. If CHS includes an arts program, then its arts facilities will need to be improved and updated as well. Though CHS has the only dedicated auditorium in the district, it has rudimentary facilities, with insufficient lighting, sound equipment, or support spaces (*e.g.*, backstage and green room areas). US-27:14. CHS has a band hall, but does not have a dedicated studio art space. *Id.*

81. It is implausible that the District's proposed magnet programs will have the power to overcome the two high schools' entrenched racial identities and bring enrollment within Plan B's diversity goals. US-1:14-15. Under Plan B, the District must enroll, full-time, approximately110-160 white students at ESHS – where no white students have enrolled – to meet the District's diversity goals. *Id.* at 10, 13 (District must pull in white students from CHS at a rate of four times current *part-time* enrollment rates). Plan B's IB and dual credit/dual enrollment programs are highly constrained by their admissions criteria. Tr. 426:10-427:22. It is doubtful that the small PWS-eligible population will enroll at ESHS: parents in the focus groups indicated the strong likelihood that current part-time IB Programme students from CHS would

simply depart the program if required to enroll full time enrollment at ESHS. US-1:10, 14-15; *see supra* 64-66.

82.     Additionally, the District assumes without foundation that a significant portion of non-black students who are ineligible for IB or dual enrollment/dual credit will still opt for ESHS's general education program rather than enrolling at the CHS STEM/Arts program. US-1:15; Tr. 426:10-427:22. This is an unlikely outcome given historical school choice patterns in the District. Tr. 426:10-427:22. The District does not contemplate any rebranding of the high schools under Plan B to disrupt these historical patterns. *See* D-21; *c.f.* US-3:22-23, 27; US-1:12-13.

          ii.     Middle Schools.

83.     Under Plan B, the District would close DMS and consolidate the middle schools at the MG facility. Tr. 417:8-16; D-21. The District also intends to implement a STEM/Arts program at the middle school for 7th and 8th grade students. D-21. The District lacks capacity to meet the program, facility, and staffing requirements for a STEM/Arts program at the middle school level just as it does at the high school level. *See supra* IV.A.i. The District's proposal to manage the enrollment in the middle school STEM/Arts program to achieve an enrollment that is 50% black / 50% non-black would guarantee the underrepresentation of black students because the 7th and 8th grade enrollment in 2016-2017 at a consolidated middle school is projected to be 70% black. US-3:11.

84.     The District's proposed expansion of the STAR program for high-achieving 7th and 8th graders increases the potential for a highly tracked and segregated middle school experience for black and white students alike. US-1:21-22. Black students are significantly underrepresented in the existing STAR program. In the 2014-2015 school year, the STAR

program was only 28% black, while MG's student population (7th and 8th grade) was 45% black. Tr. 396:14-397:5; 815:18-816:19; Dkt. #200-1 at 7. The District's plan for an unspecified expansion of the STAR program, in which black students are already underrepresented, combined with the creation of a new STEM/Arts program, may result in a disproportionate number of black students in the general education program. US-1:21-22. By contrast, the United States Plan contains provisions to prevent within-school segregation, including a requirement that enrollment in all programs and classrooms is within fifteen percentage points of the school-wide average by race. US-3:17.

### B. The District Has Not Demonstrated the Viability of Plan B.

85.     As experts for the United States and the District testified, MG does not have the capacity to accommodate the approximately 250 additional students that would be reassigned from DMS under the District's Plan B. Tr. 50:21-24; US-27:14. To address the immediate capacity shortfall, the District would need to construct 10 to 12 new classrooms. Tr. 50:21-24; US-27:14; US-51/D-18:4.

86.     The District's facilities expert, Mr. Henderson, estimates that the addition of a 12-classroom wing to MG, including administration space and restrooms, would cost $2.4 million. Tr.149:22-150:11; US-51/D-18:14.

87.     In arriving at his estimate for the MG renovations, Mr. Henderson did not analyze whether the existing support spaces, such as the gym, library, music room, and cafeteria, could accommodate 250 additional students. Tr. 161:23-162:10. He acknowledged, however, that the additional students would increase load on support spaces and that expanding support spaces would add to the total cost of the project. Tr. 161:23-25, 162:15-18. These potential costs were not included in his estimate. Tr. 162:19-23. Ms. Hardy confirmed that because of increased

enrollment at MG under Plan B, the District would be required to enlarge the cafeteria. Tr. 50:21-51:2.

