**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

DIANE COWAN, minor, by her mother                                    PLAINTIFFS
and next friend, Mrs. Alberta Johnson, et al.;
FLOYD COWAN, JR., minor, by his mother
and next friend, Mrs. Alberta Johnson, et al.;
LENDEN SANDERS; MACK SANDERS;
CRYSTAL WILLIAMS; AMELIA WESLEY;
DASHANDA FRAZIER; ANGINETTE
TERRELL PAYNE; ANTONIO LEWIS;
BRENDA LEWIS;

   and

UNITED STATES OF AMERICA                            INTERVENOR-PLAINTIFF

V.                                                              NO. 2:65-CV-31-DMB

BOLIVAR COUNTY BOARD OF
EDUCATION, et al.                                                DEFENDANTS

<u>OPINION AND ORDER</u>

On May 17, 1954, the United States Supreme Court issued the landmark decision of *Brown v. Board of Education*, holding that "in the field of public education the doctrine of 'separate but equal' has no place."  347 U.S. 483, 495 (1954) ("*Brown I*").  A year later, on May 31, 1955, the Supreme Court issued a second order directing compliance with *Brown I* "with all deliberate speed."  *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955) ("*Brown II*").  Ten years after *Brown II*, residents of Bolivar County, Mississippi, filed this now fifty-year-old action seeking the desegregation of their school system.  After decades of litigation, this case is currently before the Court for the determination of an appropriate desegregation remedy for the high schools and middle schools in the Cleveland School District ("District") in Bolivar County.

Upon consideration of the parties' proposed desegregation plans, the Court concludes that, in order to achieve constitutionally-required desegregation, the District must consolidate its high schools and must consolidate its middle schools.

## I
## Procedural History

### A. Filing and First Order

On July 24, 1965, 131 minor children, acting through their parents or guardians, filed this action against the Bolivar County Board of Education and numerous of its members, alleging that the defendants "have pursued and are presently pursuing a policy, custom, practice and usage of operating the public schools of Bolivar County, Mississippi, on a racially segregated basis." Doc. #37-1 at ¶ 7. In their complaint, Plaintiffs alleged that the action was brought "on their own behalf and on behalf of all other Negro children and parents … located in Bolivar County, Mississippi, who are similarly situated and affected by the policies, practices, customs and usages complained of herein."[1] *Id*. at ¶ 5.

Of relevance here, the original complaint alleged:

Bolivar County District No. 4 maintains six white schools: (1) Cleveland High School[,] (2) Margaret Green Junior High School[,] (3) Pearman Elementary School[,] (4) W.J. Parks Elementary School[,] (5) Boyle Elementary School [and] (6) Merigold Elementary School.

Each of these schools is limited to attendance by white pupils only and are staffed by white teachers, white principals, and other white professional personnel. Regardless of location, these schools may be attended by white pupils only. …

Bolivar County District No. 4 also maintains four Negro schools: (1) East Side High School[,] (2) Nailor Elementary School[,] (3) B.L. Bell Elementary School [and] (4) Hayes Cooper Elementary School.

---

[1] The docket does not reflect that this matter was ever certified as a class action.

> Each of these schools is limited to attendance by Negro pupils. They are staffed
> by Negro principals, Negro teachers and other Negro professional personnel.
> Regardless of location, these schools may be attended by Negro children only.

Doc. #37-1 at ¶¶ VII(i) & (j).[2]

On July 22, 1969, Chief Judge William C. Keady issued an order directing that "School District Number Four of Bolivar County … [is] permanently enjoined from discriminating on the basis of race or color in the operation of said School District."[3] Doc. #33 at 1. The order further directed the defendants to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system." *Id.*

Judge Keady's order adopted a district-proposed plan dividing the school district into two zones for students attending grades seven through thirteen, and five zones for students attending grades one through six. *Id.* at 1. Under the terms of the plan, each zone was assigned a corresponding school: Zone I[4] was assigned Cleveland High School; Zone II[5] was assigned East Side High School; Zone III was assigned Hayes Cooper Elementary; Zone IV was assigned Nailor Elementary School; Zone V was assigned B.L. Elementary School; Zone VI was assigned Parks Elementary School; and Zone VII was assigned Pearman Elementary School.[6] *Id.* at 2–3. The order directed that "Boyle Elementary School shall be closed." *Id.* at 3.

Regarding the new system, Judge Keady ordered:

---

[2] In addition to the allegations against the District, the complaint alleged discriminatory practices in Bolivar County's other school districts. Doc. #37-1. Later, on August 17, 1967, a "Supplemental Complaint" against new defendants in one of the other districts in Bolivar County was filed. The desegregation efforts of these other districts are not at issue in this case.

[3] Bolivar County School District Four is now the Cleveland School District. Doc. #12 at 1.

[4] Zone I was defined as "[a]ll of the District's territory lying west of the main tracks of the Illinois Central Railroad as now located in the District." Doc. #33 at 2.

[5] Zone II was defined as "[a]ll of the District's territory lying east of the main tracks of the Illinois Central Railroad as now located in the District." *Id.*

[6] Because only the schools in Zones I and II are the subject of this opinion, the geographic boundaries of Zones III–VII are not relevant and thus not included here.

> For the school year 1969-70, each student attending elementary grades 1 through 6 shall be assigned to attend the school in the zone in which he resides, and students attending grades 7 through 12 shall be assigned on the basis of their freedom of choice previously exercised ….

> For the school year 1970-71 and thereafter, each student in all grades 1 through 12 shall be assigned to attend the school in the zone in which he resides, provided, however, that any student entering the 12th grade for the school year 1970-71, irrespective of the place of his residence, shall have the right, if he so desires, to attend that high school which he attended for the school year 1969-70 ….

> Within the full extent of the district's ability so to do, including the availability of qualified personnel, not less than one of every six classroom teachers of a different race shall be employed and assigned to each of the schools or attendance centers for the 1969-70 school year, and for the 1970-71 school year and thereafter there shall be full faculty and staff desegregation, to such an extent that the faculty at each school is not identifiable to the race of the majority of the students at any such school.

Doc. #33 at 3–4 (emphasis in original).

Additionally, Judge Keady directed that "[a]ll children … shall be treated substantially alike" with regard to transportation; "[n]o students shall be segregated or discriminated against … in any grade, service, facility, or program … that may be conducted or sponsored by the school in which the student is enrolled;" and "[t]he defendants, to the extent consistent with the proper operation of the school system as whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual school system." *Id*. at 4–5. To enforce all of his directives, Judge Keady ordered the defendants to submit annual reports on the status of their desegregation efforts and quarterly reports detailing the transfers of students. *Id*. at 6–7.

Six months later, on January 22, 1970 (after receiving two quarterly reports submitted by the District), Judge Keady issued an order stating that "[e]ffective for the second semester of the

current school year 1969–70, students entering the system for the first time shall be assigned to an attendance center on the basis of proximity of residence." January 22, 1970, Order at 4.[7]

### B. United States Intervention and 1989 Consent Order

On January 23, 1985, following the District's submission of over fifteen years of annual and quarterly status reports, the United States filed a motion to intervene as a plaintiff. Doc. #1 at 16. On March 21, 1985, the Court granted the United States' request to intervene. *Id.* The same day, the United States filed a "Complaint-in-Intervention" ("Intervenor Complaint"), alleging:

> Defendants have actively pursued the following policies and practices, which have frustrated the implementation of the Court's [July 22, 1969] Order in *Cowan* and impeded the elimination of the vestiges of the dual system of public education in School District Four.
>
> a. Defendants have instituted informally a dual residence policy and practice allowing students to attend schools in zones outside of their residence if the student establishes a second residence during the week.
>
> b. The dual residency policy has adversely affected the desegregation of School District Four and has served to maintain segregated schools.
>
> c. Defendants have made faculty assignments on the basis of race so that faculty are assigned to schools identifiable as 'white' or 'black' based upon student enrollment ….
>
> d. Defendants have made professional staff assignments on the basis of race so that black persons serve as administrators for those schools with predominantly black student enrollments while white persons serve as administrators of schools with majority white student enrollments.
>
> e. Defendants in order to maintain racial segregation have chosen to construct three new schools in areas such that black students continue to attend schools with 100% black enrollments.

---

[7] The January 22, 1970, order does not appear on the Court's electronic docket but is available at the Clerk of Court's Office.

     f.  Defendants have discriminated against students attending Eastside High School, Nailor, and Merigold elementary schools with respect to the condition and maintenance of facilities.

Intervenor Complaint at ¶ 13.[8]  No answer to the United States' intervenor complaint appears on the docket.[9]

On November 8, 1985, Judge Keady transferred the case to United States District Judge Glen H. Davidson.  Doc. #101 at 2.  On September 2, 1986, Judge Davidson entered an order transferring and reassigning the case to United States District Judge L.T. Senter.  *Id.*  The case was formally transferred to Judge Senter the next day.  Doc. #1 at 17.

From September 1986 until September 1989, the parties engaged in a protracted period of discovery while the District continued to submit status reports to the Court.  *See id.* at 17–19.  On September 21, 1989, Judge Senter entered a Consent Order which: (1) imposed additional requirements for faculty/professional desegregation, including that "the faculty and professional staff at each school to the extent feasible shall reflect the districtwide ratio of minority and nonminority faculty and professional staff;" (2) instituted a "majority-to-minority transfer policy;" (3) directed the District to offer a minimum of two exclusive college preparatory classes at each high school and to provide transportation to students taking such courses;  (4) modified the elementary and junior high attendance zones;[10] (5) instituted a plan to "ensure uniform

---

[8] The three new schools referenced in the Intervenor Complaint were Cypress Park Elementary, Eastwood Junior, and Bell Elementary ("a black school under the dual system reconstructed on the same site)."  Intervenor Complaint at ¶ 15.  The Intervenor Complaint does not appear on the Court's electronic docket but is available at the Clerk of Court's Office.

[9] On June 17, 1985, the Court entered an order directing that a complaint filed by private citizens in a separate civil action be treated as a complaint in intervention in this action.  *See* Doc. #1 at 16.  The District answered the private intervenor complaint on August 1, 1985.  *Id.*  The private intervenor complaint was dismissed without prejudice on September 5, 1989.  *Id.* at 19.

[10] The 1989 Consent Order provided that the former Merigold Elementary School, which closed on July 1, 1986, would become part of the Pearman Elementary School zone (Zone VII).  Doc. #12 at 6–7; Doc. #6-2.  The order also modified the geographic boundaries of Zone IV.  Doc. #12 at 7.

opportunity of course offerings to all students throughout the district;" (6) directed the creation of "a voluntary magnet school at one of the predominantly black elementary schools or at the former Hayes Cooper Elementary School in Merigold;"[11] (7) directed the parties to take actions to ensure that "[t]here will be no disparity of maintenance of any of the schools within the district;" (8) mandated the development and implementation of "a plan for desegregating the predominantly black Eastwood Junior High School [D.M. Smith];"[12] and (9) required the submission of annual reports on the status of its desegregation efforts.[13]  Doc. #12 at 2, 4, 6–7, 9, 12, 14–16.

Under the majority-to-minority transfer policy, the Court directed that "[w]henever there shall exist schools containing a majority of either black or white students, the school district shall encourage and permit a student (black or white) attending a school in which his or her race is the majority to choose to attend another school where his/her race is in the minority."  *Id*. at 4. Additionally, the District was directed to advertise the transfer program and to "establish a transportation system to transfer the Majority-to-Minority transfer students."  *Id*. at 5.

---

[11] The 1989 Consent Order directed the District to set "admission requirements … that neither race will exceed 50%, plus or minus 5% of the total student population enrolled at the school."  Doc. #12 at 9.  During the course of the litigation, the United States represented that "these enrollment targets, which are not reflective of the actual current student population in the District, have resulted in disproportionately high enrollment of white students at Hayes Cooper relative to the District-wide population," about which the United States "reserve[d] the right to seek … [m]odifications in this case in the future."  Doc. #109-1 at 22 n.7.

[12] Eastwood Junior High School was renamed D.M. Smith Middle School in 2007.  Tr. 49, 736.

[13] The reports were to include "at least the following information":  total student enrollment of the district by race for the current school year; total student enrollment of each school by race for the current year; total number of students by race participating in the magnet school programs, including each student's sending and receiving school; total number of students by race participating in the majority-to-minority transfer program, including each student's sending and receiving school; total number of private school returns by race, including each student's receiving school; a description of all new construction (including renovations, modifications and additions), repairs or renovations related to health, safety, or emergencies, or repairs necessary to comply with state or local government buildings proposed to be undertaken; "[a] current and accurate description of any and all enrichment-type programs in operation during the current school year, by school;" "[a]n evaluation by the school district of the effectiveness of its desegregation measures;" the total number of full time teachers by race in the District; the total number of full time teachers by race in each school in the District; and the total number of administrative staff, by race, of each school facility.  Doc. #12 at 14–16.

As for course offerings, Judge Senter ordered:

> Beginning with the 1988–89 academic year and each year thereafter, the school district will identify specific required college preparatory courses, a minimum of two of which shall be offered each year exclusively at Eastside High School and a minimum of two of which will be offered each year exclusively at Cleveland High School. The courses offered at each high school shall not be based upon student preference at that school. Transportation shall be provided to those students at Cleveland High School who are taking the courses at Eastside High School, and transportation shall be provided to those students at Eastside High School who are taking the courses at Cleveland High School.

*Id*. at 7–8.

### C. 1992 and 1995 Consent Orders

On November 13, 1992, Judge Senter entered a second consent order, in which he granted the District "permission to develop and implement a magnet school program at the junior high level in the Cleveland School District, which program shall, to the extent possible and applicable, reflect the same implementation plans called for [in] the 1989 Consent Order for the elementary magnet school program." Doc. #13 at 2.

On February 6, 1995, Judge Senter entered a third consent order. Doc. #14. The 1995 Consent Order granted the District "permission to develop and implement a magnet school program at the high school level in the Cleveland School District, which … shall to the extent possible and applicable, reflect the same implementation plans called for in the 1989 [and 1992] Consent Order[s]." *Id*. at 2. The 1995 Consent Order observed that the "District has complied with the [1992 Consent Order] in implementing a magnet school program at the junior high level." *Id*. With the exception of an August 21, 2003, reassignment of this case back to Judge

Davidson, *see* Doc. #101 at 2, the matter lay largely dormant for approximately sixteen years after entry of the 1995 Consent Order.[14]  *See* Doc. #1 at 21.

### D.  Judge Davidson's Initial Order

On April 7, 2011, the United States filed a "Motion to Exceed Page Limit," representing that it intended to submit a motion for miscellaneous relief to address "the District's failure to desegregate its schools in the forty-one years since the 1969 Order was entered by the Court." Doc. #3 at 1–2.  Judge Davidson granted the motion four days later.  Doc. #4.

On May 2, 2011, citing the defendants' "lack[ of] will to meaningfully integrate its schools," the United States filed a motion asking the Court to:  (1) find the defendants in violation of federal laws and the orders of this Court and (2) "order Cleveland to devise and implement a desegregation plan that will immediately dismantle its one-race schools and put the District on a path to unitary status."  Doc. #6 at 43.  In support of its motion, the United States argued that the District operated "One-Race Schools" and "Racially Identifiable Schools," and "[r]einforc[ed] the [r]acial [i]dentity of its [s]chools through [f]aculty and [s]taff [a]ssignment." *Id*. at 23, 30, 36.  Specifically, of relevance here, the United States asserted:

> In a school district where approximately 67% of the students are black and 30% of the students are white, half of Cleveland's schools–the schools on the east side of the railroad tracks–are all black or virtually all black. The majority of the schools on the west side of the railroad tracks, including Cleveland High School, Margaret Green Junior High School, and Parks Elementary School, enroll a student body that is at least twenty percent more white than the student population for the District as a whole.

*Id*. at 12–13 (internal citations omitted).  The United States also represented:

> [D]ata reported by the District reflects that while approximately 60% of the District's teachers are white and 40% are black, the ratio of black to white

---

[14] During this time, the District continued to submit annual reports.  *See* Doc. #1 at 21.

teachers is disproportionately large in schools with an all-black or predominantly black student population, and disproportionately small in schools that have a large contingent of white students. Thus, during the 2009-2010 academic year 89% of the teachers at Cleveland High School (on the west side) were white, but only 24% of the teachers at East Side High School were white. At the middle school level, 80% of the teachers at Margaret Green Junior High School (on the west side) were white but only 25% of the teachers at D.M. Smith Middle School (on the east side) were white.

*Id*. at 27.

On August 18, 2011, after seeking and receiving an extension to respond to the United States' motion, the District responded in opposition. *See* Doc. #10; Doc. #15; Doc. #26. In its supporting brief, the District argued that it was not in violation of federal laws because: (1) indices of interracial exposure "show the success of [the District's] desegregation efforts;" (2) "the District's magnet programs and robust majority-to-minority transfer initiative prove its good faith in attempting to achieve desegregation;" and (3) "the District must not be held responsible for demographic changes unrelated to former state-imposed segregation." Doc. #27 at 9. Additionally, the District urged the Court to consider "the stability of desegregated enrollment." *Id*. at 18.

On October 6, 2011, after seeking and receiving a separate extension, the United States replied in support of its motion. Doc. #29; Doc. #30; Doc. #31. In its reply, the United States argued, in essence, that the arguments raised in the District's response did not relieve the District of its duty to achieve desegregation in its schools. Doc. #31.

On February 27, 2012, Plaintiffs filed a motion for leave "to add, substitute or file [a] motion to intervene on behalf of present African American parents who have children that attend a school within the Cleveland School District." Doc. #37 at 4. Two days later, on February 29,

2012, Judge Davidson granted Plaintiffs twenty days "to file a motion to substitute parties pursuant to Rule 17(a) of the Federal Rules of Civil Procedure." Doc. #38.

On March 20, 2012, Plaintiffs, pursuant to Rule 17 and Judge Davison's order, filed a motion to substitute as plaintiffs eight African American parents of students in the Cleveland School District: (1) Lenden Sanders, (2) Mack Sanders, (3) Crystal Williams, (4) Amelia Wesley, (5) Dashanda Frazier, (6) Anginette Terrell Payne, (7) Antonio Lewis, and (8) Brenda Lewis. Doc. #40. Judge Davidson granted the motion to substitute on March 28, 2012. Doc. #43 at 13–14. In the same order, he concluded:

> After the District received authority in the 1995 Consent Order to implement a magnet school at the high school level, the District applied for and received funding to establish a magnet program at Eastside High to increase desegregation of the high school. The District reports that the magnet program, which currently operates without funding from the Department of Education, consists of a visual and performing arts program for grades 9 through 12 and an international baccalaureate diploma program for grades 11 and 12. In addition to Eastside High's magnet program, in an effort to attract minority students to the school, the District "buses" students who attend Eastside High and Cleveland High to each other's schools to take certain classes in an attempt to enrich and equalize the educational experience of the two schools. *Despite the District's attempts to attract Caucasian students to the majority-African-American Eastside High, today, the school is attended by 99.7% African-American students ….*
>
> After the District received authority in the 1992 Consent Order to implement a magnet school program at the junior high level to promote greater desegregation, the District applied for and received funding to establish the magnet program at D.M. Smith Middle School. The magnet program, which currently operates without funding from the Department of Education, consists of an arts and international baccalaureate program that serves grades 7 to 8 in an attempt to reduce minority group isolation at the junior high level. *Despite D.M. Smith Middle School's magnet program, the school remains a racially identifiable African-American school with an attendance of 99.7% African-American students ….*
>
> [W]ith respect to student assignment, the District should submit a plan for improving integration in only Eastside High School and D.M. Smith Middle

School. The Court finds the District has demonstrated a good faith effort to comply with prior desegregation Orders and federal law with respect to its elementary schools.