88.     Mr. Henderson testified that expanding support spaces at MG could be expensive if there were issues with structural integrity or foundational cracking. Tr. 162:24-163:2, 163:22-25. Indeed, he observed cracking in the masonry units at MG in 2008, but has not checked whether the situation has worsened since then. Tr.164:1-10. He testified that he would not build onto a structure showing cracking without engaging a structural engineer to investigate further, as the cracks could mean something serious. Tr. 163:11-21, 164:11-17.

89.     The United States' expert, Mr. Poros, analyzed the impact of 250 additional students on MG generally and on its support spaces. Specifically, Mr. Poros determined that as presently utilized, the MG cafeteria is too small to accommodate the projected middle school student enrollment. Tr. 603:15-20. Mr. Poros estimates an overall cost of $3.9 million to add a classroom wing and new cafeteria to MG. US-27:14-15. However, he testified that his estimate might be low, as he used a square footage cost that was lower than the District's expert, who has more experience with pricing in the Delta region. Tr. 604:18-605:9, 610:16-23. Using the District's square footage estimate of $165, Mr. Poros's estimate of the renovation costs would increase to $4.4 million. *See* US-51/D-18:14; US-27:15. Mr. Poros also concluded that MG would need two science labs and a visual arts room to support the planned STEM/arts magnet programs under Plan B. US-27:14-15.

90.     During site visits conducted in October 2014 and January 2015, Mr. Poros observed and documented diagonal cracking indicative of foundation movement throughout the masonry units in the MG cafeteria. Tr. 580:25-581:5, 584:23-585:21 ("cause for investigation and concern"); US-27:8; US-31:b19. He concluded that renovations on the existing structure

would be "putting good on bad;" the best option would be to demolish the existing cafeteria and build a new one in its place. Tr. 603:21-25; 604:4-8; US-27:15.

91.     The cost of expanding MG in order to effectuate Plan B also may exceed the District's three-mill levy capacity, which is $3.1 to $3.4 million. Tr. 273:17-274:10; D-15:3; US-27:15. If used to construct the additional classrooms and other facility enhancements required by Plan B, this amount would have to include all cost overruns and unexpected expenses arising during the course of construction. Tr. 267:13-19. To the extent cost overruns and unexpected expenses forced the total construction cost higher than the District's three-mill levy capacity, the funds to cover those additional expenses would have to be taken from the District's operational funds. Tr. 267:20-24. Ms. Hardy testified that doing so would effectively take money from students and the instruction occurring in the District's classrooms. Tr. 267:25-268:3.

92.     To fund these expansions and renovations through a general obligation bond issue, the District would have to obtain the approval of a super-majority of voters, which is often difficult to obtain in Mississippi. D-15:2. This would likely prolong or impede the necessary expansion of the MG facility. *Id.*

93.     The proposed renovations to MG will not be completed by the beginning of the 2016-2017 school year, even if financially feasible. As Mr. Henderson testified, the classroom addition will take 12-18 months to complete, not including any time needed to address the shortage in cafeteria space. *See* Tr. 50:24-51:1 (stating that the Board would need at least a year to get the new classrooms built); 150:12-17; Tr. 605:10-15.

94.     The District presented no evidence that it has the financial capacity to support a STEM/Arts program at its existing facilities. Although the District's superintendent noted that she does not see any financial impediments to implementing either of the District's proposed

34

plans, the District's CFO acknowledged that neither she nor anyone from her staff has prepared a financial analysis to determine the actual cost of the programmatic proposals contained in Plan B. Tr. 222:18-20; 268:4-269:8. This is particularly problematic given testimony that per pupil expenditures ("PPE") at schools with magnet or specialty programs are typically higher than those at traditional comprehensive schools. Tr. 272:20-273:1; *see also* Tr. 271:16-272:10. Even Dr. Rossell believes that a successful dedicated secondary magnet program is a virtual impossibility. Tr. 120:11-25 ("I've never seen [a successful dedicated magnet program] at the high school level."); D-11E:5 ("Dedicated magnet schools are . . . expensive and almost impossible at the secondary level.").