*Id*. at 24–25, 36–37 (emphases added).[15]

Turning to faculty and staff, Judge Davidson found that, even considering a "20% measure of deviation, which is not accounted for in any of the prior desegregation Orders," forty percent of the District's schools failed to reflect the district-wide ratio of minority and non-minority faculty and staff. *Id*. at 39. Nevertheless, Judge Davidson concluded:

[T]he District has <u>attempted</u> to comply with the prior desegregation Orders by hiring and retaining minority teachers and administrators and engaging in activities to recruit qualified African-American applicants, including targeting predominantly African-American colleges and universities …. Accordingly, the District should propose a plan to achieve the mandated racial balance among faculty in the District ….

*Id*. (emphasis in original).

### E. Submission of Initial Plans and Subsequent Opinion

On May 15, 2012, the District submitted a "Proposed Plan … to improve integration at East Side High School and D.M. Smith Middle School." Doc. #44 at 1. The proposed plan called for: (1) the creation of new magnet programs at East Side High and D.M. Smith; (2) enhancements to the curriculums at East Side High and D.M. Smith designed to attract white students; (3) opening courses at East Side High and D.M. Smith which are unavailable to Cleveland High and Margaret Green students; and (4) reassignment of faculty so that "[b]y the end of the 2013-2014 school year ... faculty racial makeup at each school will be within … 15% points of the school level's (elementary or secondary) racial composition." *Id*. at 1–6.

---

[15] Judge Davidson noted in the order that the magnet programs implemented at Hayes Cooper and Bell Elementary produced successful integration. Doc. #43 at 28–29.

On August 30, 2012, the United States filed an objection to the District's proposed plan. Doc. #48. In its objection, the United States argued that the District's plan relied on magnet programs and exclusive course offerings, two mechanisms which had failed in the past. *Id.* at 8–10. Representing that the "District has agreed to reach its [faculty reassignment] targets by the beginning of the 2013-14 school year," the United States did not object to the plan's proposal to reassign faculty and staff under this new timeline. *Id.* at n.1.

Judge Davidson held a hearing on the District's proposed plan and the United States' objection on December 11, 2012. Doc. #55; Doc. #66. At the hearing, the United States argued for "consolidating the District's middle schools and high schools into a single-grade structure for grades six through twelve …." Doc. #81 at 3. The next month, on January 24, 2013, Judge Davidson issued an order rejecting the District's proposed plan, finding:

> [T]he attendance zones, as defined by the former railroad tracks in Cleveland, perpetuate vestiges of racial segregation. The high school and junior high school students should have a true freedom of choice to attend either high school and either junior high school. Accordingly, the Court orders that the heretofore-established attendance zones shall be abolished, thus establishing an open-enrollment procedure ….
>
> Also, the majority-to-minority transfer program … is hereby abolished. The requirement for [a student] to be a minority in the transferee school is eliminated, thus permitting any child within the District to enroll in either of the high schools or junior high schools, regardless of the racial composition of the student body at such schools.

Doc. #78 at 8–9.

On February 21, 2013, the United States filed a motion to alter Judge Davidson's order. Doc. #80. In its motion, the United States argued that the freedom of choice plan endorsed by the Court was unconstitutional and had been previously rejected by Judge Keady when, during a 1969 hearing, he observed that "no longer may the effectiveness of any plan depend upon the

wishes or choices of students or their parents." Doc. #81 at 12–13. The United States again advanced a consolidation plan. *Id*. at 18–21.

Judge Davidson denied the motion to alter his order on the ground that the judgment was "plausible in light of the record viewed in its entirety." Doc. #90 at 2 (citing *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 296 (5th Cir. 2008)). In deciding not to alter his ruling, Judge Davidson noted that "the data before the Court does not warrant modification of the Court's opinion and Order to at this time order consolidation of the District's two high schools and two junior-high schools." *Id*.

### F. Appeal and Remand

The United States timely appealed Judge Davidson's January 24, 2013, ruling and his decision denying the United States' motion to alter. Doc. #94. On April 1, 2014, the Fifth Circuit Court of Appeals issued an opinion finding that "[t]he district court did not make clear its conclusion that the problem of the continuing racial isolation and racial identifiability of D.M. Smith Middle School and East Side High School would be resolved by the implementation of a freedom of choice plan." *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 240 (5th Cir. 2014). Accordingly, the Fifth Circuit reversed and remanded "for a more explicit explanation of the reasons for adopting the freedom of choice plan, and/or for consideration of the alternative desegregation plans proposed by the parties, as appropriate."[16] *Id*.

On June 18, 2014, on joint motion of the parties, Judge Davidson issued a scheduling order setting litigation deadlines, including a deadline for submitting proposed desegregation plans, in the wake of the Fifth Circuit's remand. Doc. #99. The scheduling order states that "[i]n

---

[16] The opinion did not define "alternative desegregation plans." The Court presumes the opinion refers to the District's May 15, 2012, proposed plan, and the United States' proposed consolidation plan.

the event the Court holds a hearing on competing desegregation plans and orders a plan, the District will implement the plan by the beginning of the 2015–2016 school year or under another timeline set by the Court." *Id.* at ¶ 12.

Approximately one month later, on July 21, 2014, Judge Davidson issued an order recusing himself from this action and assigning the case to the undersigned United States District Judge. Doc. #101.

### G. Second Submission of Plans and Filing of Motions

After this case was transferred to the undersigned, the parties twice moved for extensions of the deadline to submit proposed desegregation plans. Doc. #104; Doc. #106. The Court granted the first motion in part, and granted the second, extending the deadline to submit plans through and until January 23, 2015. Doc. #105; Doc. #107.

On January 23, 2015, the United States and the District filed competing proposed plans to achieve desegregation. Doc. #108; Doc. #109. On February 13, 2015, the District filed objections to the United States' plan,[17] and the United States filed objections to the District's two plans. Doc. #112; Doc. #113. Following a February 20, 2015, prehearing conference, this Court issued an order on February 25, 2015, directing the parties to circulate all expert reports by March 20, 2015, and to complete discovery by April 21, 2015. Doc. #117. About a week later, after another prehearing conference held March 3, 2015, the Court noticed an evidentiary hearing on the competing desegregation plans for May 18, 2015. Doc. #127.

One week before the close of the discovery period, on April 14, 2015, Plaintiffs filed a motion to substitute Reverend Edward Duvall for Plaintiffs Wesley and Payne. Doc. #160. In

---

[17] On February 27, 2015, Plaintiffs filed "Plaintiffs' Response to the Objections of the Cleveland School District to the Justice Department's Proposed Plan" in support of the United States' plan. Doc. #123.

their motion, Plaintiffs represented that Duvall "is the African-American parent of two children enrolled in the Cleveland School District" and that Wesley and Payne "have children who have graduated from the Cleveland School District." *Id.* at ¶¶ 3–4. On April 30, 2015, the District, without filing an accompanying memorandum brief, filed a motion to dismiss Plaintiffs Frazier, Lewis, and Williams or, in the alternative, to exclude their proposed testimony at the upcoming hearing, for failure to appear for a noticed deposition. Doc. #166.

On May 4, 2015, and May 8, 2015, the United States and the District, respectively, filed motions in limine to exclude certain expert evidence. Doc. #172; Doc. #176. On May 14, 2015, the United States filed a motion to strike the District's motion in limine as untimely. Doc. #185. The same day, the District, citing a desire to formulate a new desegregation plan, filed a motion to continue the hearing on the parties' proposed plans. Doc. #183.

## H. Hearing and Rulings

On May 15, 2015, this Court entered an order denying Plaintiffs' motion to substitute, citing Plaintiffs' failure to make the necessary showing to justify substitution under Rule 17 of the Federal Rules of Civil Procedure. Doc. #191. In addition to denying substitution, the order provided that, "it appearing that the grounds for Payne's and Wesley's standing to pursue this action – the enrollment of their children in Cleveland schools – has vanished, Payne and Wesley are ordered to show cause, within fourteen (14) days of the issuance of this order, why they should not be dismissed from this action for lack of standing." *Id.* at 4–5 (footnote omitted).

Three days later, on May 18, 2015, the Court denied the District's motion to continue the hearing, finding that the District's desire to delay the hearing did not outweigh considerations of the District's diligence; the effectiveness of a continuance; the inconvenience to the parties, witnesses and the Court; and the absence of prejudice. Doc. #194. In doing so, the Court noted

that "the denial of the continuance does not necessarily bar the District from seeking to present evidence regarding [a new plan] on a later date …." *Id.* at 4 n.3. The Court also denied the parties' motions in limine on the grounds that, as the trier of fact, the Court would be able to "determine whether, and to what extent, all proffered evidence will be considered." Doc. #196. Having denied the motions in limine, the Court denied the United States' motion to strike as moot. *Id.* The same day, the Court denied the District's motion to dismiss Frazier, Lewis, and Williams because the District's right to discovery could be protected by imposing the less severe sanction of excluding Frazier, Lewis, and Williams from testifying at the evidentiary hearing. Doc. #195.

The evidentiary hearing on the proposed desegregation plans began on May 18, 2015, and concluded on May 22, 2015.[18] Doc. #205. On June 5, 2015, the Court toured and inspected all schools operated by the District with counsel for the parties. Approximately two months after the evidentiary hearing, on July 27, 2015, the parties submitted proposed findings of fact and conclusions of law. Doc. #207; Doc. #208.

On October 16, 2015, the Court directed the parties to "file … a single affidavit … prepared by a person with competent knowledge setting forth a revised or updated estimate for the implementation of that party's respective plan, assuming the Court's adoption of such plan as of the date of this order." Doc. #209. Both parties submitted the requested affidavits on October 30, 2015. Doc. #210; Doc. #212.

---

[18] The hearing began one day after the 61st anniversary of *Brown I*.

## II
## Preliminary Matters

### A.  Scope of Remand

Before describing and analyzing the parties' proposed desegregation plans, it is important to establish the scope of inquiry on remand.  As mentioned above, the Fifth Circuit remanded this action "for a more explicit explanation of the reasons for adopting the freedom of choice plan, and/or for consideration of the alternative desegregation plans proposed by the parties, as appropriate."  *Cowan*, 748 F.3d at 240.

As a general matter, "[a] remand made without deciding anything, apart from directing further proceedings, determines only that the further proceedings must be had[.  S]imilarly, a remand for an explanation of the lower court's decision to enable informed review leaves the lower court free to change its mind."  18B Fed. Prac. & Proc. Juris. § 4478.3 (2d ed.).  Thus, while a remand "mandate controls on all matters within its scope, … a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." *Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986).

Here, the Fifth Circuit's remand of Judge Davidson's January 24, 2013, order did not decide anything apart from the necessity of a further explanation of Judge Davidson's freedom of choice decision.   Thus, remand grants the Court discretion to change its mind as to the appropriate desegregation plan to be adopted.  18B Fed. Prac. & Proc. Juris. § 4478.3.  Likewise, insofar as the opinion left open the consideration of alternative desegregation plans, such properly remains before this Court.  *See Newball*, 803 F.2d at 826.  Accordingly, in considering

18

the appropriate desegregation plan, the Court is not constrained by Judge Davidson's adoption of a freedom of choice remedy, and may consider any plan properly before it.[19] *Id*.

## B. Applicable Standards

The goal of desegregation was precisely articulated by the Fifth Circuit Court of Appeals in *Cowan*:

> In desegregation cases, the objective is to eliminate from the public schools all vestiges of state-imposed segregation. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about. The duty is not simply to eliminate express racial segregation: where *de jure* segregation existed, the school district's duty is to eliminate its effects root and branch …. "[T]he burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now."

748 F.3d at 238 (internal citations omitted and footnote omitted).

"To guide courts in determining whether the vestiges of *de jure* segregation have been eliminated as far as practicable, the Supreme Court has identified several aspects of school operations that must be considered, commonly referred to as the *Green* factors: student assignment, faculty, staff, transportation, extracurricular activities, and facilities." *Anderson*, 517 F.3d at 298. "In fashioning and effectuating the [desegregation] decrees, the courts will be guided by equitable principles." *Milliken v. Bradley*, 433 U.S. 267, 279–80 (1977) (alteration in original). These equitable principles are: (1) "the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation;" (2) the remedy "must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct;" and (3) state and local authorities

---

[19] In its proposed findings of fact, the District argues that "[t]he Government did not appeal the Court's finding that all elementary schools were integrated despite Cypress Park and Nailor Elementary having mainly black enrollment. Therefore, all black schools are not *per se* unconstitutional." Doc. #207 at 4 n.1. Putting aside the question of whether the failure to appeal actually had this effect, there is no dispute that single race schools are not per se unconstitutional, as explained below.

have an interest "in managing their own affairs, consistent with the Constitution." *Id.* at 280–81 (internal quotation marks omitted).

The district court's duty in a desegregation case is to "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." *Cowan*, 748 F.3d at 240. When evaluating plans, "delay in achieving effective desegregation and uncertainty about whether a proposed plan will, in fact, achieve desegregation have been unacceptable flaws in any school desegregation plan since *Green*." *United States v. CRUCIAL*, 722 F.2d 1182, 1191 (5th Cir. 1983). The implementation of desegregation remedies is reviewed for abuse of discretion. *Cowan*, 748 F.3d at 238.

In asking the Court to implement one of its plans, the District advances two initial arguments: (1) that the chosen remedy must be limited by the nature and scope of the constitutional violation which, in this case, is "the attendance zone line imposed by Order of this Court;" and (2) the Court should defer to the District's plans. Doc. #112 at 9–10; *see* Doc. #207 at ¶¶ 133, 137.

### 1. Constitutional violation at issue

While the District argues that the constitutional violation to be remedied by this Court is the drawing of the attendance zone lines, the United States responds that the injury to be remedied is not the zones themselves, but the injury the zones were intended to redress – the de jure segregation system. Doc. #122 at 3–4. The United States also argues that "when remedies have proven unsuccessful in practice, the District remains obligated to take all available steps to correct the original constitutional violation." *Id.* at 3 (citing *Columbus Bd. of Educ. v. Penick*,

20

443 U.S. 449, 458 (1979); *Davis v. E. Baton Rouge Sch. Bd.*, 721 F.2d 1425, 1435 (5th Cir. 1983)).

The Court agrees with the United States. In this case, the constitutional violation at issue is decades of state-sponsored segregation which existed at the point Judge Keady issued his initial order in 1969. The District has not cited, and this Court has not found, authority standing for the proposition that court-ordered desegregation plans that fail to achieve the desired desegregation absolve a school district of responsibility for remedying the effects of the initial state-sponsored segregation. To the contrary, the law is clear that, "[u]ntil [a school board] has achieved the greatest degree of desegregation possible under the circumstances the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system." *Davis*, 721 F.2d at 1435. Thus, where a court-ordered plan fails to achieve desegregation, a school district or board remains obligated "to come forth with a more effective plan." *Penick*, 443 U.S. at 459–60.

There is no dispute here that, in violation of the Constitution, the District has operated a dual system and that, as observed by Judge Davidson's January 2013 order, the District has failed to achieve the greatest degree of desegregation possible under the circumstances. Accordingly, the District "bears the continuing duty to do all in its power to eradicate the vestiges of the dual system." *Davis*, 721 F.2d at 1435. If the District fails to discharge this duty, this Court "has broad power to fashion a remedy that will assure a unitary school system." *Penick*, 443 U.S. at 459. Put differently, Judge Keady's implementation of attendance zones places no restriction on this Court in fashioning a desegregation remedy.

21

### 2. Deference

The District next argues that, because it has been acting in good faith to desegregate its schools, its plans are entitled to deference. Doc. #112 at 10, 17 (citing *Green*, 391 U.S. at 439; *Wright v. Council of Emporia*, 407 U.S. 451, 479 (1972) (Burger, J., dissenting); *Hall v. West*, 335 F.2d 481, 484 (5th Cir. 1964)); *see* Doc. #207 at ¶ 133 (citing *Green*, 391 U.S. at 439).

The United States responds:

> Without conceding the assertion of good faith here, even assuming that a school district has complied in good faith with a court-ordered desegregation plan, such compliance alone does not satisfy the district's continuing obligations to take further action to effectuate meaningful desegregation. *See Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) ("A school system is not, of course, automatically desegregated when a constitutionally acceptable plan is adopted and implemented, for the remnants of discrimination are not readily eradicated. … We have several times refused to find unitary a school system whose operation continues to reflect official failure to eradicate, root and branch, the weeds of discrimination."). The appropriate measure at this juncture is not whether the District has operated in good faith in the past, but whether its proposed plans are reasonably calculated to effectively desegregate East Side and D.M. Smith.

Doc. #122 at 4 (internal footnote omitted).

The provision of *Green* cited by the District states that "[w]here the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief." 391 U.S. at 439. However, the *Green* court also observed that "the availability to the board of other more promising courses of action may indicate a lack of good faith, and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method." *Id*. The notion expressed in *Green* that where a district proposes an effective, constitutionally permissible plan, such plan is entitled to deference, is reflected in the other two cases the District cites. *See Wright*, 407 U.S. at 479 ("When a plan devised by local authorities crosses the threshold of achieving actual desegregation, it is not for the district courts

22

to overstep local prerogatives and insist on some other alternative."); *Hall*, 335 F.2d at 484 ("the sequence of responsibility is first the school authorities, then the local district court") (internal quotation marks omitted).  Thus, to the extent either of the District's proposed plans promises to achieve desegregation, such plan may be entitled to deference.

## C.  Standing of Plaintiffs Payne and Wesley

Neither Payne nor Wesley responded to the Court's May 15, 2015, directive to "show cause, within fourteen (14) days of the issuance of this order, why they should not be dismissed from this action for lack of standing."   Accordingly, Plaintiffs Payne and Wesley will be dismissed from this action for lack of standing and for failure to comply with an order of the Court.  *See United States v. Hays*, 515 U.S. 737, 743–44 (1995) ("*Allen v. Wright*[, 468 U.S. 737, 755 (1984),] made clear that even if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment' by the challenged discriminatory conduct.") (internal quotation marks omitted); *see also Larson v. Scott*, 157 F.3d 1030, 1031 (5th Cir. 1998) ("A district court sua sponte may dismiss an action for failure … to comply with any court order.") (citing Fed. R. Civ. P. 41(b)).

## III
## Geography and History of the District

As this Court previously observed:

Cleveland, Mississippi is a small city in eastern Bolivar County in the Mississippi River Delta with a population of a little over 12,000 residents.  The city was a creation of the railroad system; the land that is now Cleveland was the approximate halfway point between Memphis, Tennessee, and New Orleans, Louisiana.  The Louisville, New Orleans & Texas Railroad incorporated the town, which was named Cleveland in honor of then-President Grover Cleveland in 1886.  Cleveland has since become home to Delta State University and has been named one of the hundred best small communities in the United States.  Cleveland is also the base of the Cleveland School District, which encompasses 109 square miles and serves the cities of Cleveland, Boyle, Renova, and Merigold.

23

Doc. #43 at 1–2.  The District is roughly bisected by railroad tracks which run north to south through the towns of Merigold, Renova, Cleveland, and Boyle.  U.S. Ex. 2.[20]

## IV
## The School District

### A.  The District Today

Cleveland, the center of the District, was characterized by Judge Davidson in his January 2013 opinion "as an oasis in the Mississippi Delta."  Doc. #78 at 4.  The city has been described as "a gem … in a beautiful spot … close to Memphis [and] not too far from New Orleans."  Tr. 360.  Cleveland is home to Baxter Health Care, Bolivar Medical Center, Delta State University, and the recently-opened GRAMMY museum.[21]  Tr. 347, 360–61.  Cleveland is said to have "a very, very good economy" that is "light years ahead" of the rest of the Delta.  Tr. 877.  No party presented evidence describing the businesses or cultures in Boyle, Merigold, or Renova – the other towns in the District.

According to the 2010 Census, the towns and areas of the District have a population of 19,292 individuals, with a racial composition of approximately 45.5% white, 51.5% African American, and 3.0% other races (including individuals of two or more races).  National Center for Education Statistics, *CENSUS 2010, Table [P3] Race [8], Cleveland School District, MS*

---

[20] Exhibits submitted by Intervenor-Plaintiff United States are referenced as "U.S." followed by the exhibit number.  The District's exhibits are referenced as "CSD" followed by the exhibit number.  Plaintiffs did not introduce documentary evidence at the hearing.