95.     To the extent the District's creation and maintenance of the STEM/Arts program contemplated in Plan B is dependent on magnet or other grant funding, its ability to finance the program remains uncertain. The district must obtain sufficient capital and operational funding to implement and support the varied programs in an environment where funding depends on receiving a competitive federal grant to develop new programs, which is uncertain at best, or upon the PPE from the State to support programming. Tr. 807:17-808:11; US-47/D-12:13-14. As Dr. Smrekar testified, the grant process for the Magnet School Assistance Program ("MSAP"), the source of federal funding for magnet programs, with which she has been involved in various ways during the last 10 years, is lengthy and demanding. Tr. 327:25-328:23; 419:6-420:24. To succeed in obtaining such a grant, the District would be required to generate a detailed narrative reflecting its plans for implementing and sustaining a magnet program that will attract and retain families in a way that prevents, reduces or eliminates racial segregation. Tr. 420:9-421:17. As with any grant program, there is no guarantee that submitting an application will actually result in obtaining an award or that federal funding will continue year to year. Without this external

funding, the addition of a STEM/Arts program could take away from the District's existing academic programs. Tr. 807:17-23; 817:14-818:5.

96.     The District also failed to conduct an analysis to establish that it has adequate staffing to implement Plan B. Tr. 224:4-22, 71:13-20. For the last several years, the District has had four or five teacher vacancies at each of its middle and high schools. Tr. 223:20-23. These vacancies exist separate and apart from any vacancies that might arise as a result of the District's implementation of specialty programs like a STEM/Arts magnet. Tr. 223:24-3. While the superintendent testified that the District has to have teachers for its students, this does not establish that the District has adequate staffing to implement the specialized programs it proposes under Plan B. Tr. 222:22-223:4. Indeed, the superintendent acknowledged that although a STEM program might not require a greater number of teachers, the training those teachers require would be different. Tr. 224:23-225:6.

97.     The District's ability to provide adequate staffing for its Plan B is further complicated by its acknowledged difficulty hiring teachers in the STEM areas, particularly math and upper level science. Tr. 225:25-226:8; 423:20-424:24; 425:18-426:9. During the past school year, for example, the District hired a part-time teacher for an upper level math course at ESHS because it was unable to find a full-time math teacher. Tr. 226:9-227:2. More broadly, there is a state-wide teacher shortage in Mississippi. The shortage is particularly acute in the Mississippi Delta. Tr. 48:6-12.

98.     The District is even less equipped to staff the Arts portion of the program proposed in Plan B. As Ms Hardy testified, to offer magnet programming in the Arts, the District would need to form community partnerships because the District lacks the teachers and resources

36

it would need to support the Arts program on its own. Tr. 52:19-53:4. The District provided no

testimony on how those partnerships could or would be forged.

      **C.**    **Plan B Lacks the Support of District Experts, Key District Officials, and the Community**.

    99.    As previously noted, although Plan B is the superintendent's preferred plan,

several members of the school board do not prefer Plan B. *See supra* III.C. In addition, the

District's own experts testified that they do not favor Plan B because it limits freedom of choice.

*See* Tr. 53:17-54:8; 118:8-11; D-11E:14 ("The district's Plan B is not my preferred plan."). Dr.

Rossell, in particular, took issue not only with Plan B's enrollment caps but also with the fact

that it relies on a dedicated STEM magnet program that is short on details. Tr. 111:23-112:9;

119:12-120:2. When asked whether CHS would be a dedicated STEM magnet high school under

Plan B, Dr. Rossell testified that "it's not clear." Tr. 119:12-17. She explained that this is

because the plan is a work in progress and suggested that the Court and the parties "wait to see

what Plan C looks like." Tr. 119:18-24. Assuming that Plan B would convert CHS to a dedicated

STEM/Arts magnet, Dr. Rossell testified that it is difficult to have more than a few dedicated

magnet schools in a district and noted that the District already has two. Tr. 120:3-9. She testified

further that it is almost impossible to create and operate dedicated magnet programs at the high

school level. Tr. 120:11-121:10; *see supra* 94.