[21] At the time of the evidentiary hearing, the GRAMMY museum was under construction.  Tr. 360–61.  The Court takes judicial notice of the museum's opening, which was announced on the City of Cleveland's official website on March 7, 2016.  *See* City of Cleveland, Mississippi, www.cityofclevelandms.com (last accessed April 29, 2016); *see also In re Katrina Canal Breaches Consol. Litig.*, 533 F.Supp.2d 615, 632 (E.D. La. 2008) ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites.").

(available at http://nces.ed.gov/programs/edge/tables.aspx?ds=census&y=2010).[22]   As of May 22, 2015,[23] the District had a total enrollment of 3,723 students.  Doc. #200-1.  Of these students, approximately 28.8% were white, 66.7% were African American, and 4.5% were other races.  *Id*.

The bulk of the District's secondary school student population lives in Cleveland and its outskirts.  *See* U.S. Ex. 2.  Within Cleveland, African American students reside primarily in the southeast portion of town (where East Side High is located), to the east of the railroad tracks and to the south of State Highway 8.  *Id*.  White students residing in Cleveland reside primarily in the southwest portion of town (where Cleveland High is located), to the west of the railroad tracks and to the south of State Highway 8.  *Id*. Outside of Cleveland, white students live almost exclusively on the west side of the tracks; however, African American students outside of Cleveland are not concentrated on either side of the tracks.  *Id.*

The District currently operates ten schools, as more fully discussed below.  In addition to the District schools, there are twelve private schools within a fifty-mile radius of Cleveland: Presbyterian Day School, in Cleveland; Bayou Academy; North Sunflower; Indianola Academy; Pillow Academy; Washington Day School; Christian Day School; St. Joseph; Lee Academy; Presbyterian Day School, in Clarksdale; Mariana Academy; and Heritage Christian Academy. Tr. 803–04.

## B.  The District Schools

The ten schools currently operated by the District consist of two magnet elementary schools servicing grades pre-K through 6th (Bell Academy and Hayes Cooper Center);[24] two

---

[22] *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

[23] A court-ordered annual report of enrollment in the District was filed after the close of the hearing.  *See* Doc. #200-1.  In order to ensure the accuracy of the opinion, this Court will use the most recent enrollment data, rather than the data presented at the hearing.

zoned elementary schools servicing grades K through 5th (Parks Elementary and Pearman Elementary);[25] one zoned elementary school servicing grades K through 2nd (Nailor Elementary);[26] one zoned elementary school servicing grades 3rd through 5th (Cypress Park Elementary);[27] two middle schools (Margaret Green Middle School and D.M. Smith Middle School); and two high schools (Cleveland High and East Side High). Doc. #200-1. Only the high schools and middle schools are at issue here.

The District is overseen by Superintendent Jacqueline Thigpen, an African American woman,[28] and by a five-person school board ("Board"), of which two members are African American. Tr. 221, 810, 811.

### 1. High schools

Cleveland High and East Side High, the District's two high schools, operated as zoned schools until the 2013–2014 academic year.[29] Doc. #109-1 at 4. The two high schools are close in distance, located only 1.2 miles apart. *Id.*

---

[24] Although the United States has raised the possibility that the enrollment plan at the magnet elementary schools may be unconstitutional, *see* Doc. #109-1 at 8 n.1., neither party briefed the issue. The magnet schools are well-regarded in the District community and by experts. Tr. 373, 771. Of note, Bell Academy has a total enrollment of 365 students, of which 41.6% are white; 52.6% are African American; and 5.8% are of other races. Hayes Cooper has a total enrollment of 367 students, of which 49.9% are white; 43.6% are African American; and 6.5% are of other races. Doc. #200-1.

[25] Parks Elementary has a total enrollment of 362 students, of which 49.5% are white, 46.1% are African American, and 4.6% are of other races. Pearman Elementary has a total enrollment of 262 students, of which 22.1% are white, 68.7% are African American, and 9.2% are of other races. Doc. #200-1.

[26] Nailor Elementary has a total enrollment of 376 students, of which 0.8% are white, 98.7% are African American, and 0.5% are of other races. Doc. #200-1.

[27] Cypress Park Elementary has a total enrollment of 272 students, of which 0.4% are white, and 96.6% are African American. Doc. #200-1.

[28] Thigpen's two predecessors were also African American. Tr. 810–11.

[29] At times in this opinion, Cleveland High School is referenced as "CHS" or simply "Cleveland High," and East Side High School is referenced as "ESHS" or simply "East Side High."

Since Judge Davidson's January 2013 order, the schools have operated under a "freedom of choice plan," under which any high school student can enroll in either Cleveland High or East Side High. Tr. 20. Also, ostensibly still operating under the 1989 Consent Order, the District allows students at one school to take classes at the other. Tr. 649–50. When students elect to take a class at a different school, they are bussed from their enrolled high school to the site of their class at the other high school. Tr. 232. Buses run each day between the two schools every class period except the last period of each day. *Id.* Depending on student course selection and course scheduling, it is possible for a student to make multiple trips between East Side High and Cleveland High during the course of a single day. Tr. 240. While the trip between the two schools may only take five to seven minutes, commuting students are often late for classes. Tr. 240, 629.

Although the high schools offer shared classes, they operate under their own budgets and run their own athletic teams and extracurricular programs.[30] *See* Tr. 202, 263, 652. In a typical budget year, Cleveland High normally has greater expenditures, but East Side High generally has a higher per pupil expenditure.[31] Tr. 263.

### a. Cleveland High School

Cleveland High, which is housed on the same campus as Margaret Green Middle School,[32] is comprised of four structures: (1) a main building built in 1949 (44,889 square feet);

---

[30] Cleveland High and East Side High teams occasionally play each other. Tr. 790–91. When the teams play at Cleveland High, the fans sit in separate areas. *Id.* Although separate fan seating is a mandate of the Mississippi High School Activities Association, East Side High does not follow this rule. Tr. 798. While the community may be divided in their loyalties, and the rivalry game between Cleveland High and East Side High may "get[] a little heated," in the end, alumni of both schools get along. Tr. 755–56.

[31] Cindy Holtz, the Business Manager for the District, attributed the higher per pupil expenditures to East Side High's faculty having more advanced degrees than their Cleveland High counterparts, and East Side High's running of magnet programs. Tr. 263, 271.

[32] The two buildings are connected by a walkway. Tr. 428.

(2) a gymnasium built in 1939 (17,114 square feet); (3) a band, computer, and tech lab built in 1964 (16,518 total square feet); and (4) a cafeteria built in 1959 (4,475 square feet). Tr. 428; Doc. #109-2.

John Poros, an expert in architectural design called by the United States, summarized the condition of Cleveland High's structures in his report:

> The existing Cleveland High School facility has fair to poor conditions of interior finishes (materials such as floor tile, baseboard, acoustical ceiling panels, and plaster wall surfaces), difficulties with accessibility overall, and some deficiencies in facilities to support teaching. Acoustical ceiling panels are old, stained and sagging, wall surfaces in areas are damaged and rough, and floor tiles are scuffed and stained. Restrooms are in fair condition with newer tile floors, plumbing fixtures like urinals and toilets, as well as new plastic laminate toilet partitions. The state of the interior finishes are a matter of appearance and do not pose a safety hazard (as would be the case if the floor tile was crumbling and fraying creating a trip hazard, or if acoustical ceiling panels were to fall). The steel windows are not leaking, but are heavily caulked and thus not energy efficient. The roofs have been maintained as part of the District's overall maintenance plan.

U.S. Ex. 27 at 4 (internal citations omitted).[33] Poros also opined that Cleveland High contains a number of design issues which render it potentially non-compliant with the Americans with Disabilities Act. Tr. 561, 589. Specifically, the science lab is located on the second floor such that "if you are in a wheelchair [it] becomes difficult to impossible to … use that lab;" the entry for disabled students "kind of snakes through the library;" a ramp to the cafeteria potentially violates the ADA; and "there are some bathrooms that are on a half level down from the main level …." Tr. 589–90. Poros stated that these problems could be remedied within a year and the cost of repairs would not "be that significant." Tr. 590. Apart from the stated deficiencies, Poros deemed the facilities to be pedagogically "adequate." U.S. Ex. 27 at 4.

---

[33] Based on the Court's observations during its June 2015 site visit to Cleveland High's campus, Poros accurately assessed the condition of Cleveland High's facilities.

As for athletics, due to the size "and other functional difficulties" of the gymnasium, Cleveland High athletic teams use the gymnasium at Margaret Green. *Id*. at 4–5. Poros testified that the "[o]utdoor sports have the most basic fields, stands, press box, and field house," but are generally adequate. *Id*.

Poros also testified that Cleveland High has a maximum physical capacity of 720 students, and an optimal student capacity of 576 students.[34]  Tr. 571–73.  Based on these standards, during the three school terms immediately prior, Cleveland High never reached maximum physical capacity but regularly exceeded its optimal capacity.  As of May 22, 2015, the school had a total enrollment of 614 students, of which 45.4% were white, 47.4% were African American, and 7.2% were of other races.  Doc. #200-1.  For the 2013-2014 academic year, the first year of open enrollment, Cleveland High had a total enrollment of 616 students, of which 46.6% were white, 46.1% were African American, and 7.3% were of other races.  Doc. #102-1.  For the 2012–2013 academic year, the year before the implementation of open enrollment, the school had a total enrollment of 595 students, of which 47% were white, 45.5% were African American, and 7.4% were other races.  Doc. #93-1.

Based on testing in English I, Algebra II, Biology I, and U.S. History, Cleveland High is rated as a "C" school.  Tr. 221.

### b.  East Side High School

East Side High sits across a two-lane road from D.M. Smith Middle School.  Doc. #109-1 at 8.  The East Side High compound is comprised of three buildings:  (1) a main building built in

---

[34] Poros calculated the optimal capacity by taking the Mississippi School Design Guidelines' suggestions for students per grade level classroom and multiplying the numbers by "the number of instructional classrooms that were relevant …" and by the number of other "particular spaces," such as lab rooms, band rooms, and gymnasiums. Tr. 572.  He calculated maximum capacity by multiplying the number of classrooms by the Mississippi Department of Education's "statewide maximum capacity of 30 students per classroom."  *Id*. at 572–73; U.S. Ex. 28.

1956 (52,370 square feet); (2) a band hall built in 1965 (6,791 square feet); and (3) a Science

Building built in 1974 (10,951 square feet).  Doc. #109-2.

Poros, as he did for Cleveland High, also provided his assessment of East Side High's

buildings in his report:

> The general building layout has a number of advantages in that most of the
> building is one story, the circulation is continuous and accessible, and the building
> has enough space around it to easily support additions.
>
> The building, although old, is in fair condition in terms of interior finishes
> (materials such as floor tile, baseboard, acoustical ceiling panels, and plaster wall
> surfaces).  Interior finishes are worn in areas but replaceable.  A
> renovation/addition project from 2012 certainly has helped to bring up the overall
> interior finish condition of the building. The HVAC system has been recently
> upgraded and science labs renovated. The roofs have been maintained as part of
> the District's overall maintenance plan.

U.S. Ex. 27 at 7.[35]

Poros explained that East Side High's facilities suffer from some accessibility issues.  *Id.*

at 6.  Specifically, "[t]he four science rooms on the second floor are not [handicap] accessible

and would require the installation of an elevator, the fire-rated enclosure of the existing interior

and exterior stair, and the creation of a fire-rated corridor to access the existing outdoor exit

stair."  U.S. Ex. 27 at 5–6.  Except for this accessibility issue, Poros opined that "[t]he building is

satisfactorily equipped in terms of the curriculum that is offered …."  *Id*. at 5.  The school has a

newly restored track, a football field, a baseball field, and a field house.  *Id*.

Poros estimated that East Side High has an enrollment capacity of somewhere between

769 and 1153 students.[36]  U.S. Ex. 27 at 24–26.  In contrast, Joseph Henderson, an expert in

---

[35] During the Court's June 2015 site visit, the Court found East Side High's interior spaces to be generally in fair to
poor condition, and certain exterior and interior areas neither well maintained nor cleaned.  While Poros opined in
his report that East Side High's "roofs have been maintained," U.S. Ex. 27 at 7, the Court observed instances of
water-stained ceilings, and toured some areas which emitted odors indicating possible water and moisture intrusion.

school architecture called by the District, opined that "the educational capacity of the [East Side High] campus [is] 600 to 675 students."[37] CSD Ex. 18 at 1.

Currently, East Side High offers an International Baccalaureate Diploma Programme for eleventh and twelfth graders.[38] Tr. 35. This program, which was created to draw a diverse group of students to East Side High, offers "academically higher subjects" in math, psychology, history, English, Spanish, "Theory of Knowledge," and biology. Tr. 35, 289–90; CSD Ex. 12 at 17. Additionally, East Side High exclusively offers classes in AP calculus, trigonometry, and public speaking. U.S. Ex. 73. The IB program and the other "exclusive" offerings are available to Cleveland High students through busing. *Id.*

Through a memorandum of understanding with Mississippi Delta Community College, East Side High further offers college level courses for high school and/or college credit. Tr. 230–31, 238–39. Any student may enroll in these classes but must pay a sixty dollar fee in order to obtain college credit. Tr. 231. The classes are taught by East Side High teachers "who have a master's [degree] and above and meet Mississippi Delta [Community College] criteria for faculty." Tr. 239.

---

[36] Poros derived the higher number by calculating the "total number of seats in the school" from the "maximum number of students per classroom allowed by the Mississippi School Design Guidelines." U.S. Ex. 27 at 24–25. He calculated the lower number by taking East Side High's estimated classroom and computer lab capacity supplied by Beverly Hardy, the District's magnet coordinator, multiplying that capacity by an 85% utilization rate, and then adding the estimated capacity of remaining educational spaces in the school (two science laboratories, a gymnasium, a STEM laboratory, an art room, a band room, and a music room), multiplied by utilization rates ranging from 38% to 75%. *Id.* at 24–26. According to Poros, this second calculation produces an average utilization rate of 75%, "which is low." *Id.* at 26. If all instructional spaces "are used at the highest average utilization range of 85%," East Side High's capacity falls at 870 students. *Id.* at 25.

[37] Henderson reached his estimates by multiplying East Side High's 25 instructional classrooms by 24 students (for the 600 student estimate) and by 27 students (for the 675 student estimate). CSD Ex. 18 at Ex. A. Henderson explained that he did not consider the non-classroom spaces (the laboratories, gymnasium, STEM laboratory, art room, band room, and music room) because the "spaces aren't used every period of every day." Tr. 167–68.

[38] This IB program for ninth and tenth graders was discontinued because students were not academically prepared for it. Tr. 292. The District is targeting to re-institute the program within three years. *Id.*

As of May 22, 2015, East Side High had a total enrollment of 344 students, of which 100% were African American. Doc. #200-1. For the 2013-2014 academic year, East Side High had a total enrollment of 349 students, of which 99.7% were African American, and 0.3% were other races. Doc. #102-1. For the 2012-2013 academic year (before open enrollment), the school had a total enrollment of 355 students, of which 99.2% were African American, and 0.8% were other races. Doc. #93-1.

For the 2014-2015 academic year, forty-eight Cleveland High students enrolled in one or more IB classes at East Side High. CSD Ex. 12 at 17. Of the forty-eight enrolled Cleveland High students, thirty (62.5%) were white, fourteen (29.2%) were African American, and four (8.3%) were of other races. *Id*. Forty-six students from East Side High, all African American, were enrolled in at least one IB course. *Id*. During the same time period, fifty-six students participated in the dual enrollment classes, with "several" students taking a psychology course at Delta State University. Tr. 229–230, 239.

Based on testing in English I, Algebra II, Biology I, and U.S. History, East Side High is rated as a "B" school. Tr. 221.

## 2. Middle schools

All 6th through 8th graders in the District, except for the 6th graders attending the District's two magnet elementary schools, attend either Margaret Green Middle School or D.M. Smith Middle School.[39] Doc. #109-1 at 8. As mentioned above, Margaret Green is located on the same campus as Cleveland High, and D.M. Smith is located across the street from East Side High.

---

[39] At times in this opinion, Margaret Green Middle School is referenced as "MGMS" or simply "Margaret Green," and D.M. Smith Middle is referenced as simply "D.M. Smith."

At the close of the 2014–2015 school year, the two middle schools had a combined enrollment of 761 students, with a racial makeup of 66.7% African American, 28.6% white, and 4.7% other races.  Doc. #200-1.

### a.  D.M. Smith Middle School

D.M. Smith Middle School consists of one building, built in 1976, which measures 45,682 square feet in size.  Doc. #109-2.  The building, which includes a new classroom wing completed in 2012, utilizes an "open" classroom concept,[40] under which room partitions do not extend to the ceiling.  U.S. Ex. 27 at 6; Tr. 574–75.  In order to bring the classrooms up to the National Fire Protection Association Code, which is referenced by the Mississippi Department of Education's educational guidelines, the walls would need to be extended to the ceiling and many of the classrooms would require the installation of an exterior opening.  Tr. 576–77.  Additionally, the District would need to install sprinklers in the building.  *Id*.

According to Poros, D.M. Smith's "2012 wing is in new condition" but the remainder of the building has "interior finishes ... in fair condition:  somewhat worn, but serviceable and easily updated if needed."[41]  U.S. Ex. 27 at 6.  Outside the building, D.M. Smith lacks any "play fields."  *Id*.

Poros testified that the building housing D.M. Smith has a maximum physical capacity of 840 students and an optimal student capacity of 636 students.  U.S. Ex. 27 at 6; Tr. 578.  As of

---

[40] According to Poros, the open classroom style was common in the late 1960's and early 1970's, with the idea that the partitions would be mobile and "teachers would, of their own volition, [change] around their classrooms ...."  Tr. 575.  However, teachers complained about the noise from adjoining classrooms and, except for a "very small number of schools," the idea was a "failed experiment."  Tr. 575–76.  D.M. Smith's partitions are not moveable and Poros opined that the rooms would not "apply as an open classroom" under Mississippi Department of Education guidelines.  *Id*. at 576.

[41] Based on its own inspection of D.M. Smith, the Court concurs with Poros' evaluation.  The Court also observed, among other things, that D.M. Smith shares a cafeteria and common wall with Cypress Park Elementary (with no express demarcation between the two schools at the point of the common wall), that the boundaries of the school site are not fenced, and that the exterior grounds were in need of maintenance.

May 22, 2015, D.M. Smith had a total enrollment of 248 students, of which 99.6% were African American, and 0.4% were of other races. Doc. #200-1. For the 2013-2014 academic year, the school had a total enrollment of 258 students, of which 99.6% were African American, and 0.4% were other races. Doc. #102-1. For the 2012-2013 academic year (before open enrollment), the school had a total enrollment of 300 students, of which 99.7% were African American, and 0.3% were of other races. Doc. #93-1.

D.M. Smith operates an IB program called "Middle Years." Tr. 35. As of April 29, 2015, the Middle Years Program enrolled 245 students, virtually the entire enrollment at D.M. Smith. U.S. Ex. 17. As the numbers above show, enrollment at D.M. Smith has "dwindled over the last five years." Tr. 51. Last year, D.M. Smith was a "failing school." *Id.* Most recently, it received a "D" rating. *Id.*

### b. *Margaret Green Middle School*

Margaret Green Middle School consists of three buildings: (1) a main building built in 1959 (26,991 square feet); (2) an addition built in 1955 (17,840 square feet); and (3) a gymnasium built in 1976 (19,133 square feet). Doc. #109-2.

Generally, as reported by Poros, "[t]he condition of Margaret Green is poor." U.S. Ex. 27 at 7. The building has numerous indices of foundation settlement, including "diagonal cracking of CMU and brick walls … primarily in the cafeteria," and tilting of a doorframe.[42] *Id.*; Tr. 585.