PROPOSED CONCLUSIONS OF LAW

I.    **THE DISTRICT BEARS THE BURDEN OF OFFERING AN ACCEPTABLE REMEDIAL PLAN THAT PROMISES REALISTICALLY TO DESEGREGATE THE DISTRICT'S MIDDLE AND HIGH SCHOOLS.**

    In its April 1, 2014 Opinion in this case, the Fifth Circuit concluded that the District must

adopt a desegregation plan that promises to work at the earliest practicable date to eliminate the

vestiges of segregation in District middle and high schools: "Now, six decades after *Brown v.*

37

*Topeka Board of Education,* '[t]he burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.'" *Cowan*, 748 F.3d at 238 (citing *Green v. Cnty. Sch. Bd. of New Kent Cnty.,* 391 U.S. 430, 439 (1968); *Davis v. E. Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1437 (5th Cir. 1983)) (internal citation omitted); *see generally United States v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836, 847 (5th Cir. 1966) ("The only school desegregation plan that meets constitutional standards is one that works."). This ruling is the law of the case and "may not be reexamined by the district court on remand." *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (citing *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004)); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). Accordingly, the appropriate inquiry at this juncture – more than 50 years after initiation of the lawsuit – is whether the desegregation plans proposed by the parties are reasonably calculated to desegregate ESHS and DMS, thus meeting constitutional requirements. As the Fifth Circuit instructed, this Court must now "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." *Cowan*, 748 F.3d at 240.

　　Where, as here, prior remedies have not achieved desegregation, a school district remains obligated to "take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Hull v. Quitman Cnty. Bd. of Educ.,* 1 F.3d 1450, 1453 (5th Cir. 1993) (quoting *Freeman v. Pitts,* 503 U.S. 467, 485 (1992)); *see also Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 458 (1979); *Davis*, 721 F.2d at 1435 (5th Cir. 1983). This duty exists "to ensure that the principal wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored

by the violation, is no longer present." *Freeman*, 503 U.S. at 485. The duty is not simply to eliminate express racial segregation: where *de jure* segregation existed, the school district's duty is to eliminate its effects "root and branch." *Green*, 391 U.S. at 437-38.

II.     **THE 2013 FREEDOM OF CHOICE PLAN HAS FAILED AND MUST BE REPLACED WITH A NEW PLAN.**

        The freedom of choice plan ordered by the Court and implemented in the 2013-2014 school year has not desegregated ESHS or DMS in the two school years in which it has been in effect, nor does it offer any promise of desegregation in the future. For this reason, the District must replace the plan with one that is constitutionally adequate – i.e., promises to desegregate the District's middle and high schools. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15 (1971); *Green*, 391 U.S. at 439-440; *Davis*, 721 F.2d at 1437.

        The Supreme Court and Fifth Circuit have consistently held that "freedom of choice" plans that have not worked, or do not promise to work, must be rejected when alternatives that promise immediate desegregation are available and workable. *See Green*, 391 U.S. at 439-42; *Hall v. St. Helena Parish Sch. Bd.*, 417 F.2d 801, 807-09 (5th Cir. 1969). In *Green*, the Supreme Court found that simply opening the doors of a formerly *de jure* black or *de jure* white school to students of the other race is constitutionally inadequate if it does not result in actual desegregation at all schools. *See Green*, 391 U.S. at 437. Noting that "the general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation," the Court held that such a plan is permissible *only* "[w]here it offers real promise of aiding a desegregation program." *Id.* at 440. "If under an existent plan there are no whites, or only a small percentage of whites, attending formerly all-Negro schools, or only a small percentage of Negroes enrolled in formerly all-white schools, then the plan, as a matter of law, is not working." *Hall*, 417 F.2d at 807.  Even where a freedom of choice plan might "prove itself in

operation," the Supreme Court and Fifth Circuit have held that "if there are reasonably available other ways . . . promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable." *Green*, 391 U.S. at 441; *Hall*, 417 F.2d at 809.

The Fifth Circuit has reversed "freedom of choice" plans on numerous occasions where those plans have failed, in practice, to desegregate one-race schools. *See, e.g., Lee v. Marengo Cnty. Bd. of Educ.,* 588 F.2d 1134, 1135-36 (5th Cir. 1979) (reversing district court's order of a "freedom of choice" plan where the "plan is not working to achieve desegregation" and where one-race black schools continued to exist in a small, majority-black school district); *see also* Dkt. #81 at 7-11 (citing cases). In this case, while not rejecting freedom of choice outright, the Fifth Circuit cast significant doubt on the appropriateness of such a remedy in Cleveland, noting that freedom of choice "has historically proven to be an ineffective desegregation tool." *Cowan*, 748 F.3d. at 238.  The Court enumerated "apparent deficiencies in the plan that were not addressed by the district court," including, notably, that "there was no evidence or explanation indicating that the freedom of choice plan was likely to work, and all the available empirical evidence indicates that the plan is not likely to contribute to meaningful desegregation at D.M. Smith Middle School or East Side High School." *Id.* at 238-39.