Margaret Green has a maximum physical capacity of 750 students and an optimal student capacity of 568 students. U.S. Ex. 27 at 7. As of May 22, 2015, it had a total enrollment of 513

---

[42] Poros' evaluation of the school's condition, as reflected in his report and his testimony at the hearing, was confirmed during the Court's June 2015 inspection of the premises.

students, of which 50.9% were African American, 42.5% were white, and 6.6% were of another race. Doc. #200-1. For the 2013-2014 academic year, Margaret Green's total enrollment was 534 students, of which 49.3% were African American, 44.0% were white, and 6.7% were other races. Doc. #102-1. For the 2012-2013 academic year (before open enrollment), the school had a total enrollment of 461 students, of which 43.4% were African American, 49.9% were white, and 6.7% were of other races. Doc. #93-1.

Margaret Green operates a "criteria based program" called STAR. Tr. 51. To qualify for the program, students must obtain teacher recommendations, achieve a certain score on a pre-algebra test, and have an "A-B average." Tr. 52. The program has been described as "terrific" and "goes to the strength of the school district." Tr. 396. For the 2014-2015 school year, ninety-five students were enrolled in Margaret Green's STAR program. Tr. 816. Of the 95 students, 29.5% were African American, 57.9% were white, and 12.6% were of other races. *Id.*

While Margaret Green's academic rating is not apparent from the record, a United States expert who reviewed the academic performance and accountability records opined that the school "is academically stable and is on solid academic footing." Tr. 395–96.

### C. District Bonding Capacity

According to a report by one of the District's experts, "for significant capital improvements," there are generally four ways in Mississippi in which a school district may borrow funds: (1) a general obligation bond issue, (2) a limited tax (three mil) note, (3) a general obligation lease purchase, and (4) a sixteenth section loan.[43] CSD Ex. 15 at 2.

"A general obligation bond is the primary means by which a Mississippi school district may finance significant capital improvements." *Id.* Such bond may only be issued if 60% of

---

[43] Other fund raising avenues are likely to produce "very limited" funding. CSD Ex. 15 at 4.

voters in the district approve the bond in a special election.  *Id*.  The District's general obligation debt limit is estimated at $27,993,700.  *Id.* at 3.

A district may also borrow funds through the issuance of a limited-tax (three mil) note if it publishes notice and does not receive a petition supported by twenty percent of registered voters calling for an election on the notes.  CSD Ex. 15 at 3.  The District currently has the capacity to issue limited-tax notes in the approximate amount of $3.1 million to $3.4 million.  *Id*.

Further, "Mississippi school districts may finance capital improvements for a period of up to 20 years through a general obligation lease."  *Id*.  A district may issue a lease if it publishes notice and does not receive a petition calling for an election on the lease, and must then repay the lease each year from any available revenues.  *Id*.  The District currently has "several" leases under this program.  *Id*. at 4.

Finally, "[a] Mississippi school district may borrow from its Sixteenth Section principal trust fund to pay for capital improvements."  *Id*. at 4.  The balance in the District's Sixteenth Section fund is approximately $432,841.  *Id*.

### D.  Community Perceptions

According to Dr. Chresteen Seals, a Board member, academics and athletics of the District's schools are "very important in the community where we live because we don't have too much else there."  Tr. 243, 245–46.  Athletic events at East Side High are "packed" and Cleveland High events are even more crowded.  Tr. 651–52.

Beyond athletics, both schools maintain very loyal alumni bases.  Tr. 196, 641, 796. While East Side High alumni are generally proud of their school, some believe that other community members view East Side High and D.M. Smith in a negative light.  Tr. 704, 790.

One African American parent in the District spoke of "being outcast because we are the track schools, a school on this side of the track and a school on that side of the track." Tr. 732.

**V**
**<u>Focus Groups</u>**

In seeking to formulate desegregation plans, both the United States and the District convened focus groups to evaluate the community's views on the state of the school system. Unsurprisingly, their focus groups generally yielded different results.

**A. The District's Focus Groups**

To run its focus groups, the District retained Dr. E.E. "Butch" Caston, a former provost and academic vice president at both Delta State University and the Mississippi University for Women; and Dr. Cassie Pennington, a retired school superintendent from Indianola, Mississippi. Tr. 829–30, 837. The District chose Pennington and Caston because "[t]hey have both had years and years and years of experience facilitating and mediating and working with education in the State of Mississippi."[44] Tr. 38.

After consultation with Caston and Pennington, the Board "came up with the idea of … focus groups where people from the community would be asked to come in and share ideas of what we could do to make our school district and our community a positive experience for not only our children but the parents and all the community members." Tr. 38. The District decided to create six focus groups, with two focused on the elementary schools, two focused on the middle schools, and two focused on the high schools. Tr. 38–39. To populate these groups, the District asked each of the following to nominate five persons to serve: (1) the principals of each school, (2) the Ministerial Association, (3) the mayor of Cleveland, (4) the Chamber of

---

[44] Caston, who testified at the evidentiary hearing and was admitted as an expert in focus groups, estimated that he facilitated or led approximately seventy community focus groups during his career. Tr. 831.

Commerce, and (5) "industry … basically Travenol and a couple other industries in Cleveland …." *Id*. The District then sent packets of information to focus group participants. Tr. 59. Although the packets included background information on magnet programs and magnet schools, they did not include any information on school consolidation. Tr. 60.

The District's focus group nominees were split among the six groups, with each group convening twice in August 2014. Tr. 68, 838. Each meeting involved two hour-long sessions held in the District's offices. Tr. 838, 841.

The focus groups were typically twelve to fifteen people in size. Tr. 80, 839. In addition to the participants, each session was attended by Jamie Jacks, counsel for the District; Beverly Hardy, the District's magnet coordinator; and Karen Fioranelli, another District official. Hardy, Jacks and Fioranelli attended as "resource people … to answer questions that [Pennington and Caston] may not be in a position to give [the] best answer." Tr. 843. Although the United States was invited to participate in the groups, no representatives on its behalf attended in person. Tr. 841–42. However, the District set up a telephone connect to allow United States' representatives to listen to the sessions. Tr. 842.

Superintendent Thigpen opened each meeting with a greeting before departing.[45] Tr. 842. Despite the presence of Thigpen, Jacks, Hardy, and Fioranelli, Caston testified that the participants were uninhibited in their participation. Tr. 845. Nevertheless, notes from a meeting reflect that Jacks referenced a study on white flight. Tr. 866.

During the discussions, according to Caston, the "top priority" expressed by focus group members was a desire for "quality programs, quality personnel [and] quality leadership." Tr. 844–45. With regard to the high schools, Caston explained:

---

[45] According to Caston, Thigpen just said a "few words" of greeting. Tr. 842.

> The matter of one high school building, new school, neutral site would … get a lot of discussion, lot of questions. And then it would wane; and then it would move to the two high schools, two current high schools. And so their wish is for the magnet theme to continue upward, quality programs, quality faculty. That was consensus. And there would be exceptions to that, individual exceptions.

Tr. 848. In a report he prepared approximately seven months after the focus group meetings, without any meeting minutes and without "detailed notes," *see* Tr. 854, Caston summarized the focus group results:

> The overall sentiments in all groups targeted successful programming (diversity and student performance) in the district (magnets, STAR, IB, band, athletics). In all groups (4), there was individual to mixed support for the organization/structure of the two high schools and middle (junior high school) schools. There was general serious concern about low performance at D.M. Smith Middle School. Discussion of the one high school was consistently toward the construction of a new high school. Anticipated challenges for such were discussed. Successful magnet and other innovative programming resulting in integration at multiple sites were cited in the groups as encouragement that significant success is possible for Eastside High School and Cleveland High School. It was evident that the general participant sentiment recognized the success regarding student enrollment and diversity in the district. It was the widely held view that the Cleveland School District is one of the very few success stories with integration in the Delta and State.

CSD Ex. 59 at 1.

In addition to the focus groups, the District placed an online survey on its website. Tr. 69, 81. The survey, which was a part of the District's registration packet for students, asked parents to rank their top three preferred magnet programs. *Id.*; *see also* U.S. Ex. 11. The District received 756 responses to the survey.[46] U.S. Ex. 11. The highest rated programs were Science, Technology, Engineering and Math (STEM); "Creative Arts;" and "Dual Enrollment with Delta State University for 11th and 12 grade." *Id.*

---

[46] According to Hardy, "[e]very parent was supposed to fill out the survey." Tr. 69. Although "[s]ome of them did not … a great number did." *Id.*

## B. United States' Focus Groups

On October 15 and 16, 2014, Clare Smrekar,[47] an expert for the United States, led four focus groups "to collect the authentic values, viewpoints, perspectives, and priorities of parents as each reflected upon the academic quality, social environment, racial diversity, and general strengths and weaknesses of CSD schools." U.S. Ex. 1 at 3–4. The groups were attended by between three and eight community members, Smrekar, and Joe Wardenski, counsel for the United States. *See* Tr. 454; U.S. Ex. 10A at 1, 7, 13, 20. While Wardenski largely participated in the sessions as a questioner, notes of the sessions reflect that on at least one occasion, he gave a "legal perspective" that "Smith and others" were not integrated schools. U.S. Ex. 10A at 16.

At these focus groups, "[p]arents–both black and white and other–repeated a shared sentiment and core priority: to provide stronger, more vibrant and engaging learning opportunities for all students across Cleveland, now." U.S. Ex. 1 at 24. Smrekar conceded that "[n]o firm, delineated, specific, unanimous opinion" emerged from her groups, but testified that "the families ... and community members coalesced around … general notions of academic rigor and excellence that would drive or produce diversity in the end. [T]hey envisioned new academic programs and rich new opportunities for all kids." Tr. 505.

## C. Criticisms of Focus Group Methodologies

At the hearing, Smrekar criticized the procedure the District followed in arranging and implementing the focus groups that led to the creation of one of the District's proposed desegregation plans (Plan A). Tr. 364–69. In particular, Smrekar testified that: (1) the inclusion of magnet information in the packets sent to the participants was unduly influential, (2) the

---

[47] Smrekar, an Associate Professor at Vanderbilt University, was admitted as an expert during the hearing on the topics of the social context of school desegregation policy, school choice, family and school and community relations, and school diversity. Tr. 331, 341.

groups were too large to allow for discussion of a complex topic like desegregation, (3) the presence of a large number of people associated with the District could have influenced the conversation, (4) the setting in the school board offices was a "concern," (5) the representatives from the School Board played too active a role in the sessions, and (6) the nominating process was skewed toward voices "in leadership." Tr. 366-70. Based on these deficiencies, Smrekar explained that she would not rely on the outcomes of the focus groups to assess the likelihood of white flight. Tr. 374.

The District accurately points out, however, that the evidence shows the United States' focus groups suffered from at least two of the same deficiencies identified by Smrekar due to Wardenski's presence and involvement in some discussions. Doc. #207 at ¶ 61 (citing Tr. 454–59). Consequently, the Court concludes that, as a whole, the focus groups conducted by the District and by the United States suffer from sufficient deficiencies to render their results largely unreliable. Accordingly, such results will be given little weight in evaluating the parties' proposed desegregation plans.

## VI
### District's Plan A

On January 23, 2015, commensurate with the modified deadlines[48] of the scheduling order, the District filed two separate proposed desegregation plans: a preferred "Plan A" and an alternative "Plan B."[49] Doc. #108.

---

[48] On motions, the Court issued two orders extending the deadlines for the parties to submit their proposed desegregation plans. Doc. #105; Doc. #107.

[49] During its opening statement at the hearing, the District set the tone for its presentation of evidence on the two plans, advocating for the maintenance of separate schools:

> So if we err, I suggest we should err on the side of caution to make sure that we make this school district better and that we do nothing which has the risk of causing it to fail. Because we have two high schools. We have two valedictorians. We have two salutatorians. We have two athletic teams. We have two student body councils. We have two of everything. We have two homecoming

## A. Specifics of Plan A

Believing that parents in the District craved choice, the District formulated its Plan A. Tr. 45–46. As presented, Plan A seeks to continue Judge Davidson's open enrollment plan, "refined with the addition of distinct, attractive academic programming choices at East Side High which are only available to students who enroll full time at East Side High." Doc. #108-1 at 1. Under the plan, the District's 8th grade students would be afforded an opportunity to enroll at either East Side High or Cleveland High on a first come, first served basis, with each school maintaining an enrollment cap of 550 students. *Id*.

To encourage enrollment at East Side High, Plan A: (1) modifies East Side High's IB program so that the offerings would only be available to East Side High students;[50] and (2) calls for the creation of an exclusive "early college program" at East Side High. Doc. #108-1 at 2. The early college program would serve as a partnership with Delta State University under which qualified 11th and 12th grade students at East Side High could enroll there for up to twelve hours of college courses for either college credit, or a combination of college and high school credit.[51] *Id*. To qualify for the program, an East Side High student would have to receive a composite score of at least 21 on the ACT and "have completed all high school core courses." *Id*.

---

queens. It gives an opportunity for twice, at least twice the number of students to succeed and to excel when they otherwise might not have that opportunity and that is important. It's very important.

Tr. 17.

[50] In its plan, the District represents that there are currently seventy-six students enrolled in the IB program. Forty-eight of the seventy-six are Cleveland High students, and thirty of the forty-eight are white. The District contends that an unspecified number of these students would "opt to attend East Side High" if the IB program was exclusive. Doc. #108-1 at 3.

[51] In January 2015, the District represented that it "anticipates signing a Memorandum of Understanding outlining the partnership in the coming weeks." Doc. #108-1 at 7.

With regard to the middle schools, Plan A calls for "the continuation of … 'open enrollment' … with the consideration of a merger of the two schools following the completion of the current School Improvement Grant which D.M. Smith is receiving through the 2016-2017 school year." Doc. #108-1 at 4. In the interim, and after the proposed merger, Margaret Green would continue to operate its STAR program. *Id.*

In explaining the delay in merging the two middle schools, the District originally submitted that "to [merge] immediately [would] result in the loss of the SIG funds the district is scheduled to receive in years 2015-2016 and 2016-2017 which total more than 1 million dollars." Doc. #108-1 at 5. However, before the hearing, the District represented that it "received word from the Mississippi Department of Education that [SIG] funds could transfer to the new Margaret Green. Therefore, the District could implement the new middle school [in] August 2016." Doc. #121 at 10.

In its November 2015 submission to the Court, the District represents that Plan A could be implemented for the 2016–2017 school year. Doc. #210 at 2.

### B. Evidence on Plan A

### 1. Plan A's predicted impact on desegregation

During the hearing, the District and the United States elicited testimony from two experts on Plan A's likely impact on desegregation within the District's schools. Christine Rossell, a professor of political science at Boston University called by the District, was admitted as an expert in desegregation plans and their outcomes, statistical analysis of desegregation plans, and parents' potential attitudes associated with desegregation. Tr. 84–85, 88. Claire Smrekar, as mentioned above, was called by the United States and qualified as an expert on the topics of the social context of school desegregation policy; school choice; family and school and community

43

relations; and school diversity.  Tr. 331, 341.  Both experts submitted reports to the Court, which were admitted into evidence.

### a. Rossell's testimony and expert reports

Rossell, unsurprisingly, testified in support of the District's Plan A.  She has studied public school desegregation for more than forty years, assisted school districts in designing desegregation plans, and served as an expert witness on desegregation plans.  Tr. 84–85, 87. Rossell testified that she has done more than anyone else in designing and researching desegregation plans, and has completed more parent surveys than all but maybe one person.[52] Tr. 87–88.

Rossell explained that she uses two types of indices for evaluating levels of desegregation—the index of dissimilarity and the index of interracial exposure.  Tr. 92.  The index of dissimilarity "is a racial imbalance index."  Tr. 92–93.  In contrast, the interracial exposure index measures the "percentage [of] white [students] in the average black child's school."  Tr. 92.  In articulating the distinction between these two metrics, Rossell elaborated that a school district with one white student in each school would have a perfect racial balance, but a very low interracial exposure.  Tr. 92–93.

Rossell testified that the interracial exposure in the District is increasing and that the percentage of white students in the District is declining.  Tr. 94.  She explained that, if this trend continues, the District will eventually reach "maximum integration."  Tr. 94.  Rossell noted that,

---

[52] Rossell admitted though that she had not conducted a parent survey since she conducted one in Hattiesburg in 1989.  Tr. 125–26.  The only other survey she has conducted in Mississippi was in Natchez-Adams in 1988.  *Id.*

while the racial imbalance in the District has fallen generally, it increased slightly for the 2014-2015 school year.[53] Tr. 95.

In addition to looking at the statistics for the District as a whole, Rossell's report purports to analyze the index of dissimilarity and the interracial exposure indices for the District's secondary schools. *See* CSD Ex. 11-E (Table 2b). Her calculations indicate a pattern of decreases in racial imbalance[54] (except for the 2006-2007 and 2012-2013 academic years) and a pattern of increases in interracial exposure (except for the academic years from 2010–2013). *Id*.

Based on her analysis, Rossell opined that the District is "not quite in the middle of the pack" when compared to school districts that had been declared unitary since 1986 in the difference between the percentage white in the District versus the percentage white in the average African American child's school. Tr. 99. As for racial balance, Rossell noted that the District is more racially balanced than numerous school districts at the time they were declared unitary, including Kansas City, Missouri; Fulton County, Georgia; Mobile County, Alabama; DeKalb County, Georgia; Dallas, Texas; Muskogee County, Georgia; Baton Rouge, Louisiana; and Denver, Colorado. Tr. 99–100. Rossell also noted that, while Cleveland "has got 40 percent of its schools at or above 90 percent black," this number is less than the percentages approved by courts in Detroit and St. Louis. Tr. 108.

Given her findings, Rossell urged the Court to "[s]tick with the open enrollment plan. It respects human dignity, the human dignity of both races. It gives people choice, and it's

---

[53] Rossell hypothesized that this increase may be due to the fact that she used a different date for determining enrollment for the 2014–2015 academic year. Tr. 95.

[54] It appears Rossell miscalculated the index of dissimilarity for secondary schools by looking at the total student population in the District rather than the population of secondary schools. *See* Tr. 824; CSD Ex. 11E (Table 2b). The District, apparently conceding this error, argues that "even if Dr. Rossell erred in certain calculations of the index of dissimilarity, the outcomes of her analysis regarding the index of interracial exposure are unaffected." Doc. #207 at 9 n.4.

probably going to be the most stable and–desegregation [sic] over the long [term]." Tr. 101. She felt, however, that Plan A should be implemented without enrollment caps. Tr. 112.

As for the actual impact of Plan A on white student enrollment at East Side High, Rossell testified that she could not predict whether restricting IB courses would attract "many" white students to enroll at East Side High. Tr. 117–18. Rossell opined that limiting the magnet programs to only East Side High students "may or may not produce a large increase in integration at these schools." CSD Ex. 11-E at 6.

### b. Smrekar's testimony and expert report

Smrekar testified that Plan A was unlikely to create racially balanced schools, which she defined as "reflect[ing] the racial composition of the school district … with some reasonable, flexible [deviation]."[55] Tr. 382. With regard to reasonable deviation, Smrekar explained that 15 percentage points "is an established standard of some flexibility across urban school districts that have been part of school desegregation" and that the number could be used in "all school districts." Tr. 383. For the Cleveland School District, this would "translate[] into a white enrollment of between 50 and 20 percent." Tr. 402.

Addressing the IB program proposal, Smrekar differentiated between a "program within a school" (or PWS) and a "dedicated magnet school." Tr. 401. According to Smrekar, "decades of policy research indicate … that white parents prefer dedicated magnets when magnets are placed in minority neighborhoods …. A PWS model is not [in] the best interest if you are trying to pursue desegregation because white parents prefer a dedicated [magnet] rather than a PWS." Tr. 402. Smrekar opined that the exclusive IB program would have insufficient "pull power" to

---

[55] Smrekar testified that this definition "has been well established across the research literature and across the legal opinions related to desegregation." Tr. 382.

attract approximately ninety white students (the amount necessary to bring East Side High to a 20% white enrollment) to enroll at East Side High. Tr. 405. In reaching this conclusion, Smrekar noted that "the sense of loyalty and affiliation and legacy to Cleveland," and the fact that an 8th grade student choosing their school under Plan A would not know whether she would qualify for the IB program. Tr. 405–07.