At the time the Fifth Circuit considered this Court's 2013 remedial order, the record on appeal only included the 2013-2014 pre-enrollment projections provided to this Court by the District in April 2013. That preliminary data indicated that this Court's new freedom of choice plan would *likely* fail to attract white students to ESHS and DMS. Dkt. #113. Now, however, the student enrollment data from the last two school years demonstrate conclusively that the freedom of choice plan *has* failed to "prove itself in operation." *Green*, 391 U.S. at 440-41. The plan

offers no promise of desegregating ESHS and DMS in the future and must be replaced with an effective, constitutional alternative. *Id*; *Swann,* 402 U.S. at 15; *Davis*, 721 F.2d at 1437.

III. **THE DISTRICT HAS FAILED TO MEET ITS BURDEN OF OFFERING A PLAN THAT PROMISES TO WORK AND TO WORK NOW.**

The District has presented no evidence to suggest that either of its proposed plans, Plan A or B, promise to desegregate ESHS and DMS. FOF[4] III.A & IV.A. Even the District's expert testified that ESHS and DMS could remain one-race black schools under any freedom of choice system. FOF 63, 99. Therefore, both plans are constitutionally inadequate and must be rejected. *Green*, 391 U.S. at 439-440.

A. **Plan A is Constitutionally Inadequate and Must be Rejected.**

The District's Plan A is a freedom of choice plan that: (a) makes no changes to the existing middle school freedom of choice plan, and (b) makes minor changes to the existing high school freedom of choice plan, none of which promise to desegregate ESHS. FOF 60-61. For this reason, Plan A suffers from the same constitutional deficiencies as the existing freedom of choice plan, detailed above. Plan A must therefore be rejected. *Swann,* 402 U.S. at 15; *Green*, 391 U.S. at 439-440; *Davis*, 721 F.2d at 1437.

At the middle school level, Plan A offers no change from the current failed freedom of choice plan. As explained above, virtually no white students have enrolled at DMS since the current plan was implemented. FOF 61. Plan A simply continues the status quo for middle school enrollment. It contains no new provisions to attract white students to DMS or otherwise alter existing middle school enrollment patterns. FOF 60-61. For this reason, Plan A is constitutionally inadequate and must be rejected.

---

[4] Citations to the above Proposed Findings of Fact are formatted in the following manner: FOF [section(s)], or FOF [paragraph number(s)].

The minor changes proposed at the high school level, detailed above, are similarly not likely to attract sufficient numbers of white students to ESHS to alter that school's identity as a one-race black school. FOF 62.

First, the existing IB Programme at ESHS has never attracted a single white student to enroll full-time, and there is no evidence that sufficient numbers of white students would depart from this trend. FOF 64-66. To the contrary, evidence suggests that white students would continue to enroll at CHS. FOF 66. Even in a "best case scenario," where all 30 white students who currently take IB classes part-time at ESHS chose to enroll there full-time, ESHS would remain over 90 percent black and continue to be a racially identifiable black school. *Flax* v. *Potts,* 915 F.2d 155, 161 n.8 (5th Cir. 1990).

Second, the proposed Early College Program offers little likelihood of contributing to desegregation at ESHS. FOF 67-68. The proposed program would offer some highly qualified 11th and 12th grade students the option to take courses at Delta State University for free, but is unlikely to alter white students' choice of high schools. FOF 68. Qualified white students at CHS who wished to take college coursework could still do so under the District's existing dual credit/enrollment program. *Id*.

Finally, the District's proposal to cap student enrollments at both high schools at 550 students, and to continue the existing "first-come, first-served" enrollment approach, may increase rather than decrease segregation in the high schools, FOF 62, particularly given that the plan provides no assurance that any white students will enroll at ESHS. Because Plan A is not reasonably calculated to lead to significant white enrollment at ESHS or DMS, if any at all, the plan fails to meet constitutional requirements and must be rejected.