With regard to the "early college program,"[56] Smrekar testified that for the 2014-2015 academic year, forty-four twelfth grade students would have been eligible for the program. Tr. 413. Of these forty-four students, half were white, 40% were African American, and 10% were of other races. *Id.* In addition to being relatively small, Smrekar noted that the early college program, which is another form of a PWS, would suffer from the same low pulling power as the IB program. Tr. 414. All in all, Smrekar concluded that Plan A is not "reasonably calculated to … attract 90 or more white students to East Side High School." Tr. 415.

As for drawing students to D.M. Smith, Smrekar testified that D.M. Smith "has a historic legacy, an identity associated with [a] predominantly black neighborhood" and that she did not "see any evidence, any possibility, any plausible possibility of D.M. Smith attracting white students under Plan A." Tr. 395. In her report, Smrekar went even further, stating that "Plan A completely abrogates the District's obligation to achieve racial desegregation in the shortest amount of time in a way that impacts *all* middle school students in CSD." U.S. Ex. 1 at 10 (emphasis in original).

Next, Smrekar criticized Plan A's pairing of enrollment caps with a first come, first served system, "because [the system] favors the families who [have the] most resource[s], who

---

[56] Smrekar testified that the Delta State Dual Enrollment program proposed under Plan A does not meet the traditional definitions of an early college program because it lacks a "summer bridge program" to prepare the students for college courses. Tr. 409–11.

are in the best position to make these decisions, who can get the information and act on it in the most expedient ways …." Tr. 397. While Smrekar felt that the enrollment caps may alleviate some of the overcrowding at Cleveland High, she felt that "a cap creates a constraint or a bad second choice …." Tr. 400.

## 2. Feasibility of Plan A

All parties agree that Plan A is, in essence, a continuation of the District's current open enrollment policy with the addition of an early college program. Accordingly, there is little question that the District has the means to implement the proposed plan. Superintendent Thigpen testified that she was unaware of any financial impediments to the District implementing Plan A.[57] Tr. 222. Additionally, Cindy Holtz, the District's business manager, testified that the District has funds to pay for the early college program under Plan A. Tr. 275.

John Poros, the United States' architectural expert, testified that the District's facilities are adequate to implement Plan A. Tr. 599. He also testified that under the Mississippi School Design Guidelines, the District is considered "small," and that the recommended school populations for a small district are 300 to 600 for middle schools and 400 to 800 for high schools. Tr. 608–09. However, Poros said that these recommendations refer more to learning communities, not school enrollment, and that a school may use downsizing strategies to achieve smaller groups from larger enrollments. Tr. 617–18.

Beverly Hardy, the former principal of Hayes Cooper and the District's magnet coordinator, explained that the District has not experienced any issues in implementing Judge Davidson's open enrollment plan and that there is nothing standing in the way of any parent

---

[57] Thigpen admitted that she did not know the precise staffing needs for implementation of Plan A. Tr. 224.

choosing any middle school or high school.  Tr. 46, 49–50.  She believes that student tardiness caused by busing can be remedied by changes to the schools' schedules.  Tr. 809.

### 3.   District officials' opinions of Plan A

With the exception of Superintendent Thigpen, who supports Plan A and Plan B but prefers the latter,[58] Plan A was the desegregation plan of choice for the majority of the District's school officials who testified at the hearing.

Hardy testified that Plan A "was the best plan for our school district and [is] what the parents wanted."  Tr. 45–46.  She explained that "anybody anywhere likes to be able to choose where they want their child to attend school.  They want to choose whatever they do."  Tr. 49. After speaking with Dr. Rossell, however, Hardy believes that Plan A should be implemented without enrollment caps.  Tr. 50.

Obie James, an African American in-school suspension teacher and football and softball coach at East Side High, offered testimony supporting Plan A.  He testified that he came home to Cleveland from living in Arkansas so that his children could attend East Side High.  Tr. 183–84, 278.  James pointed out that under the current open enrollment plan, there are no impediments to children choosing to attend any of the schools in the District.  Tr. 187.

Todd Fuller, a Cleveland resident in his eighth year of service on the Board, testified that he supports Plan A because "our country was founded on freedom of choice [and] I felt like that is the one thing that the students and parents wanted, particularly those now that have … kids in the … schools."  Tr. 201.  Fuller elaborated that extracurricular activities are very important for children in the region and that the way the current open enrollment system is set up allows

---

[58] *See* Tr. 221.

children to participate in extracurricular activities which they otherwise might not be able to pursue. Tr. 202.

Dr. Chresteen Seals, an adjunct professor at Mississippi Valley State University, and a School Board member since November 4, 2014, testified that in a "perfect world" she would want to build a "[b]rand new school in a central location." Tr. 243–45. Seals believes, however, that a new school is not financially feasible. Tr. 245. In the absence of a new school, Seals prefers Plan A because she does not want to close schools and because "under Plan A there is choice of where you want to go." Tr. 245.

### 4.   Community opinions of Plan A

The testimony at the evidentiary hearing revealed mixed community support for Plan A. Gary Gainspoletti, an accountant, business owner, and alderman-at-large for the City of Cleveland, testified that, based on conversations with his clients, "[t]he general sentiment of the people that I have talked to is leave it alone, keep the system that we have in place because it has worked in Cleveland where it obviously hasn't worked in other communities in the Delta." Tr. 879–80.

Aparna Nandula, a parent in the District, testified that she opposes Plan A because Cleveland High lacks academic and extracurricular opportunities for her daughter. Tr. 685.

Another parent in the District, Edward Duvall, testified that he does not support Plan A because the plan "won't be any different than what we have now" and that children currently at Cleveland High would not have an "incentive to go to East Side or to come across the railroad tracks …." Tr. 707–08.

## C.  Analysis of Plan A

In its objections, and in its proposed findings of fact and conclusions of law, the United States asserts that Plan A is a "freedom of choice"[59] plan and that:  (1) "the Supreme Court and Fifth Circuit have consistently held that 'freedom of choice' plans that have not worked, or do not promise to work, must be rejected when other workable desegregation alternatives are available that promise immediate desegregation;" (2) freedom of choice has not produced appreciable results in the wake of Judge Davidson's ruling; and (3) there is no evidence the proposed modifications to the freedom of choice plan would produce different results.[60]  Doc. #113 at 11–20; Doc. #208 at 41–42.

Specifically, the United States argues that "the Supreme Court and Fifth Circuit have consistently held that 'freedom of choice' plans that have not worked, or do not promise to work, must be rejected when other workable desegregation alternatives are available that promise immediate desegregation."  Doc. #113 at 11.  This interpretation of freedom of choice case law seems to rest on a section of *Green* in which the Supreme Court held:

> Although the general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation, there may well be instances in which it can serve as an effective device.  Where it offers real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, non-racial system there might be no objection to allowing such a device to prove itself in operation.  On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable.

*Green*, 391 U.S. at 440–41 (internal footnote omitted).

---

[59] There is no question that Plan A is a "freedom of choice" plan within the meaning of relevant jurisprudence.  *See Green*, 391 U.S. at 433 (plan considered freedom of choice where "each pupil except those entering the first and eighth grades … may annually choose between … schools").

[60] Plaintiffs raise largely the same arguments.  *See* Doc. #123 at 7.

This conclusion was affirmed six years later in *Monroe v. Board of Commissioners*, when the Supreme Court noted that a "free transfer" plan must be rejected if, "*like 'freedom of choice,'* … it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system …." 391 U.S. 450, 459 (1968) (emphasis added); *see Arthur v. Nyquist*, 514 F.Supp. 1133, 1139 (W.D.N.Y. 1981) ("The law requires that if the court concludes there are reasonably available ways of integrating the school system which promise to be speedier and more effective than freedom-of-choice measures, then it must impose them.").

In remanding Judge Davidson's opinion, the Fifth Circuit, citing *Green*, noted that "[a] freedom of choice plan is not necessarily an unreasonable remedy for eliminating the vestiges of state-sponsored segregation, but it has historically proven to be an ineffective desegregation tool." *Cowan*, 748 F.3d at 238 (citing *Green*, 391 U.S. at 439–40). The Fifth Circuit found that Judge Davidson failed to explain why the freedom of choice plan would be effective in ending segregation or why he selected the freedom of choice plan over the other available alternatives. *Id*. at 240. This focus on the effectiveness of open enrollment and the availability of other reasonable alternatives resonates with *Green*'s holding that freedom of choice plans will be constitutional only if such plans are supported by evidence that they *will* work and if they are the most effective of the available desegregation options. Thus, in evaluating Plan A, the Court must first decide whether the plan offers real promise in creating a unitary system and, if so, whether it is the most effective of available desegregation remedies.

Addressing the promise of a unitary system, the United States argues that, since Judge Davidson implemented the freedom of choice plan, there has been no appreciable change in the racial composition of the District's schools. Doc. #113 at 12–13; Doc. #208 at 41. The United

States therefore contends that the District's proposals under Plan A are unlikely to significantly alter the non-minority enrollment at East Side High or D.M. Smith. Doc. #113 at 13, 19. In response, the District essentially argues that racial imbalance in schools is not per se unconstitutional. Doc. #121 at 4; Doc. #207 at ¶¶ 148–152. Accordingly, in determining Plan A's promise to create a unitary system, the Court must decide to what extent, if any, the Constitution demands changes in non-African American enrollment at East Side High and at D.M. Smith. If the Constitution demands a change, the Court must then decide whether Plan A is likely to bring about the required change.

### 1. Propriety of one-race schools

As the District correctly argues, under *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 12 (1971), "[t]he Supreme Court has rejected any requirement of a particular degree of racial balance." Doc. #207 at ¶ 149. Thus, "some racially homogenous schools within a school system do not necessarily violate the federal Constitution." *Cowan*, 748 F.3d at 238. In the Fifth Circuit, however, there is a "general presumption against the maintenance of a system with substantially one-race schools." *Davis*, 721 F.2d at 1434 (collecting cases). Where such schools exist, the school district bears the burden "to demonstrate that the remaining one-race schools are not vestiges of past segregation." *Id.* To this end, "[t]he retention of all-black or virtually all-black schools within a dual system is … unacceptable where reasonable alternatives may be implemented." *Cowan*, 748 F.3d at 238–39 (quoting *Valley v. Rapides Parish Sch. Bd.*, 702 F.2d 1221, 1226 (5th Cir. 1983)). In other words, while "racial proportionality is not required" "in the context of mandatory desegregation," *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 732 (2007), the specific

53

circumstances in a district may render the maintenance of single-race schools unconstitutional. *Davis*, 721 F.2d at 1434.

"Courts have accepted that, depending on circumstances, different [racial] percentages may define a school as a one-race school." *Flax v. Potts*, 915 F.2d 155, 161 n.8 (5th Cir. 1990) (noting courts have utilized range of between 70% and 90% single race). In his March 28, 2012, order, Judge Davidson noted that "[t]he term 'one race schools' generally refers to schools with a student body of at least 90% [one race]." Doc. #43 at 22.

Here, although Smrekar testified that a student enrollment of within 15% of the District racial makeup represents racial balance, *see* Tr. 341, 383; there was no testimony as to what constitutes a one-race school in the District. *See Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 353 (5th Cir. 1982) (district court erred by applying one-race presumption based on racial deviations). In the absence of such testimony, the Court will utilize Judge Davidson's definition of a one-race school, which represents the highest ratio identified by courts. Accordingly, for the purpose of this opinion, a one-race school in the District is one with a single race of greater than 90%. When utilizing this definition, it is clear that both East Side and D.M. Smith are one-race schools. The question thus becomes whether their one-race enrollments are vestiges of past discrimination.

While this Court has not found any Fifth Circuit case law specifically enumerating factors to consider when determining whether single-race schools are vestiges of past segregation, the Fifth Circuit's *Cowan* opinion observed:

> The retention of single-race schools may be particularly unacceptable where, as here, the district is relatively small, the schools at issue are a single junior high school and a single high school, which have never been meaningfully desegregated and which are located less than a mile and a half away from the only other junior high school and high school in the district, and where the original purpose of this configuration of schools was to segregate the races. Apart from the

> fact that Cleveland has not sought a declaration of unitary status and has not
> challenged the district court's conclusion that further remedies are necessary, on
> the record now before us, the situation in Cleveland is distinguishable from those
> where we have found that the retention of some one-race schools did not preclude
> a declaration of unitary status.

748 F.3d at 238–39. Other Fifth Circuit decisions have considered "ethnic housing patterns,"

*Davis*, 721 F.2d at 1435; whether the housing patterns occurred during the life of the proposed

plan, *Flax*, 915 F.2d at 161–62; whether "essentially uncontroverted" evidence shows that the

district has eliminated all vestiges of discrimination, *id*. at 161; and whether the district had made

"intensive efforts" to eliminate one-race schools, *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d

218, 228 (5th Cir. 1983).

Drawing from this relevant and binding authority, the Court concludes that, in

determining whether one-race schools are vestiges of past segregation, a court should consider:

(1) the size of the district, (2) the number of schools at issue, (3) the distance between the

relevant schools, (4) whether the relevant schools had ever been desegregated, (5) whether the

schools were originally intended to be single race schools, (6) whether the district had previously

been declared unitary, (7) the extent to which housing patterns influence the enrollment at the

schools, (8) whether the housing patterns occurred during the life of the proposed plan, (9) other

evidence of vestiges of discrimination, and (10) whether the district has made intensive efforts to

eliminate one-race schools.

As the Fifth Circuit explained in *Cowan*, the first six factors weigh against the continued

maintenance of one-race schools at East Side High and D.M. Smith. 748 F.3d at 238–39. While

the District presented some evidence that parents prefer neighborhood schools, it is unclear to

what extent, if any, housing patterns currently impact enrollment at East Side High and D.M.

Smith, in the wake of open enrollment. Accordingly, the seventh and eighth factors are neutral.

However, insofar as there is little to no evidence of vestiges of discrimination in areas unrelated to student assignment (faculty, transportation, extracurricular activities, and facilities), the ninth factor weighs in favor of the District. Finally, while the District's implementation of magnet programs at East Side High may qualify as efforts to eliminate one-race schools, such efforts may hardly be considered "intensive." Consequently, the Court gives little weight to the tenth factor.

Upon consideration of the Fifth Circuit-endorsed factors, the Court concludes that the continued operation of East Side High and D.M. Smith as single-race schools is a vestige of discrimination and that, therefore, a plan which allows such continued operation must be rejected.[61]

---

[61] In arguing that its one-race schools are constitutionally permissible, the District, in its response to the United States' objections, relies primarily on two cases: (1) *Stell v. Savannah-Chatham Cty. Board of Education*, 888 F.2d 82, 84–85 (11th Cir. 1989), in which the Eleventh Circuit affirmed implementation of a magnet school program, notwithstanding evidence of racial imbalance in some schools; and (2) *Parents Involved*, 551 U.S. at 756 (Thomas, J., concurring), in which Justice Thomas wrote that "[u]nlike *de jure* segregation, there is no ultimate remedy for racial imbalance." Doc. #121 at 4–6. Both cases are easily distinguishable from this case.

First, in *Stell* (an opinion not binding on this Court), there was "ample evidence to support the district's conclusion that [the] plan is valid and would lead to effective and stable desegregation if given an opportunity to succeed." 888 F.2d at 86 (internal quotation marks omitted). Specifically, the district in *Stell* presented "credible experts in the field of school desegregation [who] testified as to the validity of the school board's survey techniques, the reliability of the board's enrollment and transfer projections, and the possibilities of success of the school board's plan." *Id.* at 83. Additionally, the Eleventh Circuit observed that, while the relevant "schools may not have yet met the goal established by the school board, they are not 'segregated' schools in which minority children are isolated." *Id.* at 85. Thus, at most, *Stell* stands for the proposition that current racial imbalance will not invalidate a plan where evidence suggests that the plan will be effective and where such racial imbalance does not result in isolation of the minority students.

In *Parents Involved*, Justice Clarence Thomas, writing in concurrence, observed that "[a]lthough racial imbalance can result from *de jure* segregation, it does not necessarily, and the further we get from the era of state-sponsored racial separation, the less likely it is that racial imbalance has a traceable connection to any prior segregation." 551 U.S. at 756. In making this observation, Justice Thomas distinguished between districts which either did not have a history of de jure segregation or had such a history and been declared unitary, and districts with a history of de jure segregation in which the harms of the dual system had not been remedied. *Id.* at 752–54. The latter is the situation in this case.

### 2. Whether Plan A will eliminate one-race schools

In arguing that the changes to the freedom of choice plan proposed by the District's Plan A will not produce effective results, the United States contends that: (1) alterations to the IB program and creation of a new magnet program were already considered and rejected by Judge Davidson; (2) there is no evidence the exclusive IB offering would encourage white students to enroll at East Side High; (3) the Delta State program will not encourage desegregation; (4) a 550-student enrollment cap could exacerbate segregation; and (5) the proposal for the middle schools makes no changes to the current system.

#### a. Previous proposals

The United States argues that, in 2012, the District proposed to restructure the IB program within the context of its initial plan which Judge Davidson found inadequate. Doc. #113 at 13–14. Insofar as this proposal was in the context of a different plan, Judge Davidson's conclusion has no bearing on this Court's inquiry.

#### b. Efficacy of exclusive offerings and early college program

Next, the United States asserts there is no evidence any white families would send their children to East Side High to enroll in the IB program. Doc. #113 at 15. Indeed, the United States represents that its "observations during … parent focus groups … suggest that at least some white families would choose to keep their children at Cleveland High, even if it meant not participating in the IB program." *Id*. Additionally, the United States argues that, even if all white IB students enrolled at East Side High, East Side High would still be a 92.1% African American school. *Id*. at 14–15.

As for the early college program, the United States argues that the proposed early college offerings at Delta State would be ineffective because students in the District who have a

composite score of 18 or higher on the ACT already have an option for dual enrollment credit. *Id*. at 16. The United States further contends that insofar as the early college program requires an ACT score of 21, and the average ACT score in the District is 17.9, the qualifications for the program would appeal to a small percentage of the District. *Id*.

The District responds that it anticipates "some" white students will enroll at East Side High as a result of the proposed changes. Doc. #121 at 8. The District represents that, while it cannot stop students from enrolling under the current dual enrollment option, Delta State is considering increasing tuition, and that such an increase would encourage students to enroll in the free early college program at East Side High. *Id*. The District does not address the United States' point that the early college program would only be available to a small percentage of students.

As mentioned above, the evidence is weak that either exclusive offering would draw white students to East Side High. Hardy, the District's magnet coordinator, averred that, based on the focus groups, she anticipated some parents would "strongly consider sending their child to" East Side High. Doc. #114-6 at ¶ 9. However, there is no indication how many parents would engage in such consideration, or to what extent the thought would lead to increased enrollment. This uncertainty is of especial concern given that, as of the 2014–2015 school year, only thirty white students were even enrolled in the IB program, and only twenty-two 12th grade white students would even qualify for the early college program.

With regard to the early college program, the evidence is undisputed that the program would be available to only a small number of white students. Furthermore, there is nothing in the record to suggest that any of the eligible white students, who can already pursue college

credit courses through other means, would elect to enroll full-time at East Side High for the purpose of obtaining college credit.

Under these circumstances, the Court cannot conclude that Plan A's freedom of choice concept promises to transform East Side High and D.M. Smith from one-race schools. Accordingly, the plan is deemed unconstitutional in this regard.

### c. Enrollment caps

The United States argues that "Plan A assumes that the 550-student enrollment cap at each high school would function to 'move' white students to East Side in sufficient numbers to eliminate the racial identifiability of East Side as a black school[, but t]he basis for this assertion and assumption … remains unclear …." Doc. #113 at 18–19.