**B.  Plan B is Constitutionally Inadequate and Must be Rejected.**

i.  <u>The District has offered no evidence that Plan B would achieve and maintain a</u>
<u>desegregated enrollment at ESHS.</u>

Courts have found magnet schools and programs to be an acceptable component of a

desegregation plan in some cases. *See, e.g.*, *Davis*, 721 F.2d at 1440. However, the record in this

case indicates that the secondary magnet programs contemplated by Plan B are not likely to

achieve and maintain a desegregated enrollment at ESHS. FOF 81-82. All evidence suggests that

the District lacks the financial and operational capacity to implement a new dedicated magnet,

operate several new and continuing PWS magnets, and continue operating the existing magnet

schools at the elementary level. FOF 77, 85, 91, 94-96. As the District's own expert testified,

there are few examples of school districts that have successfully operated multiple magnet

schools, particularly at the secondary level. FOF 94.

Magnet programs, particularly specialized ones like the STEM/Arts program proposed at

CHS, are resource-intensive. FOF 76. Accordingly, the District's plan requires seeking and

obtaining a highly competitive federal MSAP grant in the next available funding cycle or, in the

absence of MSAP funding, diverting limited operational resources from existing programs to

support the newly proposed programs. FOF 95. The District has not demonstrated that it has

sufficient numbers of qualified teachers to support the proposed STEM/Arts program. FOF 96-

98. Indeed, the District has faced significant challenges in recruiting and retaining math and

science teachers for even its general education program. FOF 97. In addition, CHS lacks the

specialized facilities necessary for a successful STEM/Arts program. FOF 79-80. In short, the

District has not established that it could create or support the ambitious magnet program it

contemplates in Plan B.

Even if the District had the capacity to implement Plan B, the District has offered no

evidence that Plan B would actually result in immediate or sustained white student enrollment at

ESHS. First, although the District would adopt racial enrollment targets at CHS, there is no guarantee that the targets would be met. It is possible that CHS enrollment would remain disproportionately white even under a lottery-based system, and ESHS' enrollment would necessarily remain disproportionately black. FOF 81. Furthermore, as under Plan A, the enrollment cap at CHS may function to compel black students who want to go to CHS to enroll at ESHS. Finally, retaining the names, mascots, and athletics teams at ESHS would maintain the longstanding racial identifiability of ESHS as a black school, and would hinder white enrollment. *See Stanley v. Darlington Sch. Dist.*, 879 F. Supp. 1341 (D.S.C. 1995). *See* FOF 26.

        ii.   <u>The District has not offered evidence that the middle school plan is affordable or practical.</u>

        The District's plan to consolidate the middle schools under Plan B could, if fully implemented, result in desegregation of the middle school grades. However, the middle school plan suffers from several problems. The success of the plan is contingent on the District successfully meeting a broad constellation of highly uncertain or unlikely conditions, including but not limited to: finding sufficient funding and capacity under the District's three-mill bonding authority for the expansion and renovation of MG to accommodate all middle school students in the District; securing sufficient capital and operational funding to implement and support the variety of proposed programs; and, ensuring adequate qualified staffing. FOF IV.B. In addition, Plan B contemplates the operation of multiple PWS at the consolidated middle school—the STAR program for high achievers, a STEM program, and a general education program—but does not contain sufficient safeguards to prevent within-school segregation that may result from these programs. FOF 83-84. *See Boyd v. Pointe Coupee Parish Sch. Bd.* 505 F.2d 632, 633 (5th Cir. 1974); *McNeal v. Tate Cnty. Sch. Dist.*, 508 F.2d 1017, 1020 (5th Cir. 1975); *United States v. Gadsden Cnty. Sch. Dist.*, 572, F 2d 1049, 1050 (5th Cir. 1978). Plan B's success also depends

on the support of the District and the Cleveland community, and the District presented testimony

from only one witness, the current superintendent, who actually favored Plan B. FOF 71-72.

After fifty years of unsuccessful desegregation remedies for the middle and high schools, and

given the availability of a more reliable, immediate, and permanent remedy in the United States

Plan, the District has failed to demonstrate why the Court should approve Plan B.