In response, the District contends that it anticipates being able "to accommodate all students who choose Cleveland High …." Doc. #121 at 8 n.3. Relatedly, the District asks this Court to implement Plan A without the enrollment caps and allow the District to return to the Court if the facilities at either school cannot accommodate the enrolled students. Doc. #207 at ¶ 120. To the extent the District has withdrawn Plan A's use of enrollment caps by requesting Plan A be implemented without enrollment caps, the Court need not consider whether such caps are unconstitutional within the context of Plan A.[62]

### d. Middle school plan

The United States argues that, as drafted,[63] Plan A makes no alterations to the current middle school arrangement, which has produced a single race school at D.M. Smith. Doc. #113

---

[62] Given Smrekar's testimony that, due to historic enrollment trends, the enrollment caps outlined in Plan A would be "highly unlikely to produce … desegregation," Tr. 399, consideration of such caps in the context of Plan A would not change this Court's conclusions regarding the constitutionality of the plan.

[63] To the extent the District seeks to modify Plan A by calling for an immediate consolidation of the middle schools at East Side High, such plan suffers from the same logistical flaws discussed below in the context of Plan B.

59

at 19.  The District does not respond to this argument.  Thus, the District has offered absolutely

no evidence that Plan A would alter the enrollment at D.M. Smith, a burden only it bears.

Accordingly, insofar as Plan A would result in a one-race school at D.M. Smith, this fact

provides additional grounds for Plan A's rejection.[64]

### D.  Summary

Freedom of choice plans may be implemented only if they promise to work and if they

are the most effective of the reasonably available alternatives.  In order to work, a plan in the

District must turn D.M. Smith and East Side High from one-race schools to just schools.  Based

on enrollment numbers, freedom of choice has not worked to achieve desegregation in the

District.  Because Plan A's freedom of choice plan would leave D.M. Smith and East Side High

as one-race schools, the plan is unconstitutional and may not be adopted.[65]

### VII
### District's Plan B

### A.  Specifics of Plan B

The Board developed Plan B as an alternative to Plan A based on the view expressed in

the focus groups that parents wanted freedom of choice but were not opposed to closing D.M.

Smith.  Tr. 51.  In formulating this plan, the Board looked at the success of its magnet

elementary schools and "thought, [w]ell, we don't know why we can't apply this to junior high

or high school."  Tr. 204.

---

[64] Furthermore, as explained below, consolidation is a more reasonable and effective desegregation alternative.

[65] In reaching this conclusion, the Court gives no credence to the District's suggestion that rejection of the freedom of choice plan somehow violates the African American "students' constitutional right to free association."  *See* Doc. #207 at ¶ 152 (citing *United States v. Jefferson Cty. Bd. of Educ.*, 380 F.2d 384, 424 (5th Cir. 1967) (Godbold, J., dissenting)).  The right to associate must yield to compelling state interests, including the interest "in eradicating discrimination …."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *see also Parents Involved*, 551 U.S. at 720 (recognizing "the compelling interest of remedying the effects of past intentional discrimination").

Under Plan B, the District would assign every student to East Side High and then re-open Cleveland High as a "STEM magnet with local arts partnerships." Doc. #108-1 at 8. The enrollment for the Cleveland High magnet would be capped between 450 and 550 and "[a]dmission will be determined by a computer lottery similar to the lottery utilized at the District's two elementary magnet schools, Hayes Cooper Elementary and Bell Academy." *Id.* at 10. Students would apply for the Cleveland High magnet program between November 1 and February 28 of each school year. *Id.* at 9. Further, East Side High would operate the IB program and the early college program described in Plan A. *Id.* According to the District, "[t]he enrollment goals for both schools will be 65% black and 35% non-black with a reasonable deviation [of 15%] allowed …."[66] *Id.*

As for the middle schools, Plan B calls for D.M. Smith to close in the 2017-2018 academic year, with the building to be converted into extra space for Cypress Park Elementary students. *Id.* at 10. Beginning in the 2017-2018 school year, all students in the 6th, 7th, and 8th grades, except for 6th grade students enrolled at Bell and Hayes Cooper, would have to enroll at Margaret Green. *Id.* Margaret Green would continue to operate its STAR program and would implement a new STEM program "which will also use local arts partners like the Delta Music Institute, the Grammy Museum and the Delta Arts Alliance." *Id.* at 9–10. Access to the STEM program would be determined by a "similar lottery … used for Cleveland High's STEM program." *Id.* at 10.

Plan B, which was submitted to the Court in January 2015, initially called for full implementation by the 2017–2018 school year. *Id.* In its November 2015 submission to the

---

[66] While the plan presented to the Court referred to "goals" and "targets," language which appears to make the racial ratios aspirational rather than binding, the District's proposed findings of fact seem to argue that such ratios would be mandatory. *See* Doc. #207 at ¶ 159. The Court will consider the plan under both formulations.

Court, the District represents that "it will be very difficult to successfully [sic] implement Plan B's enrollment process ... and STEM curriculum" by the 2017–2018 school year." Doc. #210 at 3–4. The District further represents that "[b]ecause of the construction and curriculum design necessary to implement [the middle school portion of] Plan B, the District needs until August ... 2017 to launch Plan B." *Id*. at 2–3.

## B. Evidence on Plan B

### 1. Plan B's predicted impact on desegregation

Christine Rossell, the District's expert, testified that Plan B is not fully formulated and that "there are some details that need to be worked out." Tr. 119. However, while she does not favor Plan B, Rossell testified that the plan is preferable to the United States' proffered plan. Tr. 112, 118.

Claire Smrekar, the United States' expert, supports only the one middle school aspect of Plan B. Tr. 417, 426–27. In her report, however, she expressed concern that "[t]he District provides no data or projected estimates on enrollment size for the new STEM within-school magnet or expanded STAR program." U.S. Ex. 1 at 20. "Without a more complete explanation, rationale, and detailed plan for student enrollment in the STAR and STEM programs, the potential for within-school segregation in classrooms and across programs at Margaret Green is unacceptably high under Plan B." *Id*. In concluding such, Smrekar cited the current STAR program's disproportionate enrollment of non-African Americans and the "strong potential" that the proposed lottery's "reasonable deviation" could reduce the number and percentage of "non black students who are enrolled in the general education program." *Id*.

For the high schools, Smrekar believes that Plan B is unlikely to create meaningful desegregation due to the low pulling power of the proposed PWS at East Side High and

"insufficient evidence to support the District's assertion that any non-black students who wish to attend Cleveland High School but are not admitted to that school through the admissions lottery would attend East Side in sufficient numbers to produce a racially diverse student body." U.S. Ex. 1 at 12–14. Specifically, Smrekar reiterated the concern expressed in her testimony about Plan A that the proposed early college program at East Side High was unlikely to draw a sufficient number of white students. *Id*. at 14. Additionally, noting that "the current 'early college' eligible-student pool in [the District] is … disproportionately non-black," she also expressed concern that the general education population at East Side High would remain segregated under Plan B, even if the school itself desegregated. *Id*. at 12, 14.

As for Cleveland High, Smrekar observed in her report:

[S]ince collected responses to the District's [magnet] survey were not racially identifiable (i.e., the District did not ask respondents to indicate their race), we do not know whether (or not) magnet themes reflect widely or equally shared interests by parents across racial groups. In other words, we do not know whether (or not) the surveys are representative of the entire population of parents in the district. Consequently, the conclusion reached by the District that the attraction to these thematic curricula will produce and sustain a racially mixed student enrollment pattern at each high school is neither supported by the information I reviewed, nor likely, given historical student enrollment patterns and school loyalties.

*Id*. at 15.

## 2. Feasibility of Plan B

The testimony and other evidence about the feasibility of the District's Plan B revealed serious concerns about the District's potential to implement the STEM magnet aspect of the plan. These concerns relate to the District's current faculty, financial, and facility capacities. Additionally, both experts, Smrekar and Rossell, testified as to the difficulties of operating a dedicated high school magnet in a smaller school district.

63

### a. Faculty feasibility

Smrekar testified that the District lacks the capacity to implement a STEM focused magnet high school, as called for in Plan B, because "the District faces the critical teacher shortage … in science and math." Tr. 423–24. In her report, Smrekar explained that her "review of teacher professional background data furnished by the district regarding teacher certification by subject area at the secondary level [revealed] no evidence that the district has the organizational capacity to support or maintain a dedicated STEM high school magnet program." U.S. Ex. 1 at 16. She believes that the same faculty issues would "undercut" the proposed magnet program at the middle schools. *Id*. Regardless of its capacity, Smrekar's report notes that Plan B "provides insufficient information regarding … a plan to support and staff STEM programs." *Id*. at 16.

Hardy, the District's magnet coordinator, testified that, as with Plan A, the District has not undertaken a formal analysis to determine its staffing needs under Plan B. Tr. 71. She believes, however, that "we have the faculty available that we would be able to do this." *Id*. Notwithstanding this statement, Hardy commented that the proposed arts "partnerships" are necessary because the District has insufficient faculty to support an arts magnet program, as contemplated under Plan B. Tr. 52–53.

### b. Facility feasibility

In concluding that the District lacked the capacity to implement a STEM-focused dedicated magnet high school, Smrekar cited the difficulty in cultivating facilities for the "engineering piece" of the STEM program. Tr. 424. Also, in her report, Smrekar noted that plan B lacks "a facilities plan … to execute fully and implement with fidelity the STEM magnet

programs with adjusted/expanded enrollment at each high school and Margaret Green MS …."
U.S. Ex. 1 at 16.

The architectural experts agreed that the District is not currently equipped to implement numerous aspects of Plan B. Poros offered a report that "[in] order to offer science laboratories as a shared resource to all the 450-550 STEM students envisioned at CHS, the district would need to add a minimum of four accessible science classrooms, assuming five periods of science were taught each day and each classroom holding 24 students." U.S. Ex. 27 at 12–13. He further opined that if Cleveland High were to also offer an arts program, it would need to upgrade its auditorium and band hall. *Id*. Poros did not provide a cost-estimate for these improvements.

As for the middle schools, Poros believes that, in order for Margaret Green to accommodate the additional students from D.M. Smith, it would need to add ten to twelve classrooms (including science laboratories), "water closets and two lavatories per sex," a teacher's resource room, and an electrical closet. U.S. Ex. 27 at 13–14. Poros estimates the cost for these additions to be approximately $1.95 million plus a 25% "allowance."[67] *Id*. at 14. Finally, Poros hypothesized that Margaret Green would need to construct a new cafeteria, including a kitchen and storage area, for $1.15 million plus a 25% "allowance." *Id*. However, he remarked that the need for the additional cafeteria and kitchen could be obviated by changes in scheduling. Tr. 616–17.

According to Joseph Henderson, the District's architectural expert, Margaret Green's campus could accommodate the students from East Side High by adding twelve classrooms, a

---

[67] Poros' estimate assumed the construction of nine classrooms, despite recommending the construction of ten to twelve. *See* U.S. Ex. 27 at 13–14.

small administrative area, and restrooms to the existing structure. Tr. 149–50. The addition of the extra spaces could be completed in 12 to 18 months and would cost approximately $2.4 million. Tr. 150. Henderson's cost estimate, however, did not consider the cracking of Margaret Green's walls, which he opined could increase the estimate. Tr. 161–64. He also admitted that he did not consider the extra load on the support spaces at the middle school when developing his estimate. Tr. 162.

### c. Financial feasibility

Jacqueline Thigpen, the District's Superintendent, testified that she does not foresee any financial impediments to implementing Plan B. Tr. 222. Nevertheless, she hypothesized that the District "would use federal and district funds to assure that [the necessary] training takes place." Tr. 227. However, Smrekar believes the District's plan is insufficient to secure magnet funding for its proposed school because "[t]he proposed … dedicated STEM with arts magnet high school, as outlined in the District's plan, fails to demonstrate in any depth or detail the design necessary to adequately support and sustain theme-supportive personnel or facilities (labs, studios) and materials (computers, software) as required by [Magnet School Assistance Program] grantees." U.S. Ex. 1 at 16–17. Notwithstanding Smrekar's concerns, Hardy testified that the District's Board "is prepared to cover the expense of those programs with or without a grant." Tr. 807.

### d. Dedicated high school magnets

Rossell explained that it is difficult to have more than "a few" dedicated magnets in a school district and that Cleveland already has two magnet schools. Tr. 120. Having never seen a successful dedicated magnet school at the high school level, she also believes that it is "almost impossible" to operate such an institution. *Id*. at 120–21. Smrekar echoed Rossell's concern,

noting that "[w]hole-school magnet schools … can be effective in a larger, urban school setting

….  But those are usually found in large, urban school districts, [with] large portfolios of choice

... that enable parents to shop, consume, and select."  Tr. 425.  Smrekar could not name a

dedicated magnet high school in a district the size of the Cleveland District.  *Id.*

### 3.  District officials' opinions of Plan B

Thigpen testified that, while she supports both Plan A and Plan B, she prefers Plan B

because it consolidates the middle schools but allows choice at the high school level.  Tr. 221–

22.  Todd Fuller, a member of the District's Board, testified that, while he prefers Plan A, he

thinks that Plan B is a "very good plan[.]"  Tr. 215.

### 4.  Community opinions of Plan B

Community members varied in their evaluations of Plan B.  Aparna Nandula, a parent in

the District, testified that she "like[s]" Plan B, but could not "comment on it much because it is

not going to be useful for [her] daughter," who is expected to graduate before the possible

implementation of the plan.  Tr. 685.

Vickie Blake, another parent in the District, testified that she is very concerned about the

educational ratings of the District's middle schools.  Tr. 663.  While she likes the idea of a

STEM magnet, dual enrollment, and the IB program, she prefers the United States' plan.[68]  Tr.

667, 670.

Edward Duvall, another District parent, testified that he opposes Plan B because he feels

that establishing a magnet at Cleveland High would "syphon all the smart kids from East Side

---

[68] Blake posed the question, "[I]f you can have [the magnet programs] with two schools, why couldn't we have all those programs with one school and have the good programs and then also have the added funds[?]"  Tr. 670.

….” Tr. 709. He is concerned that this siphoning would result in "all of the good white kids and all of the good black kids [at Cleveland High], and East Side have all of the bad kids." Tr. 709.

Fuller testified that if Plan B were implemented, the District "absolutely" may lose students because there are eight or ten private schools within a 50-mile radius of Cleveland and that this number is "too many."[69] Tr. 205. Hardy echoed Fuller's concern that the community would object to Plan B, testifying that the District "would lose some students. There is no doubt about it. How many we don't know." Tr. 54.

### C. Analysis of Plan B

The United States objects to Plan B on the grounds that: (1) the high school portion of the plan is unlikely to be implemented; (2) the middle school portion of the plan is unlikely to be implemented; (3) the middle school plan unnecessarily delays desegregation; (4) the proposed programs at Margaret Green could result in within-school segregation; and (5) it is unclear whether the high school plan would result in desegregation.

### 1. Implementation of high school plans

The United States argues that Plan B should be rejected for the simple reason that the District does not have the capacity to implement a STEM magnet at Cleveland High, as called for by Plan B. Doc. #208 at 43. As support for this proposition, the United States points to: (1) Rossell's opinion that dedicated magnet high schools are nearly impossible to operate; (2) Smrekar's opinion that the District lacks the teachers and specialized facilities necessary to implement a STEM magnet; and (3) Smrekar's opinion that, given the lack of details in the magnet plan, it is unlikely that the District would receive magnet funding. *Id.* at 35, 43–44.

---

[69] Fuller explained that if students leave, the school district will lose funding. Tr. 206.

The District contends that, based on their testimony, Thigpen and Hardy believe the District has the staff and funds necessary to implement a magnet theme and that Smrekar "admitted that a magnet theme other than STEM might 'take off the table' the problem of staffing and facilities." Doc. #207 at ¶ 159 (citing Tr. 71–72, 222–23, 508).

Although this Court has not found a Fifth Circuit case dealing with whether a district has the capacity to implement its own plan, it is beyond dispute that the District must introduce a plan that realistically promises to work and work now, and that a district court must exclude plans "that are inadequate or infeasible." *Cowan*, 748 F.3d at 238, 240. It stands to reason a plan that cannot be implemented is infeasible, and does not promise to work and does not promise to work now. So, if the District is unable to implement the magnet program portion of Plan B, the plan must be deemed to fail. *See Quality Ed. for all Children, Inc. v. Sch. Bd. of Sch. Dist. No. 205*, 385 F. Supp. 803, 823–24 (N.D. Ill. 1974) ("It is vital that any plan which is to be implemented must … be operationally and economically feasible ….").

As the District asserts, both Hardy and Thigpen testified that the District has the funds and staff necessary to implement Plan B. Tr. 71–72, 222–23. Hardy testified that the District has "the math and science teachers for what the state requires now, and the STEM program will, of course, be the same subject areas with a more rigorous curriculum." Tr. 72. Hardy, however, offered no support for the proposition that state standards are the same as magnet standards. Likewise, Thigpen testified that she did not actually know the staffing requirements for Plan B. Tr. 224. Given the uncertainty in this testimony, the Court credits Smrekar's opinion that, based upon her review of teacher certification by subject area, "there is no evidence that the district has the organizational capacity to support or maintain a dedicated STEM high school magnet program." U.S. Ex. 1 at 16.

69

Similarly, beyond offering vague assurances of funding, the District officials offered no facts or evidence upon which this Court could comfortably conclude that the District has the capacity to secure a magnet grant or, in the absence of a magnet grant, other money to support a STEM program at Cleveland High through other means. Indeed, insofar as Plan B itself does not call for specific construction at Cleveland High,[70] it is unclear whether the District officials' statements about funding were even intended to encompass the capacity to upgrade the facilities. Even if such funding could be secured, the District has offered no estimate as to when Cleveland High's facilities could be upgraded to meet the requirements of a STEM program.

Finally, it is not enough to say that the District has the potential to formulate a magnet program free from faculty, funding, or facility deficiencies. As Smrekar and Rossell explained, the formulation and maintenance of a magnet program demands substantial time and resources. Rossell even went so far as to testify that she had never seen a successful dedicated magnet at the high school level. Tr. 120–21. In light of this testimony, the Court declines to endorse a dedicated magnet plan based on nothing more than an expressed possibility that such a plan is likely feasible.

In short, the District has proffered little to no evidence that it has the faculty to run a STEM program or the ability to fund such a program at the high school level. There is absolutely no evidence that the District could procure sufficient facilities within a reasonable time frame (or has a plan in place to desegregate the high schools before the implementation of its plan). Given Rossell's reservations regarding a dedicated magnet high school and the unresolved matters described above, the Court must conclude that the District has failed to sustain its burden of proving that Plan B promises to work and promises to work now. *See Hoots*

---

[70] *See* Doc. #108-1 at 7.

*v. Pennsylvania*, 539 F.Supp. 335, 342–43 (W.D. Pa. 1982) ("The Board's [magnet] proposal is still in an embryonic state. They have no projections on how many students would be expected to attend this voluntary program, or how racially mixed this school might be. The plan is too vague and the effects on desegregation too speculative to be acceptable ...."); *see also Coal. to Save our Children v. State Bd. of Educ.*, 757 F. Supp. 328, 353 (D. Del. 1991) ("The court is not in the business of modifying desegregation orders to make way for concepts.").

### 2. Implementation of middle school plans

The United States also argues that Plan B should be rejected because the proposed middle school programs, like the high school programs discussed above, do not promise to work. Specifically, the United States argues:

> The success of the [middle school] plan is contingent on the District successfully meeting a broad constellation of highly uncertain or unlikely conditions, including but not limited to: finding sufficient funding and capacity under the District's three mil bonding authority for the expansion and renovation of [Margaret Green] to accommodate all middle school students in the District; securing sufficient capital and operation funding to implement and support the variety of proposed programs; and, ensuring adequate qualified staffing .... Plan B's success also depends on the support of the District and the Cleveland community, and the District presented testimony from only one witness, the current superintendent, who actually favored Plan B.

Doc. #208 at 44–45.