IV.    **THE UNITED STATES' CONSOLIDATION PLAN IS THE ONLY PLAN BEFORE THE COURT THAT MEETS CONSTITUTIONAL REQUIREMENTS, AND WILL ACHIEVE FULL DESEGREGATION OF THE MIDDLE AND HIGH SCHOOLS.**

    A.  **The United States Plan would enable the District to meet its obligations on all the *Green* factors at the middle and high school level.**

The United States' proposed consolidation plan would result in one middle school and

one high school, both of which would be desegregated and reflect the District-wide student

enrollment demographics when implemented and in the future.[5] FOF 7. Consolidation is an

accepted, constitutional desegregation remedy. *See Swann*, 402 U.S. at 21-22 (discussion of the

court's broad remedial powers in desegregation cases). In addition to ensuring desegregation of

middle and high school students at the school level, the United States Plan contains provisions to

ensure against within-school segregation in the new consolidated schools.  FOF 84.  By creating

a single-grade structure in grades 6 through 12, implementation of the proposed plan would

obviate any actual or potential problems involving disparities in faculty/staff assignment between

racially identifiable schools serving the same grade levels. Similarly, as all students would be

attending school in the same facilities, any concerns about facilities disparities would also be

eliminated by this plan. With regard to extracurricular activities, this plan's proposed

consolidation of existing athletics teams and student activities would minimize the potential for

---

[5] This plan does not address the District's continuing desegregation obligations with respect to its elementary schools.

segregated activities, although continued monitoring of this factor during the first several years

of the new schools would be warranted. *Green*, 391 U.S. at 435-36. In short, the United States

Plan is a "vehicle to help the district advance towards a nonracial system of public education that

will eliminate the effects of the former segregated system and allow the district to return to local

control." *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-cv-00109-MHH, slip op. at 13-14 (N.D.

Ala. Apr. 21, 2015) (quotations omitted) (citing *Green*, 391 U.S. at 436).

### B. The District's unsubstantiated fear of "white flight" resulting from consolidation cannot justify maintaining the *status quo* or adopting a plan that is unlikely to result in desegregation.

The District's main objection to the United States Plan is a fear that white families in

Cleveland would not send their children to consolidated, majority-black schools. FOF II.B.i. The

District reiterates these fears even though the District proposes to consolidate middle schools

under Plan B and *all* white families in the District currently send their children to schools with

significant black enrollments, including the majority-black Pearman Elementary, Bell Academy,

Nailor Elementary, and Margaret Green. FOF 57.

It is a settled proposition that fear of white flight "cannot [be] . . . accepted as a reason for

achieving anything less than complete uprooting of the dual public school system." *See United

States v. DeSoto Parish Sch. Bd.*, 574 F.2d 804, 816 (5th Cir. 1978) (quoting *United States v.

Scotland Neck City Bd. of Educ.*, 407 U.S. 484, 491 (1972)). "From the inception of school

desegregation litigation, accommodation of opposition to desegregation by failing to implement

a constitutionally necessary plan has been impermissible." *DeSoto Parish*, 574 F.2d at 816 n.25

(citing *Morgan v. Kerrigan*, 530 F.2d 401, 420 (1st Cir. 1976)). A district's "fear that white

students will flee the system is no justification for shrinking from the constitutional duty to

desegregate the [district's] schools.") *Davis*, 721 F.2d at 1438. Moreover, deep loyalties to

existing schools, by either the white community or the black community, cannot trump

constitutional mandates to desegregate. *See United States v. Choctaw Cnty. Bd. of Educ.*, 417 F.2d 838, 842 (5th Cir. 1969) ("An all-Negro school, even if desired by the students and their parents, is just as wrong constitutionally, as an all-white school desired by white students and their parents.").

As the Fifth Circuit reiterated in its recent decision in this case, "white flight may be one legitimate concern 'when choosing among *constitutionally permissible* plans.'" *See Cowan*, 748 F.3d at 240 (quoting *United States v. Pittman*, 808 F.2d 385, 391 (5th Cir. 1987)) (emphasis added). Since neither of the District's plans meets constitutional requirements, the fear of white flight may not be considered in this case. *Id.*