First, under both Poros' and Henderson's estimates, the necessary funding for Margaret Green's expansion would be somewhere between two and three million dollars, a range which falls within the District's three mil bonding capacity. Unlike the other available funding sources, there is nothing in the record which would suggest that the District lacks the capacity to obtain a three mil note to renovate Margaret Green. Rather, it appears the only way the District could *fail* to obtain the necessary three mil note would be if twenty percent of registered voters petitioned for a special election and if the note was voted down in the subsequent special election. There is

no indication this particular series of events would occur. Thus, the Court concludes that the United States' argument to the contrary must be rejected. Insofar as it appears the District has the capacity to pay for these improvements, the Court finds that the District's ability to obtain funding for the facilities does not invalidate Plan B.

Moreover, except for the evidence related to faculty needs discussed below, the only evidence related to implementation of the magnet programs at the middle school – the testimony of Hardy, Thigpen, and Holtz – supports a finding that the District has the capacity to implement the proposed middle school programs.

Regarding faculty, the evidence supporting the District's inability to implement the middle school programs is much weaker than for the high school portion of Plan B. As explained above, Smrekar's report states that the District's ability to implement Plan B at the middle school level is "undercut by the evident lack of a pool of qualified teachers in a specific content area (math) …." U.S. Ex. 1 at 16. However, unlike her opinion of the high school program, Smrekar never opined or testified that the District's faculty situation renders implementation of the middle school programs unlikely or impossible.

Finally, the Court is not persuaded that the lack of District official support is grounds for rejection of the plan. Indeed, if it was, the United States' plan (which has no District official support) would have to be summarily rejected.

In sum, the evidence related to the District's capacity to implement the middle school aspect of Plan B is mixed. While it appears the District has the financial ability to procure the necessary middle school facilities, there is a question of whether the District has the ability to attract the necessary faculty to operate a middle school STEM magnet program. Although these circumstances are less than ideal, the Court cannot conclude that the middle school proposal

72

under Plan B is so uncertain to be implemented as to warrant its rejection. *See Ayers v. United States*, 769 F.2d 311, 314 (5th Cir. 1985) ("Though it may lack specific details with respect to the exact steps to be taken in each area of implementation and the precise timing of such steps, the plan presents a comprehensive framework for implementation of desegregation.") (citation omitted and internal alterations omitted).

### 3.  Speed of desegregation of D.M. Smith

The United States argues that the 2017–2018 target date for the consolidation of the middle schools would take more time than that proposed by the United States. Doc. #113 at 20; Doc. #208 at 44. Although the timelines proposed in the various plans may likely no longer be practicable given the timing of this order, the implementation timelines for the plans and the evidence before the Court suggests that Plan B, which requires significantly more construction and funding than the United States' proposal below, would likely consolidate the middle schools at least one year later than the plan for consolidation urged by the United States. Thus, the question becomes whether such a delay is constitutionally permissible.

"[C]ontinued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of [the Supreme] Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." *Alexander v. Holmes Cty. Bd. of Educ.*, 396 U.S. 19, 20 (1969). An unwarranted delay, therefore, may be sufficient grounds to reject a proposed plan. *CRUCIAL*, 722 F.2d at 1191 ("[D]elay in achieving effective desegregation [has] been unacceptable … in any school desegregation plan since *Green*."); *see Adams v. United States*, 620 F.2d 1277, 1295 (8th Cir. 1980) (rejecting plan that "unnecessarily

delays desegregation at the junior and senior high levels [where] the junior high schools would be integrated over a four-year period [and] the high schools over a seven-year period").

In *Miller v. Board of Education*, the Fifth Circuit considered whether a three to five year delay to allow for construction of three new elementary schools was permissible under *Alexander*'s dictate of immediate desegregation. 482 F.2d 1234, 1235–36 (5th Cir. 1973). In concluding that the delay was impermissible, the Fifth Circuit held that "[w]hile we wholeheartedly approve of the innovative concepts of educational parks, which in the long run will indeed end [segregation], the laudatory purpose cannot freeze half a decade of education into a dual system's mold." *Id*. at 1236.

Like the Fifth Circuit in *Miller*, this Court approves of the District's goal of ending segregation in its middle schools. However, also like the *Miller* court, this Court cannot countenance an additional year of segregated schooling for Cleveland's middle school students when a more immediate alternative exists. Accordingly, Plan B must be rejected as constitutionally infirm in this regard.[71]

#### 4. Within-school segregation at new Margaret Green

The United States next argues that Plan B could result in within-school segregation at Margaret Green because African Americans are under-represented in the STAR Program and that, if the trend continues, the STAR Program could remain a "disproportionately white program" with "[t]he regular education curriculum and the STEM program [being] disproportionately black." Doc. #113 at 24; *see also* Doc. #208 at 44 (Plan B "does not contain sufficient safeguards to prevent within-school segregation that may result [at Margaret Green].").

---

[71] When comparing the two plans, the United States also observed that Plan B's proposed consolidation of the middle schools would require more "resources" than the United States' plan. Doc. #113 at 23. However, the United States did not cite, and this Court has been unable to find, any authority which would support the proposition that the availability of a cheaper desegregation plan invalidates a proposed plan.

74

The District responds:

> If Plan B is chosen by this Court, the District will ensure that all enrollment criteria for these special programs will not discriminate on the basis of race. Specifically, the District will ensure that entrance into the STEM program at Margaret Green is based on the same lottery system used for the other elementary magnets and which will also be used for the high school STEM magnet. As for the STAR program, it has specific academic criteria and is based on, among other things, test scores. As such, the population in the program will fluctuate from year to year, but the procedure for gaining entrance into the program is constitutional.

Doc. #121 at 10–11.

The Fifth Circuit has observed that it is "manifestly clear that the decisions of the Supreme Court and this Court require[] the elimination of not only segregated schools, but also segregated classes within the schools." *Johnson v. Jackson Parish Sch. Bd.*, 423 F.2d 1055, 1056 (5th Cir. 1970). Where classes are based on achievement grouping and result in segregation sufficient to raise an inference of discrimination, such "grouping may nevertheless be permitted in an otherwise unitary system if the school district can demonstrate that its assignment method is not based on the present results of past segregation or will remedy such results through better educational opportunities."[72] *United States v. Gadsden Cty. Sch. Dist.*, 572 F.2d 1049, 1052 (5th Cir. 1978); *see Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 (5th Cir. 1989) (achievement grouping acceptable in light of evidence that "system … employ[ed] was] educationally sound, both in theory and in practice"). However, where an inference of discrimination exists and a showing of non-discrimination cannot be made, the grouping must end. *Id.*

---

[72] The *Gadsden* court referred to a method of selection based on standard tests and teacher recommendations as "ability grouping." 572 F.2d at 1051. "Achievement grouping and ability grouping have been used interchangeably by the courts over the years, but represent separate and distinct concepts." *Montgomery v. Starkville Mun. Separate Sch. Dist.*, 665 F.Supp. 487, 495 n.12 (N.D. Miss. 1987), *aff'd*, 854 F.2d 127 (5th Cir. 1988). "Achievement testing … is designed to measure a student's *present* performance and how proficient he has become in mastering certain skills. On the other hand, ability grouping is based upon IQ test results, as opposed to standardized achievement tests, and predicts a student's *future performance*." *Id.* (emphasis in original).

There can be no dispute that enrollment in the STAR Program, which is determined by an algebra test, teacher recommendations, and grade point average, may be characterized as achievement grouping. Furthermore, the evidence shows that the STAR Program has an enrollment of just 29.5% African American students in grades seven and eight, despite that student population being approximately 48.5% at Margaret Green. Put differently, the African American population at Margaret Green eligible for the STAR Program is 1.64 times greater than the African American population in the STAR Program itself. This discrepancy is sufficient to raise an inference of discrimination. *See Montgomery*, 665 F.Supp. at 496 (finding inference of discrimination where "1.6 times as many whites are assigned to high achievement groups as are enrolled in the grades as a whole"). The District, however, has made no effort to show that the enrollment standards creating this discrepancy are not based on the present results of past segregation or will remedy such results through better educational opportunities. In the absence of such a showing, the Court cannot conclude that Plan B's continued use of the STAR Program as a means to achieve desegregation is permissible.

### 5. High school plan unlikely to lead to desegregation

The United States also argues that, even if the District *could* implement the high school component of Plan B, there is no evidence the plan will effectively desegregate the high schools. Doc. #208 at 43–44. In making this argument, the United States reasserts its position that neither the IB program nor the early college program, either alone or in combination, can ensure that white students will enroll at East Side High in large enough numbers to result in desegregation. *Id*. The United States also argues that "[i]t is possible that CHS enrollment would remain disproportionately white even under a lottery-based system, and ESHS' enrollment would necessarily remain disproportionately black." *Id*. at 44. Finally, citing *Stanley v. Darlington*

*School District*, 879 F.Supp. 1341 (D.S.C. 1995), the United States contends that "retaining the names, mascots, and athletics teams at ESHS would maintain the longstanding racial identifiability of ESHS as a black school, and would hinder white enrollment."[73]  *Id*. at 43.

First, to the extent Plan B's enrollment targets are not compulsory, the uncertain drawing power of the proposed IB and early college programs would compel rejection of the plan on the ground that it does not promise to desegregate East Side High.  However, to the extent Plan B requires specific enrollment ranges at each school, the lack of drawing power is largely irrelevant insofar as a school with mandatory enrollment does not need to draw students.  For the same reason, the alleged continued character of East Side High as "a black school" would not impede the promised desegregation.

Although the United States argues that "there is no guarantee that the targets would be met," Doc. #208 at 44, there is nothing in the record which would suggest the District is incapable of satisfying its goal of having both schools[74] fall within the stated goals.  Thus, the Court rejects the United States' argument that Plan B's use of racial goals at the high schools would not achieve desegregation.

### D.  Summary

For the reasons above, the Court concludes that Plan B is unconstitutional because:  (1) it unreasonably delays desegregation in the District's middle schools; (2) it would propagate within-school segregation at the new Margaret Green Middle School by maintaining an

---

[73] Plaintiffs raise largely identical arguments.  *See* Doc. #123 at 7.

[74] The existence of goals for both schools alleviates the United States' concern that "[e]ven assuming the [Cleveland High] lottery is planned in a manner that would ensure Cleveland High's student enrollment is 50 to 80 percent black and 20 to 50 percent [white], as the District proposes, the resulting enrollment at East Side is likely to remain proportionately black, depending on the number of students who ultimately choose to enroll there."  Doc. #113 at 23.

achievement grouping program that results in substantial under-representation of African Americans without sufficient justification; and (3) the high school element of the plan does not promise to work and work now.

## VIII
## United States Plan

### A. Specifics of United States Plan

The United States' plan ("U.S. Plan") requires the simultaneous consolidation of the District's high schools and the District's middle schools. Doc. #109-1 at 2. Under this plan, "the District would, beginning in the 2016-2017 school year, assign all students in 9th-12th grades to a single comprehensive high school housed in the current Cleveland High and Margaret Green facilities."[75] *Id*. at 15. It also calls for all faculty and staff currently assigned to the two high schools to be re-assigned to the consolidated high school.[76] *Id*. at 19. The United States estimates that this consolidated high school would open with approximately 1,098 students with a racial makeup of 62.9% African American, 32.4% white, and 4.7% other. *Id*. at 15.

Simultaneously, under the U.S. Plan, the District, also beginning in the 2016-2017 school year, would assign all 6th through 8th grade students (except for the 6th graders at Bell and Hayes Cooper) to a consolidated middle school housed at the current East Side High facility.[77]

---

[75] Although the U.S. Plan notes that it does not require new construction, it observes that "a new high school would be an attractive option to the community generally, which would undoubtedly contribute to the success of this desegregation plan and yield educational benefits to all Cleveland students." Doc. #109-1 at 17. The United States estimates that "the District could construct a new high school with a 1,200 student capacity for $20-26 million on a 35-37 acre site …." *Id*. The United States represents that its estimates of the District's finances show a capacity to raise this much money. *Id*. at 18 n.6.

[76] Under the U.S. Plan, "[i]f combining the two high schools' staff resulted in redundant positions, the District would undertake a process to reassign affected staff to other positions or schools, or take other action deemed appropriate by the District and in compliance with the operative orders in this case and federal law." Doc. #109-1 at 19. The plan also calls for the elimination of duplicative extracurricular activities. *Id*. at 20.

[77] The United States notes that "[t]he East Side facility is in good overall condition and could house a middle school program immediately with few, if any, modifications or upgrades needed in the short term." Doc. #109-1 at 25.

*Id*. at 21. As with the consolidated high school, the U.S. Plan requires the elimination of redundant faculty and staff positions and duplicative extracurricular activities. *Id*. at 24. It mandates the continued offering of D.M. Smith's IB program, but appears to make continuation of the STAR program optional. *See id*. at 22–23. The United States estimates that the consolidated middle school would open with approximately 692 students with a racial makeup of 70.5% African American, 26.2% white, and 3.3% other.[78] *Id*. at 21.

In the January 2015 submission of its consolidation plan, the United States proposed full implementation for the 2016-2017 academic year. However, the U.S. Plan directs the District to, during the 2015-2016 year: (1) make efforts to "rebrand" the consolidated schools; (2) take steps to establish proper educational curricula and programs for the new schools, such as within-school programs; and (3) form an advisory panel to engage the community in ensuring effective desegregation of the schools. *Id*. at 20–21.

To ensure the District continues to move in the direction of desegregation, the U.S. Plan calls for continued annual reporting. Doc #109-1 at 26. Additionally, the U.S. Plan requires that the District receive the Court's approval: (1) for any planned changes to the structure or use of existing or new school facilities, (2) to change the zoning for elementary schools, or (3) to introduce or change any within-school or limited enrollment programs. *Id*.

In its November 2015 submission to the Court, the United States represents that its plan may still be implemented by the 2016–2017 academic year and "that no significant modifications

---

[78] The United States attributes the lower white percentage to the fact that "some sixth graders will remain at the two magnet elementary schools, which are disproportionately white relative to the District-wide student population." Doc. #109-1 at 21–22. Although not dispositive in this matter, the Court notes that the disproportionate white percentage in the magnet elementary schools does not speak highly of the District's potential to employ magnet programs as desegregation tools.

to the implementation timeline are necessary, assuming the Court's adoption of the United States' Proposed Plan as of the date of the Court's recent order." Doc. #212 at ¶ 12.

### B. Evidence on U.S. Plan

### 1. U.S. Plan's impact on desegregation

To the extent the U.S. Plan requires the formation of a single middle school and a single high school, there is no question it will create perfect racial balance at the secondary school level in the District. However, the experts disagreed on the extent the U.S. Plan would impact the District's racial exposure – that is, to what extent the plan would create diversity in the District's schools.

Smrekar, the United States' expert, testified:

> [A]fter careful analysis, after reviewing all the documents, after spending almost a year thinking about this and spending time in this community, it is my conclusion that a one-high-school model is the most effective, will achieve desegregation realistically and immediately. I believe it will draw students and maintain diversity in this community because it offers what the families demanded.[79]

Tr. 429. Additionally, Smrekar believes that the consolidated schools would allow for "thematic academies," which would, in turn, allow for choice at the schools. Tr. 429–30. The one-school model "is justified for at least three reasons, right: desegregation, academic quality and enhance[d] educational environments, and equity and opportunity. Tr. 436.

Smrekar testified that research has shown that the ideal size for a middle school is 600-650 and the ideal size for a high school is 800–900. Tr. 433. She testified, however, that 1000 "is still [an] ideal high school size to maximize both social supports and academic and

---

[79] Smrekar made two visits to the Cleveland community – one in July 2014 and one in October 2014. Tr. 341, 357. The July visit, which lasted three days, was a "fact finding" trip during which Smrekar toured the schools and town, met with school officials, and led a community meeting. Tr. 346–54. The October trip involved leading the focus groups. Tr. 357.

extracurricular opportunities, and the same is true at the middle school.  Tr. 433–34.  According to Smrekar, this holds true even for high schools closer to 1100 students.  *Id*. at 434.

Addressing the "rebranding" aspect of the U.S. Plan, Smrekar testified that the concept of rebranding or "fresh start" comes from magnet school research.  Tr. 435.  "[W]hen you are developing a magnet school, you want a fresh start, you want to rebrand.  You want parents to see this as something new, something different, and something authentic."  *Id*.  Smrekar explained that this concept of rebranding could apply in Cleveland because parents expressed a desire for a new school and "a new educational experience."  *Id*.  Rebranding is also important because, according to Smrekar, it will allow the District to distinguish between traditional consolidation, in which one "school is being pushed into [an] existing school," and the situation here, where a two-school model changes to a one-school model.  Tr. 436.  Along the same vein, Smrekar testified that, if the Court adopts the U.S. Plan, it will be important to memorialize the successes and histories of the two high schools.  Tr. 438–39.

With regard to potential losses of extracurricular opportunities, Smrekar testified that the single school concept could increase the size of the District's student government and athletic teams.  Tr. 444.  She could not state, however, whether the U.S. Plan would result in the loss of any athletic scholarships for students.  Tr. 499.

Rossell, the District's expert, criticized the U.S. Plan as a "mandatory reassignment plan" that would reduce diversity in the District.  Tr. 103.  Specifically, Rossell noted that mandatory reassignment plans,[80] which she defined as "where you force children to go to opposite race

---

[80] In her research, Rossell did not differentiate between consolidation and other forms of mandatory reassignment. Tr. 129–30.

schools,"[81] have been found to cause white student enrollment loss. Tr. 103. In addition to white student enrollment loss, Rossell explained that mandatory reassignment plans cause "bright flight," which she defined as the loss of "black intellectuals … Hispanic intellectuals … Asian intellectuals, and hardworking motivated middle class parents …."[82] Tr. 103. She opined that for districts with a greater than 35% minority population, implementation of a mandatory reassignment plan causes a loss of 65% white enrollment from three years before the plan to eleven years after the plan, and that implementation of a voluntary magnet plan causes a loss of 44%. Tr. 107. Rossell attributed white loss to three factors: (1) racial prejudice, (2) worries about losing control of a child's education, and (3) a desire for neighborhood schools.[83] Tr. 140–41. Of these three factors, losing control is the most important in her opinion.[84] *Id*. at 140. Rossell remarked that "between the parent surveys and national surveys, it's quite clear that black parents want neighborhood schools plus choice." Tr. 125.

---

[81] According to Rossell, there are three types of mandatory reassignments. Tr. 126–27. "One is where you have no choice. If you live at a certain address and your race is a certain race, you are assigned to a school that the District decides." Tr. 126. The second involves mandatory reassignment with magnet school offerings. Tr. 127. Finally, there is "controlled choice[,] … which is better in terms of parent support than mandatory reassignment or mandatory reassignment with magnet schools." Tr. 127. Under controlled choice,

> [e]ither you get rid of all the attendance zones or you keep attendance zones. But the bottom line is first thing you try to do is to get people to volunteer to go to the correct school racially. And then if you don't get enough of a certain race, you cut them off and you try to get their second choice.

*Id*.

[82] "Bright flight" is a term coined by Rossell. Tr. 103.

[83] While Rossell did not define a neighborhood school, the Fifth Circuit has defined "a true neighborhood assignment system [as] assigning students to the school nearest the student's home up to the capacity of the given school …." *Ellis v. Bd. of Pub. Instruction of Orange Cty.*, 423 F.2d 203, 207 (5th Cir. 1970). Neither party has advanced the idea of neighborhood schools as a desegregation method in this case. The Court notes, however, that the proximity of the two schools and the applicable housing patterns would likely render such an approach ineffective.

[84] When asked about current attitudes regarding race and freedom of choice in education, Rossell testified, "[J]ust before Barack Obama was elected President of the United States, 90 percent of Americans would vote a fully qualified black president. So I assume that attitudes towards the principle of integration and the abhorrence of racial prejudice are pretty much united and everyone is united on this issue. What they oppose is force." Tr. 826.