Even if the Court found that one or both of the District's proposed plans were constitutionally adequate, then the Court must "grapple with the complexities of [the white flight] issue," *Cowan*, 748 F.3d at 240, when deciding between those plans and the United States Plan. The Court would then need to assess whether the alleged white flight that would result from the United States Plan – the likelihood of which the United States disputes – weighs so heavily in favor of the District's plan that it justifies choosing that plan over the United States Plan, which is calculated both to achieve desegregation and educationally benefit all students in the District. *Davis*, 721 F.2d at 1438. As the Fifth Circuit has noted, "'[w]hite flight' must be met with creativity, not with a delay in desegregation." *Id.* For example, "[f]urther use of special programs designed to make the desegregated schools more attractive to students and parents . . . is entirely appropriate, as long as the cause of desegregation is not frustrated." *Id.*

Here, the District has presented no persuasive evidence that white flight will occur following consolidation of the middle and high schools. The District's expert based her opinion that white flight would occur on decades-old research from other communities, and conducted no

Cleveland-specific research to determine the level of white flight that would occur under the United States Plan. FOF 28-34. By contrast, the United States' expert completed a comprehensive, Cleveland-specific contextual analysis and concluded that significant white flight would be unlikely. FOF 54-57.

The United States Plan also meets the Fifth Circuit's instruction to address fears of white flight "with creativity, not with a delay in desegregation." *Davis*, 721 F.2d at 1438. The plan encourages the District to incorporate a range of specialized academic programs, including the programs it has proposed in its plans, to all students in the new middle school and new high school. The United States Plan recognizes the challenges of consolidating schools and meets those challenges with a number of creative, affirmative measures calculated to smooth the transition. The plan contemplates an implementation year during which the District would engage with all stakeholders—parents, students, community members, and District personnel— to plan and adopt academic programs, address staffing and facilities needs, rebrand the new schools with new names and mascots to make them welcoming to all students, publicize and market the new schools and programs, and adopt other measures intended to ensure the success of the new schools and affirmatively address concerns about student departure from the school system when the new schools open. US-3:16; FOF 6, 13. Additionally, the plan would create a multiracial advisory panel of parents, community members, and students to support and advise the District during the planning year and following implementation. FOF 22. Though the United States acknowledges "the apprehension that students [and parents] may feel about changing schools," it also recognizes that consolidation will "open[] doors of opportunity that have been closed for too long." *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-cv-00109-MHH, slip op. at 26 (N.D. Ala. Apr. 21, 2015).

V.   **CONCLUSION**

The District's two proposed plans each fail to meet the well-established constitutional requirement, reiterated by the Fifth Circuit in its April 1, 2014 decision in this case, that the District satisfy its "burden . . . to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Cowan*, 748 F.3d at 238 (citing *Green*, 391 U.S. at 439) (emphasis added). The United States Plan would promise a "speedier and more effective conversion to a unitary, nonracial school system," *Green*, 391 U.S. at 441, than either of the District's two plans. Therefore, the Court should reject the District's proposed plans and order the District to implement the United States Plan at the earliest practicable date.

Respectfully submitted this 27th day of July, 2015,

*For Plaintiff-Intervenor United States of America:*

FELICIA C. ADAMS
United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS 38655-3608
Telephone: (662) 234-3351
Facsimile: (662) 234-4818

VANITA GUPTA
Principal Deputy Assistant Attorney General

EVE HILL
Deputy Assistant Attorney General

ANURIMA BHARGAVA
Chief
RENEE WOHLENHAUS
Deputy Chief
Educational Opportunities Section
Civil Rights Division

s/ Aziz Ahmad
AZIZ AHMAD (DC # 1004817)
JOSEPH J. WARDENSKI
KELLY GARDNER
Trial Attorneys
Educational Opportunities Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW, PHB 4300
Washington, D.C. 20530
Telephone: (202) 305-3355
Facsimile: (202) 514-8337
Aziz.Ahmad@usdoj.gov

*For Private Plaintiffs:*

s/ Shakti Belway
Shakti Belway (MS # 102095)
P.O. Box 19974
New Orleans, LA 70179
Telephone: (504) 333-6877
shakti.belway@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2015, I electronically filed a copy of the foregoing

Proposed Findings of Fact and Conclusions of Law with the Clerk of the Court using the Court's

CM/ECF system. Notice of this filing was sent by operation of the CM/ECF system to all

counsel of record.

<u>/s/ Aziz Ahmad</u>
AZIZ AHMAD (DC # 1004817))
Attorney for Plaintiff-Intervenor