In looking at Mississippi schools, Rossell noted that mandatory reassignment plans had caused substantial white enrollment loss in the school districts of Natchez-Adams, Hattiesburg, and McComb. Tr. 97–108. She also remarked that a "neighborhood school plan" implemented in Madison County was successful in creating desegregation and maintaining interracial exposure. Tr. 109.

Based on her research on mandatory reassignment plans, Rossell opined that, should the Court implement the U.S. Plan, "approximately half of the white students assigned to the East Side schools will not show up in the first two years or the first three years." Tr. 821. According to Rossell:

> The first people who will not show up will be the people who have the means [to] put children in private schools. That is disproportionately white, but it isn't only white. It will also be black and Hispanics who have those means …. The next group will be motivated middle class and working class families. And then even the poorest families will eventually just not move into a school district.

Tr. 827.[85] Rossell's estimates in this regard are consistent with her research on white enrollment loss following mandatory reassignment. Tr. 821.

Smrekar defined mandatory reassignment as "typically associated with school districts that move from local zoning arrangements to reassignments that take kids out of those local zones across town via bussing." Tr. 439. She testified that the U.S. Plan is not a form of mandatory reassignment because the District is not currently zoned and because "[u]nder this plan, there is one school. All children attend this one high school. There is no other sort of mechanism that eliminates their local zone because this is a small school district." Tr. 439–40.

---

[85] Rossell testified that "there is still an income difference between blacks and whites, although, there are many wealthy African Americans. And the 9th wealthiest woman in the world, through her own means, is Oprah Winfrey, who was educated in Kosciusko, Mississippi." Tr. 828.

83

As for white enrollment loss, Smrekar considered the history of racially identifiable legacies of the schools, the private school supply, tuition costs, and the racial composition of public schools in the contiguous counties. Tr. 440–41. She also considered the financial demographics of the region and the District, and the results of her focus groups, but not the community meeting held in July 2014. Tr. 520, 898–99. Based on these considerations, Smrekar opined "that white departure will not occur in any kind of significant or damaging magnitude …." Tr. 441. She explained that the private school market only included two schools – Bayou Academy and Presbyterian Day School.[86] Tr. 441. More generally, Smrekar elaborated that "white departure or any kind of de-enrollment has to do with a whole array, like housing factors, economic factors like closure of a factory, closure of a major employer. That kind of context is not in play here." Tr. 443. Rather, Smrekar classified Cleveland as a "stable economy" with a "stable economic work force." *Id*. Conversely (and somewhat contradictorily), Smrekar testified that she based such conclusion on the economic demographics of the District and her belief that parents would not want to spend money to send their children to private schools. Tr. 898. In reaching this conclusion, Smrekar did not consider the results of desegregation efforts in Natchez, Hattiesburg, McComb, Indianola, Shaw, or Madison County. Tr. 508–09.

Smrekar opined that the survey data utilized by Rossell in considering white enrollment loss is outdated and that "the most recent survey data … indicates a large shift in attitudes around racial integration, [and] around race and beliefs about racial integration." Tr. 897. According to

---

[86] During the United States' rebuttal case, Smrekar explained that the additional private schools in the area do not impact this conclusion because, beyond Bayou Academy, "[a]ll the other [secondary] schools are 40 to 50 miles away .... So you are looking at quite a burden, a financial burden, time burden for families." Tr. 900.

Smrekar, when parents have a choice of schools, their primary concerns are quality, proximity, and safety. Tr. 899.

While Smrekar testified that consolidation of the schools would likely preclude magnet funding, she explained that there a number of alternative funding sources, such as "an endless list of private, corporate foundations interested in assisting school districts, particularly [those] that are moving in … an innovative direction." Tr. 480, 521.

### 2. Feasibility of U.S. Plan

Poros testified that the District's facilities are "educationally adequate" and are "adequate in terms of the student population numbers." Tr. 563. Specifically, Poros concluded that the combined optimal capacity of Cleveland High and Margaret Green is 1,144 students, which "exceeds the projected population of a comprehensive 9th-12th grade high school by ninety-seven students, leaving room for modest growth in the student population under [the U.S. P]lan." U.S. Ex. 27 at 8. While Cleveland High's single science lab would be sufficient for a consolidated high school, Poros opined that a second lab could be converted from existing classrooms. Tr. 587–88; U.S. Ex. 27 at 9–10.

As for East Side High, Poros opined that the school's optimal capacity could accommodate the projected enrollment for a single middle school. Tr. 591. Additionally, Poros stated that the transition from high school to middle school would create a "surfeit of specialized facilities for that middle school." Tr. 590-91.

In reaching his conclusions, Poros did not consider what impact consolidation would have on the new school's athletic conference assignment. Tr. 612. Accordingly, he could not testify whether the new school would have sufficient athletic facilities. *Id.*

As detailed above, Henderson testified that East Side High, in its current configuration, could not accommodate the projected enrollment for a consolidated middle school. Tr. 146. However, he testified that it would be cheaper to turn East Side High into a consolidated middle school than it would be to turn Margaret Green into a consolidated middle school. Tr. 164–65.

To the extent the U.S. Plan advocates (but does not require) the construction of a new school, Henderson estimated that a new high school with a full athletic complex would cost between $35 and $37 million. Tr. 148; CSD Ex. 15 at 4.

### 3. District officials' opinions of U.S. Plan

At the hearing, the District's officials testified unanimously against the U.S. Plan. Fuller, a Board member, testified that a loss of choice in schools for his children would be "insulting." Tr. 201. From conversations with parents and "constituents," Fuller believes that consolidation would involve enrollment loss and that, as a result of this loss, the District would lose a "large proportion" of its funding. Tr. 210. Holtz, the District's business manager, testified that for every student that attends a school in the District, the District receives $5,535 from the State and that any loss in enrollment would result in a corresponding loss of funding. Tr. 887. According to Fuller, this loss of funding would result in a loss of extra-curricular and educational opportunities. Tr. 210. Seals, another Board member, testified that she was opposed to consolidation because she was concerned for a loss of athletic and extra-curricular activities. Tr. 245–46.

James, an East Side High faculty member and coach, testified that the U.S. Plan "really scared me because … I came home [to Cleveland] for one reason, for my kids to go to East Side." Tr. 184. James testified that consolidation would be "a hard pill to swallow because [of] … the tradition [and] the pride," and that he believes consolidation would force some teams to

cut interested players. Tr. 184–86. According to James, this loss of athletic opportunities is worrisome because a lot of kids don't have parents and "sometimes these sports are the only thing that save these kids." Tr. 186. James testified that his daughter asked him whether she could attend a different school if the U.S. Plan is implemented. Tr. 184. Finally, he testified that he would leave town if consolidation is implemented. Tr. 194

### 4. Community opinions of U.S. Plan

Thigpen, the District's superintendent, testified that there is "some community support [for consolidation], but there is also support for not consolidating the schools." Tr. 222. This opinion was borne out in the testimony presented to the Court.

Gary Gainspoletti, an accountant, business owner, and alderman-at-large for the City of Cleveland, testified that people in Cleveland are nervous, fearful, and resentful regarding the possibility of consolidation. Tr. 880. Obie James testified that he only knew one East Side High parent who supported consolidation, and that parent did not graduate from East Side High. Tr. 198.

On the opposite end of the spectrum, Tim Holbrook, who worked as a principal at D.M. Smith and Cleveland High, testified that he believes consolidating the high schools "makes sense." Tr. 625. Holbrook believes consolidation is appropriate because he has "seen so many things that we're lacking for want of having pooled resources, some things that could happen if these schools were together[,] such as more offerings." *Id.* In discussing potential cost savings, Holbrook identified the cost for school administrators, and transportation of students between the schools.[87] Tr. 625–26.

---

[87] Holtz testified that the only place the District would save money under the United States' plan would be in bus driving positions totaling $29,600 in expenses. Tr. 886. She explained that operational costs would not drop because "you are still utilizing the same facilities." Tr. 893.

Holbrook believes consolidation of the athletic teams and bands would improve the quality of play and performance. Tr. 635–36. He also believes students at both East Side High and Cleveland High are enthusiastic about the idea of a consolidated school. Tr. 637–38. Holbrook admitted, however, that these beliefs came from discussions about a brand new high school. Tr. 653. While he acknowledged that he is aware of fears in the community that consolidation would result in the loss of tradition, Holbrook testified that "you can't change tradition, you can't lose tradition, it's established in time." Tr. 641–42.

Leroy Byars, a former football coach at East Side High, testified that consolidation would create more competitive teams and would allow for more sports offerings. Tr. 793. But Byars also testified that he does not believe white students would attend the consolidated middle school at East Side High. Tr. 800.

Keith White, Duvall, Nandula, and Blake, all parents in the District, testified in support of consolidation. Blake testified that she supports the U.S. Plan because she would "like to see … improvement in the educational opportunities for all the students in the district [and] it just makes sense that if we pooled our resources …. we would have more funds available that could … be pooled and be used to enhance the education." Tr. 667. She conceded, however, that she did know whether there would be savings or whether consolidation would improve the academics at the District's schools. Tr. 674–75.

Duvall supports the U.S. Plan because: (1) "economically … there is a need in our district to get rid of some of our schools;" (2) "we will be able to save money, we will be able to build the state of the art school that our kids deserve;" (3) "[w]e could have better programing for our kids, which we don't have now; (4) "[w]e can break down this wall of racism that divides us and keeps us separated, and we could create a new culture in our school system that's going to

88

unite us and unite our whole city;" and (5) consolidation would result in better athletic and academic programs. Tr. 706.

Nandula supports the U.S. Plan because she thinks a larger student population would increase competition and that competition would be good for students. Tr. 683.

White testified that the U.S. Plan "is a step toward a bigger dream or improvement for Cleveland School District." Tr. 731. He would prefer a brand new school because "no matter how you take these schools up, how you band-aid them, they still won't be up to par in the long run." Tr. 731. White believes though that consolidation is "great," and that it "is needed in the community [as] something to join our community" and to eliminate the idea of "track schools, a school on this side of the track and a school on that side of the track." Tr. 732.

Lenden Sanders, one of the plaintiffs, supports the U.S. Plan because it "will allow every student to participate in all the programs and whatever they have to offer. Every child will have the opportunity to participate … if they qualify …." Tr. 754–55. He believes that consolidation will increase academic and extra-curricular options. Tr. 755.

### C. Analysis of U.S. Plan

The District concedes that the U.S. Plan is constitutional. Doc. #207 at ¶ 161. However, in its objections, the District urges the Court to reject the consolidation plan because:

> (1) Statistics show a "consolidation" plan will have disastrous long term effects on the District's otherwise stabilized and improving integration; (2) the District's plans are constitutional and this Court should defer to the District's plan; (3) [a]ll of the middle school students cannot be educated in the East Side High building, as proposed by the United States; (3) [sic] the IB program cannot be automatically transferred to Cleveland High, as suggested by the United States[;] and (4) [sic] the District does not have the funds to build a new high school.

Doc. #112 at 5–6. Additionally, at the hearing and in their proposed findings of fact, the District contends that the United States' plan would result in a loss of extracurricular activities and

athletic opportunities, and also result in schools that fall outside the recommended enrollment range in Mississippi.

### 1. Impact of consolidation

Relying heavily on Rossell's testimony and the fears expressed by certain community members, the District argues that consolidation should be rejected because it will drastically reduce the white enrollment in the District. Doc. #207 at ¶¶ 143–47, 153–55. The United States responds that white flight may only be considered when choosing between constitutional plans and that even if white flight could be considered, the U.S. Plan is unlikely to cause white flight. Doc. #208 at 47–48.

#### a. Consideration of white flight

Concerns of white flight, while "legitimate when choosing among constitutionally permissible plans, cannot be accepted as a reason for achieving less than complete uprooting of the dual public school system. 'White flight must be met with creativity, not with delay in [de]segregation.'" *United States v. Pittman*, 808 F.2d 385, 391 (5th Cir. 1987) (quoting *Davis*, 721 F.2d at 1438).

In this case, having already found two of the three plans submitted unconstitutional for the reasons above, the Court is not in a position to choose between constitutionally permissible plans. Accordingly, white flight is an inappropriate objection to the U.S. Plan. *See id*.

#### b. Likelihood of white flight

To the extent white flight is a valid concern, the evidence on the issue is mixed. Rossell's testimony predicting a mass exodus of white students, which was based in part on twenty-five year old survey data and case studies that failed to differentiate between consolidation and other forms of mandatory reassignment, is flawed. Likewise, Smrekar's

testimony, which predicted little to no white flight, based in part on an inaccurate count of local private schools, failed to consider the impact of consolidation in similar districts. Similarly, while the District officials and Leroy Byars, a former District employee, predicted a substantial loss in white enrollment, such dire predictions are somewhat offset by the fact that the District currently maintains numerous majority-African American schools with significant white enrollments without suffering white enrollment loss – Pearman, Bell, Naylor, and Margaret Green.

The Court suspects that white enrollment loss related to consolidation, like most things, will fall somewhere between the two extremes. The District is likely to suffer some white enrollment loss as a result of consolidation. While this is a concern, it is insufficient, in the absence of an alternative constitutional plan, to reject consolidation. Rather, potential white enrollment loss is a problem that must be met with creativity. To this end, the U.S. Plan calls for a rebranding effort, a diverse offering of academic programs, and the formation of a multi-racial advisory panel to ease the transition—all methods this Court finds reasonable and appropriate.

## 2. Deference

Although the District argues the U.S. Plan should be rejected in deference to either Plan A or Plan B, deference, as explained above, may only be accorded to constitutional plans. Because the Court has found the District's proposed plans unconstitutional, no deference is warranted.

### 3. East Side High capacity

The District, pointing to the fact that the total middle school enrollment at Margaret Green and D.M. Smith was 771 students in February of 2015,[88] takes issue with the United States' estimate, as presented in its plan, that the consolidated middle school would have 692 students. Doc. #112 at 18. Indeed, at the hearing, Henderson, the District's architectural expert, testified that the projected enrollment for a consolidated middle school would be closer to 800. Tr. 147. The District argues that, under either formulation, East Side High lacks capacity to house the projected middle school enrollment. Doc. #112 at 18.

As explained above, Poros and Henderson reached different estimates of East Side High's capacity utilizing different types of calculations. Poros considered the capacity of non-"dedicated spaces" like laboratories and the gymnasium; Henderson did not. Though this Court is inclined to credit Poros' estimate, it need not reach such a conclusion in disposing of the District's objection. There is ample testimony that any space deficiency at East Side High could be easily and quickly addressed by adding between two to four classrooms, a construction project well within the District's financial means.

### 4. Availability of IB program

The District, citing the affidavit of its co-magnet coordinator, Debbie Fioranelli, contends that the IB programs are school specific, and that by transitioning East Side High to a consolidated school, the District would lose the high school IB program until it can re-apply for a new program. Doc. #112 at 18–19. The United States responds that the Diploma Programme Manager of the International Baccalaureate program advised the United States that the

---

[88] The number has since dropped to 761.

consolidated high school would be able to maintain its IB program if certain conditions were met. Doc. #122 at 15; *see also* Doc. #122-2.

The District has not disputed the United States' assertion that East Side High could maintain its IB program following consolidation. Thus, the District's concern regarding the IB program is without merit.

### 5. Cost of new school

The District contends that its expert estimated a new high school would cost approximately $36.5 million. Doc. #112 at 19. The District also argues that, even with the lower sum, the chances are unlikely that it could pass a bond for $26 million, the upper range of the United States' cost estimate for a new school. *Id.* The District further states that Margaret Green and Cleveland High may be designated historical landmarks, which could complicate any construction efforts. *Id.* at 19–20.

The United States responds to the District's concerns about construction by arguing that the U.S. Plan does not require construction of a new school. Doc. #122 at 16. Because the Court agrees that the U.S. Plan does not require construction of a new school, the District's objection to the cost of construction is not grounds for rejecting the United States' plan.

### 6. Extracurricular activities and athletics

At the hearing, community and Board members testified overwhelmingly about the importance of extracurricular activities and athletics within the community, as well as about the fear of losing such opportunities. Apart from speculation that an unknown number of students may lose scholarship opportunities and that sports teams *may* have to cut kids, however, there is absolutely no evidence that consolidation will result in any appreciable loss of athletic or extracurricular opportunities. To the contrary, the U.S. Plan only calls for the elimination of

*redundant* extracurricular activities. Accordingly, the District's concerns regarding extracurricular activities and athletic opportunities are insufficient to defeat the U.S. Plan.

### 7. Enrollment size

As mentioned above, the Mississippi School Design Guidelines recommend that the District should have a middle school population of 300-600 students and a high school population of 400-800 students. Tr. 608–09. But, these guidelines do not encompass "physical school … size" but refer to a population within a school. Tr. 618. There is no indication that a consolidated school could not create smaller populations within a larger enrollment population. The U.S. Plan explicitly contemplates the formation of academies within each school. The Mississippi School Design Guidelines' population recommendations, therefore, do not provide a basis for rejecting the U.S. Plan.

### IX
### <u>Appropriate Remedy</u>

As observed in *Cowan*, the district court's duty in a desegregation case is to "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." 748 F.3d at 240.

In considering the proper means to desegregate the District, the Court is confronted with three plans: (1) the District's Plan A, (2) the District's Plan B, and (3) the U.S. Plan. For all of the reasons discussed above, the Court concludes that the District's Plan A is inadequate to desegregate the schools, and that Plan B is inadequate and infeasible. Accordingly, the Court is left with the United States' indisputably constitutional plan of consolidation.

The U.S. Plan, though, is not without challenges. It pushes the limits of the District's facilities and, most concerning, is opposed by some community members and key decision makers in the District. However, the U.S. Plan is the only one most likely to achieve the desired

effect of desegregation. Thus, consolidation represents the only constitutional avenue presented and available to this Court.

In ruling for consolidation, the Court does not call into question the sincerity or the motives of supporters, both African American and white, of the District's plans, including the District officials and community members who testified in support of such plans. The Court is convinced that support for the District's plans stems from the same laudable purpose that motivates the United States and Plaintiffs – an overwhelming desire to ensure excellent education for all children in the District. Although these good intentions cannot render the proposed unconstitutional plans constitutional,[89] the District's commitment to the education of its children will no doubt ensure that the gem that is Cleveland, along with its surrounding areas, only shine brighter as the shadows of segregation recede.

# X
## Conclusion

Nearly fifty years ago, the United States Supreme Court announced that "[t]he haltingly slow days of all deliberate speed have given way to the mandated duty to immediately desegregate." *Miller v. Bd. of Educ. of Gadsden*, 482 F.2d 1234, 1236 (5th Cir. 1973) (citing *Alexander*, 396 U.S. at 20). In the decades since this pronouncement, the District has failed to meet this obligation as it concerns the high schools and middle schools in Cleveland, Mississippi. This failure, whether born of good faith, bad faith, or some combination of the two, has placed Cleveland in the unenviable position of operating under a desegregation order long after schools in bastions of segregation like Boston, Jackson, and Mobile have been declared unitary. More

---

[89] *See Keyes v. Sch. Dist. No. 1*, 609 F.Supp. 1491, 1506 (D. Colo. 1985) ("The adequacy of any desegregation plan is … measured not by its intentions but by its effectiveness.") (citing *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979)).

important, and of far greater harm, the delay in desegregation has deprived generations of students of the constitutionally-guaranteed right of an integrated education. Although no court order can right these wrongs, it is the duty of the District to ensure that not one more student suffers under this burden.

Accordingly, and for all of the reasons above:

1. Plaintiffs Wesley and Payne are **DISMISSED** for lack of standing;

2. The Court **ADOPTS** the desegregation plan [109] proposed by the United States; and

3. In view of the Court's adoption of the United States' plan on this date, the parties are each **DIRECTED** to submit to the Court a proposed timeline to implement the United States' plan in such a way as to ensure the immediate termination of the District's dual system in its high schools and middle schools. The proposed timeline is to be submitted no later than twenty-one (21) days from the entry of this Opinion and Order.

**SO ORDERED**, this 13th day of May, 2016.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**